## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CATHOLIC LEGAL IMMIGRATION NETWORK, INC., 8757 Georgia Ave., Suite 850, Silver Spring, MD 20910; | Case No.  20-cv-3812 |
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, 1861 Bay Road, East Palo Alto 94303; | **COMPLAINT** |
| KIND, INC., d/b/a KIDS IN NEED OF DEFENSE, 1201 L St. NW, 2nd Floor, Washington, DC 20005; and | |
| COALITION FOR HUMANE IMMIGRANT RIGHTS OF LOS ANGELES, 2533 West 3rd Street, Suite 101, Los Angeles, California 90057; | |
| *Plaintiffs,* | |
| vs. | |
| EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, 20 Massachusetts Ave. NW, Washington, DC 20529; | |
| JAMES MCHENRY, in his official capacity as DIRECTOR OF THE EXECUTIVE OFFICE FOR IMMIGRATION REVIEW; 20 Massachusetts Ave. NW, Washington, DC 20529; | |
| U.S. DEPARTMENT OF JUSTICE, 950 Pennsylvania Ave., NW, Washington, DC 20530; and | |
| WILLIAM P. BARR, in his official capacity as ATTORNEY GENERAL OF THE UNITED STATES, U.S. Department of Justice, 950 Pennsylvania Ave., NW, Washington, DC 20530 | |
| *Defendants.* | |

## INTRODUCTION

1.      Plaintiffs bring this action to prevent Defendants from imposing prohibitive fees on individuals who are defending themselves against deportation from the United States.  The fees would be mandated by a Final Rule issued by the Executive Office for Immigration Review ("EOIR"), a sub-agency of the Department of Justice ("DOJ"), on December 18, 2020, at 85 Fed. Reg. 82,750 (the "Final Rule").

2.      The Final Rule would apply to respondents in proceedings in Immigration Courts and before the Board of Immigration Appeals ("BIA" or "Board"), which are components of EOIR.  In this Complaint, such proceedings are referred to as "Removal Proceedings."

3.      The Final Rule at issue here was not created in isolation.  It is one product of a flurry of interrelated but staggered rulemakings that Defendants held this year to curtail access to critical procedural and substantive protections from deportation.  For Removal Proceedings, Defendants here and elsewhere gave short shrift to fundamental fairness and the importance of an accurate outcome—particularly where the respondents are indigent.

4.      The Final Rule would require respondents in Removal Proceedings to pay significantly higher fees for applications, motions, and appeals in Immigration Courts and before the BIA.  Those elevated fees would place long-established statutory protections, procedural safeguards, and even access to federal court review, out of reach of indigent United States residents, including longtime residents with spouses and children who are U.S. citizens, and individuals and families who have fled persecution and torture to seek asylum in this country. The Final Rule would thus deprive them of access to procedures for full and fair and constitutionally compliant adjudication of the government's case against them.  Unless the fees are enjoined, tens of thousands of low-income individuals facing deportation from the United States will be expelled from their homes and separated from their families without a meaningful hearing.  Many may be removed to countries where they face certain persecution and even

torture—not because their claims failed after an adjudication on the merits, but because they could not pay the toll for access to this country's immigration court system.

5.      The Final Rule would increase almost eight-fold the fees to seek reopening or reconsideration before the BIA and to appeal an Immigration Court decision; a respondent would need to work more than 130 hours at minimum wage to afford the proposed $975 fee.  It would increase six-fold the charge to appeal a decision of a Department of Homeland Security ("DHS") officer.  It would more than triple the fees to seek cancellation of removal or suspension of deportation.  And it would impose an entirely new fee for those seeking asylum in the United States.

## SUMMARY OF CLAIMS

6.      In promulgating the Final Rule, Defendants violated requirements of the Administrative Procedure Act ("APA"), which bars rules that are arbitrary or capricious, an abuse of discretion, or contrary to law, and which provides multiple procedural safeguards, such as requiring meaningful notice and opportunity for the public to comment on proposed rules.

7.      First, the Final Rule is arbitrary and capricious, and violates the requirement that agencies engage in reasoned decision-making.  The Final Rule provides no reasoned explanation for Defendants' abrupt departure from decades-long agency policy with regard to fees in Removal Proceedings, for the fees themselves, or for the Rule's impact.  To the contrary, the record shows that Defendants failed to give adequate consideration or weight to the burden the fees would impose on individuals in immigration proceedings and on organizations providing representation or advice to such individuals.  For example:

   a.   Defendants did not examine whether the increased fees would foreclose eligible individuals from seeking asylum, cancellation of removal, or suspension of deportation, or filing motions or appeals.

   b.   Defendants' position that the possibility of "fee waivers" mitigates any burden imposed by the fee increases is without support, because it ignores

3

that fee waivers are not available at all for asylum applicants; that
Immigration Court fee waivers are entirely discretionary; that the time to
file an application, motion, or appeal is not tolled if the fee waiver is
denied; and that preparing and filing fee waiver applications may prove
insurmountable hurdles (in cost and complexity) for indigent individuals.

The Final Rule thus fails under the APA because it is arbitrary, capricious, an abuse of
discretion, without reasoned basis, and contrary to law.

8.      Second, Defendants violated APA procedure in the rulemaking process.
Defendants published their Notice of Proposed Rulemaking ("NPRM") on February 28, 2020,
just as the COVID-19 pandemic began to sweep across the United States, yet they gave the
public just 30 days to submit comments.  That period was just half of the 60 days generally
regarded as the reasonable minimum period for public comment on a proposed rule and would be
onerous even in ordinary times.  With a global pandemic necessarily consuming the resources of
the public, including organizations and individuals who advocate on behalf of those facing
deportation, the abbreviated comment period denied the public a meaningful opportunity to
submit comments.  Despite requests from scores of stakeholders to extend or freeze the comment
period, Defendants, without explanation, adhered to the 30-day comment period, precluding
many organizations from providing the robust analysis and comments that they would otherwise
have provided, and denying others the time needed to develop and submit any comments at all.

9.      Third, a welter of other APA violations infected the rulemaking process,
misleading the public and otherwise constraining its ability to provide fulsome comments.

a.   The NPRM included false statements, such as that no new fees were
proposed.  That is false.  The Final Rule creates an entirely new non-
waivable $50-fee just to apply for asylum in Immigration Court
proceedings.

b.  Defendants' stated justification for the Final Rule relied heavily on the results of a "comprehensive study" on fees that EOIR had purportedly conducted, yet Defendants withheld from the commenting public the fee study's methodology and the data it generated that were used to calculate the proposed fees.

c.  Defendants did not disclose information about how the fees would be used, further hampering the public's ability to analyze and provide robust comment on the rules.

d.  Defendants also concealed from the public the full impact of the proposed rule:  after the comment period closed, they published five additional Notices of Proposed Rulemaking to implement a raft of procedural changes to Immigration Court and BIA proceedings.  Those changes would render the terms of the Final Rule even more onerous and less rational, but their publication after the NPRM's comment period closed prevented the public from making comments directed to the full impact of the Final Rule's operation.

10.     Fourth, despite the direct impact that the Final Rule would have on small entities that provide guidance or legal services for respondents in the proceedings subjected to the increased or new fees, Defendants failed to consider the impact of the Proposed Fee Rule in the manner required by the Regulatory Flexibility Act ("RFA").  Rules enacted in violation of the RFA may be set aside under the RFA, or under the APA.

11.     Fifth, because the Final Rule leaves persons in the United States subject to deportation without access to procedural protections, particularly those persons who are unable to pay the increased fees, the Final Rule violates the Due Process and Equal Protection Clauses of the Fifth Amendment to the United States Constitution.

12.     Plaintiffs in this action provide legal services for, or have as members, individuals whom the U.S. government is seeking to deport through Removal Proceedings before EOIR. Plaintiffs also support, and have as members, others who provide such services.  The Final Rule will devastate Plaintiffs—expanding the amount of time and cost required for each respondent's case, leaving less funding for removal defense, and resulting in diminished capacity to take on new cases.  The Final Rule will hamper the ability of Plaintiffs to place clients' and members' cases with pro bono counsel.  It will leave the ultimate beneficiaries of Plaintiffs' work— including asylum seekers and other indigent individuals and families at risk—without counsel in adversarial proceedings that threaten their life, liberty, and families.  For Plaintiffs' clients, members, and countless others, the Final Rule will force choices such as between food or rent and defense against removal, and will lead to deportations that should not happen.

13.     For the foregoing reasons, and as detailed below, Plaintiffs seek vacatur of the Final Rule, and preliminary relief pending final judgment.

## PARTIES

### I.     Plaintiff Catholic Legal Immigration Network, Inc. (CLINIC)

14.     Plaintiff Catholic Legal Immigration Network, Inc. ("CLINIC") is a not-for-profit organization incorporated in Washington, DC, and headquartered in Silver Spring, MD.

15.     Pursuant to its mission, CLINIC coordinates and provides technical support and services to a network of approximately 400 dedicated affiliate organizations, spread out across 48 states and the District of Columbia.  CLINIC also provides legal representation directly and in partnership with bro bono attorneys to vulnerable adults, children, and families in proceedings in Immigration Courts and before the BIA, including Removal Proceedings, and including in connection with the applications, motions, and appeals that are subject to the Final Rule, and it partners with pro bono counsel to provide such representation.

16.     Among other services, CLINIC provides its affiliates with trainings, expert technical support, and other resources as needed.  These include providing the trainings,

technical support, and expertise related to the applications, motions, and appeals subject to the Final Rule.

17.     The affiliates pay membership fees to CLINIC to receive these services, which are directed at better equipping the affiliates to perform their client-based services.

18.     CLINIC operates a "Defending Vulnerable Populations Program" that seeks to increase the number of fully accredited representatives and attorneys who are qualified to represent immigrants in Removal Proceedings and other Immigration Court proceedings. Through the Defending Vulnerable Populations Program, CLINIC conducts court skills training for affiliate staff, pro bono attorneys, and other attorneys working for not-for-profit organizations, and develops practice advisory materials on removal defense, asylum appeals, and other topics to assist affiliate staff.

19.     CLINIC's Defending Vulnerable Populations Program also operates a "Motion to Reopen Project" that assists immigrants with reopening their Removal Proceedings and with pursuing protection, such as asylum, for themselves and their children.

20.     CLINIC's Defending Vulnerable Populations Program also operates a "BIA Pro Bono Project" that identifies detained individuals who have received a removal order but have appealable issues.  CLINIC places some of the individuals with pro bono counsel who receive training and mentorship from CLINIC.  CLINIC also represents some of the individuals directly in their appeals.

21.     CLINIC's affiliate organizations provide services to approximately 500,000 immigrants each year.  These services include advising, counseling, providing resources, and representing individuals in Immigration Courts throughout the country and before the BIA, including with respect to the applications, motions, and appeals that are the subject of the Final Rule.

22.     In addition to providing benefits to the affiliates, many of CLINIC's programs also advance CLINIC's overall mission of providing services and benefits to immigrants.

7

CLINIC's support of its affiliate programs and its direct representation work and support of pro bono attorneys and projects are undertaken in service of CLINIC's broader purpose of promoting the dignity, and protecting the rights, of immigrants.

23.     CLINIC is a "small entity" under the RFA because its revenues for 2019 were just over $10 million.

## II.     Plaintiff Community Legal Services in East Palo Alto (CLSEPA)

24.     Plaintiff Community Legal Services in East Palo Alto ("CLSEPA") is a not-for-profit legal services provider.

25.     CLSEPA is incorporated in California and has its headquarters in East Palo Alto, CA.

26.     CLSEPA's mission is to provide legal services that are transformative in nature, enabling diverse communities in and around East Palo Alto to achieve a secure and thriving future.

27.     CLSEPA's staff includes attorneys, paralegals, and social workers.

28.     Pursuant to its mission, CLSEPA's staff provides direct legal services to individuals in its target communities, including legal advice and representation to hundreds of individuals in Removal Proceedings, or who may be subject to Removal Proceedings, in Immigration Court and before the BIA, including with respect to the types of applications, motions, and appeals that are the subject of the Final Rule.

29.     In furtherance of its mission, CLSEPA also operates a pro bono program, through which CLSEPA places individuals with pro bono attorneys to represent them in Immigration Court and before the BIA.  CLSEPA provides the pro bono attorneys with whom it places individuals continued training and technical support, including with respect to the applications, motions, and appeals that are the subject of the Final Rule.

30.     Pursuant to its mission, CLSEPA also trains and supports community members in matters of immigration, and trains and supports attorneys at other not-for-profit organizations to

represent individuals in Immigration Court and before the BIA, including with respect to the types of applications, motions, and appeals that are the subject of the Final Rule.

### III.  Plaintiff KIND, Inc., D/B/A Kids in Need of Defense (KIND)

31.     Plaintiff KIND, Inc., d/b/a Kids in Need of Defense ("KIND"), is a not-for-profit organization incorporated in Washington, DC.

32.     KIND's headquarters are located in Washington, DC, and KIND has field operations in Atlanta, GA, Baltimore, MD, Boston, MA, Houston, TX, Los Angeles, CA, Newark, NJ, New York, NY, San Francisco and Fresno, CA, Seattle, WA, and Washington, DC, and Northern Virginia.

