**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CATHOLIC LEGAL IMMIGRATION NETWORK, INC., *et al.*,<br><br>                            Plaintiffs,<br><br>        v.<br><br>EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, *et al.*,<br>                            Defendants. | Case No. 20-cv-03812-APM |

**DECLARATION OF JEHAN LANER ROMERO IN SUPPORT OF PLAINTIFFS'
MOTION FOR A STAY OF EFFECTIVE DATES UNDER 5 U.S.C. § 705
OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION**

I, Jehan Laner Romero, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1. The facts contained in this declaration are known personally to me and, if called as a witness, I could and would testify competently thereto under oath.

2. I serve as an Immigration Attorney and Director of Advocacy at Pangea Legal Services ("Pangea"), where I conduct intake consultations and represent individuals facing removal proceedings, in addition to coordinating Pangea's appellate and federal litigation efforts. I have worked at Pangea since 2017.

3. Pangea is a 501(c)(3) non-profit corporation, with its main office in San Francisco, CA, and an office in San Jose, CA. We have fifteen full-time staff members, including twelve immigration attorneys.

4. Pangea's mission is to stand with immigrant communities and to provide services through direct legal representation, especially in the area of deportation defense. In addition to direct legal services, Pangea is committed to advocating on behalf of the community it serves through policy advocacy, education, and legal empowerment efforts. Pangea's efforts focus primarily on Northern California's Bay Area; however, in some instances, Pangea has also collaborated with other immigration services organizations across the nation.

5. Pangea was founded to help address the critical need for the representation of detained and non-detained individuals in the San Francisco immigration court system. That need arises from a number of factors, including (but not limited to) the complexity of immigration law and the grave negative consequences that may result from deportation.

6. Pangea provides a number of immigration legal services to its clients, including: conducting intake consultations and referrals for noncitizens who need attorneys; representing noncitizens in removal proceedings before the Executive Office for Immigration Review ("EOIR") in the immigration courts and at the Board of Immigration Appeals ("BIA"); providing on-call, same-day legal assistance to noncitizens who are arrested by U.S. Immigration and Customs

Enforcement ("ICE") in the Bay Area; representing noncitizens completing affirmative asylum applications and other applications for relief; representing noncitizens in federal litigation, including in habeas corpus petitions and appeals; and, recently, representing individuals in post-conviction relief petitions in state criminal court.

7. Pangea provides direct legal services to over 400 clients annually. Approximately 87% of our clients are in removal proceedings. On behalf of these clients, we pursue all available relief or protection from removal in immigration court, including asylum, cancellation of removal for lawful permanent residents and non-permanent residents, and termination of proceedings. At present, approximately 250 of Pangea's clients have asylum applications pending in immigration court and seventeen have pending applications for cancellation of removal. In addition, we represent individuals on appeal to the BIA and in motions to reopen and reconsider in immigration court and at the BIA.

8. We are able to provide free legal services for most of our clients through state funding and local grants for indigent legal services. However, about twenty percent of our clients pay for removal defense legal services, typically because they do not qualify for grant funding due to geographic limitations or certain limits on state funding. For those that pay, we charge well below market rates and our clients typically make payments in $100 monthly installments. The vast majority of our clients are indigent.

9. Grant funding does not cover the cost of EOIR filing fees.

10. The Rule challenged in this case, *EOIR; Fee Review*, 85 Fed. Reg. 82750 (Dec. 18, 2020) ("Rule"), would harm Pangea and Pangea's clients in multiple ways, including by frustrating Pangea's mission to serve as many immigrants in removal proceedings as possible.

11. As discussed below, if the Rule goes into effect, many more Pangea's clients will be unable to afford the EOIR filing fees. As a result, the Rule will significantly impact our clients' ability to pursue available relief, appeals, and motions. For Pangea clients who do not qualify for our free legal services, the Rule will interfere with their access to counsel.

12. Many of Pangea's asylum clients would not be able to afford the new $50 filing fee for asylum applications. Pangea's asylum clients are typically newer arrivals who do not yet have work authorization and therefore have no income. It will be even more difficult for individuals to pay this fee in light of another new rule that would require asylum seekers to submit their asylum applications within 15 days of their first immigration court appearance. *See EOIR; Procedures for Asylum and Withholding*, 85 Fed. Reg. 81698 (Dec. 16, 2020). Because the $50 asylum fee cannot be waived, many Pangea clients who are otherwise eligible for asylum would be unable to apply for asylum.

13. Currently, most of Pangea's cancellation of removal clients were able to afford the $100 filing fee because they have more financial resources than our asylum clients. However, most of these clients will be unable to afford the new filing fees for cancellation of removal, which triple the cost of applications for cancellation of removal. As discussed, Pangea's clients are indigent and already struggle to pay monthly bills that are less than $300.

