**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CATHOLIC LEGAL IMMIGRATION NETWORK, INC., *et al.*,<br><br>                        Plaintiffs,<br><br>        *v.*<br><br>EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, *et al.*,<br>                        Defendants. | Case No. 20-cv-03812-APM |

**DECLARATION OF CRISTINA DOS SANTOS IN SUPPORT OF PLAINTIFFS' MOTION FOR A STAY OF EFFECTIVE DATES UNDER 5 U.S.C. § 705 OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION**

## DECLARATION OF CRISTINA DOS SANTOS

Pursuant to 28 U.S.C. § 1746, I, Cristina dos Santos, hereby declare under the penalty of perjury as follows:

1. I am over the age of 18, have personal knowledge of the facts set forth herein, and if called as a witness, could and would testify competently as set forth below.

2. I am an attorney, licensed to practice in the State of California and the State of New York. I presently am the Director of the Immigration Program at Community Legal Services in East Palo Alto (CLSEPA). I joined CLSEPA in 2015 and became the Immigration Program Director in May 2020.

3. CLSEPA is a nonprofit legal services provider headquartered in East Palo Alto, California. CLSEPA's mission is to provide transformative legal services that enable diverse communities in East Palo Alto, California, and across the region to achieve a secure and thriving future. Our team, which includes attorneys, paralegals, a social worker, and others, works side-by-side with clients, members of the surrounding community, and local community-based organizations, churches, and schools to bring about lasting change. We strive to achieve CLSEPA's mission using multiple innovative strategies, including community education, individual legal advice and representation, legal assistance to community groups, policy advocacy, and impact litigation. CLSEPA carries out this mission with a budget of approximately $5.3 million and approximately 41 staff members, including administrators and program staff spread across CLSEPA's three main areas of programmatic focus – immigration, housing, and economic advancement.

4. The program I direct, CLSEPA's immigration program, has a full-time staff of sixteen (16), including nine (9) attorneys, one (1) closely supervised legal fellow with pending bar

results, four (4) paralegals, one (1) DOJ-accredited representative, and one (1) social worker. We also have one (1) part-time attorney in the role of Senior Counsel.  Together, we provide legal and social services and engage in advocacy focused on helping low-income immigrant survivors of domestic violence and other crimes, refugees and asylum seekers, immigrant youth and young adults, and immigrants facing deportation in court.  Our work includes direct representation, provision of *pro se* services, training and resources to support community members in navigating the legal system and exercising their rights, and advocacy and collaboration with community partners to bring about fair and inclusive treatment of immigrants and their families.  CLSEPA also has a robust pro bono program through which it places low-income clients for representation and trains and mentors volunteer attorneys to represent those clients before the Immigration Court, the Board of Immigration Appeals (BIA), and U.S. Citizenship and Immigration Services (USCIS).

5. CLSEPA has a large removal defense practice for a program of its size.  CLSEPA's removal defense program provides representation to hundreds of individuals facing the risk of removal in proceedings before the Immigration Courts and the BIA.

6. A critical part of the funding for this work is on a "per case" basis.  This means that when cases take longer or require more staff hours, we can promise fewer deliverables to funders and we take in less funding.

7. A drop in funding can occur fairly quickly.  For at least one of our contracts, the funder authorizes payment of a set amount of funding for each new client whose case we promise to accept for representation.  We receive a percentage of the "per case" funding at the start of the grant period, an additional percentage in the middle, and the remainder when each case is completed.  The staging of the payments recognizes that each case needs a certain level of

staffing at the outset and that significant work is needed for case screening and acceptance and in the early stages of representation.  However, if, by the end of a given funding cycle, we have not been able to take on the number of new cases promised, we do not receive the balance of the funds and also must return the funds provided to that point for those cases.

