**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CATHOLIC LEGAL IMMIGRATION
NETWORK, INC., et al.,

              *Plaintiffs,*

   v.

EXECUTIVE OFFICE FOR IMMIGRATION
REVIEW, et al.,

              *Defendants.*

**Case No. 1:20-cv-03812-APM**

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR A STAY OF EFFECTIVE DATES UNDER 5 U.S.C. § 705
OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION**

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 3

    I.    The Final Rule Would Raise Fees For Individuals in Removal Proceedings.................... 3

        A.    Removal Proceedings ........................................................................................ 4

        B.    The Importance of Having Representation in Removal Proceedings........................... 4

        C.    The Existing Fees ............................................................................................ 5

        D.    Requests For Discretionary Fee Waivers .............................................................. 6

    II.    The Proposed Fee Rule and the Notice of Proposed Rulemaking ...................................... 8

        A.    The Fee Increases in the Proposed Fee Rule. ........................................................ 8

        B.    The Notice of Proposed Rulemaking................................................................... 9

        C.    The Comment Period........................................................................................ 10

    III.    The Final Rule and Its Impact on Plaintiffs .................................................................. 12

        A.    The Provisions of the Final Rule ......................................................................... 12

        B.    Defendants Disregarded Evidence Concerning the Inability of Respondents to Pay the Proposed Fees ................................................................................................. 13

        C.    Defendants Did Not Respond to the Public's Comments that the Mere Possibility of Fee Waivers Would Not Mitigate the Impact of the Fees. ...................................... 14

        D.    The Final Rule Did Not Consider Evidence of the Impact of the Fee Increases on Plaintiffs and Other Legal Services Providers...................................................... 15

        E.    The Final Rule Did Not Consider Evidence of the Impact of the Fee Increases Once the Subsequent Rules Went into Effect ................................................................ 17

ARGUMENT ....................................................................................................................... 17

    I.    Plaintiffs Are Likely to Succeed on Counts I–IV of Their Complaint:  Their Claims That the Final Rule Was Enacted in Violation of the APA and RFA.......................................... 18

        A.    Plaintiffs Have Standing to Assert Their Claims.................................................... 18

            1.    All Plaintiffs Have Organizational Standing ....................................................... 19

            2.    Plaintiffs CLINIC and CHIRLA Have Associational Standing to Assert Their Claims ......................................................................................................... 20

        B.    Plaintiffs are Likely to Succeed on Count I Because the Final Rule Is Arbitrary, Capricious, an Abuse of Discretion, and Contrary to Law. .................................... 22

            1. Defendants Ignored Significant Concerns in Promulgating the Final Rule................ 22

            2.    The Final Rule Does Not Provide a Reasoned Basis for Increasing Fees ............. 25

3.      The Final Rule Offers No Justification or Rationale for Departing From Longstanding Agency Policy and Practice Regarding Fees for Applications, Motions, and Appeals ....................................................................................................................... 28

4.      The Final Rule is Contrary to Law ......................................................................... 29

C.      Plaintiffs Are Likely to Succeed on Count II Because in Limiting the Comment Period for the Proposed Fee Rule to 30 Days, at the Onset of a Global Pandemic, Defendants Violated the Notice and Comment Requirements of the APA. ........................ 30

D.      Plaintiffs are Likely to Succeed on Count III Because their Rulemaking Process Violated the APA ..................................................................................................................... 33

1.      Defendants Refused to Disclose the Methodology or Data Underlying Their Analysis. ....................................................................................................................................... 33

2.      Defendants Closed the Comment Period Before Providing Notice of Additional Proposed Rules That Would Magnify the Impact of the Fee Increases............................ 35

E.      Plaintiffs Are Likely to Succeed on Count IV Because the Final Rule Was Promulgated in Violation of the RFA ..................................................................................... 36

1.      Plaintiffs CLINIC, CLSEPA, and CHIRLA are "Small Entities" Under the RFA .... 36

2.      The Rulemaking Process Failed to Comply With Requirements of the RFA ........ 36

II.     Plaintiffs Will Be Irreparably Harmed Absent Preliminary Relief................................. 38

A.      The Final Rule Will Irreparably Harm Plaintiffs' Programs and Missions............... 38

B.      The Final Rule Will Irreparably and Immediately Harm CHIRLA's Members. ....... 41

C.      The Final Rule Deprived Plaintiffs of Procedural Protections Under the APA, Causing Immediate and Irreparable Harm. ............................................................................ 42

III.    The Balance of Equities and the Public Interest Favor Plaintiffs ................................... 42

IV.     The Final Rule Should Be Stayed or Preliminarily Enjoined in its Entirety................... 44

CONCLUSION.................................................................................................................... 46

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allentown Mack Sales & Serv., Inc. v. NLRB,*
   522 U.S. 359 (1998).............................................................................22

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n,*
   988 F.2d 146 (D.C. Cir. 1993)..............................................................26

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.,*
   946 F.3d 615 (D.C. Cir. 2020)..............................................................18

*Am. Radio Relay League, Inc v. F.C.C.,*
   524 F.3d 227 (D.C. Cir. 2008)..............................................................23

* *Am. Wild Horse Pres. Campaign v. Perdue,*
   873 F.3d 914 (D.C. Cir. 2017)..............................................................22

*Ayuda, Inc. v. Attorney Gen.,*
   848 F.2d 1297 (D.C. Cir. 1988)............................................................30

* *Califano v. Yamasaki,*
   442 U.S. 682 (1979).............................................................................44

*California v. Azar,*
   911 F.3d 558 (9th Cir. 2018) ...............................................................45

* *Casa de Maryland, Inc. v. Wolf,*
   2020 WL 5500165 (D. Md. Sept. 11, 2020).....................................12, 35

* *Cement Kiln Recycling Coal. v. E.P.A.,*
   255 F.3d 855 (D.C. Cir. 2001)..............................................................36

* *Conn. Light & Power Co. v. Nuclear Regulatory Comm'n,*
   673 F.2d 525 (D.C. Cir. 1982)........................................................31, 35

*Ctr. for Sustainable Econ. v. Jewell,*
   779 F.3d 588 (D.C. Cir. 2015)..............................................................21

*Czyzewski v. Jevic Holding Corp.,*
   137 S. Ct. 973 (2017)...........................................................................19

*Dada v. Mukasey,*
   554 U.S. 1 (2008)...................................................................................8

*Damus v. Nielsen*,
    313 F. Supp. 3d 317 (D.D.C. 2018) ........................................................................44

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020)..............................................................................................28

*Dillmon v. Nat'l Transp. Safety Bd.*,
    588 F.3d 1085 (D.C. Cir. 2009) ..............................................................................29

\* *Dist. of Columbia v. U.S. Dep't of Agric.*
    444 F. Supp. 3d 1 (D.D.C. 2020) .............................................................................18

\* *Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016)...................................................................................24, 25, 28

*Engine Mfrs. Ass'n v. EPA*,
    20 F.3d 1177 (D.C.Cir.1994) ...................................................................................33

\* *Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015) ................................................................................19

\* *Gomez v. Trump*,
    2020 WL 5367010 (D.D.C. Sept. 4, 2020), *amended in part*, 2020 WL
    5886855 (D.D.C. Sept. 14, 2020) ......................................................................44, 45

*Hardaway v. D.C. Hous. Auth.*,
    843 F.3d 973 (D.C. Cir. 2016) ................................................................................18

\* *Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)..................................................................................................19

*Home Box Office, Inc. v. FCC*,
    567 F.2d 9 (D.C. Cir. 1977) .....................................................................................26

\* *Hunt v. Washington State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)..................................................................................................20

\* *Immigrant Legal Res. Ctr. v. Wolf*,
    2020 WL 5798269 (N.D. Cal. Sept. 29, 2020) ..........................................12, 43, 45

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) .....................................................................................38

*Louisiana Forestry Ass'n Inc. v. Sec'y U.S. Dep't of Labor*,
    745 F.3d 653 (3d Cir. 2014).....................................................................................35

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)..................................................................................................18

*Make the Rd. New York v. McAleenan*,
  405 F. Supp. 3d 1 (D.D.C. 2019), *rev'd on other grounds and remanded sub
  nom. Make The Rd. New York v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020)..................................42

\* *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)..............................................................................22, 26, 27, 28

\* *N. Carolina Growers' Ass'n, Inc. v. United Farm Workers*,
  702 F.3d 755 (4th Cir. 2012) ...............................................................31, 32, 35

\* *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
  145 F.3d 1399 (D.C. Cir. 1998)...................................................................44

*Nat'l Treasury Emps. Union v. United States*,
  101 F.3d 1423 (D.C. Cir. 1996)...................................................................38

*Ng Fung Ho v. White*,
  259 U.S. 276 (1922)...................................................................................4

*Nken v. Holder*,
  556 U.S. 418 (2009)...................................................................................42

\* *Nw. Immigrant Rights Project v. U.S. Citizenship & Immigr. Servs.*,
  2020 WL 5995206 (D.D.C. Oct. 8, 2020) ...............................................17, 20, 43

*O'Donnell Constr. Co. v. Dist. of Columbia*,
  963 F.2d 420 (D.C. Cir. 1992).....................................................................44

*Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*,
  901 F. Supp. 2d 54 (D.D.C. 2012).................................................................43

\* *Pangea Legal Services v. U.S. Department of Homeland Security*,
  2020 WL 6802474 (N.D. Cal. Nov. 19, 2020) ...................................20, 31, 32, 33

*Portland Cement Ass'n v. EPA*,
  665 F.3d 177 (D.C. Cir. 2011)......................................................................35

\* *Sessions v. Dimaya*,
  138 S. Ct. 1205 (2018)................................................................................4

\* *Shands Jacksonville Med. Ctr. v. Burwell*,
  139 F. Supp. 3d 240 (D.D.C. 2015).........................................................33, 34, 35

*Sorenson Commc'ns Inc. v. F.C.C.*,
  755 F.3d 702 (D.C. Cir. 2014).....................................................................25

*Sugar Cane Growers Co-op. of Fla. v. Veneman*,
  289 F.3d 89 (D.C. Cir. 2002)...................................................................30, 42

*_U.S. Cellular Corp. v. F.C.C._,
   254 F.3d 78 (D.C. Cir. 2001)................................................................37

_Winter v. Nat. Res. Def. Council, Inc._,
   555 U.S. 7 (2008)........................................................................18

**Statutes**

5 U.S.C. § 553(b) ....................................................................33, 35

5 U.S.C. § 601(6) ........................................................................36

5 U.S.C. § 604(a) ....................................................................36, 37

5 U.S.C. § 605(b) ....................................................................36, 37

5 U.S.C. § 611(a)(1) ....................................................................36

5 U.S.C. § 706(2) ........................................................................22

8 U.S.C. § 1182(a) ........................................................................4

8 U.S.C. § 1227(a) ........................................................................4

8 U.S.C. § 1229a ........................................................................3, 4

8 U.S.C. § 1252(a)(1) ....................................................................4

31 U.S.C. § 9701(b) ....................................................................30

**Other Authorities**

Board of Governors of the Federal Reserve System, _Report on the Economic
   Well-Being of U.S. Households in 2017_ (May 2018)..............................14

Conference Report on H.R. 4782, 134 Cong. Rec. H8297-01, 1988 WL 176092
   (Sept. 26, 1988)........................................................................29

Consolidated Appropriations Act, Senate Amendment to H.R. 33 (Dec. 21, 2021) ......6

DHS, Immigration Examinations Fee Account Fiscal Year 2019 Report to
   Congress Statement of Financial Condition,
   https://tinyurl.com/y9v9ay26 ........................................................30

EOIR Adjudication Statistics (Apr. 15, 2020),
   https://tinyurl.com/ya3ge9bp ........................................................23

EOIR, BIA Practice Manual (last updated Oct. 5, 2020),
   https://tinyurl.com/y9bu6p8v ........................................................6

EOIR CLINIC, Comments in Opposition to Proposed Rulemaking: Fee Review,
85 Fed. Reg. 11,866 (March 30, 2020) ...................................................................24

DOJ, Immigration Court Practice Manual (Nov. 13, 2020),
https://tinyurl.com/ya7vqrlu ..........................................................................6, 7

Office of the Inspector General, U.S. Dept. of Justice, Audit of the Executive
Office for Immigration Review's Fiscal Year 2019 Financial Management
Practices (June 2020),
https://tinyurl.com/ybgpty33 ................................................................................28

Policy Memorandum from James R. McHenry III to EOIR (Dec. 18, 2020),
https://tinyurl.com/y99d3xj3 ..................................................................................6

Pub. L. 100-459, 102 Stat. 2186, 2203 (Oct. 1, 1988), § 209(a) (codified at 8
U.S.C. §§ 1356(m)-(n)) ..........................................................................................29

Pub. L. 116-93, 133 Stat. 2317, 2396 (Dec. 20, 2019) ..............................................6

**Regulations**

8 C.F.R. § 1003 ............................................................................................3, 4, 6, 7

8 C.F.R. § 1103 ............................................................................................6, 7, 12

13 C.F.R. § 121.201 ...................................................................................................36

51 Fed. Reg. 39,993 .....................................................................................................5

85 Fed. Reg. 11,866 ..............................................................................7, 8, 9, 10, 34

85 Fed. Reg. 46,788 ...................................................................................................32

85 Fed. Reg. 72,584 ...................................................................................................39

85 Fed. Reg. 78,240 ...................................................................................................39

85 Fed. Reg. 82,750 ........................................................................................ *passim*

Executive Order 12866, 58 Fed. Reg. 51,735 (Sept. 30, 1993) ...........................10, 31

Executive Order 13563, 76 Fed. Reg. 3,821 (Jan. 18, 2011)……………………………...10, 31

Pursuant to Local Civil Rule 65.1(d), Plaintiffs request that this motion be heard on an expedited basis to avoid the irreparable harm to Plaintiffs and the public if the Final Rule takes effect on January 19, 2021.