33.     Pursuant to its mission, KIND advocates throughout the United States for the rights of unaccompanied migrant and refugee children in this country.

34.     KIND provides free legal representation for unaccompanied migrant children through its field offices across the country, directly and through partnerships with pro bono counsel.

35.     Pursuant to its mission, KIND also provides programs that educate unaccompanied minors about their rights.

36.     Pursuant to its mission, KIND also provides mental health and social services for its clients, advocates for new law and policy in the United States and in countries where child refugees originate, and educates policymakers and the broader public about issues impacting refugee and migrant children.

37.     Pursuant to its mission, KIND has represented, or referred to pro bono attorneys for representation, many children in proceedings in Immigration Court and before the BIA, including representations that have involved the types of applications, motions, and appeals that are the subject of the Final Rule.

38.     For cases that KIND refers to pro bono attorneys, KIND provides the assigned pro bono attorneys with continuing technical guidance and training, including as to the types of

applications, motions, and appeals that are the subject of the Final Rule.  KIND provides similar training to its own in-house attorneys.

39.     Pursuant to its mission, KIND has provided numerous training programs on how to represent children who are alone in immigration proceedings, including in Removal Proceedings.  More than 50,000 slots have been filled for these programs.

**IV.     Plaintiff Coalition for Humane Immigrant Rights of Los Angeles (CHIRLA)**

40.     Plaintiff Coalition for Humane Immigrant Rights ("CHIRLA") is a not-for-profit membership-based organization.

41.     CHIRLA is incorporated in California and has its headquarters in Los Angeles. CHIRLA has additional offices in California and also has an office in Washington, DC.

42.     CHIRLA's mission is to ensure that immigrant communities are fully integrated into society with full rights and access to resources.  For more than 30 years, CHIRLA has worked to empower immigrants to advocate for and secure policies that promote freedom of movement, full human rights, and the vigorous civic action that strengthens democracy.

43.     In furtherance of its mission, CHIRLA carries out a range of programs, services, and activities, including grassroots organizing and advocacy with and on behalf of its members and a legal services program that provides representation to clients, which includes members of CHIRLA and others in proceedings before EOIR and USCIS.

44.     CHIRLA has approximately 13,000 dues-paying and active members.

45.     The majority of CHIRLA's members are low-income immigrants in mixed status families, in which one or more members are undocumented.

46.     Some of CHIRLA's members became legal service clients after joining CHIRLA as members, while other CHIRLA members joined as members after being clients of CHIRLA.

**V.     Defendant Executive Office For Immigration Review (EOIR)**

47.     Defendant Executive Office for Immigration Review ("EOIR") is an Agency of the Executive Branch of the United States government.

48.     EOIR is a component agency of the U.S. Department of Justice.

49.     EOIR includes the Office of the Chief Immigration Judge ("OCIJ"), which establishes operating policies and oversees policy implementation for approximately 460 immigration judges located in more than 60 Immigration Courts and two adjudications centers located across the country.

50.     EOIR also includes the Board of Immigration Appeals ("BIA," or the "Board"). The BIA is the highest administrative body for interpreting and applying immigration laws.

51.     The BIA is located at EOIR headquarters in Falls Church, Virginia, and has nationwide jurisdiction to hear appeals from decisions rendered by Immigration Judges and by district directors of DHS in a range of proceedings between the government of the United States and a citizen, non-citizen, or business.

## VI.     Defendant James McHenry

52.     Defendant James McHenry ("McHenry") is the Director of the EOIR.

53.     McHenry's responsibilities include overseeing Immigration Court proceedings, appellate reviews, and administrative hearings, as well as supervising Immigration Judges and members of the BIA.

54.     McHenry is sued in his official capacity.

55.     McHenry authorized the promulgation of the Final Rule at issue here.

## VII.    Defendant U.S. Department of Justice (DOJ)

56.     Defendant U.S. Department of Justice ("DOJ") is an executive Department of the United States.

57.     EOIR is an office within DOJ, and EOIR's director reports directly to the Deputy Attorney General and ultimately to the Attorney General.

## VIII.   Defendant William P. Barr

58.     Defendant William P. Barr ("Barr") is the Attorney General of the United States.

59.     As Attorney General of the United States, Barr is the head of the DOJ and its component agencies, including the EOIR.

60.     Barr is sued here in his official capacity.

## JURISDICTION AND VENUE

61.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the claims in this case arise under the laws of the United States, including but not limited to the immigration laws and the Administrative Procedure Act, 5 U.S.C. § 702.

62.     The promulgation of the Final Rule setting forth the EOIR Fee Schedule on December 18, 2020, is a "final agency action" and therefore subject to judicial review by this Court.  5 U.S.C. §§ 704, 706.

63.     Venue is proper under 28 U.S.C. § 1391(e) because Defendants are agencies and officers of the United States, the action does not involve real property, and at least one Plaintiff resides in this district.

## THE FEE RULE

I.     **Introduction:  The System of Immigration Courts**

64.     Immigration proceedings in Immigration Courts and before the BIA determine whether respondent individuals and families in such proceedings may remain in the United States or whether they will instead be "removed" (*i.e.*, deported).

65.     Removal Proceedings are initiated by the United States government and prosecuted by the United States government.

66.     Respondents in Removal Proceedings have the right to representation at their own expense.  Unaccompanied immigrant children are provided government-appointed counsel while in government custody.  Other individuals who are unable to afford counsel must seek out and obtain assistance from not-for-profit legal services providers or pro bono counsel, or they must proceed pro se.

67.     Respondents in Removal Proceedings are entitled to due process under the Constitution and as provided by statute and regulations.  *See, e.g.*, 8 U.S.C. § 1229a; *Bridges v. Wixon*, 326 U.S. 135, 154 (1945) ("[Because removal] visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom[,] . . . meticulous care must be exercised lest the procedure by which [an alien] is deprived of that liberty not meet the essential standards of fairness.").

68.     Respondents in Removal Proceedings have a right to defend themselves against removal, which may include seeking protection or relief from removal by, for example, applying for asylum or other forms of relief.  *See* 8 U.S.C. § 1229a(c)(4).  Certain long-time legal permanent residents and others may seek cancellation of removal, *see* 8 U.S.C. § 1229b, which allows individuals to remain in the United States with lawful immigration status.  Individuals fearing persecution or torture in the country or countries to which they would otherwise be returned may apply for asylum, withholding of removal, and/or protection under the Convention Against Torture.

69.     If the judge presiding over an Immigration Court proceeding (*viz.*, an Immigration Judge) finds that a respondent in Removal Proceedings is removable, and the Immigration Judge does not grant asylum or some other protection or relief and instead enters an order of removal, the individual has the right to appeal that order to the BIA.  *See* 8 U.S.C. § 1229a(c)(5).  The government, too, may appeal the decision of an Immigration Judge.

70.     Such appeals must be filed within 30 days of the Immigration Judge's decision. 8 C.F.R. § 1003.38(b).

71.     An individual may also appeal certain decisions of DHS officials to the BIA. Such appealable decisions may include a denial of a family-based visa (I-130) petition.  This type of appeal also must be filed within 30 days of the decision.

72.     If the BIA affirms a removal order, the individual may seek judicial review through a petition for review by a United States Court of Appeals.  *See* 8 U.S.C. §§ 1252(a)(1);

1252(a)(5); 1252(d)(1).  Appeal to the BIA is a remedy that must be exhausted as a condition precedent to seeking federal court review.  8 U.S.C. § 1252(d)(1).

73.     An individual who claims that an Immigration Judge or the BIA made an error of law or fact in issuing a removal order has a statutory right to file a motion to reconsider that removal order within 30 days of its entry.  *See* 8 U.S.C. § 1229a(c)(6).

74.     An individual who claims that there are new facts that warrant reopening Removal Proceedings that previously resulted in a removal order has a statutory right to move to reopen such proceedings.  With some exceptions, such motions must be brought within 90 days of a removal order.  *See* 8 U.S.C. § 1229a(c)(7); *see also Dada v. Mukasey*, 554 U.S. 1, 18 (2008) (describing the "important safeguard" of a motion to reopen, the purpose of which "is to ensure a proper and lawful disposition" in Removal Proceedings).

75.     The procedural rights set forth in paragraphs 66–74 *supra*, and codified by statute, serve to ensure that individuals facing "the loss of all that makes life worth living," *Bridges*, 326 U.S. at 147, receive due process and have meaningful access to judicial review.

76.     The availability of federal court review of BIA decisions is critical to due process and to development of the law.

77.     Over the years the Courts of Appeals have remanded thousands of cases to the BIA.  *EOIR, Adjudication Statistics – Circuit Court Remands Filed*, https://tinyurl.com/y8z55tbc.

78.     Because legal expertise is valuable for navigating the complex statutes and regulations underlying Removal Proceedings, and because so many respondents in Removal Proceedings are indigent, many respondents seek and obtain assistance from not-for-profit legal services providers and pro bono attorneys.

79.      Respondents represented by counsel in Removal Proceedings have greater success defending against removal than do respondents without legal representation.

80.     Nevertheless, large numbers of respondents appear without counsel in Immigration Court and BIA proceedings. *See, e.g.*, Ingrid Eagly & Steven Shafe, American Immigration Council, Access to Counsel in Immigration Court (Sept. 28, 2016), https://tinyurl.com/ya3geod8; TRAC, Representation Makes Fourteen-Fold Difference in Outcome: Immigration Court "Women with Children" Cases (July 15, 2015), https://trac.syr.edu/immigration/reports/396/.

## II.     EOIR Filing Fees

### A.  INS (formerly of DOJ), USCIS (of DHS), and EOIR (of DOJ).

81.     Before 2002, the former Immigration and Naturalization Service ("INS"), then a sub-agency of the DOJ, was responsible for both immigration enforcement and the adjudication of applications for immigration benefits and naturalization.

82.     In 1983, EOIR was formed as a sub-agency of DOJ, as part of a reorganization that combined the BIA with the Immigration Judge functions previously performed by the INS. EOIR remains part of DOJ to this day.

83.     The Homeland Security Act of 2002 created the executive department of the Department of Homeland Security (DHS), dissolved the INS, and allocated immigration functions formerly performed by INS to DHS and its component agencies. *See* Homeland Security Act of 2002 ("HSA"), Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002) (codified at 6 U.S.C. §§ 251, 255).

84.     The HSA created an agency within DHS that focused on adjudication of immigration benefits and naturalization. That sub-agency is now known as U.S. Citizenship and Immigration Services ("USCIS"). HSA § 451, 116 Stat. at 2195 (codified at 6 U.S.C. § 255).

85.     USCIS's duties include the adjudication of visa and naturalization petitions, affirmative asylum applications, refugee applications, and "all other adjudications" previously performed by the INS. HSA § 451(b)(1)-(5), 116 Stat. at 2195-2196.

86.     The Homeland Security Act maintained EOIR as part of the DOJ.  HSA § 1102, 116 Stat. at 2273-2274 (codified at 6 U.S.C. § 521); *see also* 8 U.S.C. § 1103(g)(1) (Attorney General authority over EOIR).

**B.   The 1986 Fee Rule.**

87.     In 1986, EOIR promulgated a rule (the "1986 Fee Rule") raising the cost for filing appeals from removal decisions (of non-bond decisions), motions to reopen Removal Proceedings, and motions to reconsider removal decisions from $50 to $110, and raising other immigration-related fees by smaller amounts.  For example, the fee for an application for suspension of deportation was increased $25, from $75 to $100.  51 Fed. Reg. 39,994 (Nov. 4, 1986).

88.     In proposing the 1986 Fee Rule, EOIR stated the "[c]harges [we]re to be fair and equitable, taking into consideration direct and indirect cost to the Government, value to the recipient, public policy or interest served, and other pertinent facts."  51 Fed. Reg. 2895 (Jan. 22, 1986).

89.     To account for the risk that the increased fee for suspension of deportation applications could be burdensome for families applying in the same proceeding, the 1986 Fee Rule provided that one fee could cover two or more individuals in the same proceeding.  *Id.*

90.     The 1986 Fee Rule set "several fees for administrative appeals processes . . . at less than full recovery recognizing longstanding public policy and the interest served by these processes."  51 Fed. Reg. at 39,993.

91.     Since 1986, the maximum assessed fee for an application filed with the Immigration Court has not exceeded $100; there has never been a fee for an asylum application; the fee to appeal has not exceeded $110; and the fee to file a motion to reopen or to reconsider has not exceeded $110 (in some instances, there was no fee), as shown in the following table:

| Type of Application, Motion, or Notice of Appeal | Filing Fee (1986-2020) |
|---|---|
| *Before an Immigration Judge* | |
| EOIR-40 Application for Suspension of Deportation (EOIR-40) | $100 |
| EOIR-42A Application for Cancellation of Removal for Certain Permanent Residents (EOIR-42A) | $100 |
| EOIR-42B Application for Cancellation of Removal and Adjustment of Status for Certain Nonpermanent Residents (EOIR-42B) | $100 |
| Application for Asylum and For Withholding of Removal (I-589) | No Fee |
| Motion to Reconsider | $110 |
| Motion to Reopen | $110 |
| Notice of Appeal from a Decision of an Immigration Judge (EOIR-26) | $110 |
| *Before the Board of Immigration Appeals* | |
| Notice of Appeal to the Board of Immigration Appeals from a Decision of a DHS Officer (EOIR-29) | $110 |
| Motion to Reopen | $110 |
| Motion to Reconsider | $110 |

92.     In 1997, EOIR updated the fee schedule to account for the new Form EOIR-42, Application for Cancellation of Removal, setting the cancellation of removal fee at $100.  62 Fed. Reg. 10,312, 10,336 (Mar. 6, 1997) (interim rule).  The new fee schedule did not raise any of the fees set in the 1986 schedule.