14. Presently, Pangea will sometimes advance EOIR filing fees for clients who cannot afford those filing fees, but who have pressing filing deadlines such that it is too risky to submit a fee waiver request which may be denied and the filing rejected. Given the volume of our asylum clients, Pangea would be unable to advance the $50 filing fee for asylum applications. Pangea would be unable to advance the much higher filing fees for cancellation of removal and appeals and motions to the BIA.

15. As a result, to the extent they are eligible, more Pangea clients will be forced to submit fee waiver requests. However, there is no standard for fee waiver requests, which makes it difficult for Pangea attorneys to effectively advocate on behalf of clients seeking fee waivers. In addition, EOIR will reject applications, motions, and appeals that are filed without a filing fee if the fee waiver request is denied. Therefore, when a Pangea client has an approaching filing deadline or a short filing deadline, such as the thirty-day deadline for an appeal, filing a fee waiver request risks resulting in a rejected and untimely filing.

16. Moreover, the BIA has denied well-supported fee waiver requests submitted by

Pangea attorneys on behalf of indigent clients unable to afford EOIR filing fees.

17. In one case, Pangea filed an appeal to the BIA along with a fee waiver for a single mother earning minimum wage, with no child support. Her monthly expenses were approximately $3,120, which was higher than her $2,200 monthly income. However, the BIA rejected her fee waiver. She was forced to use money intended for important childcare expenses to cover the $110 filing fee.

18. In another case, the BIA rejected a fee waiver for a Pangea client seeking to file a notice of appeal who was recently released from detention. His income was $2,600 a month, and his monthly expenses totaled $2,004. The rejection notice stated that he had fifteen days to resubmit payment for the BIA's consideration, however this did not extend the BIA's filing deadline, so the BIA could still reject his filing as untimely. This client did not receive this notice until the fifteenth day. He was forced to borrow money from multiple friends in order to pay the $110 filing fee along with his late-filed appeal which, fortunately, was accepted.

19. In a similar case, another client had $1,680 in monthly income and $1,600 in monthly expenses. The BIA rejected her fee waiver request submitted along with her notice of appeal. We received notice of the rejection after the thirty-day deadline for appeal. Pangea advanced her filing fees and moved the BIA to certify her appeal with the new filing fee.

20. Because of the deficiencies in the fee waiver process, some Pangea clients who do not qualify for our free legal services may forgo paying for Pangea's low-cost legal services in order to be able to pay necessary filing fees. Pangea clients seeking to appeal or to file motions with the BIA are especially likely to forgo legal services in order to be able to pay the new filing fees, where the fees are especially high and the risk of filing a fee waiver and have a filing rejected is also high.

21. As described below, if the Rule goes into effect it would also significantly impact Pangea's mission and funding, including by reducing the number of applications Pangea can file and the number of clients Pangea is able to represent. In 2020, sixty-five percent of the organization's funding was tied to grants requiring some form of deliverables (e.g., a specific

number of asylum applications filed or clients represented).

22. Pangea risks losing funding from clients who can no longer pay for legal services because they need to pay high filing fees, which in turn would threaten our ability to satisfy our mission. Pangea generates approximately four percent of its income through the low-cost services it provides to individuals in removal proceedings who are not eligible for government or foundational grants, which amounts to half of one staff member's gross salary.

23. Pangea's mission and funding will also be threatened because Pangea staff will have to spend more time preparing fee waiver requests, diverting resources from other work and other clients. The time Pangea staff spends on a fee waiver depends on the complexity of a client's financial circumstances and ability to document income and expenses. Pangea clients who live in multifamily households often struggle to identify who pays for what expenses, further complicating fee waiver requests. Because our clients are indigent, they typically do not have the privilege of maintaining a stable monthly budget, and so Pangea attorneys must review available records to get an average of monthly expenses. Because the Rule would increase the number of fee waiver requests Pangea staff would be required to prepare and submit, Pangea staff would have less time to prepare other applications and represent new clients, which in turn would impact Pangea's funding.

24. Finally, Pangea's mission and funding would be threatened because many Pangea clients will be unable to afford to apply for available forms of relief, either because the fee cannot be waived, as with asylum applicants, or because fee waivers are denied. Therefore, Pangea would submit fewer asylum applications and other forms of relief on behalf of clients. Pangea's asylum practice would be especially hard-hit. This would significantly impact Pangea's funding—if we cannot serve the number of clients required by our grant funding, we would have to reduce staffing. And most importantly, it would dramatically undermine Pangea's mission.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed at Berkeley, California on December  23 , 2020.

										_____
										Jehan Laner Romero