8. CLSEPA also receives grants from foundations to support our removal defense program.  If CLSEPA were to be unable to meet the "deliverables" that it promises to funders when grants are awarded, the organization would be at serious risk of being granted less funding in the next funding cycle.  CLSEPA would also suffer harm to its reputation in the grant-making community. As we would become less able to meet community needs, we would suffer reputational harm in the larger surrounding community as well.

9. When we at CLSEPA learned of the proposal by the Department of Justice's Executive Office of Immigration Review (EOIR) to increase EOIR filing fees, we knew we would want to submit comments through the notice-and-comment process.

10. CLSEPA has provided comments in response to other notices of proposed rule-making that we have seen as harmful to the community we serve and, in some cases, to the organization itself.  For example, CLSEPA submitted comments addressing EOIR's Proposed Rules on Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, RIN 1125-AA96, 85 Fed. Reg. 52491 (Aug. 26, 2020), and EOIR's proposed Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, RIN 1125-AA94, 85 Fed. Reg. 36264 (June 15, 2020).   The comment period for both of these latter two rules was only 30 days, which was difficult and burdensome and to some extent limited the depth and breadth of our comments.  In those two instances, however, the 30-day comment period did not render it altogether impossible for us to comment, as both came

later in the COVID-19 pandemic, after we adjusted to the challenges of remote work.  The situation was markedly worse when EOIR proposed a new fee schedule and allowed only a 30-day comment period earlier in the onslaught of the pandemic.

11.  The proposed fee schedule that EOIR published on February 28, 2020, was of great concern to us.  Our team was worried about the impact on our client community and the funding and sustainability of our removal defense program.

12.  The clients we serve have little to no income.  This is particularly so among asylum seekers who have only recently arrived in the United States.  When CLSEPA holds clinics for individuals who are pro se asylum seekers, some of the individuals who attend have told us they cannot even afford to pay for the passport-style photos that are a required part of the Form I-589 (asylum and withholding of removal) application.  Some tell us they cannot even afford bus fare to get to our clinics.  Additionally, in our experience, asylum seekers who have been in the United States only a brief time almost never have checking accounts, and they often do not know how to obtain money orders.  An application fee for these individuals would have devastating effects.

13.  One impact we expect to see from the asylum application fee is delay in filing for asylum, as some asylum seekers will be forced to wait until they can save enough to pay the application fee.  This will result in missed deadlines.  The asylum statute, with some exceptions that can be difficult to meet, requires that applications for asylum be filed within one year of arriving in the United States.  This is already a difficult deadline for some to meet for a variety of circumstances, including the impact of trauma.  Additionally, Immigration Judges can impose tighter deadlines to file the application.  As a result of a new fee to apply for asylum, many will be relegated to a lesser form of protection in the form of withholding of removal, which does not

have a fee. The standard to prevail with a claim for withholding of removal is much higher, which means that many who qualify for asylum will nonetheless lose their cases and be returned to the persecution they fled. An additional concern is that many will not even apply for withholding of removal out of confusion over the inability to file for asylum due to the fee and the fact that the application for asylum and for withholding of removal use the same Form I-589.

14. CLSEPA is one of a few nonprofit legal services providers in the region that provides full-scope representation to individuals who are detained while in EOIR proceedings. We also work with detained Immigration Court respondents through a local "Attorney of the Day" program. Filing fees at the level EOIR proposed would (and, as now finalized, will) prove to be an insurmountable hurdle for nearly all who are detained. Those who have recently arrived in the United States have essentially no financial resources. They typically will not be able to pay even a $50 fee. Detained long-time residents will also have great difficulty paying increased filing fees. Their families will often have lost the primary breadwinner to detention and be struggling to pay for basic necessities like food and shelter. And if there is any hope of release while proceedings are pending, the detained individual in most cases will face high bond amounts. An appeal or motion to the BIA will be out of the question at the cost level EOIR proposed and has now finalized. An application for cancellation of removal will also become too costly for many who might have been able to afford the fee if it remained $100.