## PRELIMINARY STATEMENT

This case challenges one in a fusillade of hastily-enacted and inadequately supported rules that the government has promulgated to prevent indigent and vulnerable asylum seekers and other immigrants from obtaining fair adjudication of their status. The Final Rule at issue here would raise up to eight-fold the fees that individuals must pay in order to file the applications, motions, and appeals they need to defend themselves from deportation in Removal Proceedings brought by the government.[1] *See* Final Rule, Executive Office for Immigration Review; Fee Review, 85 Fed. Reg. 82,750 (Dec. 18, 2020) ("Final Rule").

Defendant the Executive Office for Immigration Review ("EOIR") is fully funded by congressional appropriations. Nonetheless, after more than 30 years without increasing the fees for the filings that respondents need to make in Removal Proceedings, Defendants determined that rendering procedural and other protections inaccessible to people facing deportation would fit in well with their efforts to close the doors to the nation's Immigration Court system. So in 2018, EOIR conducted what it calls a "comprehensive study" of fees and expenses and, on February 28, 2020, purportedly relying on that study (but without disclosing its methodology or data), Defendants published a proposed rule increasing fees for Immigration Court and BIA filings up to eight-fold (the "Proposed Fee Rule"). Although the impact of the fees would largely fall on indigent persons who rely on free or low-cost legal services—if they have legal representation at

---

[1] The term "Removal Proceedings" is used here and in the Complaint to encompass proceedings before the Immigration Courts and the Board of Immigration Appeals ("BIA"), both of which are housed within EOIR, which is part of Defendant the Department of Justice.

1

all—Defendants announced that the "possibility" of fee waiver requests would mitigate the negative effects of the increases (a position that ignores reality, as discussed *infra* pages 6–8).

Defendants truncated the comment period on the Proposed Fee Rule to 30 days in March 2020—just as the COVID-19 pandemic took hold in the United States. Despite multiple requests from Plaintiffs and other organizations to extend the comment period and to disclose the "comprehensive study," Defendants ended the comment period after just 30 days, and without disclosing the data or methodology undergirding the rule. Defendants thereafter noticed proposals for additional rules further altering Immigration Court proceedings (the "Subsequent Proposed Rules"); those Subsequent Proposed Rules would exacerbate the impact of the fee increases. By withholding critical information and staggering their rulemaking, Defendants ensured that the public's comments could not address the true and full impacts of the Proposed Fee Rule.

The Final Rule was issued, without significant change from the Proposed Fee Rule, on December 18, 2020. The new fees would irreparably harm Plaintiffs and burden respondents in Removal Proceedings, and their families and communities, unless they are enjoined before taking effect. This Court has the authority under 5 U.S.C. § 705 to issue a stay of the rule pending a full adjudication on the merits, and under Fed. R. Civ. P. 65 to issue a preliminary injunction with the same effect. The same standard applies.

First, Plaintiffs are likely to succeed on the merits of Counts I through IV.[2] The Final Rule is arbitrary, capricious, and violates the standards for reasoned decision-making required by the Administrative Procedure Act ("APA") (Count I); the comment period was inadequate because it limited the public's opportunity to comment to 30 days at the start of the pandemic (Count II);

---

[2] The same is true of Counts V and VI, but Plaintiffs are not seeking preliminary relief on the basis of those claims, as they would require the Court to reach constitutional claims that may be avoided.

Defendants denied the public the opportunity to understand and comment on the Proposed Fee Rule by withholding the methodology and data used to create the "comprehensive study" on which they purportedly based their fee proposal and by engaging in staggered rulemaking that concealed the full impact of the Proposed Fee Rule (Count III); and Defendants did not acknowledge that the Final Rule would have an impact on small entities, including three Plaintiffs here, let alone analyze that impact—as required under the Regulatory Flexibility Act ("RFA") (Count IV).

Second, if it goes into effect, the Final Rule will devastate Plaintiffs and their members.

Finally, maintaining the current fee structure until final adjudication on the merits will cause no hardship to the government, which has maintained that fee structure for decades—and which has appropriated funds for EOIR operations for FY2021—whereas allowing the Final Rule to go into effect would cause tremendous hardship for Plaintiffs, and for respondents in Removal Proceedings, and their families and communities, presenting the very real possibility of immigrants' loss of liberty, their families, and—to the extent they are unable to seek asylum and are returned to their countries of origin to face persecution—their lives.

Plaintiffs have standing to assert their claims against Defendants, and request that preliminary relief be granted to avoid the irreparable harm that the Final Rule would wreak.

## STATEMENT OF FACTS

## I.      The Final Rule Would Raise Fees For Individuals in Removal Proceedings

EOIR, an agency within the Department of Justice ("DOJ"), is responsible for adjudicating Removal Proceedings instituted and prosecuted by the U.S. Department of Homeland Security ("DHS") to remove (i.e., deport) respondents from this country.  *See* 8 U.S.C. § 1229a.  EOIR oversees and enacts regulations that bind the nation's network of more than sixty Immigration Courts and the agency's appellate body, the BIA. *See* 8 C.F.R. 1003.0, 1003.1(a)(1).

3

### A.  Removal Proceedings

A removal proceeding is adversarial in nature and involves high stakes for nearly all respondents.  *See, e.g.*, *Sessions v. Dimaya*, 138 S. Ct. 1205, 1213 (2018) (reiterating that "deportation is 'a particularly severe penalty'"); *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922). The government is represented in all instances.  Ingrid Eagly and Steven Shafer, Access to Counsel in Immigration Courts, at 1, https://tinyurl.com/y7hbl2rm.  Avenues for a respondent to defend against removal are limited.  If the Immigration Judge sustains the charge(s) of removability, the respondent may avoid removal by showing eligibility for relief or protection, such as asylum or cancellation of removal, that would allow the person to remain in the United States.  8 U.S.C. § 1229a(c)(4).  If an Immigration Judge finds that a respondent in Removal Proceedings is removable and is not entitled to asylum or another protection or relief, the Immigration Judge enters an order of removal.  *See* 8 U.S.C. §§ 1182(a), 1227(a).

Respondents may appeal an Immigration Judge's order to the BIA, as may the government. 8 U.S.C. § 1229a(c)(5).  Such appeals must be filed within 30 days.  8 C.F.R. § 1003.38(b).  If the BIA affirms a removal order, the individual may seek judicial review within 30 days through a petition for review by a United States Court of Appeals.  *See* 8 U.S.C. § 1252(a)(1).  Appeal to the BIA is a condition precedent to seeking federal court review.  *Id.*

### B.  The Importance of Having Representation in Removal Proceedings

Respondents are far more likely to prevail in Removal Proceedings if they have counsel. But while respondents have a right to legal representation at their own expense, with very limited exceptions, the government does not provide or pay for representation.  See 8 U.S.C. § 1229a(b)(4)(A) ("[T]he [non-citizen] shall have the privilege of being represented, at no expense to the Government.").  Many respondents in removal proceedings are indigent and cannot afford counsel, relying on either free legal service providers, pro bono counsel, or appearing pro se.

Declaration of Cristina dos Santos ("dos Santos Decl.") ¶ 12; Declaration of Michelle N. Mendez ("Mendez Decl.") ¶ 11; Declaration of Angelica Salas ("Salas Decl.") ¶ 14.

Plaintiffs Catholic Legal Immigration Network, Inc. ("CLINIC"), Community Legal Services in East Palo Alto ("CLSEPA"), Kids in Need of Defense ("KIND"), and The Coalition for Humane Immigrant Rights ("CHIRLA") are not-for-profit organizations that provide legal services for immigrants across the United States.  Compl. ¶¶ 14, 24, 31, 40.  Plaintiffs CLINIC (and its affiliates), CLSEPA, KIND, and CHIRLA represent indigent individuals in Removal Proceedings directly and throughout pro bono partners.  *Id*. ¶¶ 15, 26, 34, 43.  CHIRLA is a membership organization whose members are predominantly low-income immigrants in mixed status families, one or more of whom are undocumented, many of whom are in Removal Proceedings.  Salas Decl. ¶ 7.

### C.  The Existing Fees

In 1986, the former Immigration and Naturalization Service (INS) and EOIR promulgated a rule (the "1986 Fee Rule") raising the cost for filing appeals, motions to reopen, and motions to reconsider from $50 to $110, and raising or decreasing other immigration-related fees by smaller amounts.  Powers and Duties of Service Officers; Availability of Service Records, 51 Fed. Reg. 39,993 (Nov. 4, 1986).  The 1986 Fee Rule set "several fees for administrative appeals processes . . . at less than full recovery recognizing longstanding public policy and the interest served by these processes."  51 Fed. Reg. at 39,993.

Since 1986, the maximum fee for an application filed with the Immigration Court has not exceeded $100; the fee to appeal has not exceeded $110; and the fee to file a motion to reopen or to reconsider has not exceeded $110 (in some instances, there was no fee).

Between 1985 and 2018, EOIR did not conduct a single fee study, and following the 1986 Fee Rule, it did not undertake to raise fees until now.  85 Fed. Reg. at 82,754.  For decades,

Immigration Court and BIA operations have been funded by congressional appropriation; EOIR is not a fee-based agency.  *See* 85 Fed. Reg. at 82,754.  In FY-2020, EOIR received nearly $673 million in congressional appropriations.  Pub. L. 116-93, 133 Stat. 2317, 2396 (Dec. 20, 2019).  For FY-2021, Congress appropriated $734 million to EOIR, a nine percent increase from FY-2020.  Consolidated Appropriations Act, Senate Amendment to H.R. 33 (Dec. 21, 2021).

### D.   Requests For Discretionary Fee Waivers

Many respondents in Removal Proceedings cannot afford the fees associated with filing the applications, motions, or appeals that are necessary to their defense.  Salas Decl. ¶ 14; Declaration of Michelle M. Ortiz ("Ortiz Decl.") ¶ 10.  Such Respondents may apply for a discretionary fee waiver.  *See* 8 C.F.R. §§ 1003.8(a)(3), 1003.24(d), 1103.7(c).