93.      The fee increases that would be imposed by the Final Rule are the first fee increases for applications, motions, and appeals subject to the Final Rule since 1986.

**C.  EOIR Operations Are Funded By Congressional Appropriation.**

94.     For decades, Immigration Court and BIA operations have been funded almost entirely by congressional appropriation.

95.     The Final Rule states that the DOJ, including EOIR, is funded by congressional appropriations.  85 Fed. Reg. 82,750, 82,754.

96.     In Fiscal Year 2020, EOIR received nearly $673 million in congressional appropriations.  Pub. L. 116-93, 133 Stat. 2317, 2396 (Dec. 20, 2019).

97.     For Fiscal Year 2021, Congress has appropriated $734 million to EOIR, a nine percent increase from Fiscal Year 2020.  Consolidated Appropriations Act, Senate Amendment to H.R. 33 (Dec. 21, 2021).

98.     The Final Rule does not state that EOIR had a budgetary shortfall.

99.     The Final Rule does not state that DOJ needs the fees collected by EOIR to meet its costs.

100.    By enacting the Final Rule, EOIR fundamentally shifted from a congressional appropriation model of funding, to a model in which the so-called "beneficiary" pays.  In this case, however, the "beneficiary" is a respondent in Removal Proceedings commenced by the United States government.

101.    The June 2020 report of the DOJ Office of the Inspector General critiqued the current EOIR leadership's "lack of knowledge" of the EOIR budget. https://tinyurl.com/ybgpty33.

### III.    Fee Waivers in Removal Proceedings

102.    Many respondents in Removal Proceedings have not been able to afford the existing fees.

103.    Many more respondents in such proceedings will not be able to afford to pay the fees set by the Final Rule.

104.    Respondents in Removal Proceedings may apply for a discretionary fee waiver. *See* 8 C.F.R. §§ 1003.8(a)(3), 1003.24(d), 1103.7(c); EOIR, Immigration Court Practice Manual*, supra*, at 53 (last updated July 2, 2020), https://tinyurl.com/y9flwne6; EOIR, BIA Practice Manual at 4445 (last updated Oct. 5, 2020), https://tinyurl.com/y9bu6p8v.

105.    Applicants for a fee waiver generally submit Form EOIR–26a to Immigration Courts or the BIA.  That form asks for detailed information about income, assets, and expenses.

The applicant must sign under penalty of perjury, but the form provides no accompanying instructions.  Some Immigration Judges require that significant documentation be submitted with Form EOIR–26a.

106.    The form requires that any attorney or other legal representative for the respondent attest that he or she "reviewed the details provided herein and [is] satisfied that this fee waiver request is made in good faith."

107.    A decision by the Immigration Court or by the BIA to grant or deny a fee waiver request is entirely discretionary.  *See* 8 C.F.R. §§ 1003.8(a)(3), 1003.24(d); *see also* Immigration Court Manual, *supra*, at 55; EOIR, BIA Practice Manual at 45 (last updated Oct. 5, 2020), https://tinyurl.com/y9bu6p8v ("When an appeal or motion normally requires a filing fee, the Board has the discretion to waive that fee upon a showing of economic hardship or incapacity."); 85 Fed. Reg. at 82,759 ("fee waivers are discretionary by nature").

108.    There is no requirement that a decision by the Immigration Court or by the BIA to grant or deny a fee waiver be committed to writing.  *See* https://tinyurl.com/y99d3xj3 ("the regulations do not require a written ruling on a fee waiver request").

109.    There are no publicly available guidelines or standards as to what a showing of economic hardship or incapacity entails.  *See Id.* ("EOIR has no policy directing the automatic grant or denial of a fee waiver request.  IJs and AIJs retain independent judgment and discretion in assessing fee waiver requests. 8 C.F.R. §§ 1003.1(d)(1)(ii), 1003.10(b).").

110.    By regulation, no fee waiver is available for a DHS fee that that agency identifies as non-waivable.  8 C.F.R. § 1103.7(c).

111.    If an application, motion, or appeal made in Immigration Court or the BIA is filed with a fee waiver application, but without payment of the fee whose waiver is sought, and the fee waiver application is denied, EOIR regards the underlying application, appeal, or motion as not properly filed.  *See* 8 C.F.R. §§ 1003.8(a)(3), 1003.24(d), 1103.7(c); EOIR; Fee Review, 85 Fed. Reg. at 11,874 n.21 (stating that if a waiver request is not granted, "the filing will not be deemed

properly filed"); Immigration Court Practice Manual, *supra*, at 55 ("If a filing is submitted without a required fee and the request for a fee waiver is denied, the filing will be deemed defectively filed and may be rejected or excluded from evidence.").

112.    The time for filing the application, motion, or appeal is not tolled if a fee waiver is denied.

113.    If a fee waiver request is denied after the filing deadline has passed for the application, motion, or appeal for which the fee waiver request was made, the respondent often must file a motion seeking acceptance of the now-untimely application, motion, or appeal, and has no guarantee that the motion will be granted.

114.    Concerns about seeking fee waivers also arise in cases involving the cancellation of removal for non-permanent residents, which requires a positive exercise of discretion.  Some Immigration Judges may regard the need for a fee waiver as a factor weighing against cancellation.

115.    Defendants have not systematically tracked data pertaining to respondents' fee waiver requests, or data pertaining to the adjudication of fee waiver requests.

116.    For example, Defendants do not maintain statistics regarding the rate at which fee waiver applications for proceedings in Immigration Court or before the BIA are requested and either granted or denied.  Similarly, Defendants do not track the impact of fee waiver denials on respondents.

117.    The Immigration Court and the BIA have denied fee waiver applications for the applications, motions, and appeals that would be subject to the Final Rule.  The denials have been decided under varying and inconsistent standards for a variety of reasons, including because fee waivers are discretionary and there is no clear standard governing such applications.

118.    Immigration Courts and the BIA have denied applications for fee waivers for the applications, motions, and appeals subject to the Final Rule without explaining the reason for such denial.

**IV.**     **The Rulemaking Process for the Final Rule**

    **A.  Notice of Proposed Rulemaking Was Issued.**

119.     On February 28, 2020, defendants DOJ and EOIR issued a Notice of Proposed Rule Making (NPRM) that proposed to increase fees associated with certain applications, motions, and appeals in Immigration Court and before the BIA (the "Proposed Fee Rule").

120.     The NPRM proposed increases for the fees assessed in "eight distinct types of filings."  Executive Office for Immigration Review; Fee Review, EOIR Docket No. 18–0101; A.G. Order No. 4641–2020; RIN 1125–AA90, 85 Fed. Reg. 11,866 (Feb. 28, 2020).

121.     The eight distinct types of filings for which the NPRM proposed fee increases included applications for three types of relief in proceedings before an Immigration Judge (together, "Applications").

    a.  One such Application fee increase would apply to applications for suspension of deportation, for which the fee would increase from $100 to $305.  *See* Form EOIR–40.

    b.  A second Application fee increase would apply to applications for cancellation of removal for certain permanent residents, for which the fee would increase from $100 to $305.  *See* Form EOIR–42A.

    c.  The third Application fee increase would apply to applications for cancellation of removal and adjustment of status for certain nonpermanent residents, for which the fee would increase from $100 to $360.  *See* Form 42–B

122.     The eight distinct types of filings for which the NPRM proposed fee increases included two types of motions that could be filed in proceedings before either an Immigration Judge or the BIA, motions to reopen proceedings and motions to reconsider (together, "Motions").

a. The applicable fees for Motions made before the Final Rule was $110, except that there was no charge for a motion to reopen based exclusively on a claim for asylum or for a motion to reconsider based on an underlying claim for asylum and no charge to file a motion to rescind and reopen based on lack of notice.

b. The NPRM proposed increasing the fee for filing Motions to $145 when made to the Office of the Chief Immigration Judge (i.e., the Immigration Courts), and proposed increasing the fee for filing Motions to $895 when made before the BIA.  *See* MTR BIA.

123.    The eight distinct types of filings for which the NPRM proposed fee increases included three types of Notices of Appeal to the BIA (together, "Appeals").

a. One such Appeal fee increase would raise the fee for filing a Notice of Appeal from a decision of an adjudicating official in a practitioner disciplinary case from $110 to $675.  *See* EOIR–45.

b. A second Appeal fee increase would raise the fee for filing a Notice of Appeal to the BIA from a decision of a DHS officer from $110 to $705. *See* EOIR–29.

c. The third Appeal fee increase would raise the fee for filing a Notice of Appeal to the BIA from a decision of an Immigration Judge from $110 to $975.  *See* EOIR–26.

124.    In addition to the eight distinct types of filings for which the NPRM proposed fee increases, the NPRM also proposed to adopt a $50 fee for filing an application for asylum in Immigration Court, based on a proposal by DHS and USCIS to require such a fee for an application filed with USCIS; there was no fee for such applications prior to the Final Rule.

125.    All of the proposed fee increases significantly exceed the increase that could be attributed to the rate of inflation since the 1986 Fee Rule or the 1997 Fee Rule.

**B.   The Comment Period for the Proposed Fee Rule Was Limited to 30 Days.**

126.    On or about February 28, 2020, the date that the NPRM was published, concerns about COVID-19 were becoming widespread in the United States.

127.    The NPRM indicated that the comment period on the Proposed Fee Rule would be limited to 30 days.

128.    The NPRM offered no explanation or justification for limiting the comment period to 30 days.

129.    Executive Orders reflect that a 60-day period is generally understood to be the minimum amount of time that allows for a meaningful opportunity to comment.  *See, e.g.*, Executive Order 13563 (Jan. 18, 2011); Executive Order 12866 (Sept. 30, 1993).

130.    On March 6, 2020, one week after the NPRM, ninety-one (91) organizations, including Plaintiffs CLINIC, CLSEPA, KIND, and CHIRLA submitted a written request to EOIR to increase the comment period to sixty days (the "March 6, 2020 Request").

131.    Defendants did not respond to the March 6, 2020 Request.

**C.   The Comment Period for the Proposed Fee Rule Was Particularly Inadequate Given the Onset of the Global COVID-19 Pandemic, Yet Requests to Extend the Comment Period Were Denied.**

132.    On March 11, 2020, the World Health Organization declared COVID-19 to be a global pandemic.

133.    On March 13, 2020, the President declared a national emergency based on the COVID-19 pandemic.  *See* White House, Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Conference (Mar. 13, 2020), https://tinyurl.com/wdlj4ra.

134.    Over the course of the 30-day comment period for the Proposed Fee Rule, forty (40) states issued "shelter in place" orders, covering more than 310 million Americans.

135.    While the public reeled from impact of the pandemic, organizations (such as Plaintiff CLINIC's affiliates, Plaintiff CLSEPA, and Plaintiff CHIRLA) that represent

individuals in Removal Proceedings, and organizations (such as Plaintiff CLINIC, Plaintiff CLSEPA, and Plaintiff KIND) that provide advice and services to such individuals, or that provide support and other services to the organizations and attorneys that represented such individuals, scrambled to continue to provide such representation, advice, support, and services.

136.    Those efforts were made more challenging because those organizations' offices either closed or were forced to limit public access, the staff members working for such organizations lost childcare as schools and day care centers closed, and such organizations and their staff had to adapt to providing services online and by telephone.

137.    Many Immigration Court cases and matters before the BIA had March filing deadlines that needed to be met, and many organizations that provide a full range of legal services to immigrants, including proceedings before USCIS, had to meet March filing deadlines in those other proceedings as well.

138.    Detained immigrants were disproportionately impacted by the COVID-19 pandemic, requiring more services from the organizations that serve them, including CHIRLA and KIND.

139.    On March 23, 2020, one hundred seven (107) organizations, again including Plaintiffs CLINIC and KIND, wrote to EOIR for the second time about the abbreviated comment period for the NPRM (the "March 23, 2020 Letter").  Their letter noted the lack of response to the March 6, 2020 request and requested a freeze of the comment period.

140.    The March 23, 2020 Letter discussed the impact on immigration legal service providers, including those  providing services related to EOIR Proceedings, of the pandemic and of orders across the country to shelter in place as entire workplaces, including some Immigration Courts, school systems, and childcare centers, had shut down.

141.    EOIR did not respond to the March 23, 2020 Letter.

142.    The comment period for the Proposed Fee Rule closed on March 30, 2020.

143.    On March 30, 2020, the United States had the highest number of COVID-19 cases in the world.

144.    The need to divert resources to respond to conditions created by the COVID-19 pandemic meant that interested persons and organizations did not have resources that would have otherwise been available to prepare and submit comments on the Proposed Fee Rule within the 30-day period.