15. The possibility of a fee waiver, where available at all, will not be a cure-all for our client community, and it will mean more work, fewer cases, and ultimately less funding support for CLSEPA. Preparing and documenting fee waivers adds additional work and attorney time to cases that are already very challenging and time intensive. We have no choice but to meet the current funding cycle's deliverable requirements, or we will likely be funded at a lower level in

the next cycle, and we may altogether lose a contract that is key to maintaining the program. This will come at a cost, however, in the form of heightened stress, wear-and-tear, and burnout for myself and the rest of the team. We will also need to take into account the added time per case when applying for future rounds of funding that are granted on a "per case" model. This will result in less funding for our work, which in turn means diminished ability to maintain our current staffing level. If and when we need to reduce the hours of even one team member or go so far as to have to cut one or more positions, we will be forced to accept even fewer new cases and have less capacity to represent existing clients. This will mean fewer individuals in the region will have legal representation for their Immigration Court cases and appeals to the BIA. In other words, even with the possibility that some clients will secure fee waivers, the new EOIR fees will translate into a lower representation rate.

16. Recognizing that serious harms would result if the proposed fee increases went into effect, we at CLSEPA had every intention of submitting comments in opposition to the proposal. Doing so in only 30 days was going to prove challenging, however. With a high-volume practice such as ours, the first priority always has to be meeting the immediate case needs of hundreds of clients with a relatively small staff while also ensuring that our pro bono partners have the level of mentorship and technical assistance they need to provide high-quality representation to the clients placed through our pro bono program.

17. With the knowledge that 30 days would be inadequate to fully assess the proposal and draft and submit thorough comments, CLSEPA joined a March 5, 2020 request that EOIR provide a 60-day comment period.

18. Following that March 5, 2020 request for a full 60-day comment period, CLSEPA faced a crisis unlike any we had ever experienced. On March 17, 2020, the county where

CLSEPA is based, San Mateo County, issued a "Shelter in Place" Order (SIP). The SIP Order required that CLSEPA significantly curtail public-facing operations and required all staff to immediately work from home. Prior to the SIP Order, our staff worked almost exclusively out of CLSEPA's offices, and many staff were forced to scramble to set up workplaces in their homes. The SIP Order also meant the closure of schools and daycares, leaving CLSEPA's staff without childcare.

19. Our staff work night and day because our clients' lives hang in the balance, and we believe every one of them deserves high-quality representation in the high-stakes adversarial proceedings of Immigration Court and in appeals to the BIA. Owing to this, we have an exceptional reputation both locally and nationally.

20. When the SIP Order went into effect, CLSEPA already had a monthly immigration consultation clinic scheduled for March 26, 2020. These clinics draw dozens of families that count on us to be there for them. We immediately had to scramble to ensure that these families would not be left without the services they were expecting to receive from us, and that CLSEPA would not suffer reputational harm in the process. At first, we tried to collect enough personal protective equipment and find a space sufficient to allow distanced but still confidential in-person consultations. This proved impossible, and we had to find a way to move toward a remote consultation model. Working out the logistics to accomplish this took time, but we were able to start offering remote immigration consultations on April 9, 2020.

21. The immigration consultation clinic was one of many adjustments we had to make in response to the SIP Order. Staff had to move quickly to cancel and reschedule meetings that had been set to take place in person. Without childcare and working from home, they also had to continue their representation of CLSEPA's clients without access to needed office equipment

like copiers, printers, and scanners. Staff also had work through the added difficulties involved in securing client signatures for filings. During the period allowed to comment on EOIR's proposed fees, while we were required to shelter in place, we still needed to meet our clients' deadlines, which neither USCIS nor EOIR tolled or extended. Although USCIS eventually permitted a 60-day extension on some deadlines, this was not announced until March 30, 2020, the day the public comment period for the proposed EOIR fee increases closed.