A decision by an Immigration Judge or the BIA to grant or deny a fee waiver request is entirely discretionary.  *See* 8 C.F.R. §§ 1003.8(a)(3), 1003.24(d); *see also* DOJ, Immigration Court Practice Manual, 55 (Nov. 13, 2020), https://tinyurl.com/ya7vqrlu; EOIR, BIA Practice Manual at 45 (last updated Oct. 5, 2020), https://tinyurl.com/y9bu6p8v; 85 Fed. Reg. at 82,759 ("fee waivers are discretionary by nature").  There are no publicly available guidelines or standards as to what a showing of economic hardship or incapacity entails.  *See* Policy Memorandum from James R. McHenry III to EOIR (Dec. 18, 2020), https://tinyurl.com/y99d3xj3.  A memorandum sent to Immigration Judges the day of the Final Rule's publication emphasizes the discretionary nature of fee waivers and instructs that a fee waiver decision need not be issued in writing.  *See id*. ("[T]he regulations do not require a written ruling on a fee waiver request.").  Detained individuals and individuals with mental illness sometimes struggle to submit the paperwork necessary for a fee waiver request.  Declaration of Adina Appelbaum ("Appelbaum Decl.") ¶¶ 15–16.  By regulation, no fee waiver is available for a DHS fee that the agency identifies as non-waivable.  8 C.F.R. § 1103.7(c).  In the absence of standards, oversight, or transparency, fee waiver adjudications are

bound to be inconsistent and often unpredictable.  Ortiz Dec. ¶ 16; Camilo Decl. ¶ 5.  While EOIR has declined to track and analyze the data in its possession, the available evidence shows that the Immigration Courts and the BIA deny fee waiver requests in varying and inconsistent ways, without reason, and even when inability to pay is clear on the face of the application.  *See* Declaration of Jehan Laner Romero ("Romero Decl.") ¶¶ 17–19; Mendez Decl. ¶ 25.

Additionally, even where nominally available, pursuit of a fee waiver may be impracticable or ill advised.  An application, motion, or appeal made in Immigration Court or before the BIA that is accompanied by an application for a fee waiver, but without payment of the fee whose waiver is sought, will be rejected as not properly filed if the fee waiver request is denied.  *See* 8 C.F.R. §§ 1003.8(a)(3), 1003.24(d), 1103.7(c); EOIR; Fee Review, 85 Fed. Reg. 11,874 n.21; Immigration Court Practice Manual, at 55.  Because there is no requirement as to how quickly a fee waiver request must be adjudicated, a fee waiver request may be denied after the filing deadline has passed for the underlying application, motion, or appeal.  Declaration of Maria Odom ("Odom Decl.") ¶ 24; Romero Decl. ¶¶ 14, 18–19.  An Immigration Judge may then deem an application waived.  Salas Decl. ¶¶ 24, 58.  At the BIA, a respondent must then move for acceptance of the now-untimely motion or appeal—although one of the Subsequent Proposed Rules would remove the authority of the BIA to grant at least some such late-filed motions and appeals.  Mendez Decl. ¶ 36.  Concerns about seeking fee waivers also arise in cases involving the cancellation of removal for certain non-permanent residents, where the need for a fee waiver may be viewed by some Immigration Judges as a factor weighing against the grant of cancellation.  Salas Decl. ¶ 18.

Because of the work involved in preparing a fee waiver request, and the risk and uncertainty surrounding the adjudication of waivers, many pro bono legal services providers simply pay the application, motion, or appeal fee for the indigent client rather than expend the time and resources

to pursue a risky course.  Odom Decl. ¶¶ 16, 23–24; Appelbaum Decl. ¶ 13.  Alternatively, pro bono providers may advise clients to come up with money for the filings if at all possible— something that is feasible for many at the rate of $100 or $110, but that will be put out of reach under the Final Rule.  Dos Santos ¶ 39; Camilo Decl. ¶¶ 5–6.

## II.     The Proposed Fee Rule and the Notice of Proposed Rulemaking

Defendants published a Notice of Proposed Rulemaking ("NPRM") in the Federal Register seeking to increase fees associated with "eight distinct types of filings" before Immigration Court and/or the BIA.  85 Fed. Reg. 11,866, 11,867 (Feb. 28, 2020).

### A.  The Fee Increases in the Proposed Fee Rule.

Three of the proposed fee increases concerned applications that Congress has authorized to allow eligible individuals to avoid removal (together, "Applications"):

- The fee to apply for suspension of deportation (Form EOIR-40) would increase from $100 to $305;

- The fee for cancellation of removal (Form EOIR-42A) would increase from $100 to $305; and

- The fee that certain nonpermanent residents must pay to apply for cancellation of removal and adjustment of status (Form EOIR 42-B) would increase from $100 to $360.

Two of the proposed fee increases concerned motions to reopen proceedings, the "purpose" of which "is to ensure a proper and lawful disposition," *Dada v. Mukasey*, 554 U.S. 1, 18 (2008), and motions to reconsider after an Immigration Judge or the BIA has rendered a decision (together, "Motions").  The fees for such Motions ranged from zero for certain types of motions, to $110, in other instances.  The Proposed Fee Rule would increase those fees as follows:

- The fee for filing Motions before the Immigration Courts would increase to $145; and

- The fee for filing Motions before the BIA would increase to $895.

The remaining three fee increases applied to three types of Notices of Appeal to the BIA (together, "Appeals"):

- The fee for filing a Notice of Appeal from a decision of an adjudicating official in a practitioner disciplinary case (Form EOIR-45) would increase from $110 to $675;

- The fee for filing a Notice of Appeal to the BIA from a decision of a DHS officer (Form EOIR-29) would increase from $110 to $705; and

- The fee for filing a Notice of Appeal to the BIA from a decision of an Immigration Judge (Form EOIR-26) would increase from $110 to $975.

**B.  The Notice of Proposed Rulemaking**

The NPRM stated that the fee increases were needed notwithstanding EOIR's nine-figure appropriation and the lack of explanation for how the increased fees would be used.  85 Fed. Reg. at 11,870.  The NPRM rested the specific fee increases on the results of a "comprehensive study" that EOIR conducted nearly two years earlier, in spring 2018.  *Id*. at 11,869.  The "comprehensive study" itself was withheld—the NPRM contained minimal, vague information about the study's methodology and none of the underlying data—just final tallies.  *Id*.  Despite requests from Plaintiff CLINIC to the Office of Management and Budget ("OMB") on March 6, 2020, and to both OMB and DOJ on March 18, 2020, neither the "comprehensive study" nor the data nor additional information about methodology was provided during the comment period.  Mendez Decl. ¶¶ 19–20.

The NPRM stated that EOIR had determined the proposed fee increases by allocating EOIR salary costs for adjudicating the various applications, motions, and appeals subject to the Proposed Fee Rule—but the NPRM did not disclose the assumptions, methodology, data, or calculations relating to the allocation.  85 Fed. Reg. at 11,869.

The NPRM stated "EOIR recognizes that the new fees will be more burdensome," and proposed that the burden would be offset because "fee waivers are still possible for those who seek

them." *Id.* at 11,874. The NPRM did not provide information bearing on how the "possib[ility]" of fee waivers would offset the impact of the fee increases. For example, the NPRM did not provide any information related to the current number or frequency of fee waiver requests, the grant or denial rates for such requests, how respondents proceeded when requests are denied, or the time involved to adjudicate fee waiver applications—or any expected effect the combination of fee increases and waivers would have on revenue. Plaintiff CLINIC made a FOIA request to EOIR for records related to fee waiver applications received and adjudicated from EOIR, but no responsive documents were received during the comment period. Mendez Decl. ¶ 18.

The NPRM did not inform the public that soon after the comment period closed, EOIR would publish a flurry of additional Notices of Proposed Rulemakings, proposing new rules governing Removal Proceedings and asylum proceedings that would directly affect the impact of the fee increases and new "defensive" asylum fee in the Proposed Fee Rule. Among other examples, the NPRM did not disclose that by combined operation of the Proposed Fee Rule and the subsequent Appellate Procedures and Administrative Closure Rule, the BIA would be stripped of authority to accept timely appeals and motions that are subsequently rejected because the Board denies the accompanying fee waiver request after the filing deadline had passed. *See* discussion *supra* Statement of Facts I(d); *see also* dos Santos Decl. ¶ 35

### C.  The Comment Period

Defendants took nearly two years from completion of their "fee study" to propose the fee increases, but provided only a thirty-day comment period on the Proposed Fee Rule, from February 28 to March 30, 2020. 85 Fed. Reg. at 11,866. The NPRM did not explain why the comment period was only half the time generally considered reasonable and recommended by Executive Orders 12866 and 13563. *See id.*; *see also* Executive Order 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993); *see also* Executive Order 13,563, 76 Fed. Reg. 3,821 (Jan. 18, 2011). Accordingly, on

March 5, 2020, Plaintiffs and 87 other organizations requested that EOIR extend the comment period to 60 days, but EOIR did not respond.  *See* Mendez Decl. ¶ 4; Odom Decl. ¶ 20.

The comment period coincided with the onset of unprecedented disruptions in the United States due to the COVID-19 pandemic—including school and daycare closings, office and government agency closings, shelter-in-place orders, and the transition to virtual work for many— that made it difficult for the public to prepare detailed comments on the Proposed Fee Rule.  Dos Santos Decl. ¶¶ 18–29.  The challenges were compounded for Plaintiff organizations, which had to continue providing representation and other services in connection with Removal Proceedings— all while in-person client meetings became impossible, especially for organizations serving detained clients.  *See* Salas Decl. ¶¶ 19, 25–26; Odom Decl. ¶ 21.  On March 23, 2020, Plaintiffs CLINIC and KIND, along with 105 other organizations, wrote once again to repeat the request to extend the comment period.  *See* Mendez Decl. ¶ 17; Odom Decl. ¶ 20.  The comment period closed after 30 days, with no response.

Defendants received only 601 comments during the comment period, significantly fewer than are submitted for other proposed immigration rules.  Nearly all of the comments were opposed to the proposed rule.  *See* 85 Fed. Reg. at 82,752.  Among a host of concerns, public comments were directed to the purported need for the fee increases, given that EOIR is an appropriated agency, *see id.* at 82,753; Defendants' failure to justify the magnitude of the fee increases, *see id.*; the lack of statutory authority for the fee increases, *see id.*; Defendants' failure to disclose the methodology and data of the "comprehensive study" so that the public could make meaningful comments on the fee increases, *see id.* at 82,754–55; the inadequacy of the 30-day comment period, *see id.* at 82,770; Defendants' lack of explanation or accountability for a new "defensive" asylum application fee, *see id.* at 82,765–67; the impact of the fee increases on the public and on Plaintiffs

and similarly situated organizations, *see id.* at 82,774; and the inadequacy of the "possibility" of fee waivers to mitigate the impact of the fee increases, *see id.* at 82,774, 82,778.

### III.    The Final Rule and Its Impact on Plaintiffs

On December 18, 2020, the Final Rule issued, with no notable changes from the Proposed Fee Rule.  The Final Rule is to become effective on January 19, 2020.

#### A.  The Provisions of the Final Rule

The Final Rule would impose the fee increases set forth in the NPRM.  The Final Rule stated the purpose for the increases was "to update the fees in accordance with the processing costs identified by the EOIR fee study so that the fee amounts more accurately reflect the costs for EOIR's adjudications of these matters." 85 Fed. Reg. at 82,751 (internal citations omitted).  The Final Rule does not substantively address comments questioning the need to increase the fee rates in view of EOIR being an appropriated agency or the level of fee increases.  *See, e.g.*, *id*. at 82,754.

The Final Rule also incorporates by reference a DHS rule imposing a $50 fee for filing asylum applications.  *See, e.g.*, *id*. at 82,751 (incorporating citations to "8 C.F.R. part 106" into 8 C.F.R. § 1103.7).  Implementation of that Rule was preliminarily enjoined by two district courts. *See Immigrant Legal Res. Ctr. v. Wolf*, 2020 WL 5798269 (N.D. Cal. Sept. 29, 2020); *Casa de Md., Inc. v. Wolf*, 2020 WL 5500165 (D. Md. Sept. 11, 2020), *appeal filed*, No. 20-2217 (D.C. Cir. Nov. 11, 2020).  The government appealed from both, but dropped its earlier-noticed appeal, leaving that temporary injunction in place for now.  *See* Defendants' Unopposed Motion for Voluntary Dismissal of Appeal, *Immigrant Legal Res. Ctr. v. Wolf*, No. 20-17339 (9th Cir. Dec. 28, 2020), ECF 9.

The Final Rule does not dispute that it represents a significant change from long-standing policy, but provides no justification for departing from that policy.  Nor did Defendants dispute

12

that Plaintiffs and members of the public had a reliance interest in the existing policy and fee structure.