145.    Many United States government agencies, including the Consumer Financial Protection Bureau, Food and Drug Administration, National Credit Union Administration, the Securities and Exchange Commission, Department of Agriculture, and U.S. Forest Service, reopened or extended comment periods on proposed rule changes in the period between February 28 and March 30, 2020.

146.    Ordinarily, the public submits extensive and numerous comments to proposals related to immigration fees.  For example, in late 2019, USCIS proposed an increase for certain immigration-related fees.  Although USCIS initially limited the comment period to 30 days, it extended the comment period to several months.  The public ultimately submitted more than 43,000 comments on the proposed rule.  Other proposed rulemakings impacting low-income immigrants have similarly led to the submission of thousands of comments.

147.    Gripped by the challenges of a global pandemic, the public submitted only 601 comments on the Proposed Fee Rule to EOIR by the end of the 30-day comment period.

148.    For example, because Plaintiff CLSEPA had to direct staff to respond to demands and exigencies created by the COVID-19 pandemic, it was unable to submit comments on the Proposed Fee Rule during the 30-day period, despite a strong interest in doing so.

149.    Similarly, among the 147 organizations that had requested that the comment period for the Proposed Fee Rule be extended or frozen, nearly 100 did not submit comments.

150.    Following the close of the comment period for the Proposed Fee Rule, CLINIC requested that EOIR re-open the comment period.  As with the March 6 and March 23, 2020

Letters requesting EOIR to extend or freeze the comment period during the pandemic, the government did not respond to this request until it published the Final Rule.

**D.  <u>The NPRM Was Inaccurate and Inadequate.</u>**

151.    The NPRM stated that the Proposed Fee Rule included no new fees.

152.    The Proposed Fee Rule, however, included a $50 fee to file a "defensive" asylum application before the Immigration Court.

153.    Before the Proposed Fee Rule, the United States has never charged a fee for filing a defensive asylum application.

154.    Defendants' NPRM attributed the addition of a "defensive" asylum application fee to an earlier proposed rule by DHS and USCIS to add a $50 fee for the filing of an "affirmative" asylum application with USCIS.  The NPRM from DHS and USCIS stated that its proposal to add this fee applied only to DHS and USCIS, and not to EOIR.  *See* 84 Fed. Reg. 62,280, 62,318 (Nov. 14, 2019).

155.    The NPRM stated that fee waivers would be available, but did not state that EOIR would not be able to waive this new "defensive" asylum application fee.

156.    The NPRM did not provide any justification for the new "defensive" asylum application fee, or for Defendants' failure to make their own determination regarding fees for "defensive" asylum applications.  The NPRM did not discuss the impact of the new "defensive" asylum fee.

157.    DHS and USCIS subsequently issued a final rule setting forth a new USCIS fee schedule that included a mandatory, non-waivable $50 asylum application fee.  *See* 85 Fed. Reg. 46,788 (Aug. 3, 2020).  In the final rule issued by DHS and USCIS, those agencies stated that the affirmative asylum fee applied to asylum applications filed "with DHS only" and that "[w]hether the fee also will apply to a Form I-589 filed with EOIR is a matter within the jurisdiction of the Department of Justice (DOJ)."  *Id*. at 46,793.  That final rule was clear:  "DHS does not directly set any fees for DOJ."  *Id*.

158.     The Final Rule promulgated by Defendants includes the $50 fee for filing "defensive" asylum applications in the Immigration Court.  The Final Rule expressly incorporates the new USCIS fee schedule, which includes a mandatory, non-waivable $50 asylum application fee.  *See, e.g.*, 85 Fed. Reg. at 82,751 (incorporating citations to "8 C.F.R. part 106" into 8 C.F.R. 1103.7).

159.     In response to concerns about the new asylum fee, Defendants wrote in the Final Rule that the Final Rule did *not* establish a new fee for asylum applications filed before Immigration Courts and the BIA.  85 Fed. Reg. at 82,767, n.31 ("*the DHS regulation* setting the fee for [the asylum application] form *determines the fee* charged for it in EOIR immigration proceedings." (emphasis added)).  The Final Rule therefore did not address either Defendants' failure to independently determine whether to require a fee for "defensive" asylum applications, or DHS's representation that the decision whether to adopt the fee rested with Defendants.

160.     This new EOIR asylum fee is the first time in U.S. history that the Immigration Courts have charged a fee for "defensive" asylum applications.

161.     The addition of a new fee to file a "defensive" asylum application has the effect of subjecting asylum applicants to additional fees in connection with motions they may make to reopen or to reconsider asylum applications.  Before the Final Rule, applicants did not need to pay any fee in connection with such motions because existing regulations specified that no fee was required for motions to reopen or reconsider that are based exclusively on applications for relief that do not require a fee.  The Final Rule would add a fee for asylum applications, and thereby take asylum applications out of the category of "applications for relief that do not require a fee."  The Final Rule would thus impose on such applicants the fees for motions to reopen or reconsider, which previously they did not have to pay.

162.     The NPRM omitted other important information about the Proposed Fee Rule that would have permitted the public to make meaningful comments.

163.     The missing information included the very basis for the fee increases being proposed.

164.     For example, the NPRM stated that EOIR had conducted a "comprehensive study" in spring 2018 to determine the cost to EOIR for each type of application, motion, and appeal for which the NPRM proposed to increase fees.

165.     The "comprehensive study" was not published with the NPRM or at the time of the NPRM.

166.     The NPRM did not provide sufficient information about the methodology of the "comprehensive study" to allow meaningful comments about whether the "comprehensive study" was reliable.

167.     The NPRM did not disclose the data generated from the "comprehensive study" so that the public could not make meaningful comments about whether such data supported the proposed fees.

168.     Following the NPRM's publication, but before the close of the comment period, Plaintiff CLINIC, contacted the Office of Management and Budget (OMB) on March 6, 2020 and requested the "comprehensive study" referenced in the NPRM as well as the data underlying the calculations that the NPRM cited as reflecting cost to the agency.

169.     CLINIC reiterated its request for the "comprehensive study," to both OMB and DOJ, on March 18, 2020.

170.     By the close of the comment period, CLINIC still had not received a response and was forced to submit comments without any ability to review the "comprehensive study" or otherwise assess EOIR's purported calculations in support of the Proposed Fee Rule.

171.     Defendants did not publish the data collected for their spring 2018 "comprehensive study" until they issued the Final Rule.  *See* 85 Fed. Reg. at 82,755.

172.     Defendants still have not released a full set of data or complete information regarding the methodology of the "comprehensive study."

173.     The NPRM stated that EOIR allocated salary costs from General Services Administration (GSA) and Office of Personnel Management (OPM) data to each step in the process, based on the time the step takes, the average salary of the responsible staff, and the percentage of total cases in which the step occurs.

174.     The NPRM did not, however, disclose the assumptions, or the data, or the calculations pertaining to that putative salary cost allocation.

175.     The limited data that were provided in the NPRM contained errors.

176.     For example, the NPRM included errors in calculations of the compound annual growth rate.

177.     The limited data provided in the NPRM also raised red flags about the accuracy of the analysis and conclusions reached.

178.     For example, the NPRM reported that the cost allocated to staff time for adjudications before the BIA was identical regardless of the BIA procedure—i.e., regardless of whether the adjudication was an appeal, a motion to reopen, or a motion to reconsider. *See* 85 Fed. Reg. at 11,873 (showing $76.38 for Board member time for appeal from Immigration Judge decision (Final Rule sets fee for appeal at $975), for motions to reopen or reconsider (Final Rule set fee for motion at $895), for appeals of decisions of DHS Officers (Final Rule sets the fee at $705), and for appeals of the decisions of adjudicatory officials in practitioner disciplinary cases (Final Rule sets the fee at $675)).

179.     On information and belief, the different types of procedures performed at the BIA each requires different amounts of staff time.

**E.  The NPRM Withheld Important Information About Fee Waivers.**

180.     The NPRM announced that "EOIR recognizes that the new fees will be more burdensome."  85 Fed. Reg. at 11,874.

181.    The NPRM purported to address concerns about the added burden presented by the new fees in the Proposed Fee Rule by stating that "fee waivers are still possible for those who seek them."

182.    The NPRM, however, withheld from the public the information that it would need to comment properly on whether the "possib[ility]" of fee waivers offsets or mitigates the burdens of the fee increases set forth in the Proposed Fee Rule.

183.    For example, the NPRM did not provide any information related to the current number or frequency of fee waiver requests, the grant or denial rates for such requests, how respondents proceeded when requests are denied, or the time involved to adjudicate fee waiver applications.

184.    EOIR has access to every fee waiver application filed in the Immigration Courts and before the BIA and every adjudication of those fee waiver applications.  EOIR declined to examine or make publicly available the data in its possession.

185.    Such information would have helped the public analyze the Proposed Fee Rule, and provide meaningful commentary on whether the mere "possib[ility]" of fee waivers would overcome the certain burden of the fee increases.

186.    The NPRM did not address the anticipated impact that the new and increased fees set forth in the Proposed Fee Rule would have on the fee waiver request process, including what increased percentage of respondents could be expected to need fee waivers as a consequence of the new fee schedule, the likely corresponding increase in time needed to adjudicate the requests, or the impact of the foregoing on the calculations and conclusions in the NPRM.

187.    Such information would have helped the public analyze the Proposed Fee Rule, and to provide meaningful commentary on whether the mere "possib[ility]" of fee waivers would overcome the certain burden of the proposed fee increases.

188.    Before the NPRM was published with the proposed fee schedule, Plaintiff
CLINIC made a Freedom of Information Act ("FOIA") request to EOIR for records related to
fee waiver applications received and adjudicated from EOIR.

189.    The requested records would have helped CLINIC analyze the Proposed Fee
Rule, and to provide meaningful commentary on whether the mere "possib[ility]" of fee waivers
would overcome the certain burden of the fee increases.

190.    EOIR failed to disclose responsive records, or make any response to the request
for such records, within the statutorily required timeframe.

191.    After the NPRM was published, CLINIC asked EOIR to produce the past-due
records before the comment period closed.

192.    EOIR did not provide any responsive records until after the comment period
closed.

193.    After the comment period closed, EOIR produced to CLINIC some documents
responsive to its FOIA request.

194.    The data provided by EOIR to CLINIC included numerous facially inaccurate
entries, including dates that precede EOIR's existence, and revealed that Defendants have not
consistently maintained fee waiver data and do not know the number or rate of fee waiver denials
under the fee structure in place before the Final Rule nor whether there has been any consistency
to the adjudication of fee waiver requests.

195.    The data provided by EOIR to CLINIC reveal that Defendants did not have
sufficient information to evaluate whether fee waivers would provide relief from the burden of
fee increases and sufficiently mitigate the due process concerns raised by the NPRM.

196.    In the Final Rule, Defendants stated that "Respondents' financial information
submitted in support of fee waiver requests has not been tracked or universally evaluated . . . ."
85 Fed. Reg. at 82,759.

**F.  Defendants' Decision to Publish Notices of Additional Proposed Rulemakings After the Comment Period on the Proposed Fee Rule Closed Deprived the Public of the Opportunity to Comment on the Significant Cumulative Effects that the Proposed Fee Rule Would Have if Those Other Proposed Rules Were Promulgated.**

197.  At the time that EOIR published the NPRM for the Proposed Fee Rule, EOIR was also preparing to propose other rules relating to asylum law and procedure, Immigration Court practice, and BIA practice.

198.  One proposed rule was published on June 15, 2020.  *See* Dep't of Homeland Security and EOIR, Joint Notice of Proposed Rulemaking, Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 36,264 (June 15, 2020) ("Asylum Rule").

199.  Another proposed rule was published on August 26, 2020.  *See* Executive Office for Immigration Review, Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 52,491 (Aug. 26, 2020) ("Appellate Procedures and Administrative Closure Rule").

200.  A third proposed rule was published on September 23, 2020.  *See* Executive Office for Immigration Review, Notice of Proposed Rulemaking, Procedures for Asylum and Withholding of Removal, 85 Fed. Reg. 59,692 (Sept. 23, 2020) ("Asylum and Withholding of Removal Procedures Rule").

201.  The rules proposed in the three Notices of Proposed Rulemaking set forth in paragraphs 198–200 *supra*, are referred to herein as the "Subsequent Proposed Rules."

202.  In December 2020, Defendants published final rules that resulted from the rulemaking processes for the three Subsequent Proposed Rules.  *See* 85 Fed. Reg. 80,274 (Dec. 11, 2020); 85 Fed. Reg. 81,698 (Dec. 16, 2020); 85 Fed. Reg. 81,588 (Dec. 16, 2020).

203.  Those three final rules are referred to herein as the "Final Subsequent Rules."

204.    The Final Subsequent Rules, individually and together, would exacerbate the impact that the fee increases set forth in the Final Rule would have on respondents in Removal Proceedings, on Plaintiffs, and on the public in general.

205.    The NPRM did not disclose the content or relevant details of the Notices of Proposed Rulemaking for the Subsequent Proposed Rules.

206.    Because the Notices of Proposed Rulemaking for the Subsequent Proposed Rules were not published until after the comment period on the Proposed Fee Rule closed, the public had no opportunity to comment on the true impact that the Proposed Fee Rule would actually have soon after it went into effect.