22. In addition to meeting deadlines such as for USCIS Requests for Evidence (RFEs) and preparing paper applications, motions, and other deadline-driven filings, staff had to prepare clients' cases for merits hearings before the Immigration Court. At that time, EOIR was announcing Immigration Court closures with only two weeks' notice prior to hearing dates. Given that most Immigration Court filings are due a minimum of 15 days prior to hearing dates, all our filings still had to be prepared, and we had to engage in hearing preparation with our clients and our witnesses, which can take multiple weeks. In the end, while the hearings were postponed, and most were re-set to 2023 and 2024, the work to prepare for the hearings took a huge toll on staff and clients. For staff, this work represented a huge and unnecessary investment of time and resources. Most of our clients are survivors of violence. Many suffer from Post-Traumatic Stress Disorder (PTSD). For them, it was particularly traumatizing to have to prepare for the hearings only to have them canceled at the last minute.

23. Everything about the work our team had to undertake during the early days of the SIP took more time and effort. Because of the impact of trauma, preparing a declaration over the phone is especially arduous, as our clients frequently do not have a private space to talk, and when they break down, it is far more difficult for us to comfort them and help them re-focus in the way we can when we are in the same room with them. A declaration that might have

previously taken two to three hours now typically takes four to six hours or more. There were other challenges that remain but were particularly time-consuming to navigate early in the pandemic. Documents and signatures could not – and still cannot – be exchanged in person. Clients began experiencing greater income, housing, and food instability. Their stress and trauma meant our attorneys had to spend time trying to connect clients to resources that would support their survival. Our social worker was completely overwhelmed, and much of the work that went beyond her capacity fell to our legal staff.

24. From the early days of the SIP, our work with detained clients also became more difficult and time-consuming. In addition to difficulties involved in advancing regular case work for this group of clients, our staff had to respond to their mounting stress about the heightened risk of exposure to the new coronavirus that they faced in detention. The combination of individual clients' health circumstances and the conditions of their confinement meant that many had strong claims to be released, but this too added to the work our team had to complete as quickly as possible.

25. While carrying their own load of cases under extraordinarily difficult and time-consuming circumstances, our team also had to keep pro bono attorneys up-to-date about the ever shifting landscape.

26. Those first few weeks of the SIP challenged our team at CLSEPA in unprecedented ways that are difficult to describe. The strain to move our entire program staff to remote work, find ways to connect with clients remotely, meet the unrelenting deadlines, and address the increased need of our clients, all while several of our staff were parenting young children at home was all-consuming.

27. During this time, CLSEPA's interest in commenting on EOIR's proposed fees did

not wane, but our ability to do so was compromised to the point that we simply could not meet the 30-day deadline. We consequently joined a March 23, 2020 request to have the comment period frozen as we dealt with the unique pressures of the pandemic.

28. In the end, EOIR did not freeze or extend the original comment period, and despite CLSEPA's grave concerns about the proposed fees, under the crush of the pandemic and its toll on our practice, we were unable to prepare and submit the comments we intended to provide in opposition to the proposed rulemaking. Had the comment period been longer – even another 30 days – we would have provided our comments outlining the serious problems with EOIR's fees proposal.

29. EOIR's decision to limit the comment period to 30 days and its disregard for the requests to extend or freeze the comment period prejudiced CLSEPA. Despite our strong interest in commenting due to the concerns about injury to our clients and to CLSEPA itself, we did not have a meaningful opportunity to participate in the rulemaking process.

30. I am aware that EOIR has now finalized the new fee schedule with the new and increased fees set at the level the agency laid out in the February 28, 2020 Notice of Proposed Rulemaking. The Final Rule establishing the new fee schedule is set to take effect on January 18, 2021.

31. The Final Rule is already setting in motion some of the very harms we feared, and the harm will only escalate once the Rule goes into effect.