Although the Final Rule cites and relies on the "comprehensive study," it fails to address how the public could have commented on the rationales for the proposed fee increases without the methodology or data from that study.  *See* 85 Fed. Reg. at 82,755 (noting that the Department would "publish[] the data collected in its spring 2018 study, accompanied by an updated dataset that was applied to that study when finalizing this rule, upon which it has based its calculations in the docket of this rulemaking" *after* the Final Rule was issued "[i]n light of numerous comment requests").  And even though the Final Rule discloses for the first time certain features of that study, it still fails to provide crucial information about the methodology, undercutting any reasoned reliance on the study.  More fundamentally, Defendants refused to acknowledge that they are promulgating fees for quasi-judicial filings that are the only means by which individuals can defend against potentially life-threatening removals and seek to have agency errors reviewed and corrected.

### B.  Defendants Disregarded Evidence Concerning the Inability of Respondents to Pay the Proposed Fees

Despite the wealth of data at their disposal, Defendants concluded that that they did not have enough information to know whether immigrants could pay the increased fees, *see id.* at 82,759, utterly disregarding the evidence that commenters cited for their concern that "noncitizens in removal proceedings are particularly likely to struggle with the proposed fees,"[3] including (i) commenters' experience working with the impacted communities, *see* Comment by American

---

[3]  Joint Comment of Am. Immigr. Council and Am. Immigr. Lawyers Assoc., Re: Executive Office for Immigration Review, Department of Justice, Notice of Proposed Rulemaking: Executive Office for Immigration Review; Fee Review (EOIR Docket No. 18-0101) (Mar. 30, 2020) (citing TRAC Immigration, Details on Deportation Proceedings in Immigration Court (updated Feb. 2020) ("AIC Comment").

Immigration Council in Opposition to Proposed Rulemaking:  Fee Review, 85 Fed. Reg. 11,866, Comment No. EOIR-2020-0001-0139; (ii) the fact that noncitizens in removal proceedings "already struggle to retain counsel," *see id.*; (iii) a Federal Reserve study reporting that 40% of all Americans would struggle to pay an unexpected bill of $400, *see* Board of Governors of the Federal Reserve System, *Report on the Economic Well-Being of U.S. Households in 2017*, 2 (May 2018); and (iv) commenters' experience that the tight deadlines for filing the motions and appeals subject to the increased fees would compound the financial challenges, especially in the midst of a global pandemic, *see* AIC Comment.

### C. Defendants Did Not Respond to the Public's Comments that the Mere Possibility of Fee Waivers Would Not Mitigate the Impact of the Fees.

The Final Rule relies on the "possibility" of fee waivers to mitigate the commenters' concerns about the impact of the fee increases.  The Final Rule does not, however, sufficiently address evidence submitted by commenters that even for respondents who are eligible for fee waivers, those respondents cannot rely on the availability of such fee waivers because they are discretionary; there is no statutory or regulatory standard for determining fee waiver eligibility; denial of fee waivers are not clearly appealable; it is time consuming to apply for such waivers; and in some circumstances it is risky to pursue fee waivers because a decision may not issue until after the underlying papers were due; or because the need for the fee waiver may be considered a negative factor when discretion is exercised in the adjudication of the underlying application.  85 Fed. Reg. at 82,758–59; *see also, e.g.*, Odom Decl. ¶¶ 16, 24; Romero Decl. ¶¶ 14–19; dos Santos Decl. ¶¶ 15, 39–40, 43, 49; Mendez Decl. ¶¶ 25, 51–53; Appelbaum Decl. ¶¶ 14–19.

The Final Rule also did not address the concern that the increased fees would generate an increased need for fee waivers, both because of the higher burden to respondents in finding the resources to pay the higher fees, and the decreased likelihood that pro bono and other providers

14

would pay the fee for the respondents, *see* 85 Fed. Reg. at 82,767, 82,774; impose a corresponding burden on Immigration Judges and the BIA to adjudicate fee waivers, *see id. at* 82,758; increase total costs spent by staff and divert time spent by judges away from substantive matters, *see id.*; result in a longer period to decide fee waiver applications; increase the number of respondents who will be concerned that their fee waivers will not be adjudicated before the time frame for the underlying applications, motions, and appeals lapses; and increase the risk that such applications, motions, and appeals will be rejected and not ultimately accepted, or only accepted after further motion practice. *See generally id.* at 82,758–59.

### D. The Final Rule Did Not Consider Evidence of the Impact of the Fee Increases on Plaintiffs and Other Legal Services Providers

The Final Rule simply did not address comments regarding the impact that the increased fees would have on Plaintiffs and other legal services providers, stating that such concerns were "outside the limited scope of this rulemaking." 85 Fed. Reg. at 82,775. Defendants touted the central role that pro bono legal services providers play in representing indigent respondents in Removal Proceedings, *id.* at 82,779, but then ignored evidence raised in comments that legal services organizations like CHIRLA, CLSEPA, CLINIC, and CLINIC's affiliate organizations will have to devote significantly more time to preparing fee waiver requests, reducing the amount of time available to work on the merits of each client's claim and the number of individual clients each can assist. *See* 85 Fed. Reg. 82,774; *see also* Mendez Decl. ¶¶ 24, 39; dos Santos Decl. ¶¶ 40–45; Odom Decl. ¶ 28. Nor did the Final Rule consider evidence that the additional time required to prepare fee waivers or the higher cost of simply assuming the fees on behalf of individual clients will make it harder to place cases with pro bono volunteer attorneys. *See* 85 Fed. Reg. at 82,774; *see also* Mendez Decl. ¶¶ 24, 33, 39; dos Santos Decl. ¶¶ 46–48; Odom Decl. ¶¶ 24–25, 30; Salas Decl. ¶¶ 42–43.

The Final Rule did not consider evidence that legal services organizations, including CLINIC's affiliates that charge fees (albeit lower non-profit rates) to clients, will also be hurt by the Final Rule as respondents, faced with the choice of paying higher filing fees or paying an attorney to represent them, will no longer hire counsel.  *See* 85 Fed. Reg. at 82,775.  As a result, smaller removal defense programs may be forced to scale back their operations, while others may need to cut costs in other ways, including by exiting professional organizations like CLINIC, reducing revenues for those organizations and thus hindering their missions.  Mendez Decl. ¶¶ 58–59; Romero Decl. ¶¶ 20–24; Salas Decl. ¶ 47.

Likewise, Defendants ignored evidence that low-income individuals in need of immigrations services who are members of organizations serving immigrant communities, like CHIRLA, may be dissuaded from pursuing their claims, motions, and appeals as a result of the new fee rules, and will suffer other harms as well. 85 Fed. Reg. at 82,772–74; *see also* Salas Decl. ¶¶ 41–46.  This not only impacts these organizations' direct funding from memberships but also contract and grant funding, which are harmed by the shrinking membership and impact.  Salas Decl. ¶ 47.

CHIRLA, KIND, and some of the pro bono attorneys with whom they work, previously advanced the fees for clients' filings to avoid spending time and resources to prepare a fee waiver application and the risk of a denial that would cause the application to be untimely.  Those organizations will find it prohibitively expensive to pay the higher fees.  *See* Odom Decl. ¶¶ 16, 23–25(c); Camilo Decl. ¶ 7; Salas Decl. ¶ 53.  Clients for whom a legal services organization or pro bono attorney is neither able to obtain a fee waiver nor cover the fee may be discouraged from appealing adverse results in Immigration Courts.  Dos Santos Decl. ¶ 37; Odom Decl. ¶¶ 24–25.  The increased fees will disrupt the funding models of these organizations.

For noncitizens who fear returning to their countries of origin, the Proposed Fee Rule may discourage the filing of meritorious asylum applications in favor of applications for withholding of removal, which, among other harms, requires a higher level of proof and a separate application for each member of a family.  Dos Santos Decl. ¶¶ 13, 34–35.  This will increase the burden on legal service organizations, like CLSEPA, and their ability to serve more clients.  *Id.*

Last, organizations, including CLSEPA and KIND, that run trainings for pro bono attorneys or individuals preparing their own applications will need to dedicate resources to developing additional training and materials to address the process of applying for fee waivers. *See* dos Santos Decl. ¶ 36; Odom Decl. ¶ 27.

### E. The Final Rule Did Not Consider Evidence of the Impact of the Fee Increases Once the Subsequent Rules Went into Effect

After the close of the comment period on the NPRM, Defendants proposed a host of additional rule changes that substantially modified substantive asylum law and procedure before the Immigration Courts and the BIA.  *See* Compl. ¶¶ 291–99 (citing and discussing subsequent rules); *see also* Mendez Decl. ¶¶ 59–70 (providing examples); dos Santos Decl. ¶ 35 (same). Because these interconnected rule changes were announced after the comment period on the NPRM closed, the public had no opportunity to assess or comment on the *actual* impact the Final Rule would have in the context of proceedings as remade by these other rules.  The public was thus deprived of the opportunity to comment on the total impact of these fee increases.

## ARGUMENT

Plaintiffs request that the Court grant a stay order pursuant to 5 U.S.C. § 705 or, in the alternative, a preliminary injunction pursuant to Fed. R. Civ. P. 65 to postpone the effective date of the Final Rule until the final adjudication on the merits.  *See Nw. Immigrant Rights Project v. U.S. Citizenship & Immigr. Servs.*, 2020 WL 5995206, *32–33 (D.D.C. Oct. 8, 2020).

Plaintiffs meet the standards for both forms of relief:  (i) they are likely to succeed on the merits of their claims, (ii) they will experience irreparable harm if the Final Rule is permitted to go into effect, and (iii) the balance of equities and the public interest weigh in favor of the relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (applying preliminary injunction factors to stay order under 5 U.S.C. § 705).

I.     **Plaintiffs Are Likely to Succeed on Counts I–IV of Their Complaint:  Their Claims that the Final Rule Was Enacted in Violation of the APA and RFA.**

A.  **Plaintiffs Have Standing to Assert Their Claims.**

As a threshold matter, Plaintiffs note that one or more among them have standing for each claim addressed on the merits below.  *See Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973, 979 (D.C. Cir. 2016) (noting that a court may adjudicate a claim so long as at least one plaintiff has standing).[4]  Two tests apply here–one for organizational standing and, in the case of Plaintiffs CLINIC and CHIRLA, also the one for associational standing.  Both tests are met.

To establish standing, a plaintiff must demonstrate: (1) injury in fact, (2) causation, and (3) redressability.  *See, e.g., Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  "[T]hreatened injury in fact [that] is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision" suffices for an organization to litigate asserted claims. *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020) (citation omitted).

---

[4] Plaintiff KIND does not assert a claim under the RFA here, *see infra* Argument § I(E).  With that exception, each Plaintiff has standing to raise each claim on which this Motion is based.

### 1.   All Plaintiffs Have Organizational Standing

As it relates to organizational standing, Article III's requirements are met where defendants' actions cause a "concrete and demonstrable injury to the organization's activities" that is "more than simply a setback to the organization's abstract social interests.'" *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (injury requirement met where agency's "conduct perceptibly impaired the organization's ability to provide services" by causing an "inhibition of [its] daily operations"); *see also Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'").

The immense harm flowing directly from Defendants' Final Rule and Defendants' disregard for procedural requirements of the APA in their promulgation of the Final Rule is detailed in the Declarations of the Plaintiff organizations, among other record evidence, and is further set forth below in Argument Section IV, addressing the irreparable harm that will result if the Final Rule is not stayed as to its effective date or preliminarily enjoined.  These harms include but are not limited to: diversion of resources to account for the added time needed for the many cases that will need fee waiver requests under the Final Rule; reduced capacity to accept new cases; diminished funding; diminished capacity for pro bono case placement; diversion of resources to fundraise for fees that clients and members will not be able to afford and without which critical Applications, Motions, and Appeals will have to be forfeited; need to revise training materials and increase technical support; and, overarchingly, the frustration of each Plaintiff's mission, including in particular their respective capacities to deliver the high-quality, thorough, ethical representation that our profession and the high-stakes nature of Removal Proceedings demands.  Mendez Decl. ¶¶ 23, 42, 59; dos Santos Decl. ¶¶ 6–8, 15, 33–37, 40–49; Odom Decl. ¶¶ 5, 28–30; Salas Decl.

¶ 47.[5]  A host of court decisions have recognized harms virtually identical to and in some cases less than these as sufficient for organizational standing.  *See, e.g.*, *Nw. Immigrant Rights Project*, 2020 WL 5995206, *6–9.

A favorable decision from this Court unquestionably will redress the harms already suffered and prevent further irreparable harm.