207.    For example, the Asylum and Withholding of Removal Procedures Rule set forth a new requirement for individuals in "asylum only" proceedings—including individuals who arrived in the United States with only the clothes that they wore—to pay any assessed filing fee for such asylum applications within 15 days of their first Immigration Court hearing.

208.    Readers of the NPRM for the Proposed Fee Rule, which proposed a $50 filing fee for asylum applications, could not have foreseen that if the Asylum and Withholding of Removal Procedures Rule went into effect, the new $50 filing fee for asylum applications would need to be made with 15 days of asylum applicants' first Immigration Court hearing, and therefore their comments on the Proposed Fee Rule could not address such concerns.

209.    The Appellate Procedures and Administrative Closure Rule also significantly impacts the motions and appeals to which the Final Rule's new fees attach, and the fee waiver application process.  For example, Defendants have now restricted the BIA's authority to self-certify cases for review and to sua sponte reopen Removal Proceedings.

210.    Readers of the NPRM for the Proposed Fee Rule also could not have foreseen that if the nearly eight-fold increase in the filing fee for BIA appeals and motions went into effect—forcing many more individuals to seek a fee waiver—the Board would be stripped of authority it has traditionally used to accept late-filed appeals and motions.

211.     Self-certification and sua sponte reopening are mechanisms the BIA has traditionally used to accept timely appeals and motions that are subsequently rejected because the Board denies the accompanying fee waiver request after the filing deadline has passed. Without notice that Defendants planned to eliminate these important mechanisms, comments on the Proposed Fee Rule could not address the inadequacy of the fee waiver request process in light of this new rule.

212.     The Proposed Fee Rule and the Subsequent Proposed Rules are only part of a concerted effort by Defendants to limit due process for individuals subject to Removal Proceedings using piecemeal, staggered rulemaking in a manner that hides the full scope of the expected and intended harm of each rule.

213.     Indeed, a fourth proposed rule was published on November 27, 2020.  *See* Executive Office for Immigration Review, Notice of Proposed Rulemaking, Good Cause for a Continuance in Immigration Proceedings, 85 Fed. Reg. 75925 (Nov. 27, 2020).

214.     A fifth proposed rule was published on November 27, 2020.  *See* Executive Office for Immigration Review, Notice of Proposed Rulemaking, Motions To Reopen and Reconsider; Effect of Departure; Stay of Removal, 85 Fed. Reg. 75942 (Nov. 27, 2020).

215.     These additional proposed rules continue Defendants' practice of engaging in piecemeal, staggered rulemaking so that the public cannot fully comment on the expected and planned impact of each interrelated rule that modifies the immigration court system.

## IV.     **Defendants Ignored Significant Considerations When They Promulgated the Proposed Fee Rule, and They Provide No Reasoned Basis for the Final Rule**

### A.    **There Is No Basis For Changing Longstanding Policy.**

216.     The Final Rule adopts, and would implement, each of the fee increases set forth in the NPRM.

217.     The Final Rule adopts, and would implement, each of the fee increases described in paragraphs 121–124 *supra*.

218.    The Final Rule also adopts, and would implement, a $50 charge for asylum applications, triggering a slew of other fees in connection with such asylum applications.

219.    When the United States last raised fees for some of the applications, motions, and appeals covered by the Final Rule, it set "several fees for administrative appeals processes . . . at less than full recovery recognizing longstanding public policy and the interest served by these processes."  51 Fed. Reg. at 39,993.  The agency held those fees constant for three and a half decades.

220.    The Final Rule provides no reasoned support for changing this longtime policy.

221.    The NPRM states that EOIR had "determined that it was necessary to conduct an updated assessment of the costs for processing the forms and motions for which EOIR sets the appropriate fees."  85 Fed. Reg. at 11,688.

222.    The Final Rule would change the fees for applications, motions, and appeals, with no explanation or justification for the change to longstanding public policy regarding setting these fees.

223.    The Final Rule would change the fees for applications, motions, and appeals, but provides no adequately reasoned basis for such change.

**B.  Defendants Lack Authority to Promulgate the Final Rule.**

224.    Defendants lack statutory authority under INA Section 286 to impose the fees that comprise the Final Rule because that provision relates to fees for petitions for immigration and naturalization benefits previously adjudicated by the INS, and thereafter transferred to the auspices of the USCIS.  It does not relate to EOIR court filings, which are the province of the Final Rule.

225.    Defendants lack statutory authority under the Independent Offices Appropriations Act of 1952 ("IOAA") to impose the fees that comprise the Final Rule.

226.    To the extent that Defendants purported to rely on the IOAA in promulgating the Final Rule, Defendants did not adhere to the IOAA's standards for such promulgation, including

the IOAA requirement that any fees imposed be fair and based on government costs, value provided to the recipient, the public policy or interest served, and certain other factors.

227.    EOIR is obligated to make fundamentally fair and equitable proceedings available to respondents in Removal Proceedings.

228.    Defendants abrogated that obligation in promulgating the Final Rule.

**C.   The Final Rule Does Not Analyze the Impact of the Fee Increases or Provide Reasoned Bases for Allowing That Impact.**

229.    The NPRM did not discuss the full expected impact of the proposed fees on the public.

230.    In promulgating the Final Rule, Defendants did not consider the full expected impact of the proposed fees on the public.

231.    The Final Rule does not provide a reasoned basis for a rule that has such a harmful impact on the public.

232.    Moreover, because the Final Rule would deprive persons in the United States of Due Process and Equal Protection under the law, in violation of the Fifth Amendment to the United States Constitution, the public is irreparably harmed by the government's abridgement of these Constitutional rights and norms through promulgation of the Final Rule.

233.    Most respondents in Immigration Court proceedings have very limited resources available to them.

234.    In promulgating the Final Rule, Defendants did not consider that most respondents in Immigration Court proceedings have very limited resources available to them.

235.    The Final Rule does not provide a reasoned basis for the fee increases in view of the fact that most respondents in Immigration Court proceedings often have very limited resources available to them.

236.    For many respondents in Immigration Court, the services provided by Plaintiffs will be material to preventing their removal or the removal of their family from this country.

237.    In promulgating the Final Rule, Defendants did not consider that for many respondents in Immigration Court, the services provided by Plaintiffs will be material to preventing their removal or the removal of their family from this country.

238.    The Final Rule does not provide a reasoned basis for the fee increases in view of the fact that for many respondents in Immigration Court, the services provided by Plaintiffs will be material to preventing their removal or the removal of their family from this country.

239.    In Removal Proceedings, unaccompanied immigrant children are afforded numerous substantive and procedural protections due to their vulnerabilities.  *See generally* Trafficking Victims Protection Reauthorization Act, 8 U.S.C. § 1232.

240.    In promulgating the Final Rule, Defendants did not give adequate consideration to the impact of the proposed fee increases on unaccompanied immigrant children's vulnerabilities and their ability to pay the fees or seek a fee waiver.

241.    The Final Rule does not provide a reasoned basis to impose increased fees on unaccompanied immigrant children, considering their vulnerabilities and limited means.

242.    Removal can wreak havoc on individuals in Removal Proceedings and their families, including on their spouses and citizens who may be U.S. citizens.

243.    In promulgating the Final Rule, Defendants did not consider that most respondents in Removal Proceedings have very few avenues available to defend themselves and their families against removal.

244.    The Final Rule does not provide a reasoned basis for the fee increases in view of the fact that most respondents in Removal Proceedings often have very few avenues for defending themselves and their families against removal.

245.    Respondents in Removal Proceedings have due process rights, including but not limited to respondents who are wrongly placed in Removal Proceedings because they are U.S. citizens or have lawful immigration status and are not deportable.

246.    In promulgating the Final Rule, Defendants did not give adequate consideration to the impact of the fee increases on the due process rights of respondents in Immigration Court, including but not limited to respondents who are wrongly placed in Removal Proceedings because they are U.S. citizens or have lawful immigration status and are not deportable.

247.    The Final Rule does not provide a reasoned justification for the impact that the fee increases would have on the due process rights of respondents in Immigration Court, including but not limited to the due process rights of respondents who are wrongly named in Removal Proceedings because they are U.S. citizens or have lawful immigration status and are not deportable.

248.    The Immigration Court and BIA applications and procedures to which the Final Rule pertains include procedures that provide respondents with statutorily authorized protection and relief from removal as well as low-income individuals' access to appeals and procedural safeguards afforded by motions to reopen and motions to reconsider.

249.    In promulgating the Final Rule, Defendants did not give adequate consideration to the Rule's impact on respondents' ability to seek statutorily authorized protection and relief from removal or low-income individuals' access to appeals and procedural safeguards afforded by motions to reopen and motions to reconsider.

250.    The Final Rule does not provide a reasoned basis for permitting the fee increases' impact on respondents' ability to seek statutorily authorized protection and relief from removal or low-income individuals' access to appeals and procedural safeguards afforded by motions to reopen and motions to reconsider.

251.    Respondents in Immigration Court proceedings and BIA proceedings generally have the right to access federal court review of agency actions.

252.    In promulgating the Final Rule, Defendants did not adequately consider the Rule's impact on respondents' access to federal court review of agency actions.

253.    The Final Rule does not provide a reasoned justification for the impact that the fee increases will have on respondents' ability to access federal court review of agency actions against them.

254.    In promulgating the Final Rule, Defendants did not adequately consider that the new defensive asylum application fee could force respondents in Removal Proceedings to file a withholding of removal application rather than an asylum application, and that the legal standard for withholding of removal is higher than the standard for asylum.

255.    In promulgating the Final Rule, Defendants did not adequately consider that withholding of removal grants significantly fewer rights and protections than does asylum.

256.    The Final Rule does not provide a reasoned justification for the impact that the new defensive asylum application fee would have by forcing respondents in Removal Proceedings to file a withholding of removal application rather than an asylum application, where the legal standard for withholding of removal is higher than the standard for asylum and where a withholding of removal grants significantly fewer rights and protections than does asylum.

257.    The increased fees set forth in the Final Rule will impact respondents' access to counsel, and some respondents will be forced to choose between paying the fees in order to file the applications, motions, and appeals, or paying for counsel.

258.    In promulgating the Final Rule, Defendants did not consider that the increased fees will impact respondents' access to counsel, and that some respondents will be forced to choose between paying the fees in order to file the applications, motions, and appeals, or paying for counsel.

259.    The Final Rule does not provide a reasoned basis for the fee increases given that the increased fees will impact respondents' access to counsel, and that some respondents will be forced to choose between paying the fees in order to file the applications, motions, and appeals, or paying for counsel.

260.    The increased fees set forth in the Final Rule will burden the nonprofit organizations and pro bono counsel that provide representation to respondents who lack the means to pay for counsel.

261.    In promulgating the Final Rule, Defendants did not consider that the increased fees will burden the nonprofit organizations and pro bono counsel that provide representation to respondents who lack the means to pay for counsel.

262.    The Final Rule does not provide a reasoned basis for increasing fees in view of the burden that such increased fees will have on the nonprofit organizations and pro bono counsel that provide representation to respondents who lack the means to pay for counsel.

263.    At the fee levels set forth in the Final Rule, it will not be possible for many nonprofit providers and pro bono attorneys to continue their practice of paying the fees for applications, motions, or appeals of clients who are unable to do so, or of assisting such clients in accessing funds to cover such fees, or at least to do so with the same regularity.

264.    In promulgating the Final Rule, Defendants did not consider that at the new fee levels, it will not be possible for many nonprofit providers and pro bono attorneys to continue their practice of paying the fees for applications, motions, and appeals of clients who are unable to do so, or of assisting such clients in accessing funds to cover such fees, or at least to do so with the same regularity.

265.    The Final Rule does not provide a reasoned basis for increasing fees given that at the new fee levels, it will not be possible for many nonprofit providers and pro bono attorneys to continue their practice of paying the fees for applications, motions, and appeals of clients who are unable to do so, or of assisting such clients in accessing funds to cover such fees, or at least to do so with the same regularity.

266.    Some nonprofit providers and pro bono attorneys are small entities protected by various statutes from onerous rules that affect their business.

267.    In promulgating the Final Rule, Defendants did not adequately consider that some of the nonprofit providers and pro bono attorneys are small entities protected by various statutes from onerous rules that affect their business.

268.    The Final Rule does not provide a reasoned basis for increasing fees in view of the effect they will have on nonprofit providers, pro bono attorneys, and other legal service providers who are small entities protected by various statutes from onerous rules that affect their business.

269.    As a consequence of the Final Rule, legal services providers will need additional time to assist clients in preparing fee waiver applications, which will impact the overall number of clients they would be able to represent.

270.    In promulgating the Final Rule, Defendants did not consider that legal services providers will need additional time to assist clients in preparing fee waiver applications, which will impact the overall number of clients they would be able to represent.

271.    The Final Rule does not provide a reasoned basis for increasing fees in view of the burden it would place on legal services providers, who will need additional time to assist clients in preparing fee waiver applications, which will impact the overall number of clients they would be able to represent.

272.    For many legal services providers, the fee increases set forth in the Final Rule will reduce the number of their clients who are able to pay the fees for counsel, or for applications, motions, and appeals, and reduce the number of clients overall that they can represent in connection with Removal Proceedings.