32. Even before the fees were finalized, we had to map out steps we would take to prepare for them. For our pro se I-589 clinics, which are a critical part of our program and enable CLSEPA to provide essential services to vulnerable individuals whose cases we cannot accept for full-scope representation, our team has convened remotely to discuss how we will

handle a mandatory, nonwaivable asylum application filing fee.  We are aware that that a district court order preliminarily enjoined the USCIS fee for affirmative asylum applications from going into effect, but given the impact a new defensive asylum fee will have, we must take some steps to be prepared given the provision of the Final Rule and uncertainty as to when EOIR will start requiring that the fee be paid.

33.  Knowing that the fee will be an insurmountable hurdle for many in the community, we have undertaken research to identify sources of funding.  Without funding for at least some of the application fees, our team will be impeded in carrying out the core of our work, and we will have to further divert resources toward this fundraising work.  If we are able to secure funding to cover some portion of the asylum application filing fees, however, we will still need to determine how the funding would be disbursed and how money orders would be obtained for our clients' filings and those of pro se applicants we assist through our clinics.  CLSEPA's small finance team expects that it will face a significant new burden to handle the financial transactions involved.

34. The fee EOIR has added for asylum applications will cause still other harm.  Even before it goes into effect, there is risk it will cause confusion and have a chilling effect.  Once in effect, it will be a weighty undertaking to explain the requirement of a mandatory fee for our client population and work through the concerns that will arise when a client or a pro se applicant we are supporting will be relegated to withholding of removal because of inability to pay.  Additionally, where families are involved and the parent cannot afford the asylum application fee, we will need to file applications for each family member in proceedings, as families will no longer be able to rely on derivative benefits that come with asylum, but not with withholding of removal.

35. Two other new rules will exacerbate these harms. One (RIN 1125-AA94), proposed on June 15, 2020, and finalized this month (85 Fed. Reg. 80,274 (Dec. 11, 2020)), will place all applicants for asylum who are referred to an Immigration Judge via a Credible Fear Interview process in asylum-only proceedings. Another rule (RIN 1125-AA93), proposed on September 23, 2020, and also finalized this month (85 Fed. Reg. 81,698 (Dec. 16, 2020)), sets a 15-day filing deadline from the date of first hearing for applicants in asylum-only and withholding-only proceedings. Applicants referred to an Immigration Judge via a credible fear finding constitute a large number of the clients we represent. Under the operation of these two rule changes together, many of our clients will need to file their I-589 application within 15 days of their first hearing, an extremely short timeframe. Once the EOIR asylum fee goes into effect, within that 15-day period, those impacted will also need to obtain the fee amount and ensure it is paid correctly via USCIS. Even with competent legal representation, this will be an incredibly challenging feat to accomplish. If we fail to do this on behalf of our clients, they face being eligible only for withholding of removal, a less secure form of relief that requires a much higher standard of proof, more legal preparation for the case, and a greater chance of a denial and the need for appeal.

36. The new asylum fee is but one that will have devastating impact. The other EOIR fee increases now finalized and slated to go into effect on January 18, 2021, will also involve further diverting and expending of resources in ways that draw staff time away from their everyday work. In particular, CLSEPA will now have to increase the mentorship we provide to pro bono attorneys and revise existing training materials to educate both pro se clinic participants and our pro bono partners about the new and increased fees, including the fee waiver application process, which we expect our pro bono attorneys will have increasing need to pursue. This is a

decision born of necessity. The instructions for completing the fee waiver request to EOIR are minimal and leave much to judgment and experience. Our pro bono partners have rarely had to handle fee waiver requests in the past, but now will have to make this part of the casework in many instances. A central part of CLSEPA's removal defense work consequently cannot go forward without changes to the instructional materials that CLSEPA has developed and refined to reflect years of agency practice that has been upended.