### 2.  Plaintiffs CLINIC and CHIRLA Have Associational Standing to Assert Their Claims

Members of Plaintiffs CLINIC and CHIRLA have suffered the same harms.  Courts "have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

CLINIC's members consist of affiliate organizations that pay a fee to be part of the CLINIC network and receive a range of benefits in return.  *See* Mendez Decl. ¶¶ 5–7, 42–47; *see also* Declaration of Mikhael Borgonos ("Borgonos Decl.")  ¶¶ 1–2 (documenting CLINIC membership).  Injuries to CLINIC's affiliate members from Defendants' Final Rule and violations in the rulemaking process mirrors the injuries to Plaintiffs.  Mendez Decl. ¶¶ 23–27, 48–57;

---

[5] Plaintiffs have also been harmed by Defendants' procedural violations of the APA and their violation of the RFA.  *See infra* Argument IV  (demonstrating likelihood of prevailing on Counts 2, 3, and 4).  Accordingly, Plaintiffs have standing to bring these claims.  *See, e.g.*, *Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, 2020 WL 6802474, *20-22 (N.D. Cal. Nov. 19, 2020) (recognizing harm from defendants' procedural APA violations including truncated 30-day comment period that encompassed a holiday); dos Santos Decl. ¶¶ 16–29  (detailing prejudice flowing from Defendants' imposition of, and refusal to extend, 30-day comment period that coincided with early brunt of the Covid-19 pandemic); Salas Decl. ¶ 31–32 (same); Mendez Decl. ¶¶ 17–22 (addressing same, including inability to secure fee study data and fee waiver data critical to full assessment of Defendants' proposed rulemaking).

Borgonos Decl. ¶¶ 10–12.  Accordingly, just as Plaintiffs have standing in their own right, so too do CLINIC's members.

The Final Rule's harm to CHIRLA's members will be acute, because they include individual immigrants, refugees, and mixed-status families with low income who will pay the ultimate price for Defendants' violations—deportations that Congress did not intend when it provided for relief like cancellation of removal.  The Final Rule's new and dramatically escalated fees will shut the courthouse doors on these individual members and prevent them from appealing their deportation that may have been founded on legal errors that appeals could correct simply because most of these members will no longer be able to afford the filing fees.  This will result in the unnecessary ripping apart of families, and in some cases, return to life-threatening harm.  Further, these members—who are already struggling financially to meet basic needs—will face more immediate harm by having to endure additional painful financial sacrifice to try to afford their filing fees.  As Defendants themselves have stated, 85 Fed. Reg. at 82,763, individuals like CHIRLA members T.F.F., M.S.R., and Y.M.G.R. have no option but to sacrifice now so that they will have any hope of not suffering a worse fate.  Salas Decl. ¶¶ 54, 57–61.  There can be no doubt that these individual members have standing.

The standing of individual members of both CLINIC and CHIRLA is well established here, and CLINIC AND CHIRLA meet the remaining requirements of associational standing—there can be no dispute that the interests these Plaintiffs seek to protect are germane to the purpose of each organization, *see* Mendez Decl. ¶¶ 3–13; Salas Decl. ¶¶ 3–28, and neither the claims asserted nor the relief sought require individual member participation, *e.g.*, *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015) (member participation not required where the "petition

turns entirely on whether [the agency] complied with its statutory obligations, and the relief [the organization] seeks is invalidation of agency action").

Adjudication of the merits of Plaintiffs' Motion for preliminary relief is thus appropriate.

### B. Plaintiffs are Likely to Succeed on Count I Because the Final Rule Is Arbitrary, Capricious, an Abuse of Discretion, and Contrary to Law.

A rule must be the product of "reasoned decisionmaking." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998). To meet this requirement, the promulgating agency must "examine the relevant data" and "articulat[e] a satisfactory explanation for its action." *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A rule should be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Defendants here ignored evidence of the effect of the fee increases, and failed to articulate a reasoned explanation for them.

#### 1. Defendants Ignored Significant Concerns in Promulgating the Final Rule

An agency must "examine all relevant factors and record evidence." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017) (citing *State Farm*, 436 U.S. at 52). Defendants did not.

***Defendants Ignored Evidence that the Fees Are Prohibitive***

Despite numerous comments submitted by legal service providers—including Plaintiffs—attesting to the prohibitive nature of the fees, Defendants claimed simply that there was not enough information to determine whether the fees would render justice inaccessible, concluding:

> to the extent the Department possesses information that may serve as a proxy for an alien's financial status—e.g., the ability of an alien to retain representation or the ability of an alien to pay application fees set by DHS, which are generally much higher than those set by EOIR—that information suggests that most aliens would be able to afford EOIR's proposed fees.

85 Fed. Reg. at 82,756.  Defendants thus elided over fee waiver data in their own possession, *id*. at 82,759 (stating that they had not "tracked or universally evaluated" financial information submitted in support of fee waiver requests); dismissed significant evidence submitted by commenters that noncitizens in removal proceedings are particularly likely to struggle with the proposed fees, *see, e.g.*, *id*. at 82,761 (noting commenters' concerns that the proposed fee would be particularly difficult to raise in the 30 days allowed for an appeal) and at 82,763 (rejecting those concerns because individuals who may wish to appeal "should, accordingly, use the that time between the initiation of the proceeding and the immigration judge's issuance of a final decision to begin arranging funds for the future payment of the appeal"), *see also id*. at 82,779 (noting evidence by commenters that 40% of Americans would struggle to pay an unexpected $400 bill) and 82,780 (rejecting the significance of that evidence because "publication of this rule provides notice to the public such that individuals who have a valid claim for relief will have time to prepare for filing . . . including filing fees"); and offered vague reference to another agency's proceedings in lieu of Defendants' data showing approximately 37% of Immigration Court respondents lack counsel, *see* EOIR Adjudication Statistics (Apr. 15, 2020), https://tinyurl.com/ya3ge9bp, and the fact that not-for-profit and pro bono attorneys provide much of the representation that is available. Defendants' professed lack of information, conclusory reliance on "proxy" information from the affirmative benefits context, and disregard for significant available evidence, do not comport with the APA.  *See Am. Radio Relay League, Inc v. F.C.C.,* 524 F.3d 227, 241 (D.C. Cir. 2008).

### *Defendants Ignored Evidence That the Mere "Possibility" of Fee Waivers Would Not Mitigate the Impact of the Increased Fees*

Defendants touted the availability of fee waivers in dismissing nearly all of the concerns that commenters raised as to the impact of the fee increases.  *See, e.g.*, 85 Fed. Reg. at 82,760, 82,779.  But Defendants dismissed commenters' evidence that the mere "possibility" of fee

waivers would not appropriately alleviate the fee burden as they claimed.  For example, Defendants did not give weight to evidence that (i) more fee waiver requests will need to be prepared and filed, requiring more time of legal service providers, and reducing the overall number of clients such providers can represent, *id*. at 82,767–68; (ii) respondents in Removal Proceedings cannot rely on the availability of fee waivers, which are discretionary, subject to no statutory or regulatory standard, and unpredictable, *id.* at 82,758–59; (iii) it is risky to rely on the availability of a fee waiver, *see* Camilo Decl. ¶ 6; Odom Decl. ¶¶ 16, 24; Romero Decl. ¶¶ 14, 18, 19; dos Santos Decl. ¶¶ 39, 43; and (iv) the need for additional fee waiver requests would impose a greater burden on the adjudicators, increasing the impact of the preceding point, 85 Fed. Reg. 82,758.

### Defendants Ignored Evidence of the Impact of the Fee Increases on Legal Service Providers, Such As Plaintiffs

Defendants ignored evidence of the Final Rule's impact on legal service providers such as Plaintiffs.  Commenters warned that increasing fees for the first time in more than three decades would disrupt their businesses and their ability to represent clients before EOIR.  *See* 85 Fed. Reg. at 82,774.  They explained that Plaintiffs and other legal service providers would be forced to take fewer cases, add additional staff, and devote additional resources to fee waivers rather than representation of clients.  *Id.*; *see, e.g.*, Comment by CLINIC in Opposition to Proposed Rulemaking:  Fee Review, 85 FR 11,866, Comment No. EOIR-2020-0001-0207, at 29 (March 30, 2020).

Defendants ignored the evidence of the harm to Plaintiffs and other legal service providers, stating that "commenters' assertions concerning the burden of increased fees on organizations and the private bar falls outside the limited scope of this rulemaking," and branding the concerns as speculative.  85 Fed. Reg. at 82,775.  Defendants' failure to address the predictable fallout or to analyze the anticipated costs of the Final Rule on legal service providers for noncitizens renders

the Final Rule arbitrary and capricious.  *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) ("[W]here the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law.")

***Defendants Ignored Evidence that the Fee Increases Would Price the Public out of Relief in Removal Proceedings***

Commenters raised still more concerns that Defendants dismissed—that the  increased fees would diminish the integrity of EOIR Proceedings, undermine due process, reduce access to counsel, subject respondents in Removal Proceedings to abusive lending practices so that they can afford the means to defend themselves in Removal Proceedings, and "have cumulative negative, and in some cases irreversible, effects on aliens who would be unable to afford the fees, those aliens' families, and their communities." 85 Fed. Reg. at 82,760–61.  Defendants conclusorily stated that they "disagree with commenters' concerns about the rule's extensive negative impact," and peremptorily dismissed inevitable harms as "too speculative to warrant changes to the NPRM"—failing even to explain why they regarded them as "speculative."  *Id.  But see Sorenson Commc'ns Inc. v. F.C.C.,* 755 F.3d 702, 708 (D.C. Cir. 2014) (agencies must justify rule changes based on some "logic and evidence") (internal citation omitted).

## 2.  The Final Rule Does Not Provide a Reasoned Basis for Increasing Fees

The APA requires "the agency . . . to articulate a reasoned explanation for its decision," *Perdue*, 873 F.3d at 923, but Defendants do not cite a legitimate goal or provide a reasoned explanation for the fee increases.  Defendants state flatly that it is "necessary to update the fees . . . to more accurately reflect the costs for EOIR's adjudications of these matters," but do not justify their articulated goal of trying to align fees with processing costs given that EOIR is a congressionally appropriated adjudicative agency, not a fee-funded agency such as USCIS.  85 Fed. Reg. at 82,754.

Defendants' unmoored assertion of need is not "a satisfactory explanation for its action," because it does not make a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.  Whether a rational connection exists depends on the problem that the agency action seeks to solve.  Indeed, even "a regulation perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem does not exist."  *See Home Box Office, Inc. v. FCC*, 567 F.2d 9, 36 (D.C. Cir. 1977) (citations omitted).

First, Defendants identify no shortfalls in appropriations.  They cite no study or evidence, and provide no justification, for suddenly seeking—after decades—to shift the costs of an appropriated agency to indigent respondents whom the government chose to place in Removal Proceedings.  Nor do Defendants provide any evidence that taxpayers bear a "disproportionate burden in funding the immigration system," 85 Fed. Reg. at 82,751, particularly given that acknowledged public interest in the just administration of the nation's immigration laws, 85 Fd. Reg. at 11,870.  The Final Rule's unsupported premise that it is necessary to recoup EOIR's costs through fees is not enough to define a legitimate purpose, *id.* at 82,781, particularly where the cost and burden of the rules fall so heavily on those whose liberty is at stake.  Conclusory statements are insufficient to establish the problem or to justify the solution, *see Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 152 (D.C. Cir. 1993), and explanations that "run[] counter to the evidence before the agency" will necessarily fail.  *State Farm*, 463 U.S. at 43.

Second, assuming lowering costs to taxpayers is a legitimate goal, Defendants failed to demonstrate how the fee increases could achieve this purpose without diminishing the due process rights of those in Removal Proceedings.  *See* Fed. Reg. at 82,754.  Commenters submitted evidence that the fees would be prohibitively high for many respondents in Removal Proceedings and that fee waivers do not mitigate the burden of the increased fees.