273.    In promulgating the Final Rule, Defendants did not consider that as a consequence of the increased fees, many legal services providers will have fewer clients able to pay fees for counsel or for applications, motions, and appeals, and fewer clients overall that they can represent in connection with Removal Proceedings, and that there will be diminished funding for and capacity of legal services providers.

41

274.    The Final Rule does not provide a reasoned basis for increasing fees in view of the impact that the increased fees will have on legal services providers, which include but are not limited to such providers having fewer clients able to pay fees for counsel or for applications, motions, and appeals, and fewer clients overall that they can represent in connection with Removal Proceedings, and that there will be diminished funding for and capacity of legal services providers.

275.    The fee increases set forth in the Final Rule will deprive many respondents in Removal Proceedings of the opportunities for legal representation that they would have had in the absence of such increases or to make applications, motions, and appeals that they otherwise would have been able to make, leading to adverse outcomes in situations that otherwise would not have been adverse for them, and resulting in deportations that would not otherwise take place, leading to a host of harms that extend beyond such individual respondents.

276.    In promulgating the Final Rule, Defendants did not consider that the increased fees will deprive many respondents in Removal Proceedings of the opportunities for legal representation that they would have had in the absence of such increases or to make applications, motions, and appeals that they otherwise would have been able to make, leading to adverse outcomes in situations that otherwise would not have been adverse for them, and resulting in deportations that would not otherwise take place, leading to a host of harms that extend beyond such individual respondents.

277.    The Final Rule does not provide a reasoned basis for the fee increases in view of the fact that such increases will deprive many respondents in Removal Proceedings of the opportunities for legal representation that they would have had in the absence of such increases, or to make applications, motions, and appeals that they otherwise would have been able to make, leading to adverse outcomes in situations that otherwise would not have been adverse for them, and resulting in deportations that would not otherwise take place, leading to a host of harms that extend beyond such individual respondents.

### D.  **The Final Rule Does Not Provide Reasoned Support for the Fee Increases.**

278.    The calculations supporting the fee increases set forth in the Final Rule allocate almost all costs of an immigration proceeding to the respondent, without allocating a portion of the value to the government, in view of the important public interests that are served by the proper functioning of the Immigration Court system, the adversarial nature of the proceedings, Congress's intent that certain defenses and protections from removal be available to respondents, and the fair administration of justice.  *See* 85 Fed. Reg. at 82,751 ("EOIR recognizes that these applications for relief, appeals, and motions represent statutorily provided relief and important procedural tools that serve the public interest."); *id.* at 82,783 ("As DHS is the party opposite the alien in these proceedings, EOIR's hearings provide value to . . . the Federal interests that DHS represents.").  Defendants nonetheless assigned almost the entirety of the costs of staff time purportedly involved in processing and adjudicating applications, motions, and appeals to respondents.

279.    The calculations supporting the fee increases failed to adequately account for the fact that EOIR is an appropriated agency, receiving nearly $673 million in congressional appropriations in Fiscal Year 2020.

280.    In promulgating the Final Rule that allocates almost all costs of a Removal Proceeding to the respondent, Defendants did not give adequate consideration to EOIR's status as a congressionally appropriated agency.

281.    The Final Rule provides no reasoned basis for allocating almost all costs of an immigration proceeding to the respondent when EOIR is a congressionally appropriated agency.

### E.  **The Availability of Fee Waivers Does Not Mitigate the Impact of the Fee Increases.**

282.    Under the Final Rule, fee waivers will not be available for asylum seekers.

283.     In promulgating the provisions of the Final Rule that create new fees for asylum seekers, Defendants did not consider that fee waivers provide no protection for asylum seekers because they are not available to such individuals.

284.     The Final Rule does not provide a reasoned basis for creating new fees for asylum seekers where fee waivers provide no protection for such individuals because they are not available to such individuals.

285.     Even for respondents who are eligible for fee waivers, those respondents cannot rely on the availability of such fee waivers because the waivers are discretionary.  Moreover, there is no statutory or regulatory standard for adjudicating requests for fee waivers; denials of fee waivers are not clearly appealable; there is no ready way to predict whether fee waivers will be granted in many cases; it is time consuming to apply for such waivers; and in some circumstances it is risky to pursue fee waivers because a decision on the fee waiver request may not issue until after the underlying filings were due.

286.     In promulgating the Final Rule, Defendants did not consider that even for respondents who are eligible for fee waivers, those respondents cannot rely on the availability of such fee waivers because they are discretionary.  Moreover, there is no statutory standard for determining fee waiver applications; denial of fee waivers are not clearly appealable; there is no ready way to predict whether fee waivers will be granted in many cases; it is time consuming to apply for such waivers; and in some circumstances it is risky to pursue fee waivers because a decision may not issue until after the underlying papers were due or because the need for the fee waiver may be considered a negative factor when discretion is exercised in the adjudication of the underlying application.

287.     The Final Rule does not provide a reasoned basis for imposing fees where even for respondents who are eligible for fee waivers, those respondents cannot rely on the availability of such fee waivers because they are discretionary.  Moreover, there is no statutory standard for determining fee waiver applications; denial of fee waivers are not clearly appealable; there is no

ready way to predict whether fee waivers will be granted in many cases; it is time consuming to apply for such waivers; and in some circumstances it is risky to pursue fee waivers because a decision may not issue until after the underlying papers were due or because the need for the fee waiver may be considered a negative factor when discretion is exercised in the adjudication of the underlying application.

288.     The increased fees set forth in the Final Rule will generate an increased need for fee waivers, and impose a corresponding burden on Immigration Judges and the BIA to adjudicate fee waiver requests.

289.     In promulgating the Final Rule, Defendants did not consider that the increased fees will generate an increased need for fee waivers, and impose a corresponding burden on Immigration Judges and the BIA to adjudicate fee waiver requests.

290.     The Final Rule does not provide a reasoned basis for increasing fees in view of the increased need for fee waivers that will arise, and the corresponding burden on Immigration Judges and the BIA to adjudicate fee waiver requests.

**F.   The Subsequently Promulgated Rules Would Amplify the Harmful Impact of the Final Rule.**

291.     In promulgating the provisions of the Final Rule that add a new $50 "defensive" asylum application fee, Defendants did not consider the impact of that "defensive" asylum fee in view of their Asylum Rule, which became final on December 16, 2020 (*see* 85 Fed. Reg. 81,588 (Dec. 16, 2020)), and which requires that such fee be paid within 15 days of the first master calendar hearing for those in "asylum only" proceedings.

292.     The Final Rule does not provide a reasoned basis for instituting the new "defensive" asylum application fee in combination with a 15-day deadline to pay that fee and fails to account for or provide a reasoned basis for the refoulements that can result from the combined impact of these two Rules.

293.     Defendants did not consider comments regarding the new $50 "defensive" asylum application fee, asserting that most of the comments regarding that fee were "beyond the scope of this rulemaking."  85 Fed. Reg. at 82,767.

294.     The Final Rule stated:  "[B]ecause the Form I-589 is a DHS form, the DHS regulation setting the fee for that form determines the fee charged for it in EOIR immigration proceedings, and neither the NPRM nor the final rule purports to change that structure."  *Id*. n.31.

295.     Defendants' position that the provisions of the Final Rule requiring a $50 fee for defensive asylum applications does not establish a new fee is unreasonable because there has never been a fee charged for defensive asylum applications filed in Removal Proceedings.

296.     Defendants' position that the provisions of the Final Rule requiring a $50 fee for defensive asylum applications does not establish a new fee is also unreasonable in view of DHS's statement that "[w]hether the fee also will apply to a Form I-589 filed with EOIR is a matter within the jurisdiction of the Department of Justice (DOJ) rather than DHS."  85 Fed. Reg. 46,788 (Aug. 3, 2020).

297.     Despite Defendants' statement that the Final Rule does not establish a $50 fee for asylum applications, the Final Rule effectively adopts for EOIR proceedings the $50 asylum application fee instituted by DHS and USCIS under the authority of Chad Wolf and his deputy Ken Cuccinelli (Final Rule at 67-68), both of whom served in their positions in violation of the Federal Vacancies Reform Act and/or the Homeland Security Act.

298.     Defendants' Final Rule thus adopts and imposes a DHS fee that was itself unlawfully promulgated.  Defendants relied wholly on the unlawful promulgation by DHS of their $50 asylum application fee as the justification for imposing the new $50 "defensive" asylum application fee, without independent reasoning, analysis, or support for the institution of such a fee.

299.    The Final Subsequent Rules affect the impact of the Final Rule, including the circumstances in which individuals will be required to pay the fee increases, and thereby render obsolete and irrelevant any basis that the "comprehensive study" and other putative analysis by Defendants might have provided for the Final Rule, and further exacerbate the impact of the Final Rule.  In promulgating the Final Rule, Defendants  did not consider that if the Subsequent Proposed Rules issued in their proposed form, they would interrelate with Defendants' proposed fee increases, and thereby render obsolete and irrelevant any basis that the "comprehensive study" and other putative analysis by Defendants might have provided for the Final Rule, and further exacerbate the impact of the Final Rule.  The Final Rule does not provide a reasoned basis for increasing fees in view of the Subsequent Proposed Rules, which would render Defendants' reliance on the "comprehensive fee study" and other putative analysis obsolete and irrelevant, and would exacerbate the impact of the Final Rule.

## V.  **The Final Rule Will Irreparably Harm Plaintiffs**

300.    The Final Rule will cause immediate and irreparable harm to Plaintiffs CLINIC, CLSEPA, KIND, and CHIRLA and its members.  The steep fee increases would require the staff of CLINIC and its affiliates, and their pro bono partners, to spend significantly more time applying for fee waivers for their clients and litigating issues relating to such applications.

301.    This additional work would represent a significant new burden on CLINIC and its affiliates.

302.    In order to do this additional work, CLINIC and its affiliates would have less time to spend working on the merits aspect of specific Removal Proceedings, including the Applications, Motions, and Appeals filed in such cases.

303.    If the Final Rule goes into effect, because the staff and affiliates of Plaintiff CLINIC would need to spend increased time preparing and consulting on fee waiver applications for individuals in Removal Proceedings, they would have less time to spend on other aspects of CLINIC's core programs, including CLINIC's Defending Vulnerable Populations Program and

that Program's BIA Pro Bono Project, and CLINIC's Estamos Unidos  ("We Are United")
Program serving vulnerable asylum seekers who have been forced to remain in Mexico to await
their asylum hearings.

304.    The Final Rule would also negatively impact CLINIC's ability to place cases with
pro bono partners for several reasons.

305.    First, as a result of the Final Rule, any representation taken on by a pro bono
partner would include additional work beyond the work on the merits of the client's case—such
as preparing and filing applications for fee waivers and motions to accept late-filed notices of
appeal, and litigating fee waiver denials.  The additional work, which relates to fee waivers, is
much less attractive to potential pro bono partners than merits-related work.

306.    Second, in addition to diverting resources from merits-related work to fee waiver-
related work, CLINIC and its pro bono partners would also need to devote resources to seek
alternative (and limited) sources of funding for the increased filing fees.  Pro bono attorneys
working with CLINIC have sometimes covered the filing fees for clients when such fees were at
the relatively modest rates that have been in effect for the past 34 years, but such attorneys would
not do so as often under the new fee schedule.

307.    Finally, CLINIC currently leverages its expertise by working with pro bono
counsel, allowing CLINIC's staff to advise on a great many individual cases instead of directly
handling those cases in Immigration Court and before the BIA.  With fewer such cases handled
by pro bono partners, CLINIC will not be able to exploit its expertise as fully through this model,
reducing the number of overall cases on which it can advise and requiring its staff to take on a
greater number of individual cases for direct representation (and allocate staffing to do so).

308.    The Final Rule's fee increases would also significantly impact members of
Plaintiff CLINIC's affiliate network, whose staff will have to spend more time advising or
representing each individual who is or could be in Removal Proceedings.  Such additional time
would involve (i) helping clients obtain funding or resources to find the money to pay for the

Applications, Motions, or Appeals; (ii) helping respondents in Removal Proceedings determine whether making a fee waiver application is worth the risk, given the time required to prepare such applications and the possibility that the waiver will not be timely granted; and (iii) if a client decides to file a fee waiver application, helping the client prepare such application, including gathering the required supporting documentation.

309.    As a consequence of spending more time advising or representing each individual who is or could be in Removal Proceedings, many members of Plaintiff CLINIC's affiliate network could not handle as many cases as they currently do using the resources they currently have.  Because many such affiliates rely on grant funding that requires them to serve a specified number of clients or complete a specified number of cases, they may be unable to satisfy their grant funding obligations, and may therefore lose such grant funding.

310.    In order to spend the additional time required to prepare fee waiver applications, or to obtain funding to pay for the new fees, members of Plaintiff CLINIC's affiliate network would be forced to reallocate resources away from other projects, impacting their core missions. Because of the impact of the fee increases on CLINIC's affiliate network, including but not limited to those set forth in paragraphs 300–309 *supra*, many of CLINIC's affiliates would no longer be able to retain their membership as affiliates in the CLINIC network.  Accordingly, CLINIC's affiliate network would decrease in size, which will cause a corresponding decrease in the dues that CLINIC receives and relies on for its programs, thus diminishing the resources CLINIC has available for activities such as providing live training, consultancy, and training materials for affiliate staff. This would frustrate CLINIC's mission of providing low-cost legal services to indigent immigrants.  The Final Rule would also require CLINIC to update its training materials to reflect the consequences of the fee increases, including strategic considerations in making fee waiver requests, and the addition of a non-waivable defensive asylum fee.