37. Of particularly great concern are the substantial increases to fees for appeals and motions to the BIA. As Immigration Judges have come under increasing pressure to decide cases quickly and due to complications arising from recent regulatory changes and Attorney General decisions that run counter to precedent in the circuit in which we practice, we have seen an increasing need for appeals. The new fee to file an appeal is prohibitive for our clients. This will be yet another source of more work on any case requiring an appeal.

38. The same will be the case for motions to reopen and motions to reconsider, for which the new fee of $895 before the BIA will be especially prohibitive. Relatedly, motions to reopen will be needed more frequently because of another recently finalized rule that exacerbates the impact of the new Fee Rule. A new rule, proposed on August 25, 2020 (RIN 1125-AA96) and finalized this month (85 Fed. Reg. 81,588 (Dec. 16, 2020)), prevents the BIA from entertaining motions to remand (which have no fee). With this avenue closed off, our clients' only recourse will be to file motions to reopen with either a fee waiver request or the fee paid at the time of filing.[1]

---

[1] This is one example of the harmful interplay between the new Fee Rule and other rules EOIR finalized within days of one another. As I and other members of the CLSEPA team further digest the multiple final rule publications, I expect our understanding of the new rules will deepen and we will see additional examples of how one rule exacerbates the impact of one another.

13

39. Seeking a fee waiver from the BIA is risky for our clients– if the Board denies the fee waiver, the whole filing is rejected, and then one has to attempt to refile based on the argument that the deadline should be tolled.  There is no guarantee the second attempt at filing will be accepted.  In the past, clients would sometimes borrow money from friends and family in order to pay the fee of $110 and avoid the risk of filing their appeal with a fee waiver request.  The new appeal filing fee of $975 is so drastically higher that in all likelihood few will be able to borrow the money from friends and family.  We fear that some of our clients will turn to unscrupulous lenders, who often prey on our low-income, immigrant community.  Others will forego appeals because the new fee will be too daunting, even where there is reason to believe that an order of removal has been entered in error.  Where the fees block access to BIA review, they will also end access to federal court review due to the exhaustion requirement for petitions for review.

40. For CLSEPA's part, the new fees mean we must undertake fee waiver work that was not needed when the fee for a motion or an appeal was $110, and given the unpredictability of fee waivers before the Board, we will in all likelihood need to undertake further fundraising efforts because there will almost certainly be some clients who will not have a requested fee waiver granted and not have funds to cover the filing fee.   Between the added fee waiver work, the lack of sufficient funds and infrastructure to address what clients cannot cover, and the impact of the other new rules EOIR has now finalized, we are concerned that we will need to limit our appellate work going forward and not be able to meet clients' needs in this area.  The net result will be fewer appeals and an increased number of erroneous removals.

41. Even before the fee increases, CLSEPA had clients who could not afford the fees that have been in place to this point. In these instances, we helped clients complete the form used to make a fee waiver request. This took time, but not as much time as we foresee being needed as the new fees take effect. In the past, we rarely had to work with clients to prepare a declaration or marshal documentation of their poverty – the form itself, signed under penalty of perjury, was usually sufficient. However, given the discretionary nature of these waivers, the changing composition of the immigration bench, the added pressures on Immigration Judges, and the inevitable increase in fee waiver applications that will result from the fee increases, we are concerned that the process has become much more onerous. For example, we know of an instance where a fee waiver was denied because evidence was not attached to the fee waiver request. The attorney had to re-file the request with an added declaration and further evidence of family income. The waiver was then granted, but by then, the attorney had spent additional significant time on the case, including navigating a complicated and confusing process that involves USCIS's "InfoPass" system.