26

And third, Defendants did not provide a reasoned basis for increasing fees where such increases would foreclose otherwise eligible individuals from seeking asylum, cancellation of removal, suspension of deportation, or filing motions or appeals.  *See State Farm*, 463 U.S. at 43 (agencies must state a "rational connection between the facts found and the choice made").  Indeed, Defendants claimed that there is no evidence that filing fees discourage individuals from filing for lawful immigration status, but acknowledged that fees may affect an individual's "decision to file an application."  *See* Fed. Reg. at 82,760.  Defendants' admitted lack of evidence proves that they went ahead with the Final Rule with *no basis* for determining the effect of the increases on Removal Proceeding respondents.  Instead, the government decided to experiment with people's lives—increase the fees, see what happens, and maybe fix things some other time.  *See id*. at 82,759 ("[A] particular subset of those who can afford the current fees currently may not be able to after the increases, but the precise size of that subset, though potentially not as large as commenters suggested for the reasons given above, is not estimated.").  Such *deliberate ignorance* is the *sine qua non* of "arbitrary of capricious" action: Defendants hypothesize that the increase would not have a deleterious effect, but ignore evidence to the contrary.  *See State Farm*, 463 U.S. at 43.

Fourth, Defendants did not adequately consider what amount of fees would discourage enough individuals from filing that the new fee rates would lead to a reduction in Defendants' desired fee income.  85 Fed. Reg. at 82,775.  Fifth, nowhere do Defendants explain how they settled on the specific fee increases in the Final Rule.  In admitting they chose a number somewhat less than the total amount representing complete cost recoupment, Defendants necessarily had to make a choice among options of how much to raise the fee.  The Final Rule does not discuss the alternative fees that could have been charged, or how Defendants graded the burden on taxpayers, or assessed the tolerable harm to respondents.  *See Dep't of Homeland Sec. v. Regents of the Univ.*

*of Cal.*, 140 S. Ct. 1891, 1913–15 (2020) (holding that it is arbitrary and capricious for the government to rescind a regulation without considering lawful alternatives); *State Farm*, 463 U.S. at 51; *see also* Office of the Inspector General, U.S. Dept. of Justice, Audit of the Executive Office for Immigration Review's Fiscal Year 2019 Financial Management Practices (June 2020), https://tinyurl.com/ybgpty33 (criticizing, *inter alia*, EOIR mismanagement, budgeting deficiencies, and administrative inefficiencies). Nor do Defendants identify the purpose for which the increased fees will be used. This failure is particularly noteworthy given that the fees are deposited into a fund controlled exclusively by the DHS, not DOJ. *See* Section I(B)(4), *infra*.

Finally, Defendants' reliance on the "possibility" of fee waivers to offset the burden of the increased fees not only ignores the evidence and considerations raised by commenters, but it rests on no data about fee waivers: the Final Rule cites no support for their statement about the curative possibility of fee waivers, and cites no evidence regarding the projected cost of adjudicating additional fee waiver applications, or the amount that will be lost to waivers of increased fees that would have been paid at the existing level.

### 3. The Final Rule Offers No Justification or Rationale for Departing From Longstanding Agency Policy and Practice Regarding Fees for Applications, Motions, and Appeals

A "central principle of administrative law is that, when an agency decides to depart from decades-long past practices and official policies, the agency must at a minimum acknowledge the change and offer a reasoned explanation for it." *Perdue*, 873 F.3d at 923; *see also Encino Motorcars*, 136 S. Ct. at 2128 (holding that APA requires the agency to "display awareness that it is changing position" and "show that there are good reasons for the new policy"). When an agency "abandon[s] its decades-old practice," a summary discussion that "may suffice in other circumstances" becomes inadequate in light of "decades of industry reliance on [the agency's] prior policy." *Encino Motorcars*, 136 S. Ct. at 2123–26. Moreover, courts "will not assume an

28

agency has engaged in reasoned decision making when it implicitly departs from its prior precedent and provides no explanation from doing so." *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1091 (D.C. Cir. 2009).

The DOJ has not increased fees for EOIR filings over the past 34 years.  Defendants attempt to explain away this "lack of action" as a departmental failure to be remedied by the fee increases, but nothing in the rulemaking record supports this conclusory claim.  *See* 85 Fed. Reg. at 82,750–51.

The APA requires Defendants to provide a reasoned explanation for their departure from longstanding agency policy and practice in the Final Rule.  *See Perdue*, 873 F.3d at 923–24.  They gave none.

### 4.   The Final Rule is Contrary to Law

Finally, Defendants violated the APA by promulgating a Final Rule that is contrary to law.  Defendants claimed authority that they do not possess to impose the fees set by their Final Rule.  Defendants cite two sources.  The first is INA § 286(m).  The language and history of this provision belie this claim.

With the addition of Section 286(m) and a corresponding provision, Section 286(n), Congress created a fund—the Immigration Examinations Fee Account ("IEFA")—to deposit "adjudication fees for immigration adjudication and naturalization services."  Pub. L. 100-459, 102 Stat. 2186, 2203 (Oct. 1, 1988), § 209(a) (codified at 8 U.S.C. §§ 1356(m)–(n)).  Section 286(m) and the IEFA provide funding for the Immigration and Naturalization Service's ("INS") adjudications of immigration and naturalization benefits—now handled by USCIS—but do not authorize charges for the immigration court system. *See* Conference Report on H.R. 4782, 134 Cong. Rec. H8297-01, 1988 WL 176092 (Sept. 26, 1988).  Any EOIR filing fees are deposited into the IEFA, but EOIR has no control over those funds and only receives a small amount back

from DHS every year.  *See* DHS, Immigration Examinations Fee Account Fiscal Year 2019 Report to Congress Statement of Financial Condition, https://tinyurl.com/y9v9ay26.  Sections 286(m) and (n) do not grant statutory authority to DOJ to charge fees for EOIR filings for respondents in Removal Proceedings.

Defendants also rely on the Independent Offices Appropriations Act of 1952 (IOAA). There are a host of reasons to conclude that the IOAA was not intended to and does not cover adjudications in Removal Proceedings, *but see Ayuda, Inc. v. Attorney Gen*., 848 F.2d 1297, 1301 (D.C. Cir. 1988), but the Court need not reach this issue because any authority Defendants possess under the IOAA is constrained by the statutory requirement that the fees be "fair"; based on "the costs to the Government"; "the value of the service or thing to the recipient"; "public policy or interest served"; and "other relevant facts." 31 U.S.C. § 9701(b).  Defendants' reliance solely on costs to government, but failure to pay heed to considerations such as fairness and the public interest, infected their rulemaking at every turn and violated any authority they might claim under the IOAA.

      **C.  Plaintiffs Are Likely to Succeed on Count II Because in Limiting the Comment Period for the Proposed Fee Rule to 30 Days, at the Onset of a Global Pandemic, Defendants Violated the Notice and Comment Requirements of the APA.**

An agency engaged in rulemaking must "give an opportunity for interested persons to participate in the rulemaking through submission of written data, views, or arguments." *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 95 (D.C. Cir. 2002).  "The purpose of the comment period is to allow interested members of the public to communicate information, concerns, and criticisms to the agency during the rule-making process." *Conn. Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 530 (D.C. Cir. 1982).  Accordingly, "in most cases" a "meaningful opportunity to comment on [a] proposed regulation" must "include a comment

period of not less than 60 days." Executive Order 12866, 58 Fed. Reg. 51,735 (Sept. 30, 1993); *see also* Executive Order 13563, 76 Fed. Reg. 3,821 (Jan. 18, 2011). Defendants gave the public just 30 days to comment on the Proposed Fee Rule. That was insufficient standing on its own. Coinciding with the onslaught of a global pandemic that disrupted virtually every aspect of society, that abbreviated period hobbled public participation in the rulemaking process.

First, there was no urgency to the Proposed Fee Rule requiring an abbreviated comment period. *Cf. N. Carolina Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 770 (4th Cir. 2012) (explaining comment periods of "exceedingly short duration" are usually only appropriate where there are "exigent circumstances in which agency action was required in a mere matter of days"). Indeed, the fees at issue were unchanged for 34 years, and Defendants waited almost two years after their "comprehensive study" before publishing the NPRM. Neither the NPRM nor the Final Rule claims an urgent need for the fee increases. Defendants' response to the comments about the thirty-day period was dismissive, conclusory, and feckless. *See* 85 Fed. Reg. at 82,771.

Second, the developing COVID-19 pandemic rendered the 30-day period especially inadequate, and Defendants' refusal to extend, freeze, or reopen the comment period is indefensible. Courts have recognized that events interfering with the public's ability to submit comments can render even a facially sufficient comment period inadequate.

For example, in *Pangea Legal Services v. U.S. Department of Homeland Security*, DHS had limited the comment period on a rule, which "troubled" the *Pangea* court "for a number of reasons," including that the already short 30-day comment period spanned the year-end holidays, that DHS had allowed longer comment periods for similar and related rules issued during the same period, that DHS had received far fewer comments on the challenged rule than it had for those that provided for a 60-day comment period, and that DHS had engaged in a "staggered" rulemaking by

31

issuing related proposed rules after the close of the comment period, which "deprived the public of meaningful opportunity to [comment] . . . because the full impact of the Rule was not clear until after the comment period on the Rule closed."  2020 WL 6802474, at *20–22 (N.D. Cal. Nov. 19, 2020) (granting TRO against DHS rule).

The COVID-related challenges that were emerging as the NPRM was published created far more obstacles to the submission of "broad public comment" than a holiday season.  And yet, as the pandemic's impact prompted other federal agencies to extend and reopen comment periods to ensure participation by the public, Defendants dug in and ignored the requests by Plaintiffs and others to do the same.  Mendez Decl. ¶ 18.  As a consequence, Plaintiffs and other members of the public were unable to provide fulsome comments, and in many instances (as with Plaintiff CLSEPA and nearly 100 other organizations who requested more time), any comments at all.  *See* dos Santos Decl. ¶¶ 27–29.  In the Final Rule, Defendants dismiss the effect of the pandemic, summarily stating their "belie[f] that the COVID-19 pandemic has no effect on the sufficiency of the 30-day comment period," and that they are "not obligated to extend the notice and comment period at the public's request."  85 Fed. Reg. at 82,771.

There were just 601 comments submitted in total, on a subject that ordinarily draws thousands.  *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigrant Benefit Request Requirements, 85 Fed. Reg. 46,788, 46,795 (Aug. 3, 2020) (noting that proposed USCIS fee rule, with longer comment period, drew more than 40,000 comments).  *See N. Carolina Growers' Ass'n*, 702 F.3d at 770 (where the agency had received 11,000 comments over a 60-day period for a related rulemaking, the receipt of 800 comments over a 10-day comment period "d[id] not support the . . . argument that the Department provided adequate opportunity for comment").  Even more so than in *Pangea*, the circumstances of

Defendants' comment period "undercut the purpose of the notice process to invite broad public comment."  2020 WL 6802474, at *1–2.

### D. Plaintiffs are Likely to Succeed on Count III Because their Rulemaking Process Violated the APA

#### 1. Defendants Refused to Disclose the Methodology or Data Underlying Their Analysis.

The APA requires an agency to "identify and make available technical studies and data that it has employed prior to the comment period" including "the models and methodology used by an agency to support its action." *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 262 (D.D.C. 2015); *see* 5 U.S.C. § 553(b); *Engine Mfrs. Ass'n v. EPA*, 20 F.3d 1177, 1181 (D.C.Cir.1994) (APA "requires the agency to make available to the public, in a form that allows for meaningful comment, the data the agency used to develop the proposed rule").  "An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary." *Connecticut Light and Power Co. v. NRC*, 673 F.2d 525, 530–31 (D.C. Cir. 1982).  Defendants here committed precisely this "serious procedural error."

First, in both the NPRM and in the face of direct requests during the comment period, Defendants failed to provide any data about the "comprehensive study" on which they claimed to have relied in formulating the Proposed Fee Rule.  The NPRM states that the "comprehensive study" was undertaken in the Spring of 2018 to determine the cost to EOIR for each type of application, motion, and appeal for which the NPRM proposed to increase fees.  But the NPRM did not provide necessary information about either the methodology of the study or the data that it generated to allow meaningful analysis and commentary about whether the study was reliable and its results supported.  For example, although the NPRM claimed that the first phase of the "comprehensive study" entailed "gather[ing] survey data and consult[ing] with staff," 85 Fed. Reg.

11,869, it did not provide the data purportedly collected during this phase nor answer any of a host of other questions.  Defendants also failed to provide that information upon request.  Those failures violate the APA.  *See Shands*, 139 F. Supp. at 261–63.