311.    The Final Rule will also lead to a decrease in the number of individuals who will be able to afford even the lower non-profit rates that many CLINIC affiliates charge to clients to represent them in Removal Proceedings, because such individuals will be faced with the choice of paying higher filing fees or paying an attorney or other representative to represent them.  The loss of this revenue resulting from these challenges, combined with the loss of grant funding, would likely cause many affiliates to reduce the scope of the services that they provide to individuals in Removal Proceedings.

312.    Faced with a reduction in fees and membership, CLINIC would need to reduce the scope of programs that it provides, including programs associated with its core mission.

313.    Plaintiff CLSEPA will also face irreparable harm as the result of the Final Rule. CLSEPA has a large removal defense program that provides representation to hundreds of individuals facing removal in Immigration Courts and before the BIA.  A critical part of the funding for this work is on a "per case" basis, with the payments staged in a way that recognizes the significant staffing and resource demand at the screening and initial stages of a case, but requires a completion of a certain number of cases by the end of a given funding cycle.  This means that when cases take longer or require more staff hours, CLSEPA can promise fewer deliverables to funders and takes in less funding.

314.    With the Final Rule's fee increases, CLSEPA's staff would have to shift their work to applying for and litigating fee waiver applications, thus increasing the work required for each individual case.  This would cause a drop in the number of cases that CLSEPA can take on through completion, negatively impacting its funding.

315.    The Final Rule's fee increases would also directly harm CLSEPA's pro bono program, because fewer pro bono attorneys would be able to pay the filing fees for indigent clients and the additional fee waiver work would increase the burden on pro bono attorneys. CLSEPA would be unable to place clients' cases with its pro bono partners at the rate it has the

past, which would lead to even fewer individuals in Removal Proceedings gaining access to counsel.

316.    The increased need for work on fee waivers by CLSEPA staff and the decrease in pro bono case placement would frustrate CLSEPA's mission to provide transformative legal services that enable diverse communities in East Palo Alto and beyond to achieve a secure and thriving future.

317.    Plaintiff KIND will also face irreparable harm as the result of the Final Rule.  It is difficult, if not impossible, for KIND's clients in Removal Proceedings—children and young adults—to pay fees as high as those in the Final Rule.

318.    KIND frequently pays the Immigration Court and BIA fees for its clients in Removal Proceedings.  The Final Rule's steep fees would put such payments out of reach for KIND, necessitating more fee waiver work.

319.    The increased need for fee waivers would have a significant impact on KIND's program and practice due to the volume of Applications, Motions, and Appeals the organization files on behalf of its clients.

320.    The increased need for fee waivers would divert attorney and paralegal resources away from KIND's core programmatic work, which includes preparing and filing applications and motions before USCIS and in Immigration Courts on behalf of unaccompanied immigrant children, including applications for asylum and Special Immigrant Juvenile Status.

321.    KIND would need to divert resources to prepare training materials and provide technical assistance to staff and pro bono partners on the consequences of the fee increases that would be imposed by the Final Rule and best practices for fee waiver applications, including strategic considerations about whether to file such applications.

322.    The organization would also need to divert resources to fundraising efforts in order to pay the fees for some subset of its clients' Immigration Court and BIA Motions and Appeals.

323. Because of this diversion of resources, if the Final Rule goes into effect, KIND would see an immediate impact on its programming.

324. As a consequence of spending more time advising or representing each young person who is or could be in Removal Proceedings, KIND's staff could not handle as many clients as they currently do using the resources they currently have.

325. The fee increases would also affect KIND's ability to refer clients to its pro bono partners, which is a cornerstone of its representation model. KIND places the majority of its cases with pro bono attorneys.

326. KIND's pro bono attorneys often pay the filing fees for BIA Appeals or Immigration Court Motions and Applications because it would be more cost-effective than spending the time to prepare a fee waiver application under the current fee structure. But they would be far less likely to pay the significantly increased fees imposed by the Final Rule, requiring pro bono attorneys to need to file more fee waiver applications.

327. Given the increased need for fee waivers, pro bono attorneys would need to expend more time on their clients' cases and, in some cases, to file motions to accept late-filed briefs if the fee waiver is denied. This additional work would likely result in pro bono attorneys taking fewer cases from KIND.

328. A reduction in the number of clients that its pro bono attorneys could represent would have an immediate harmful impact on KIND's programming, given that the organization places most of its cases with pro bono attorneys.

329. To the extent that higher EOIR fees and a larger number of fee waiver applications absorb attorney time and other resources, and diminish KIND's ability to place cases with pro bono attorneys, KIND would likely be able to serve fewer children at its present funding level.

330. CHIRLA's members would be immediately harmed by the Final Rule, as would CHIRLA as an organization.

52

331.    Many of CHIRLA's members are in Removal Proceedings or are likely to be placed in Removal Proceedings.

332.    CHIRLA has members with a foreseeable need to file applications for asylum, members with a foreseeable need to file applications for cancellation of removal, members with a foreseeable need to file motions to reopen, members who have a foreseeable need to file motions to reopen before the Immigration Court or the BIA, and members who have a foreseeable need to file appeals to the BIA after the Final Rule takes effect.

333.    CHIRLA's members are predominantly low-income with extremely limited financial resources.

334.    Relatively few of CHIRLA's members would be able to afford the Immigration Court and BIA fees under the Final Rule.

335.    A fee waiver will not be available for the asylum fees that CHIRLA's members would face.

336.    For fees that may be waivable, CHIRLA's members in some cases would not be able to pursue fee waivers without risk of compromising their claims, and in nearly all cases, would not be assured that their respective fee waiver requests will be granted.

337.    CHIRLA does not have sufficient funds to cover fees for all members who would be subjected to the Final Rule's fees in Removal Proceedings.

338.    CHIRLA has members who have defenses to removal but who will not have the ability to pay the Final Rule's fee for pursuing a BIA appeal.

339.    CHIRLA has members who would file motions to reopen in Immigration Court or before the BIA but who will not have the ability to pay the Final Rule's fee for filing  motions to reopen.

340.    CHIRLA has members who would file asylum claims but who will not have the ability to pay the Final Rule's fee for filing defensive asylum applications in Removal Proceedings.

341.    CHIRLA has members who would file cancellation of removal claims but who will not have the ability to pay the Final Rule's fee for filing defensive cancellation applications.

342.    CHIRLA has members who would file suspension of deportation claims but who will not have the ability to pay the Final Rule's fee for filing their suspension of deportation applications.

343.    CHIRLA members at risk of not receiving a fee waiver for an Application, Motion, or Appeal will suffer immediate, irreparable harm.

344.    Many CHIRLA members will not be able to wait to make their filing for an Application, Motion, or Appeal in the hope that a fee waiver will be available to them and will have to begin to sacrifice other critical needs in order save money to be prepared for the possibility of a fee waiver denial or other inability to secure a fee waiver.

345.    CHIRLA members who are unable to file the above-mention Applications, Motions, or Appeals will be removed from the United States, causing harm to themselves and their families.

346.    CHIRLA members who are unable to pursue Applications, Motions, or Appeals due to the increased fees and lack of a reliable, predictable fee waiver process will in many instances be removed from the United States based on errors and without having had access to procedures, safeguards and review that are critical to due process.

347.    CHIRLA members who lack the financial resources to pay the increased fees implemented by the Final Rule will be limited in their access to defenses to removal, access to asylum, access to relief, access to BIA review, access to reopening and reconsideration, and ultimately access to federal court review of agency action.

348.    CHIRLA members will be irreparably harmed by the limited availability and inadequacies of Immigration Court and BIA fee waiver processes as set forth in paragraphs 102–118 *supra*.

349.    CHIRLA members who submit a fee waiver application will be harmed if their fee waiver application is denied and their Application, Motion, or Appeal is rejected because of failure to pay the fee required by the Final Rule. Such rejection, and failure to accept an untimely Application, Motion, or Appeal may result in the harm of removal.

350.    CHIRLA members who apply for asylum once the Final Rule is in effect will be harmed because the fee for asylum cannot be waived, forcing them to pay the fee or forego their asylum claim.  Failing to file for asylum presents a significant risk for such members that they will be returned to persecution or death in their home country.

351.    CHIRLA has members who will file for asylum as a family, and each family member must pay the non-waivable asylum fee.  Multiple asylum fees will cause harm to low-income families who will have to choose between paying their asylum fees and basic necessities.

352.    CHIRLA members who pay the EOIR fees rather than submitting a fee waiver request, despite being indigent, will likely sacrifice other essential expenditures, causing harm to themselves and their families.

353.    The financial harms to CHIRLA members are particularly acute due to the impact of COVID-19 on low-income individuals and families who comprise CHIRLA's membership.

354.    CHIRLA will also be harmed as an organization if the Final Rule goes into effect. CHIRLA's mission is to ensure that immigrant communities are fully integrated into our society with full rights and access to resources.

355.    The Final Rule frustrates CHIRLA's purpose and directly harms the organization.

356.    CHIRLA will experience a reduction in membership and/or membership fees as a result of those members who are removed from the United States or who cannot afford membership in the face of the asylum fees, or the increased fees required for Applications, Motions, and Appeals in connection with their EOIR proceedings.

357.    CHIRLA will suffer further harm in its own right due to the Final Rule.

358.    CHIRLA will need to undertake additional, time consuming fee waiver work, divert resources to raise funds for clients and members to cover fees, and suffer a drain on the organization's resources.

359.    The Final Rule will require CHIRLA to spend more time on cases and will reduce the organization's capacity to accept new cases.

360.    CHIRLA will lose funding that is on a "per case basis" where it cannot satisfy previously determined deliverables.

361.    CHIRLA will suffer irreparable harm to its reputation among members, with funders, and in the larger community.

### CLAIMS FOR RELIEF

### COUNT ONE

**The Final Rule Should Be Vacated
Because It Is Arbitrary, Capricious, an Abuse of Discretion,
and Not in Accordance with Law**

362.    Plaintiffs repeat and reallege the allegations in paragraphs 1 to 361 as though fully set forth herein.

363.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."  5 U.S.C. § 706(2).

364.    An agency action, including a final rule, should be vacated if the promulgating agency failed to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (citation omitted).

365.    When an agency substantially alters its position, it must "supply a reasoned analysis for the change," *State Farm*, 463 U.S. at 42, and may not "depart from a prior policy sub silentio or simply disregard rules that are still on the books."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

366.    As set forth above, Defendants failed to consider numerous relevant factors in promulgating the Final Rule.

367.    As set forth above, the Final Rule fails to provide a reasoned basis for the fee increases in view of any stated goals for the Final Rule.

368.    As set forth above, the Final Rule fails to provide a reasoned basis for the changes implemented by the Final Rule in view of numerous relevant factors, including but not limited to costs and harms on respondents, Plaintiffs, and others.

369.    In promulgating the Final Rule, Defendants offer no justification or rationale for departing from longstanding agency policy and practice regarding fees for Applications, Motions, and Appeals.

370.    The Final Rule is arbitrary, capricious, and contrary to law.

371.    The Final Rule will cause ongoing and irreparable harm to Plaintiffs.

### COUNT TWO

**The Final Rule Should Be Set Aside
Because The Thirty-Day Comment Period During a Global Pandemic
Violated the APA's Notice and Comment Requirements**

372.    Plaintiffs repeat and reallege the allegations in paragraphs 1 to 361 as though fully set forth herein.

373.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (D) without observance of procedure required by law."  5 U.S.C. § 706(2).

374.    The APA, 5 U.S.C. § 553(b), provides that "[g]eneral notice of proposed rule making shall be published in the Federal Register."  After giving the required notice, "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."  5 U.S.C. § 553(c).  The "opportunity for comment must be a meaningful opportunity."  *Gerber v. Norton*, 294 F.3d 173, 179 (D.C. Cir. 2002).

375.     Although comment periods can vary, "a sixty-day period" is generally accepted as the "reasonable *minimum* time for comment" on a typical rule." *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984) (quoting Administrative Conference of the United States, A Guide to Federal Agency Rulemaking 124 (1983)); Executive Order 12866 (Sept. 30, 1993) (stating that agencies should allow "not less than 60 days" for public comment in most cases, in order to "afford the public a meaningful opportunity to comment on any proposed regulation"); Executive Order 13563 (Jan. 18, 2011) (stating that "[t]o the extent feasible and permitted by law, each agency shall afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that should generally be at least 60 days").

376.     Defendants violated the foregoing requirements of the APA by allowing the public only 30 days to comment on their proposed fees following publication of their NPRM— and doing so in the early days of an unprecedented global COVID-19 pandemic and after two requests from stakeholders to extend the comment period.

377.     Each of the foregoing violations is an independent and sufficient reason that the Final Rule was promulgated "without observance of procedure required by law," or was otherwise promulgated in violation of the APA, and thus should be vacated.

### COUNT THREE

**The Final Rule Should Be Set Aside
Because The Rulemaking Process Violated
Violated the APA**

378.     Plaintiffs repeat and reallege the allegations in paragraphs 1 to 361 as though fully set forth herein.

379.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (D) without observance of procedure required by law." 5 U.S.C. § 706(2).