42. InfoPass is the system that USCIS uses to schedule in-person appointments with immigration applicants, respondents, or their attorneys at USCIS field offices. Fees for certain EOIR filings must be paid in person at a USCIS field office, and an attorney or respondent generally needs an InfoPass appoint to pay such fees. InfoPass appointments were previously available via an online system or via walk-in appointments for urgent or emergency matters. InfoPass appointments are now only available by calling the USCIS customer service hotline and requesting to be transferred to an upper-tier officer who is authorized to make in-person appointment for a future date. USCIS officers who staff the customer service hotline are often unfamiliar with EOIR fees and procedures, and callers must request that they be forwarded to an

upper-tier officer in order to request an InfoPass appointment. One thus must navigate two agencies' systems to pay these fees to EOIR through USCIS, and the newer limitations on obtaining InfoPass appointments in a timely manner has only been exacerbated during COVID-19 because of USCIS restrictions on in-person appointments.

43. Additionally, with no clear guidelines regarding fee waiver eligibility in EOIR proceedings, and the potential for considerable variation from judge to judge, there is an element of unpredictability that necessitates that we err on the side of caution.  Under the new fee regime, in combination with other changes such as the limitations on continuances, we are having to move toward a practice of more heavily documenting the need for a fee waiver, where one is available.  This requires more staff time per case, with all the negative consequences that follow.

44. CLSEPA has already experienced harm in the short time the new fees have been announced, as described above, and it is inevitable that our program will experience even greater harm if and when the new fees go into effect.  Our attorneys will have significant time occupied by fee waiver work we previously did not need to undertake.  The added time for each case will mean CLSEPA cannot take on the same number of new clients.  This will diminish the resources CLSEPA has to maintain its removal defense program.  The asylum fee and the lack of a fee waiver for that fee will add to the harm.

45. The new fees frustrate CLSEPA's mission to provide transformative legal services that enable diverse communities in East Palo Alto and beyond to achieve a secure and thriving future.  A key piece of that work is to prevent the deportation of immigrants in order to prevent the separation of families and removal of valued members of our diverse community.  The new and dramatically heightened fees directly impair our ability to provide core services, from counseling clients to providing them with the full-scope representation for which our program is

known.  By imposing prohibitively high fees that prevent our clients from accessing applications for protection and relief like asylum and cancellation of removal, motions, and the appeals process, the fee increases frustrate our ability to prevent the deportation of those who have legal defenses to deportation but will not have the financial means to access them.  It also frustrates our mission by increasing the amount of work required per case and therefore limiting our transformative impact by decreasing the number of individuals we can serve.

46. The new fees will also directly harm our pro bono program.  With fees at the level EOIR has now set, we will not be able to place clients' cases at the rate we have in the past, which will lead to even fewer individuals gaining access to counsel for their cases before EOIR.

47. Up to this point, fees and fee waiver requests have rarely been an issue for our pro bono attorneys.  When fees were required, the pro bono attorneys often covered paying the filing fees because it was more cost-effective than spending the time to prepare a fee waiver application.  Pro bono attorneys will be far less likely to pay the new fees, particularly those that the Final Rule sets for filings with the BIA.  This will require pro bono attorneys to file more fee waiver applications.

48. Given the increased need for fee waivers, pro bono attorneys would need to expend more time on their cases and, in some cases, to file motions to accept late-filings (if such is still possible under the new rules) if the fee waiver is denied.  This additional work will likely result in pro bono attorneys taking fewer cases.  We are also concerned it will disincline pro bono attorneys to continue their representation through to the appeal stage where an appeal is needed.

49. Overall, the new fees frustrate our organizational mission; diminish our resources, capacity, and impact; and greatly impede CLSEPA's work to provide high-quality full-scope representation to our low-income immigrant clients.  The net effect will be less due process,

diminished access to counsel, fewer vulnerable immigrants able to secure critical protections that they are eligible to have, more wrongful removals, and greater harm to family members left behind. These are among the concerns CLSEPA would have raised in comments opposing the proposed fee increases had there been an adequate and meaningful comment period. Now, we have the Final Rule and the harms it has set in motion – harms that will quickly escalate if the Final Rule is permitted to go into effect.

I, Cristina dos Santos, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 28th day of December, 2020, in Kihei, Hawaii.

                                                          CRISTINA DOS SANTOS