Second, although the NPRM and the Final Rule claimed that the availability of fee waivers would mitigate the impact of the fee requests, 85 Fed. Reg. at 11,874 ("fee waivers are still possible for those who seek them"), the NPRM did not provide any data justifying or otherwise relating to that claim—such as the number and outcome of fee waiver requests submitted under the existing fee schedule, or the expected number of fee waiver requests if the fee increases went into effect.  Without such data, the commenting public could not provide robust challenges to the NPRM's reliance on fee waivers.  Moreover, Defendant EOIR failed to respond to CLINIC's FOIA request for fee waiver data before the comment period closed.  And the data provided to CLINIC after the comment period closed reveals just how important such data would have been in challenging the rule, because EOIR's records included facially inaccurate entries, such as dates that precede EOIR's existence, and shows that Defendants have not consistently maintained fee waiver data, and do not even know the number or rate of fee waiver denials under the existing fee schedule.  Had Defendants provided the shoddy records that they had and purported to rely on, the public would have been able to undermine directly Defendants' statements that the "possibility" of fee waivers would soften the impact of the fee increases.

Lastly, the NPRM did not provide any data about the financial resources of respondents in Removal Proceedings, or their ability to pay the current or proposed fees.  Only in the Final Rule did Defendants reveal that their assumptions that respondents would "be able to afford EOIR's proposed fees" were based on the ability of some respondents to retain representation in Removal Proceedings or to pay application fees set by DHS.  *See* 85 Fed. Reg. at 82,756.  A defendant's

failure to disclose the "assumptions" and "methodology" underlying an agency's analysis until after the comment period closes prevents "meaningful public comment" and violates the notice-and-comment requirements of the APA. *Shands*, 139 F. Supp. 3d at 261–63.

### 2. Defendants Closed the Comment Period Before Providing Notice of Additional Proposed Rules That Would Magnify the Impact of the Fee Increases.

An NPRM must provide notice that is "'sufficient to fairly apprise interested parties' of all significant subjects and issues involved." *Louisiana Forestry Ass'n Inc. v. Sec'y U.S. Dep't of Labor*, 745 F.3d 653, 676 (3d Cir. 2014); *see also* 5 U.S.C. § 553(b). An NPRM is deficient if its omissions prevent interested parties from "comment[ing] meaningfully upon the agency's proposals." *Conn. Light & Power Co.*, 673 F.2d at 530–31. Relevant information that must be provided includes the potential for "collateral impact" of one rule change on another. *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011); *see also Casa de Md.*, 2020 WL 5500165, at *26–27; *N. Carolina Growers' Ass'n,*, 702 F.3d at 769–70.

When EOIR published the NPRM for the Proposed Fee Rule at issue, it was also preparing to propose other rules that would implement a raft of procedural changes to Immigration Court and BIA proceedings. These other rules, three of which are now final, exacerbate the impact of the fee increases for applications, motions, and appeals, but the NPRM did not disclose the substance of the Subsequent Proposed Rules in its regulatory pipeline, and the comment period closed before the notices for the Subsequent Proposed Rules were published. *See supra* Statement of Facts III(e). There are many ways that these subsequent rules will exacerbate the impact of the Final Rule's fee increases, *see* Compl. ¶¶ 291–99; Mendez Decl. ¶¶ 59–70 (providing examples); dos Santos Decl. ¶ 35 (same); *supra* at Statement of Facts III(e), but the public had no opportunity to make comments directed to the full impact of the Final Rule's operation.

35

### E.  Plaintiffs Are Likely to Succeed on Count IV Because the Final Rule Was Promulgated in Violation of the RFA

#### 1.  Plaintiffs CLINIC, CLSEPA, and CHIRLA are "Small Entities" Under the RFA

A small entity that will be directly affected by an agency rule may bring a claim for an RFA violation.  *See* 5 U.S.C. § 611(a)(1); *Cement Kiln Recycling Coal. v. E.P.A.*, 255 F.3d 855, 869 (D.C. Cir. 2001) (noting that the "application of the RFA . . . turn[s] on whether particular entities are the 'targets' of a given rule").

Plaintiffs CLINIC, CLSEPA, and CHIRLA are each "small entities" within the meaning of the RFA, as they are not-for-profit organizations that are independently owned and operated and are not dominant in their field of operation.  Mendez Decl. ¶¶ 5, 7; Salas Decl. ¶ 4, 11–12; dos Santos Decl. ¶¶ 3–5,  33; *see also* 5 U.S.C. § 601(6) (defining small entities); 15 U.S.C. § 632; 13 C.F.R. § 121.201; Small Business Size Standards, 85 Fed. Reg. 72,584, 72,595 (Nov. 13, 2020). The status of CLINIC, CLSEPA, and CHIRLA as small entities is consistent with EOIR's acknowledgment  that "most" immigration "attorneys and accredited representatives" that practice before it "qualify as 'small entities' under the [RFA]."  *See* EOIR Electronic Case Access and Filing, 85 Fed. Reg. 78,240, 78,246 (Dec. 4, 2020).

#### 2.  The Rulemaking Process Failed to Comply With Requirements of the RFA

The RFA entitles small entities adversely affected by final agency action to obtain judicial review of agency compliance with certain sections of the Act.  5 U.S.C. § 611(a)(1).  Here, the Final Rule fails to comply with sections 604 and 605(b).

Section 604 requires the agency to provide "a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available" and "a description of the steps the agency has taken to minimize the significant economic impact

on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected."  5 U.S.C. §§ 604(a)(4), 604(a)(6).  Section 605(b) provides that an agency may be exempt from the Section 604 requirements "if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities" and  the agency publishes in the Federal Register "a statement providing the factual basis for such certification."  5 U.S.C. § 605(b).

Although EOIR knows that may practitioners in immigration court qualify as RFA small entities, the Final Rule does not show that the agency conducted a  regulatory flexibility analysis. Because "[o]nly individuals, rather than entities, are responsible for paying the fees" implicated in the Final Rule, 85 Fed. Reg. at 82, 785, Defendants concluded that the Final Rule "would not regulate 'small entities' as that term is defined" in the RFA, *id.*, rendering such analysis unnecessary  But many "small entities," including Plaintiffs CLINIC, CHIRLA and CLSEPA, affiliates of Plaintiff CLINIC, and similarly situated organizations regularly pay the fees on behalf of their clients who cannot afford them and will have to complete fee waiver requests for their clients under the new fee regime.  Salas Decl. ¶ 27; dos Santos Decl. ¶¶ 33, 40; Mendez Decl. ¶ 34. Even if it were the case that, under the old fee rules, some individuals in Removal Proceedings paid fees in their cases, low-income and detained individuals were (and are) very unlikely to be able to afford the new fees on their own.  *See* Salas Decl. ¶ 14; dos Santos Decl. ¶¶ 12, 14, 39; Mendez Decl. ¶¶ 36, 40.  Defendants turned a blind eye the impact of the Final Rule on small entities and failed to "demonstrate a reasonable, good-faith effort to carry out RFA's mandate." *U.S. Cellular Corp. v. F.C.C.*, 254 F.3d 78, 88 (D.C. Cir. 2001).

Under the APA, a rule should be set aside if it was "contrary to law."  Because Defendants violated the RFA in promulgating the Final Rule, Plaintiffs are likely to prevail on Count IV of their Complaint (ECF 1).

## II.   Plaintiffs Will Be Irreparably Harmed Absent Preliminary Relief

Plaintiffs—not-for-profit organizations who offer legal services to low-income immigrants—face immediate and irreparable harm absent a preliminary injunction. "An organization is harmed if the actions taken by the defendant have perceptibly impaired the organization's programs." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (quotations and alterations omitted); *see also Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) (looking to whether "a defendant's conduct has made the organization's activities more difficult" or "conflict[s] with the organization's mission").

### A.   The Final Rule Will Irreparably Harm Plaintiffs' Programs and Missions

Once the Final Rule is effective, Plaintiffs will see a drop in the volume of clients they can represent, immediately and irreparably harming their programs. *See, e.g.*, Salas Decl. ¶ 39; dos Santos Decl. ¶¶ 8, 15, 31, 44, 46; Odom Decl. ¶ 30.  The reduced number of immigrants served by Plaintiffs and their pro bono partners, in turn, will lead to a significant loss in funding for Plaintiffs CHIRLA and CLSEPA, as much of their funding is on a "per case" basis. *See dos Santos Decl.* ¶¶ 6–7, 10, 15; Salas Decl. ¶ 8–9.  Given those likely cuts in funding, Plaintiffs may be unable to maintain their current staffing levels which, in turn, will further lower their capacity to represent new and existing clients, and to carry out their programmatic goals.  *See dos Santos Decl.* ¶ 10; Salas Decl. ¶ 9.  CLINIC affiliates whose funding is tethered to a minimum volume of clients served will also see their funding jeopardized.  *See Borgonos Decl.* ¶ 8, 10; Mendez Decl. ¶ 51.

For Plaintiff CLINIC, whose funding depends upon the annual fees paid by its network of almost 400 affiliates, the detrimental impact on those affiliates will likely decrease affiliate

membership, which in turn will diminish the resources available to CLINIC.  *See* Mendez Decl. ¶¶ 42, 58.  Individuals who may have otherwise retained counsel, including through CLINIC affiliates, may now need to forego legal representation so they can afford the increased filing fees. *See* Mendez Decl. ¶¶ 56–58; *see also* Romero Decl. ¶ 20; Decl. of Casey Bryant ¶¶ 3, 8.  As a result, private attorneys and low bono legal service providers affiliated with CLINIC will suffer losses in client volume, which may, in turn, preclude them from paying membership fees to CLINIC.  *See* Mendez Decl. ¶ 58; Bryant Decl. ¶ 9.

The Rule change will require Plaintiffs to divert resources from their core programmatic work to modify training materials addressing the implications of the new Fee Rule.  *See* Mendez Decl. ¶¶ 43–48; Odom Decl. ¶ 27; dos Santos Decl. ¶ 36.  The Rule change has already begun to divert resources towards filing Applications, Motions, and Appeals before the Fee Rule goes into effect, subjecting clients to exorbitant fees.  *See* Salas Decl. ¶ 20.

That there is a process by which some applicants can apply for a fee waiver does little to remedy Plaintiffs' harm.  Indeed, the need for fee waivers itself will harm the Plaintiffs' work and mission by forcing Plaintiffs (or Plaintiff CLINIC's affiliates) to devote more resources to advising clients on their eligibility for, preparing, and litigating fee waivers.  Dos Santos Decl. ¶ 15; Odom Decl. ¶ 28; Mendez Decl. ¶¶ 32, 37, 50. That work will, in turn, draw staff time away from the core work of providing direct representation, meaning Plaintiffs can take on fewer cases.  *See* Salas Decl. ¶¶ 42–43; Odom Decl. ¶¶ 28, 30; Mendez Decl. ¶ 52; dos Santos Decl. ¶¶ 15, 45.  Similarly, Plaintiffs CLSEPA, CLINIC, and KIND frequently place clients with pro bono attorneys, whom Plaintiffs train and mentor, but the need for more fee waiver work will deter pro bono attorneys from taking on cases due to the increased complexity of filing and litigating fee waivers, harming

Plaintiffs' pro bono model.  *See* Mendez Decl. ¶ 38; dos Santos Decl. ¶ 36; Odom Decl. ¶¶ 23–26, 30; Camilo Decl. ¶ 10.

Second, given the burden of filing fee waiver applications and the risk of denial, Plaintiffs in some cases may forego the fee waiver and cover the fees.  *See* Odom Decl. ¶¶ 16, 24–25; Mendez Decl. ¶ 33.  As a result of the dramatic fee increase, Plaintiffs will have to expend additional energy on fundraising efforts that they would not otherwise have had to undertake, diverting resources from their core programs.  *See* Salas Decl. ¶ 39; dos Santos Decl. ¶¶ 33, 36; Odom Decl. ¶ 29. And for those organizations who have funds set aside precisely for this purpose—to pay filing fees—those funds will rapidly deplete because of the much higher fees.  *See* Ortiz Decl. ¶ 14.  To the extent pro bono attorneys paid filing fees for indigent clients, they will also be less able to do so, particularly for the fees that have increased by several hundred dollars.  *See* Odom Decl. ¶¶ 24–25; Camilo Decl. ¶ 10; Mendez Decl. ¶ 33.