380.     The APA, 5 U.S.C. § 553(b), provides that "[g]eneral notice of proposed rule making shall be published in the Federal Register."  After giving the required notice, "the agency

shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c). The "opportunity for comment must be a meaningful opportunity." *Gerber v. Norton*, 294 F.3d 173, 179 (D.C. Cir. 2002).

381.    Notice of a proposed rule must include sufficient detail on its content and basis in law and evidence to allow for meaningful and informed comment.

382.    The APA requires an agency to make available to the public, in a form that allows for meaningful comment, the data the agency used to develop the proposed rule. *See* 5 U.S.C. § 553(b) (agency must give notice of proposed rulemaking); *Conn. Light and Power Co. v. NRC*, 673 F.2d 525, 530–31 (D.C. Cir. 1982) (notice includes available data and studies in intelligible form so that public sees "accurate picture of reasoning" used by agency to develop proposed rule).

383.    Defendants violated the foregoing requirements of the APA in numerous distinct ways, including but not limited to failing and refusing to offer an adequate justification of need for their proposed rulemaking, failing and refusing to indicate for what purpose or purposes additional fees would be used, including misleading statements that masked the introduction of new fees, failing and refusing to provide information regarding the methodology of the EOIR "comprehensive study" on which the NPRM purportedly relied, and failing and refusing to disclose the data and calculations of such study.

384.    Defendants also violated the foregoing requirements of the APA by closing the comment period on the Proposed Fee Rule before the public had notice of the Subsequent Proposed Rules, depriving Plaintiffs and the larger public of the opportunity to understand and comment on the full extent and import that the fee increases set forth in the Proposed Fee Rule would have if such increases were promulgated.

385.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (D) without observance of procedure required by law." 5 U.S.C. § 706(2).

386.    Defendants violated the foregoing requirement of the APA by closing the comment period on the Proposed Fee Rule before the public had notice of the Subsequent Proposed Rules, abusing their discretion in promulgating multiple interconnected rules without notice to the public.

387.    Each of the foregoing violations is an independent and sufficient reason that the Final Rule was promulgated "without observance of procedure required by law," or was otherwise promulgated in violation of the APA, and thus should be vacated.

## COUNT FOUR

### The Final Rule Should Be Set Aside Because
### It Was Promulgated In Violation of Regulatory Flexibility Act

388.    Plaintiffs repeat and reallege the allegations in paragraphs 1 to 361 as though fully set forth herein.

389.    The RFA, as amended, requires federal administrative agencies to analyze how rules they promulgate will affect "small entities," and to publish initial and final versions of those analyses.  5 U.S.C. §§ 603-04.

390.    Plaintiffs CLINIC, CLSEPA, and CHIRLA each are small entities within the meaning of the RFA.  CLINIC, CLSEPA, and CHIRLA each would be directly impacted if the Final Rule goes into effect.  The impact of the Final Rule on each Plaintiff would include reduced funding and the need to divert resources from core activities, which would significantly inhibit the abilities of CLINIC, CLSEPA, and CHIRLA to accept new cases, manage their existing workload, and obtain funding.

391.    Under the RFA, the Court may set aside, stay, or grant other relief with respect to a rule that an agency enacts in violation of Sections 601, 604, 605(b), 607, 608(b), 609(a), and 610 of the RFA.  5 U.S.C. § 611.

392.    The Final Rule is a "rule" within the meaning of the RFA.  5 U.S.C. § 601(2).

393.    The Final Rule is a rule that affects small entities, within the meaning of the RFA.

394.    In promulgating the Final Rule, Defendants did not analyze, or adequately analyze, how the Final Rule would affect small entities, including but not limited to (i) small law firms that provide advice and other services to respondents in Removal Proceedings, (ii) small non-profit organizations that provide legal services to respondents in Removal Proceedings, or (iii) small non-profit organizations that provide advice and other services to attorneys and organizations that provide legal services to respondents in Removal Proceedings, many such organizations and firms of which are "small entit[ies]" as defined by the RFA, 5 U.S.C. § 601(6).

395.    In promulgating the Final Rule, Defendants did not publish, or adequately publish, an initial and final version of such analysis.

396.    Instead, Defendants simply stated, erroneously, that the Final Rule "would not have a significant economic impact on a substantial number of small entities," because the Final Rule would only regulate "individuals" and would "not limit in any way the ability of practitioners to accept cases, manage dockets, or assess fees."  85 Fed. Reg. 82,785 (Dec. 18, 2020).

397.    The RFA requires agencies to describe and estimate the number of small entities that would be affected by a rule that they promulgate.  5 U.S.C. § 604(a)(4).

398.    The Final Rule does not adequately describe or estimate the number of small entities that it would affect.

399.    The RFA requires agencies enacting a rule that affects small entities to describe "the projected reporting, recordkeeping and other compliance requirements of the rule, including

an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record." 5 U.S.C. § 604(a)(5).

400.    The Final Rule does not describe the projected reporting, recordkeeping, or other compliance requirements of the Final Rule, or estimate the classes of small entities that will be subject to the requirement and the type of professional skills that would be necessary for preparation of such report or record.

401.    The RFA requires agencies promulgating a rule that affects small entities to describe "the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected." 5 U.S.C. § 604(a)(6).

402.    In promulgating the Final Rule, Defendants did not comply with their obligations under the RFA to describe steps taken to minimize the significant economic impact on small entities, or state the factual, policy, and legal reasons for selecting the alternative adopted in the Final Rule, or state why each other significant alternatives to the Final Rule considered by the Defendants was rejected.

403.    By virtue of the foregoing, promulgation of the Final Rule violates multiple requirements of the RFA, any of which requires that the Final Rule be set aside and its effect be stayed pursuant to the RFA.

404.    Because the APA requires that rules be set aside if they are not promulgated "in accordance with the law," and Defendants promulgated the Final Rule in violation of the RFA in multiple respects, the Final Rule should also be set aside pursuant to the APA.

405.    The Final Rule should be set aside under 5 U.S.C. § 706 for the additional reason that it does not reflect reasoned decision-making with respect to the impact of the Final Rule on

small entities, and fails to consider available data about the effects of the Final Rule on small entities, and fails to support its conclusions regarding such effects with substantial evidence.

**COUNT FIVE**

**The Final Rule Violates the Due Process Clause of the Fifth Amendment**

406.    Plaintiffs repeat and reallege the allegations in paragraphs 1 to 361 as though fully set forth herein.

407.    The Due Process Clause of the Fifth Amendment to the United States Constitution ("Due Process Clause") "applies to all 'persons' within the United States, including [non-citizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

408.    The government may not deprive an individual of a protected liberty or property interest "without process that is due under the Fifth Amendment." *See NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015) (internal quotations omitted).  Procedural Due Process "protect[s] a substantive interest to which the individual has a legitimate claim of entitlement." *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983).  The Supreme Court has frequently recognized the "grave nature of deportation," calling it a "drastic measure" resulting in "banishment or exile." *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948), *quoted in Sessions v. Dimaya,* 138 S. Ct. 1204, 1212–13 (2018) (plurality opinion).

409.    Individuals in Removal Proceedings have a liberty and property interest in pursuing statutorily prescribed avenues for relief, including, *inter alia*, asylum pursuant to 8 U.S.C. § 1158(a), and cancellation of removal and adjustment of status, 8 U.S.C. § 1229b.

410.    Respondents in Removal Proceedings have a liberty and property interest in the procedural protections afforded by the immigration laws and regulations, including, *inter alia*, the right to file an appeal before the BIA and the right to file a motion to reopen in Immigration Court and before the BIA, 8 U.S.C. § 1229a(c)(7).

411.    The Final Rule violates the Due Process Clause because it erects an arbitrary fee schedule that denies individuals in Removal Proceedings their rights to pursue Applications, Motions, and Appeals.

412.    The Final Rule violates the Due Process Clause because it denies asylum seekers their statutory right to file defensive asylum applications in Removal Proceedings without paying a nonwaivable fee, regardless of income.

413.    The Final Rule violates the Due Process Clause because individuals in Removal Proceedings will be unable to pursue relief from removal because waiver from the fees set by the Final Rule are determined without statutory or regulatory standards, and the outcome of the process cannot be predicted.

414.    The Final Rule violates the Due Process Clause because individuals will be removed from the United States based on errors in Removal Proceedings without having had access to procedures, safeguards, and review such errors because of the fees set forth in the Final Rule.

415.    The Final Rule violates the Due Process Clause because individuals who have received a collateral immigration benefit will not be able to move to reopen their Immigration Court or BIA cases because of the fees set forth in the Final Rule.

416.    Each of the foregoing violations is an independent and sufficient reason that the Final Rule violates the Due Process Clause.

## COUNT SIX

### The Final Rule Should Be Set Aside Because
### It Was Promulgated In Violation of the Equal Protection Clause of the
### Fifth Amendment to the United States Constitution

417.    Plaintiffs repeat and reallege the allegations in paragraphs 1 to 361 as though fully set forth herein.

418.    The Equal Protection Clause of the Fifth Amendment to the United States Constitution ("Equal Protection Clause") requires that persons have equal access to administrative and judicial processes of adjudication and review.

419.    Under the Equal Protection Clause, where liberty interests are at stake, as in Removal Proceedings, indigency cannot be a basis for the denial of access to administrative and judicial protections, remedies, procedures, and review.

420.    Defendants' Final Rule establishes a fee regime for Removal Proceedings, including Applications, Motions, and Appeals, that conditions access to justice and to due process, as well as Congressionally authorized protection from removal and refoulement and access to Federal Court review, on ability to pay, in violation of the Equal Protection Clause.

421.    Defendants' fee waiver system—one without standards, transparency, or oversight, and one that depends entirely on the exercise of unbridled discretion—exacerbates and does not cure the Constitutional deficiency of the Final Rule.

422.    Defendants' violation of the Equal Protection Clause through the Final Rule is knowing, intentional, and purposeful.

423.    Defendants' Final Rule violates the right to equal protection of members of CHIRLA and others without ability to pay for the Applications, Motions, and Appeals that are the subject of the Final Rule.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1. With respect to Counts 1–4, issue a preliminary injunction under Federal Rule of Civil Procedure 65 or an order to stay or postpone the effective dates of the Final Rule, including the fee changes set forth in such Final Rule, under 5 U.S.C. § 705 pending the Court's final adjudication of the claims herein;

2. Declare unlawful and set aside the Final Rule in its entirety, or in the alternative with respect to specific fee changes encompassed thereby;

3.  Enjoin Defendants and all those acting in active concert with them from enforcing or implementing the Final Rule in its entirety, or in the alternative with respect to specific rule changes;

4.  Enter an order vacating the Final Rule in its entirety, or in the alternative with respect to specific fee changes set forth therein;

5.  Award Plaintiffs' counsel attorneys' fees and costs pursuant to 28 U.S.C. § 2412, and any other applicable statute or regulation; and

6.  Award such other and further relief in favor of Plaintiffs and against Defendants that the Court may deem just, equitable, and proper.

Dated: December 23, 2020          Respectfully submitted,


By:   */s/ Vladimir J. Semendyai*
      Vladimir J. Semendyai

      Richard W. Mark
          *(admission pending)*
      Joseph Evall
          *(admission pending)*
      Katherine Marquart (D.C. Bar No. 1044618)
      Julianne L. Duran (*pro hac vice forthcoming*)
      Laura C. Mumm (D.C. Bar No. 1032245)
          *(admission pending)*
      Alexandra Perloff-Giles (*pro hac vice forthcoming*)
      GIBSON, DUNN & CRUTCHER LLP
      200 Park Avenue
      New York, NY 10166-0193
      Tel: (212) 351-4000
      Fax: (212) 351-4035
      rmark@gibsondunn.com
      jevall@gibsondunn.com
      kmarquart@gibsondunn.com
      jduran@gibsondunn.com
      lmumm@gibsondunn.com
      aperloff-giles@gibsondunn.com

Vladimir J. Semendyai (D.C. Bar No. 1044217)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel: (202) 955-8500
Fax: (202) 467-0539
vsemendyai@gibsondunn.com

Anthony Moreno (*pro hac vice forthcoming*)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
Suite 3000
San Francisco, CA 94105-0921
Tel: (415) 393-8200
Fax: (415) 393-8306
amoreno@gibsondunn.com

Robin Goldfaden (*pro hac vice forthcoming*)
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Blvd., #108-62
Los Angeles, CA 90010
Tel: (213) 639-3900
Fax: (213) 639-3911
goldfaden@nilc.org

Michelle Lapointe (*pro hac vice forthcoming*)
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 247
Decatur, GA 30031
Tel: (213) 279-2508
Fax: (213) 639-3911
lapointe@nilc.org

Katherine Melloy Goettel (*pro hac vice forthcoming*)
Emma Winger (*pro hac vice forthcoming*)
AMERICAN IMMIGRATION COUNCIL
1331 G Street NW, Suite 200
Washington, DC 20005
Tel: (202) 507-7512
Fax: (202) 742-5619
kgoettel@immcouncil.org
kmacleod-ball@immcouncil.org
ewinger@immcouncil.org

*Counsel for Plaintiffs*