Even when attorneys devote time to preparing a fee waiver application that meets the eligibility requirements, fee waivers are sometimes denied without explanation, denied even when the record clearly shows indigence, or denied based solely on the idiosyncratic tendencies of the particular immigration judge.  *See* dos Santos Decl. ¶ 41; Pangea Decl. ¶¶ 16–19; Mendez Decl. ¶¶ 26–28; Ortiz Decl. ¶ 16 ("Whether an individual is granted a fee waiver is highly connected to which immigration judge decides the fee waiver.").

In sum, Plaintiff organizations will experience a blistering and cascading string of irreparable harm imminently upon the Final Rule going into effect, harming their core programs, reducing the number of clients they can represent, diverting resources to training and fundraising, and harming the overall financial health of the organizations.

## B. The Final Rule Will Irreparably and Immediately Harm CHIRLA's Members.

The Final Rule will irreparably and imminently harm many of CHRILA's members by restricting their ability to defend themselves in Removal Proceedings. *See* Salas Decl. ¶¶ 49–61. Many of CHIRLA's members are in removal proceedings or are likely to face removal proceedings in the near future, and the majority of CHIRLA's members are low-income. *Id.* ¶¶ 5, 49. Despite Defendants' admonition that individuals in Removal Proceedings should begin saving early to afford a BIA appeal or motion to reopen, 85 Fed. Reg. at 82,763, CHIRLA's members "have been struggling to meet basic needs" since the onslaught of the pandemic, making savings difficult, if not impossible. *Id.* ¶ 50.

For example, CHIRLA member T.F.F. is an elderly man who will be filing for cancellation of removal in 2021 after the Final Rule goes into effect. *Id.* ¶ 58. Due to extensive medical bills, he will likely be unable to pay the $305 filing fee for cancellation of removal and will need a fee waiver. *Id.* If the fee waiver is denied—a very real possibility—he will be delayed in filing his cancellation application, be at risk of removal, lose his green card, and be cut off from the services available to lawful permanent residents. *Id.* Similarly, M.S.R. and her four children are in Removal Proceedings after successfully moving to reopen their proceedings. *Id.* ¶ 59. They will necessarily need to pay $250 for their asylum applications, a fee that is insurmountable for M.S.R. *Id.* She must face the untenable choice between scraping together $250 by sacrificing basic necessities and putting her family at risk of homelessness, or abandoning her family's asylum claims and getting removed to their country of origin. *Id.*

CHIRLA's members' harm is real, imminent, and irreparable, and it goes beyond just the cost of their respective Application, Motion, or Appeal, and extends to possible removal from the country—in some cases, to the country where they fled persecution.

### C.   The Final Rule Deprived Plaintiffs of Procedural Protections Under the APA, Causing Immediate and Irreparable Harm.

Finally, Plaintiffs face additional harm insofar as they are "being irreparably deprived of a procedural protection to which they are entitled under the APA, because the agency has not considered the comments that Plaintiffs would have submitted as part of the required notice and comment process."  *Make the Rd. New York v. McAleenan*, 405 F. Supp. 3d 1, 61 (D.D.C. 2019), *rev'd on other grounds and remanded sub nom. Make The Rd. New York v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020) .  Plaintiff CLSEPA indicated that when it learned of the EOIR proposal, it knew it "would want to submit comments through the notice-and-comment process," but the shortened time frame of the comment period during the early stages of the COVID-19 pandemic, as staff was adjusting to the challenges of remote work, made it impossible for CLSEPA to comment.  *See* dos Santos Decl. ¶¶ 16–29.  The loss of the opportunity to meaningfully comment on a rule change of such profound impact itself constitutes an irreparable harm.  *Cf. Sugar Cane Growers Co-op of Fla.*, 289 F.3d at 95 ("If a party claiming the deprivation of a right to notice-and-comment rulemaking under the APA had to show that its comment would have altered the agency's rule, section 553 would be a dead letter.").

### III.   The Balance of Equities and the Public Interest Favor Plaintiffs

The third and fourth factors under section 705 stays and Rule 65 preliminary injunctions—balance of equities and the public interest—merge in cases against the government.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).  Both factors support the issuance of the preliminary relief that Plaintiffs seek to preserve the status quo pending full adjudication on the merits.  *See Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*, 901 F. Supp. 2d 54, 56 (D.D.C. 2012) (indicating that the standard for issuance of a preliminary injunction is lower when the requested relief would preserve rather than alter the status quo).

As described above, Plaintiffs and their members will suffer irreparable harm if the Final Rule goes into effect.  *See, e.g., Immigrant Legal Res. Ctr.*, 2020 WL 5798269, at *18 (finding that the public interest favored enjoining or staying the effective date of a Final Rule that would "prevent vulnerable and low-income applicants from applying for immigration benefits, . . . block access to humanitarian protections, and . . . expose those populations to further danger"), *motion to voluntarily dismiss the appeal filed* Dec. 28, 2020.

In contrast, preliminary relief until adjudication on the merits will result in the government simply continuing to operate under the system that has been the status quo for over two decades.  In view of EOIR's status as an appropriated agency delayed implementation would not jeopardize Defendants' continued operation.  And any claim that the increases must urgently be implemented is utterly inconsistent with the Defendants' statement that they conducted the "comprehensive study" for the fee increases back in 2018—yet did not propose that the rule be implemented until January 2021.  85 Fed. Reg. at 82,786.

> Indeed, as courts addressing challenges to other immigration-related fee increases have noted,
>
> it is far from clear that Defendants would benefit from a decision that would permit the Rule to take effect, only to be set aside months from now.  That type of on-and-off administration of the immigration laws would do little to address the fiscal concerns and need for fiscal planning that Defendants invoke, while it would engender uncertainty, confusion, and unfairness for those subject to the Rule.

*Nw. Immigrant Rts. Project*, 2020 WL 5995206, at *32.

Moreover, given the likelihood of success, the issuance of a stay under 5 U.S.C. § 705 or a preliminary injunction "would serve the public's interest in maintaining a system of laws" where the Government complies with its legal obligations. *O'Donnell Constr. Co. v. Dist. of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992); *see also, e.g., Gomez v. Trump*, 2020 WL 5367010, at *34 (D.D.C. Sept. 4, 2020) (finding "a substantial public interest" in having government agencies comply with the APA), *amended in part*, 2020 WL 5886855 (D.D.C. Sept. 14, 2020), *appeal docketed* Sept. 28, 2020;

*Damus v. Nielsen*, 313 F. Supp. 3d 317, 342 (D.D.C. 2018) ("The public interest is served when administrative agencies comply with their obligations under the APA.").

## IV.    The Final Rule Should Be Stayed or Preliminarily Enjoined in its Entirety

To prevent the irreparable harm described above, this Court should stay the effective date of the Final Rule pursuant to 5 U.S.C. § 705 and order injunctive relief to effectuate that stay.  A Section 705 stay is the ordinary and appropriate remedy where, as here, a challenged agency action will cause irreparable harm "pending conclusion of the review proceedings."  *Gomez*, 2020 WL 5367010, at *37 (explaining that Section 705's "grant of power to 'issue all necessary and appropriate process' includes the power to compel agency inaction when necessary 'to preserve status or rights pending conclusion' of the action").

As in *Gomez*, this Court should stay the effective date of the Final Rule in its entirety, and reject any invitation by Defendants to constrict the scope of preliminary relief.  "[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."  *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (citation and alterations omitted); *see Gomez*, 2020 WL 5367010, at *36–37 (rejecting government's "suggest[ion] that the holding in *National Mining* does not control . . . in a preliminary posture").

This Court has equitable authority to order a nationwide remedy "to provide complete relief to the plaintiffs for the 'violation established.'"  *U.S. Dep't of Agric.*, 444 F. Supp. 3d at 49 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)); *see Gomez*, 2020 WL 5367010, at *37 (same). In the context of the APA, "a nationwide remedy is necessary to provide complete relief for promulgation of an unlawful rule" because "halting the rule's application to the plaintiff may lessen the real-world impact of the unlawful rule on the plaintiff but does not fully redress 'the violation established'—that is, the promulgation of an unlawful rule."  *U.S. Dep't of Agric.*, 444

44

F. Supp. 3d at 49.  Here, the procedural and substantive APA violations infect the Final Rule in its entirety, warranting a complete stay pending resolution of this case.  *See, e.g.*, *Immigrant Legal Resource Ctr.*, 2020 WL 5798269, at \*20 (staying effective date of entire fee rule).

Further, nationwide relief is appropriate because the record of this case "establishes that implementation of the . . . Final Rule would have 'nationwide impact' and would cause injuries of 'sufficient similarity to the plaintiffs' to other [parties] and individuals throughout the country." *U.S. Dep't of Agric.*, 444 F. Supp. 3d at 50–51 (quoting *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018)) (alterations omitted).  Plaintiffs CLINIC and KIND represent immigrants throughout the country and CLINIC has affiliates in 48 states and the District of Columbia.  Mendez Decl. ¶ 3; Odom Decl. ¶ 4.  If the Final Rule becomes effective, tens of thousands of immigrants across the nation will be denied a meaningful day in court, and many will be wrongfully deported from the United States as a result.  Organizations, communities, and individuals that support or rely on those immigrants will be devastated.  *See supra* Argument IV; Salas Decl. ¶¶ 34–49, 53–55, 58–62; Odom Decl. ¶¶ 19, 25–30; Mendez Decl. ¶¶ 23–24, 27–38, 41, 50–57; dos Santos Decl. ¶¶ 14–15, 31–34, 40, 44–49; Ortiz Decl. ¶¶ 9, 14, 17–18; Romero Decl. ¶¶ 10–11, 21–24; Borgonos Decl. ¶¶ 10–12.  Additionally, were the Court to parsimoniously limit the scope of relief, "thousands of individual lawsuits would likely follow"—in the form of additional lawsuits challenging the Final Rule—"and the potentially disparate outcomes of those cases would result in widespread administrative confusion."  *Gomez*, 2020 WL 5367010, at \*37 (recognizing "[t]hat cannot be the outcome that [the government] desire[s]").  Such a result would undermine "our country's strong interest in the uniform application of immigration law and policy."  *Id.* (collecting cases).

## CONCLUSION

Plaintiffs respectfully request that the Court grant a stay under 5 U.S.C. § 705 to postpone the effective dates of the Rules until the resolution of this case, or in the alternative, a preliminary injunction under Rule 65.


Dated: December 30, 2020                Respectfully submitted,


By:   */s/ Vladimir J. Semendyai*
       Vladimir J. Semendyai

       Richard W. Mark
          *(admission pending)*
       Joseph Evall
          *(admission pending)*
       Katherine Marquart (D.C. Bar No. 1044618)
       Julianne L. Duran (*pro hac vice*)
       Laura C. Mumm (D.C. Bar No. 1032245)
          *(admission pending)*
       Alexandra Perloff-Giles (*pro hac vice*)
       GIBSON, DUNN & CRUTCHER LLP
       200 Park Avenue
       New York, NY 10166-0193
       Tel: (212) 351-4000
       Fax: (212) 351-4035
       rmark@gibsondunn.com
       jevall@gibsondunn.com
       kmarquart@gibsondunn.com
       jduran@gibsondunn.com
       lmumm@gibsondunn.com
       aperloff-giles@gibsondunn.com

       Vladimir J. Semendyai (D.C. Bar No. 1044217)
       GIBSON, DUNN & CRUTCHER LLP
       1050 Connecticut Avenue, N.W.
       Washington, DC 20036-5306
       Tel: (202) 955-8500
       Fax: (202) 467-0539
       vsemendyai@gibsondunn.com

Anthony Moreno (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
Suite 3000
San Francisco, CA 94105-0921
Tel: (415) 393-8200
Fax: (415) 393-8306
amoreno@gibsondunn.com

Robin Goldfaden (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Blvd., #108-62
Los Angeles, CA 90010
Tel: (213) 639-3900
Fax: (213) 639-3911
goldfaden@nilc.org

Michelle Lapointe (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 247
Decatur, GA 30031
Tel: (213) 279-2508
Fax: (213) 639-3911
lapointe@nilc.org

Katherine Melloy Goettel (*pro hac vice*)
Emma Winger (*pro hac vice*)
AMERICAN IMMIGRATION COUNCIL
1331 G Street NW, Suite 200
Washington, DC 20005
Tel: (202) 507-7512
Fax: (202) 742-5619
kgoettel@immcouncil.org
ewinger@immcouncil.org