IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

CATHOLIC LEGAL IMMIGRATION
NETWORK, INC., *et al.*,

           Plaintiffs,

           v.

EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW, *et al.*,

           Defendants.
_____

Civil Action No. 1:20-cv-3812 (APM)

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR A STAY OF EFFECTIVE DATES UNDER 5 U.S.C. § 705
OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

BACKGROUND ....................................................................................................................4

I.    EOIR's Fee-Setting Authority ......................................................................................4

II.   History of EOIR Fees ....................................................................................................6

III.  The 2020 Rulemaking ....................................................................................................7

IV.   This Litigation ................................................................................................................9

STANDARD OF REVIEW ......................................................................................................10

ARGUMENT ........................................................................................................................10

I.    The INA Precludes Jurisdiction Over Plaintiffs' Claims...........................................10

II.   Plaintiffs Fall Outside the Statute's Zone of Interests...............................................13

III.  Plaintiffs Are Unlikely to Succeed on the Merits of Their APA Claims....................14

     A.    The Final Rule Is Not Arbitrary And Capricious or Contrary to Law. ......................14

          1.    *The Final Rule is consistent with the INA and the IOAA.* ...........................15

          2.    *The Agency examined all relevant factors and record evidence.* ......................18

          3.    *The Final Rule provides a reasoned basis for increasing fees.* ..........................25

          4.    *The Final Rule does not effect a change in policy and is adequately explained regardless.* ........................................................................................................26

     B.    The Final Rule Allowed For Meaningful Comment..........................................28

          1.    *The comment period satisfied the APA.* ......................................................28

          2.    *The Agency provided sufficient information to enable meaningful comment.* ...................30

     C.    The Agency Satisfied The Requirements Of The RFA. ..................................34

IV.   THE REMAINING INJUNCTION FACTORS REQUIRE DENIAL OF PLAINTIFFS' MOTION. ..........................................................................................35

     A.    Plaintiffs Fail To Establish Irreparable Harm. ..............................................35

     B.    Plaintiffs Fail To Establish That The Balance of Equities And Public Interest Favor The Requested Injunction..................................................................38

CONCLUSION ......................................................................................................................39

## INTRODUCTION

The Executive Office for Immigration Review (EOIR or the Agency), an agency within the U.S. Department of Justice (DOJ or the Department), conducts immigration court proceedings, appellate reviews, and administrative hearings as an essential component of the nation's immigration adjudication system.  For certain applications adjudicated in those proceedings, certain types of motions, and certain types of appeals, the United States charges fees.  The U.S. Department of Homeland Security (DHS) sets the fees, if any, for most applications adjudicated in those proceedings, although EOIR sets the fee for three.  EOIR also sets and charges fees for a small number of types of motions and for certain types of administrative appeals.  Unless the fee is one set by DHS and has been identified as non-waivable by DHS, 8 C.F.R. § 1103.7(c), EOIR may waive any fee it charges "upon a showing that the filing party is unable to pay the fee." 8 C.F.R. §§ 1003.8(a)(3), 1003.24(d).  The denial of a fee waiver by an immigration judge may be administratively appealed, either in an interlocutory posture or, if the denial of the waiver causes the denial of the underlying application or motion, based on that denial.

EOIR possesses two independent Congressional grants of authority to charge fees for services it provides, including the adjudication of applications, appeals, and motions in the immigration courts.  First, the Immigration and Naturalization Act (INA), at 8 U.S.C. § 1356(m), authorizes the Attorney General to designate fees for immigration adjudication services and contemplates that such fees be set at a level that will ensure full cost-recovery.  Second, the Independent Offices Appropriations Act of 1952 (IOAA), 31 U.S.C. § 9701 *et seq.*, which applies government-wide, authorizes agencies including EOIR to charge fees to individuals who receive services from the agency, and directs that agencies' provision of such services "be self-sustaining to the extent possible." 31 U.S.C. § 9701.

Further, any agency that charges fees for services it provides, including EOIR, is bound by two authorities—31 U.S.C. § 902(a)(8) and Office of Management & Budget (OMB) Circular No. A–25 Revised—that prescribe a biennial review of those fees and recommend "revising those charges to reflect costs incurred by [the agency] in providing those services." 31 U.S.C. 902(a)(8).  Prior to 2018, EOIR and DOJ had fallen out of compliance with 31 U.S.C. 902(a)(8); for over 30 years they had neither reviewed nor revised the fees charged for applications, appeals, and motions for which EOIR levies a fee.

In 2018, to restore compliance with the IOAA, the INA, 31 U.S.C. § 902(a)(8), and OMB Circular No. A–25 Revised, EOIR undertook a review of its fees. The Agency conducted a comprehensive study using activity-based costing—the preferred methodology in the private and public sectors—to determine the cost to EOIR for each type of application, appeal, and motion for which EOIR levies a fee. That study demonstrated that the costs to EOIR for processing the subject applications, appeals, and motions consistently and greatly exceed the fees EOIR charged. The difference between the fees charged and the costs incurred ranged from approximately 30 percent to nearly 800 percent. Cognizant of the statutory commands of the INA and the IOAA, and taking into consideration both the public interest in ensuring immigration courts are accessible to aliens seeking relief and the public interest in ensuring that taxpayers do not shoulder a disproportionate burden of funding the immigration courts system, the Agency undertook a rulemaking to explore updating the fees.

Accordingly, the Department published a notice of proposed rulemaking, proposing to update the fees charged for three Agency applications for relief, three types of Agency administrative appeals, and motions to reopen and to reconsider before immigration judges and before the Board of Immigration Appeals. Department of Justice, Executive Office for Immigration Review, *Executive Office for Immigration Review; Fee Review*, 85 Fed. Reg. 11,866 (Feb. 28, 2020) (Proposed Rule). Following a comment period in which hundreds of parties participated, the Agency, having considered the extensive and broad-ranging comments received, adopted the proposed updated fee schedule. *See* Department of Justice, Executive Office for Immigration Review, *Executive Office for Immigration Review; Fee Review*, 85 Fed. Reg. 82,750 (Dec. 18, 2020) (Final Rule or Rule). The Rule is scheduled to take effect on January 19, 2021.

Plaintiffs—organizations that provide legal and other services to immigrants—bring this challenge to the Final Rule, asserting claims under the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, the Regulatory Flexibility Act (RFA), 5 U.S.C. §§ 603-04, and the Due Process and Equal Protection Clauses of the Fifth Amendment to the U.S. Constitution. *See* Compl., ECF No. 1. Plaintiffs' claims disregard the authority vested in the Agency by both the INA and the IOAA, as well as Congress's direction that services for which fees are charged be self-sustaining to the extent possible and contemplation that fees ensure full cost-recovery. Nevertheless, they seek emergency injunctive relief

against the Rule on the basis of their APA and RFA claims.  *See* Pls.' Mot. for a Stay of Effective Dates Under 5 U.S.C. § 705 or, in the Alternative, Prelim. Inj. (Mot.), ECF No. 19-10.  None of their claims, however, provides a basis for such relief.

At the threshold, all of Plaintiffs' claims fail because the INA, at 8 U.S.C. § 1252(b)(9), precludes district court review over "*any* issue . . . arising from *any* removal-related activity," including "policies-and-practices challenges" arising from any "action taken or proceeding brought to remove an alien." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1029-30, 1032, 1035 (9th Cir. 2016); 8 U.S.C. § 1252(b)(9); *see also Aguilar v. ICE*, 510 F.3d 1, 9 (1st Cir. 2007); *Nat'l Immigr. Project of Nat'l Lawyers Guild* (NIPNLG) *v. Exec. Off. for Immigr. Rev.*, 456 F. Supp. 3d 16, 29-30 (D.D.C. 2020).  The Supreme Court has deemed section 1252(b)(9) "the unmistakable 'zipper' clause," channeling judicial review of all "decisions and actions leading up to or consequent upon final orders of deportation," including "non-final order[s]," into one proceeding exclusively before a court of appeals. *Reno v. Am-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483, 485 (1999).  Because Plaintiffs' claims unmistakably concern "questions that arise from the removal of an alien," this Court lacks jurisdiction to hear them. *Aguilar*, 510 F.3d at 9.

Even if Plaintiffs were able to skirt the jurisdictional bar of section 1252(b)(9), they cannot clear the APA's zone-of-interests requirement.  Because the INA supplies a cause of action to challenge issues arising from removal proceedings only to aliens, organizations such as Plaintiffs are outside the immigration statutes' zone of interests, as the D.C. Circuit has held. *See, e.g.*, *FAIR v. Reno*, 93 F.3d 897, 900-04 (D.C. Cir. 1996).

Finally, even assuming some basis exists for district court jurisdiction over Plaintiffs' claims, Plaintiffs cannot demonstrate an actual likelihood of success on those claims. *ViroPharma, Inc. v. Hamburg*, 898 F. Supp. 2d 1, 16 (D.D.C. 2012) (citing *Munaf v. Geren*, 553 U.S. 674, 690 (2008)).  None of their APA claims has merit.  First, the Agency issued the Final Rule pursuant to and consistent with authority vested in it by Congress under the INA and the IOAA.  Second, in effecting the changes the Agency provided a reasonably detailed notice of the methodology and data underlying the Rule, examined the relevant factors and evidence and responded to broad-ranging comments from the public, and amply explained the basis and reasoning for the Rule.  And third, the comment period the Agency allowed

did not violate any procedural requirement of the APA, and was not unreasonable under the circumstances.  Plaintiffs' claim under the RFA fails, too: by accurately certifying that the Final Rule will not have a significant economic impact on small entities because it regulates only individuals, the Agency satisfied that statute's requirements.

The remaining preliminary injunction factors similarly indicate against preliminary relief.  Plaintiffs' assertions of irreparable harm are largely speculative and, regardless, Plaintiffs have done nothing to show that irreparable injury is certainly impending in the absence of this Court's action before a final ruling on the merits can be made.  For similar reasons, the balance of equities and the public interest tips against Plaintiffs where the Agency's actions have been taken simply to comply with Congress's will.

Because Plaintiffs fail to show entitlement to the extraordinary relief they seek against a proper exercise of fee authority, their motion should be denied.

## BACKGROUND

## I.      EOIR's Fee-Setting Authority

The Attorney General established EOIR on January 9, 1983, through an internal DOJ reorganization.  EOIR was created as a separate component within DOJ to contain the Board of Immigration Appeals (BIA or the Board) and the immigration judge function previously performed by the then-Immigration and Naturalization Service (INS) pursuant to the Immigration and Nationality Act.  *See* Department of Justice, INS, *Board of Immigration Appeals; Immigration Review Function; Editorial Amendments*, 48 Fed. Reg. 8038 (Feb. 25, 1983).  Under delegated authority from the Attorney General, EOIR conducts immigration court proceedings, appellate reviews, and administrative hearings.

The Homeland Security Act of 2002 (HSA), Public Law No. 107–296, 116 Stat. 2135 (2002), further reorganized federal immigration and naturalization functions.  The HSA transferred immigration enforcement and benefit functions then handled by DOJ's INS to the newly created Department of Homeland Security, specifically its new U.S. Citizenship and Immigration Services (USCIS), Immigration and Customs Enforcement (ICE), and Customs and Border Protection (CBP) components.  However, the Attorney General retained the same authorities and functions under the

INA and all other laws relating to the immigration and naturalization of aliens as were exercised by EOIR, or by the Attorney General with respect to EOIR, prior to the effective date of the HSA.  8 U.S.C. § 1103(g)(1).

As relevant here, the Attorney General retained the authority to charge fees for immigration adjudication and naturalization services previously granted to him by Congress when it established the Immigration Examinations Fee Account (IEFA) within the Treasury of the United States.  *See* 8 U.S.C. § 1356(m), (n).  Section 286 of the INA, codified at 8 U.S.C. § 1356, describes collection of certain fees and fines by the Attorney General and, by virtue of references in the HSA, the Secretary of Homeland Security.  Specifically, § 1356(m) provides that the Attorney General and the Secretary may charge fees for immigration adjudication and naturalization services at a rate that would ensure full recovery of both the full cost of providing all such services, including similar services that may be provided without charge to certain categories of aliens, and any additional administrative costs associated with the fees collected.  Under that provision, and the regulations promulgated thereunder, all designated adjudication fees are deposited in the IEFA.  *See* 8 U.S.C. § 1356.  Deposits into the IEFA "remain available until expended to the Attorney General [or the Secretary] to reimburse any appropriation the amount paid out of such appropriation for expenses in providing immigration adjudication and naturalization services and the collection, safeguarding and accounting for fees deposited in and funds reimbursed from the [IEFA]."  *Id.* § 1356(n).

In addition to section 286 of the INA, the Independent Offices Appropriations Act of 1952, 31 U.S.C. § 9701, which applies government-wide, authorizes EOIR to charge fees to individuals who receive special services from the agency.  The IOAA provides, in relevant part,

> (a) It is the sense of Congress that each service or thing of value provided by an agency (except a mixed-ownership Government corporation) to a person (except a person on official business of the United States Government) is to be self-sustaining to the extent possible.
> (b) The head of each agency . . .  may prescribe regulations establishing the charge for a service or thing of value provided by the agency.  Regulations prescribed by the heads of executive agencies are subject to policies prescribed by the President and shall be as uniform as practicable.  Each charge shall be –
> (1) fair; and

       (2) based on –
          (A) the costs to the Government;
          (B) the value of the service or thing to the recipient;
          (C) public policy or interest served; and
          (D) other relevant facts.

31 U.S.C. § 9701(a)–(b).  Congress moreover directed agencies, through the "agency Chief Financial Officer," to "review, on a biennial basis, the fees . . . imposed by the agency for services and things of value it provides, and make recommendations on revising those charges to reflect costs incurred by it in providing those services and things of value."  31 U.S.C. § 902(a)(8).

       Pursuant to the IOAA, OMB has issued Circular No. A–25 Revised, which "establishes Federal policy regarding fees assessed for Government services[,] . . . provides information on the scope and types of activities subject to user charges and on the basis upon which user charges are to be set[,] . . . [and] provides guidance for agency implementation of charges and the disposition of collections."  Off. of Mgmt. & Budget, Circular A–25, "User Charges," 58 Fed. Reg. 38,142, 38,144 (July 15, 1993); *see also Fed. Power Comm'n v. N. Eng. Power Co.*, 415 U.S. 345, 349–51 (1974) (holding that OMB Circular A-25 is a "proper construction" of the IOAA and "establishes guidelines for Federal agencies to assess fees for Government services," 58 Fed. Reg. at 38,142).  The Circular directs agencies "to review charges biennially and update them as necessary."  58 Fed. Reg. at 38,142.

## II.   History of EOIR Fees

       Consistent with this authority and guidance, in 1953, the Department initially set fees for certain services it provided under the INA.  *See* TITLE 8—ALIENS AND NATIONALITY, Chapter I—Immigration and Naturalization Service, Department of Justice, Miscellaneous Amendments, 18 Fed. Reg. 3526 (June 19, 1953).  Further, in 1958, the Department promulgated regulations establishing a procedure for aliens to seek waivers of the applicable fees.  *See* TITLE 8—ALIENS AND NATIONALITY, Chapter I—Immigration and Naturalization Service, Department of Justice, Miscellaneous Amendments to Chapter, 23 Fed. Reg. 9115, 9118 (Nov. 26, 1958).  As the regulations provide, an immigration judge or the BIA "has the discretion to waive a fee for an appeal, motion to reconsider, or motion to reopen upon a showing that the filing party is unable to pay the fee."  8 C.F.R.  §§  1003.8(a)(3) (BIA), 1003.24(d) (immigration judge).  Requests to the Board must be

submitted via a Fee Waiver Request (Form EOIR-26A), while requests to immigration judges do not require any particular form, and the only evidentiary requirement is a "properly executed affidavit" or "declaration to be signed under penalty of perjury" "substantiating the filing party's inability to pay the fee."  8 C.F.R. §§ 1003.8(a)(3), 1003.24(d).  This standard has remained substantively the same since the initial regulations issued in 1958.  *Compare id. with* 23 Fed. Reg. at 9118 ("In any case in which an alien . . . is unable to pay the fee fixed for an appeal or a motion, he shall file with the notice of appeal or the motion his affidavit stating . . . his inability to pay the required fee, and shall request permission to prosecute the appeal or motion without prepayment of such fee. . . . The Board may, in its discretion, authorize the prosecution of any appeal or motion without prepayment of fee.").

Prior to 2020, the Department last undertook a review of the fees for filing motions to reopen, reconsider, or appeal to the BIA in 1984 and last revised the amounts of those fees in 1986.  *See* INS, DOJ, Powers and Duties of Service Officers; Availability of Service Records, 51 Fed. Reg. 2895 (Jan. 22, 1986) (1986 Proposed Rule); INS, EOIR, DOJ, Powers and Duties of Service Officers; Availability of Service Records, 51 Fed. Reg. 39,993 (Nov. 4, 1986) (1986 Final Rule).  As the Agency explained in the 1986 Final Rule, while a Congressional appropriation saves EOIR from dependency on fee collections to operate, the fee changes "[we]re necessary to place the financial burden of providing special services and benefits, which do not accrue to the public at large, on the recipients.  Charges have been adjusted to more nearly reflect the current cost of providing the benefits and services, taking into account public policy and other pertinent facts."  51 Fed. Reg. at 39,993.  Following a legal challenge to the 1986 Final Rule, the D.C. Circuit held that the IOAA authorized the imposition by the Attorney General, through INS and EOIR, of the subject fees.  *See Ayuda, Inc. v. Att'y Gen.*, 848 F.2d 1297, 1301 (D.C. Cir. 1988).  It also affirmed the district court's holdings that the discretionary nature of fee waiver requests mitigated the fee changes, *id.* at 1299 n.4, and that "in view of the two-year, agency-wide process of review, complete with elaborate cost accounting and notice-and-comment procedures" the fee changes were not arbitrary and capricious, *id.* at 1299.

## III.   The 2020 Rulemaking

In 2018, to ensure compliance with the IOAA, section 286(m) of the INA, 31 U.S.C.

§ 902(a)(8), and OMB Circular No. A–25 Revised, EOIR undertook a review of its fees.  85 Fed. Reg. at 82,750; 85 Fed. Reg. at 11,866-67.  The Agency "conducted a comprehensive study using activity-based costing to determine the cost to EOIR for each type of application, appeal, and motion for which EOIR levies a fee."  85 Fed. Reg. at 11,869.  As the Agency explained in the NPRM:

> The study proceeded in three phases: (1) Data collection, (2) process mapping, and (3) activity-based costing.  First, EOIR gathered survey data and consulted with staff in the OCIJ and the BIA to determine the appropriate staff levels and time required to process and adjudicate each application, appeal, or motion and studied data from the Office of Personnel Management ("OPM") and the General Services Administration ("GSA") to determine the average salary rates for applicable staff levels, including both Federal employees and EOIR contractors.  Second, EOIR developed step-by-step process maps, with assigned times and staff levels, for how each application, appeal, or motion is processed in the OCIJ and the BIA.  These estimates were validated by staff in the OCIJ and the BIA.  Finally, EOIR allocated the salary costs from the GSA and OPM data to each step in the process, based on the time the step takes, the average salary of the responsible staff, and the percentage of total cases in which the step occurs.

*Id.*; *see also id.* at 11,872 (similar).  The Agency "used this methodology to calculate an estimated cost for processing each form or motion for which EOIR levies a fee."  *Id.* at 11,872; *see also id.* at 11,870 (similar).  As the Agency noted, in the fee study, the Agency purposefully "included only direct salary costs" and did not include "other costs, such as the overhead costs for EOIR space that is used for processing applications, fringe benefits received by EOIR staff and contractors, interpreter costs, Federal Records Center costs, non-EOIR government agency costs, or the costs and time to process any non-fee-based application that is submitted in conjunction with a motion to reopen or reconsider."  *Id.* at 11,869, 11,872.  The Agency did so both "to avoid potential inaccuracies in the calculation of overhead and non-salary benefits" and to "account[] for the public interest in having non-parties bear some of the cost burden for filing documents associated with proper application of the law as it pertains to the statutory right to appeal or apply for certain forms of relief."  *Id.* at 11,869.

The fee study "demonstrate[d] that EOIR's processing costs consistently exceed the assessed fees for these EOIR applications for relief, appeals, and motions."  85 Fed. Reg. at 11,870; Dep't of Justice, Exec. Off. for Immigr. Review, EOIR 1125-AA90 Fee Study (posted Dec. 18, 2020), *available at* https://beta.regulations.gov/document/EOIR-2020-0013-0002.  Accordingly, using the results of

the fee study, the Agency prepared a revised fee schedule in which the fee for each application for relief, appeal, and motion corresponded to the direct salary costs associated with adjudication of that application, appeal, or motion.  85 Fed. Reg. at 11,870-73.

On February 28, 2020, the Department published a notice of proposed rulemaking that would increase the fees for those EOIR applications, appeals, and motions that are subject to an EOIR-determined fee.  85 Fed. Reg. at 11,866.  As the Agency explained,

> Despite the instruction in the Chief Financial Officers Act, 31 U.S.C. 902(a)(8), for agencies' Chief Financial Officers to review user fees biennially, it has been 35 years since EOIR last conducted a thorough review of the costs and appropriateness of the fees for the applications, appeals, and motions for which EOIR levies a fee. The fees have remained static, not accounting for inflation or any other intervening changes in EOIR's processing costs. EOIR is now proposing this rule to remedy the failure to update the fees in past years. The mismatch between fees and the underlying costs of review has become more of a burden on the immigration adjudication system as aliens overall have begun filing more of these fee-based forms and motions.  In just FY 2018, the U.S. taxpayer subsidization for these filings was $44,379,247.

85 Fed. Reg. at 11,869.  The Agency proposed to revise the subject fees consistent with the results of the fee study.  *Id.* at 11,870-73.  The Proposed Rule did not articulate any changes to fee waiver availability or procedures, nor did it add any new fees (although it did propose to update cross-references to DHS regulations regarding fees).  *Id.* at 11,866.  In particular, it did not add a fee for an asylum application though it noted that any fee set by DHS for such an application would apply in immigration proceedings consistent with 8 C.F.R. § 1103.7 and longstanding practice.  *Id.* at 11,871-72.  Following a 31-day period for the public to submit comments on the Proposed Rule, *id.* at 11,866, the Agency reviewed and considered 601 individual public comments received.  85 Fed. Reg. at 82,752.

On December 18, 2020, the Department issued the Final Rule, to take effect on January 19, 2021.  85 Fed. Reg. at 82,750.  The Final Rule responded to comments received in response to the Proposed Rule and adopted the fee amounts proposed without change.  *Id.*

## IV.    This Litigation

Plaintiffs Catholic Legal Immigration Network, Inc., Community Legal Services in East Palo Alto, KIND, Inc., and Coalition for Humane Immigrant Rights of Los Angeles challenge the Final Rule,

asserting claims under the APA, 5 U.S.C. §§ 701 *et seq.*, the RFA, 5 U.S.C. §§ 603-04, and the Due Process and Equal Protection Clauses of the Fifth Amendment to the United States Constitution.  Compl. ¶¶ 362-423.  Plaintiffs filed their Complaint on December 23, 2020.  *See* Compl.  On December 30, 2020, Plaintiffs moved for a stay of the Final Rule's effective dates under 5 U.S.C. § 705 or, in the alternative, a preliminary injunction on the basis of their APA and RFA claims.  *See* Mot.

**STANDARD OF REVIEW**

Plaintiffs move for a stay under 5 U.S.C. § 705, which authorizes "the reviewing court" to stay "the effective date of an agency action" pending judicial review "to prevent irreparable injury." 5 U.S.C. § 705.  Plaintiffs alternatively move for a preliminary injunction under Federal Rule of Civil Procedure 65.  The same four-factor test governs issuance of a § 705 stay and a preliminary injunction. *District of Columbia v. USDA*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (citing authority).

"A preliminary injunction is an extraordinary and drastic remedy" and "should never be awarded as of right." *Munaf*, 553 U.S. at 689-90 (citation omitted).  A plaintiff is entitled to such an "extraordinary remedy" only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  To establish such entitlement, a plaintiff must demonstrate that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Id.* at 20.  "[T]he plaintiff bears the burden of persuasion on all four preliminary injunction factors in order to secure such an 'extraordinary remedy.'" *Singh v. Carter*, 185 F. Supp. 3d 11, 17 (D.D.C. 2016) (citing authority).  However, when the government is the opposing party, the last two factors merge. *Guedes v. ATF*, 920 F.3d 1, 10 (D.C. Cir. 2019), *cert. denied*, 140 S. Ct. 789 (2020).

**ARGUMENT**

**I.    The INA Precludes Jurisdiction Over Plaintiffs' Claims.**

Although "[l]itigants generally may seek review of agency action in district court under any applicable jurisdictional grant," "[i]f a special statutory review scheme exists . . . it is ordinarily supposed that Congress intended that procedure to be the exclusive means of obtaining judicial review in those cases to which it applies." *Jarkesy v. SEC*, 803 F.3d 9, 15 (D.C. Cir. 2015).  The INA provides

such a scheme.

For aliens placed in removal proceedings, the INA provides that, "notwithstanding any other provision of law," "a petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal." 8 U.S.C. §1252(a)(5). And section 1252(b)(9) bars jurisdiction to "review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien" other than through "judicial review of a final order." *Id.* § 1252(b)(9). Section 1252(b)(9) is "the unmistakable 'zipper' clause," channeling judicial review of all "decisions and actions leading up to or consequent upon final orders of deportation," including "non-final order[s]," into one proceeding exclusively before a court of appeals. *Am.-Arab Anti-Discrimination Comm.*, 525 U.S. at 483, 485. This provision circumscribes district court jurisdiction over "*any* issue— whether legal or factual—arising from *any* removal-related activity [which] can be reviewed only through the [administrative] process." *J.E.F.M. v. Lynch*, 837 F.3d at 1026, 1029-31 (9th Cir. 2016) (cited in *NIPNLG*, 456 F. Supp. 3d at 29-30); *see Aguilar*, 510 F.3d at 9 ("As its text makes manifest, [8 U.S.C. § 1252(b)(9)] was designed to consolidate and channel review of *all* legal and factual questions that arise from the removal of an alien into the administrative process, with judicial review of those decisions vested exclusively in the courts of appeals."). That includes "challenging policies and practices that are applied during the course of a removal proceeding," *NIPNLG*, 456 F. Supp. 3d at 29; *see also J.E.F.M.*, 837 F.3d. at 1035, arising from any "action taken or proceeding brought to remove an alien," 8 U.S.C. § 1252(b)(9), whether or not the challenge is to an actual final order of removal or whether there even is a final order at all. *J.E.F.M.*, 837 F.3d at 1032.[1]

---

[1] Unlike the First and Ninth Circuits, which have held that "Congress has clearly provided that all claims—whether statutory or constitutional—that 'aris[e] from' immigration removal proceedings can only be brought through the petition for review process in federal courts of appeals," *J.E.F.M.*, 837 F.3d at 1029 (9th Cir. 2016), the D.C. Circuit has not interpreted the scope of § 1252. In addition to *NIPNLG*, which agreed with the appellate courts' interpretation of the provision, 456 F. Supp. 3d at 29, one other court in this district has examined the issue. That court recognized an "exception" to section 1252's jurisdictional bar if a plaintiff challenges "the validity of a regulation of general applicability based on the administrative record generated in rulemaking." *O.A. v. Trump*, 404 F. Supp. 3d 109, 128 (D.D.C. 2019). The government respectfully disagrees with and has appealed that decision. *O.A.*, 404 F. Supp. 3d 109, *appeal docketed*, No. 19-5272 (D.C. Cir. Oct. 11, 2019).

Under section 1252(b)(9), this Court lacks jurisdiction over this case.  Plaintiffs challenge the fees associated with seeking various forms of relief during removal proceedings.  They allege that the updated fees "will shut the courthouse doors on" low-income individuals in removal proceedings and "prevent them from appealing their deportation that may have been founded on legal errors that appeals could correct simply because [they] will no longer be able to afford the filing fees."  Mot. 21.  In that regard, Plaintiffs challenge "the process by which their [members'] removability will be determined." *Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018) (plurality).  The questions of law underlying their Complaint arise from removal proceedings because they involve challenges to the "procedure and substance of an agency determination"—an application of the rule to individual aliens—"that is inextricably linked to [any] order of removal."  *Martinez v. Napolitano*, 704 F.3d 620, 623 (9th Cir. 2012); *see Jennings*, 138 S. Ct. at 841 (plurality).

Section 1252 likewise precludes district-court jurisdiction over the organizational plaintiffs' claims.  Section 1252 permits review only of orders of removal, which can only issue to individual *aliens*.  8 U.S.C. § 1252(a).  So the organizations' challenges to the procedures that will be used to determine third-party aliens' removability are likewise barred by section 1252.  *See Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993) (holding that organizational plaintiffs "d[o] not have standing to raise their claims challenging INS policies or regulations" because under section 1252's exclusive review scheme, "these claims may only be brought in court by individual aliens after the INS' statutory interpretation is applied to them, their application for legalization is denied, and they are subject to deportation orders"); *see also Asylum Seeker Advocacy Project (ASAP) v. Barr,* 409 F. Supp. 3d 221, 225 (S.D.N.Y. 2019) (section 1252(b)(9) bars challenges, including challenges by organizations, to process for issuing removal orders where relief plaintiffs seek would indirectly "challenge [] the removal orders" issued under that process); *P.L. v. U.S. ICE*, No. 1:19-CV-01336, 2019 WL 2568648, *3 (S.D.N.Y. June 21, 2019) (similar).  For these reasons, this Court lacks jurisdiction over Plaintiffs' claims.

II.    **Plaintiffs Fall Outside the Statute's Zone of Interests.**

Even if the INA did not preclude jurisdiction over Plaintiffs' claims, those claims would still fail because Plaintiffs are outside the zone of interests served by the INA.  "Whether a plaintiff comes within the zone of interests is an issue that requires [courts] to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014) (quotations omitted).  In the APA context, the zone-of-interests requirement ensures that the party seeking review of an agency action is "'adversely affected or aggrieved' by that action 'within the meaning of a relevant statute.'"  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990) (quoting 5 U.S.C. § 702).  And to be "'adversely affected or aggrieved within the meaning' of a statute, the plaintiff must establish that the injury he complains of . . . falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint."  *Id.*  Notably, a plaintiff falls outside the zone when its "interests are . . . marginally related to or inconsistent with the purposes implicit in the statute[,]" *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987), *even if* it "might technically be injured in an Article III sense."  *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 178 (2011).

As explained *supra* at Section I, the INA supplies a cause of action to challenge issues arising from removal proceedings only to aliens, and only through circumscribed judicial review in the courts of appeals following administrative proceedings, or in the U.S. district court in narrow circumstances not applicable here.  Organizations therefore cannot be within the INA's zone of interests.  When confronted with a similar challenge brought by "organizations that provide legal help to immigrants," Justice O'Connor concluded that the relevant INA provisions were "clearly meant to protect the interests of undocumented aliens, not the interests of [such] organizations[,]" and the fact that a "regulation may affect the way an organization allocates its resources . . . does not give standing to an entity which is not within the zone of interests the statute meant to protect."  *INS v. Legalization Assistance Project of LA Cty.*, 510 U.S. 1301, 1302, 1305 (1993) (O'Connor, J., in chambers).  The D.C. Circuit has thus held that immigrant advocacy organizations are outside the immigration statutes' zone

of interests.  *See, e.g.*, *FAIR*, 93 F.3d at 900-04.[2]

## III.  Plaintiffs Are Unlikely to Succeed on the Merits of Their APA Claims.

In 2018, consistent with its obligations under 31 U.S.C. § 902(a)(8), EOIR undertook a comprehensive study of the fees assessed for certain applications for relief, appeals, and motions, and determined that the Agency's costs far exceed the assessed fees associated with each.  Through notice-and-comment rulemaking, the Agency adjusted its fee schedule so that the subject fees are more reasonably related to the full cost of providing the attendant services, pursuant to and consistent with authority vested in it by Congress under the INA and the IOAA.  Moreover, in effecting the changes the Agency reasonably detailed the methodology and data underlying the Rule, examined the relevant factors and evidence and responded to broad-ranging comments from the public, and amply explained the basis and reasoning for the Rule, thereby satisfying its obligations under the APA.  Additionally, by accurately certifying that the Final Rule will not have a significant economic impact on small entities because it regulates only individuals, the Agency satisfied the requirements of the RFA.  For all of these reasons, Plaintiffs fail to "demonstrate an actual 'likelihood' of success," *ViroPharma, Inc. v. Hamburg*, 898 F. Supp. 2d 1, 16 (D.D.C. 2012) (citing *Munaf*, 553 U.S. at 690, for the rule that preliminary injunctive relief is not warranted where a plaintiff only demonstrates "the existence of 'questions so serious, substantial, difficult and doubtful, as to make them fair ground for litigation"), and their motion must be denied.

A.  The Final Rule Is Not Arbitrary And Capricious or Contrary to Law.

The Final Rule reasonably implements two statutes expressly authorizing EOIR to charge fees up to the full cost of immigration adjudication services, including the costs of services that are provided for free to aliens not subject to those fees.  *See* 8 U.S.C. § 1356(m); 31 U.S.C. § 9701.  In those authorizing statutes, Congress has only prescribed that such fees should be reasonably related

---

[2] While the Ninth Circuit held otherwise in *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018), it did not consider *FAIR*, 93 F.3d at 903, which is controlling precedent in this Circuit. Although another court in this district has declined to extend *FAIR* to nonprofit organizations that provide legal services to refugees, the government respectfully disagrees with and has appealed that decision.  *O.A. v. Trump*, 404 F. Supp. 3d 109, *appeal docketed*, No. 19-5272 (D.C. Cir. Oct. 11, 2019).

to the cost to the agency of the service being provided and fair. *Nat'l Cable Television Ass'n v. FCC*, 554 F.2d 1094, 1108 (D.C. Cir. 1976) ("[t]o be valid, a fee need only bear a *reasonable* relationship to the cost of the services rendered by the agency"); *see also Air Transp. Ass'n of Am. v. CAB*, 732 F.2d 219 (D.C. Cir. 1984). EOIR's fees in the Final Rule more than meet that standard. The fees are calculated using an activity-based costing method—one Plaintiffs do not challenge and that is undisputedly rooted in the actual cost to the agency of these services.[3] The fees also do not exceed the value of the services that Defendants provide, a point that Plaintiffs cannot seriously dispute, given their assertions regarding the enormous value of the services to their clients. *See* Mot. 21. Moreover, the fees are fair; Defendants have adopted a conservative measure of cost and it is undisputed that the fees proposed are in fact *less than* the measure of costs to the agency, an amount expressly authorized by Congress. EOIR has also maintained without modification its fee waiver regime, under which any individual who can demonstrate they are unable to pay the fees listed in the Final Rule may seek to proceed without payment.

As discussed below, Plaintiffs' various objections to the Final Rule amount to policy disagreements with Congress, which long ago determined that fees for immigration adjudication services may be assessed at the level of costs to agencies. And Plaintiffs' fundamental objections to EOIR's charging of fees consistent with agency costs were rejected in this Circuit over 30 years ago, *Ayuda*, 848 F.2d at 1300-01 & n.8, and should now be rejected again for similar reasons.

   1. *The Final Rule is consistent with the INA and the IOAA.*

Plaintiffs argue that the Agency lacks legal authority under either the INA, 8 U.S.C. § 1356(m), or the IOAA, 31 U.S.C. § 9701, to impose the fees set by the Final Rule. Mot. 29-30. This argument lacks merit.

First, as to the INA, Plaintiffs assert that the legislative history of 8 U.S.C. § 1356(m)-(n)

---

[3] As the Federal Accounting Standards Advisory Board (FASAB) has noted, "activity-based costing has gained broad acceptance by manufacturing and service industries as an effective managerial tool[,] and [f]ederal entities are encouraged to study its potential within their own operations." *See* FASAB, Handbook of Federal Accounting Standards and Other Pronouncements, as Amended 42 (June 30, 2020), available at https://files.fasab.gov/pdffiles/2020_fasab_handbook.pdf (last visited Jan. 10, 2021). *See* 85 Fed. Reg. at 11,869 n.13 (citing prior edition of FASAB Handbook).

supports understanding the statute to "not authorize charges for the immigration court system."  Mot. 29 (citing Conference Report on H.R. 4782, 134 Cong. Rec. H8297-01, 1988 WL 176092 (Sept. 26, 1988)).  But nothing in the cited congressional report says anything about whether DOJ or EOIR may charge fees for services it provides.  Further, and more important to the inquiry, the plain language of the statute provides plenary, discretionary authority to "set" "fees for providing adjudication and naturalization services[.]"  8 U.S.C. § 1356(m).  Nowhere does the INA exclude "the immigration court system" from the general category of "adjudication and naturalization services."  *Id.*  The fact that DHS administers the IEFA, into which collected fees are deposited, is irrelevant to whether, consistent with the INA, the Department may set and collect fees for the immigration adjudication services it provides.

Even if the INA did not authorize the Department to set and collect fees for the immigration adjudication services it provides, it does not preclude such collection and, moreover, the IOAA provides an independent grant of authority to the Department to set and collect such fees.  Binding D.C. Circuit authority has already rejected any argument that "the IOAA was not intended to and does not cover adjudications in Removal Proceedings," as Plaintiffs themselves acknowledge.  Mot. 30 (citing *Ayuda*, 848 F.2d at 1301).  As the appeals court held when reviewing a challenge to the 1986 rulemaking, "the Attorney General enjoys authority to impose fees for immigration proceedings under the [IOAA]," because the "fees at issue are for a 'service or thing of value' which provides the recipients with a special benefit."  *Ayuda,* 848 F.2d at 1299, 1301.  Plaintiffs attempt to evade this holding by arguing that the fees in the Final Rule do not satisfy the IOAA's requirement that fees "shall be" "(1) fair; and (2) based on--(A) the costs to the Government; (B) the value of the service or thing to the recipient; (C) public policy or interest served; and (D) other relevant facts," 31 U.S.C. § 9701(b), because the Agency allegedly "failed to pay heed to considerations such as fairness and the public interest."  Mot. 30.  But Plaintiffs' argument ignores that the Agency explained how the updated fees do comport with *each* aspect of this requirement.  *See* 85 Fed. Reg. at 82,772 (explaining that "[t]he Department believes that the newly established fees are fair" because they are "based upon data gathered from an activity-based cost analysis[,]" and because "EOIR's calculation of fees has factored

16

in both 'the public interest in ensuring that the immigration courts are accessible to aliens seeking relief and the public interest in ensuring that U.S. taxpayers do not bear a disproportionate burden in funding the immigration system'" (quoting 85 Fed. Reg. at 11,870)).

While Plaintiffs intimate that the fees are not "fair," they offer no authority even defining that term, *see* Mot. 30; *see also* Compl. ¶ 3, and Defendants are unaware of any such definitive authority. *Contra Seafarers Int'l Union of N. Am. v. U.S. Coast Guard*, 81 F.3d 179, 182 (D.C. Cir. 1996) ("The IOAA itself provides little specific direction on how to assess the propriety of user fees."); *Cent. & S. Motor Freight Tariff Ass'n, Inc. v. United States*, 777 F.2d 722, 724 (D.C. Cir. 1985) (noting that although the IOAA's "express purpose is to make . . . services [provided by federal agencies] 'self-sustaining to the extent possible[,]' . . . [t]he IOAA describes only in the most general terms how this desideratum of agency self-sufficiency is to be accomplished."). Rather, Plaintiffs appear to advance a policy disagreement with the decision to increase these fees at all. That does not make the fees inconsistent with statutory authority.

Moreover, Plaintiffs offer no argument or grounds for concluding that the Agency's determination that the "fees are fair" is not reasonable or entitled to deference. Nor could they. For in two places, Congress has explicitly allowed the Agency to set fees at a level that allows full cost recovery: first, in the IOAA, which has as its "express purpose" making agency services "'self-sustaining to the extent possible[,]'" *Cent. & S. Motor Freight Tariff Ass'n*, 777 F.2d at 724; and second, in the INA, which authorizes the Agency to set fees to "ensure recovery of the full costs" of providing the associated services, including the costs of providing some such services at no charge to some applicants, 8 U.S.C. § 1356(m). And, notwithstanding that authority, the Agency, in consideration of competing policy and public interest considerations, exercised its discretion to set fees *below* full cost recovery. *See* 85 Fed. Reg. at 82,763 (noting the Agency "cho[se] not to set the fees at amounts that would account for full cost recovery by" excluding certain costs); *id.* at 82,772 (noting that Agency "intentionally did not include a variety of costs in its fee analysis to more fully ensure the fees remained at a level reflected by the public interest").

Accordingly, Plaintiffs are unlikely to succeed on their claim under the APA that the Final

Rule is contrary to law.

2. *The Agency examined all relevant factors and record evidence.*

As discussed above, the Final Rule is a straightforward application of congressionally provided authority. Nonetheless, Plaintiffs assert that Defendants failed to consider various relevant factors and evidence. Plaintiffs are wrong on the facts and the law.

a. Plaintiffs assert that the Agency "dismissed commenters' evidence that the mere 'possibility' of fee waivers would not appropriately alleviate the fee burden as [the Agency] claimed." Mot. 23-24. This assertion is contrary to the record. The Agency both reasonably explained why it disagreed with commenters' concerns and presented actual evidence countering concerns that fee waivers are not viable to mitigate the Rule's effects.

First, far from "dismissing" comments expressing concern about fee waiver availability, the Agency addressed these concerns at length. *See, e.g.* 85 Fed. Reg. at 82,758-60 (responding to comments concerning fee waiver availability). In response to comments "predict[ing] that . . . more people would request fee waivers," *id.* at 82,578, and that an increase in fee waiver requests would burden Agency adjudicators and immigrant legal service providers, *id.*, the Agency "agree[d] that it is possible—and perhaps even probable—that the increased fees may lead more aliens to seek a fee waiver than would without this rule[.]" *Id.* at 82,578-79. However, the Agency explained its view that these concerns are "speculative," outlining a slew of "potential countervailing considerations that would not necessarily support" the commenters' conclusions. *Id.* at 82,579. Taking both commenters' concerns and these considerations into account, the Agency concluded that "it is speculative to assert that all who could afford the lower amount will necessarily not be able to pay the higher fee[,]" and explained that the subset of applicants who would not be able to do so has not been estimated. *Id.* Plaintiffs offer no such estimate for the Agency to address conclusively, whether as relates to some increased burden on legal service providers or adjudicators, or otherwise.

Similarly, in response to comments "alleg[ing] that the fee waiver process is an insufficient remedy for low-income individuals because determinations are inconsistent," 85 Fed. Reg. at 82,758, the Agency explained that its own evidence suggests that the overwhelming majority (more than 99%)

of fee waiver requests are granted.  *See id.* at 82,779 (noting that, for FY 2019, the BIA decided 19,874 case appeals or motions, granted approximately 5,499 fee waivers, and "recorded no fee waiver requested" for approximately 14,322 cases, "suggest[ing] that, at most, the Board denied 53 fee waiver requests in FY 2019").  Although the Agency conceded that its data on this issue is not granular, *see id.* (noting that "the Board does not track fee waiver denials separately"), as the Agency pointed out, "[c]ommenters have not presented any evidence that EOIR would not continue to grant appropriate fee waivers."  *Id.* at 82,759; *see also* 85 Fed. Reg. at 82,779 ("Despite commenters' anecdotal and unsubstantiated allegations that fee waivers for any particular population are consistently denied, the Department has no data to indicate such a practice."); *id.* at 82,760 ("Despite commenters' allegations that fee waivers are inconsistent around the country, the Department has no evidence or data, and none was provided by commenters, regarding the specific adjudications of fee waivers that would support such statements.").

While Plaintiffs describe their own allegations as "evidence[,]" Mot. 24, they actually offer only anecdote and speculation that "it is risky to rely on the availability of a fee waiver" or that respondents "cannot rely on the availability of fee waivers" at all.  *Id.*  For example, in claiming that "[t]he Final Rule upends [its] EOIR practice," one of Plaintiffs' declarants states that "it is *unclear* if [fee waiver requests] will be adjudicated as quickly, or as favorably, as in the past," citing a recent rulemaking by a separate agency—USCIS—that, unlike EOIR, did "substantially narrow[] the standards for granting fee waivers," and expressing concern, without basis in the Final Rule, that "immigration judges may deny fee waivers using similar rationales."  Decl. of Maria Odom ¶ 25, ECF No. 19-6 (emphasis added).  *See also, e.g.*, Decl. of Michelle N. Mendez ¶ 25, ECF No 19-5  (noting that Plaintiff CLINIC "has *received reports* that Immigration Judges are increasingly rejecting fee waivers" but offering no information on the source, frequency, or reliability of such reports (emphasis added)); Decl. of Jason Scott Camilo ¶¶ 5-6, ECF No 19-4 (asserting that "[*i*]*n my experience*, immigration judges *sometimes* deny fee waivers, even in circumstances where the immigrant is unable to afford the fee[,]" while acknowledging that "I have never filed a fee waiver request on behalf of a client who appeals to the BIA" (emphasis added)); Decl. of Jehan Laner Romero ¶¶ 17-19, ECF No. 19-7 (reciting anecdotes

of individual fee denials).

Moreover, in recounting anecdotes of fee waiver denials, Plaintiffs' declarants offer little if any information of the evidence submitted in support of the denied requests; accordingly, they provide no basis to draw conclusions about whether fee waiver "determinations are inconsistent," 85 Fed. Reg. at 82,758, or discern trends about grants of "appropriate fee waivers[,]" *id.* at 82,759, let alone constitute definitive evidence demonstrating that fee waivers "would not appropriately alleviate the fee burden." Mot. 24. Faced with a similarly bare record in *Ayuda*, the Circuit rejected a nearly identical argument as Plaintiffs advance here. *See Ayuda*, 848 F.2d at 1299 n.4 ("Appellants intimate that the waiver provision . . . does not in fact mitigate the deterrent effect of the increased fees because the Attorney General retains discretion to decline to waive the fees even after an applicant has demonstrated his or her inability to pay. We have been directed to no evidence, however, that the Attorney General has in fact exercised his discretion in this manner."). In any event, the denial of a fee waiver may be administratively appealed in an interlocutory posture or, if it leads to the denial of the underlying application, motion, or appeal, may be appealed as part of appealing that denial.

The Agency also considered and responded to comments "oppos[ing] fee waivers as a viable solution because of the discretionary nature of fee waiver determinations." 85 Fed. Reg. at 82,758. On the whole, the Agency "disagree[d] with commenters that the discretionary nature of fee waivers is problematic."[4] *Id.* at 82,760. As the Agency explained, "[t]he appropriate regulations, 8 CFR 1003.8(a)(3), 1003.24(d), 1103.7(c), clearly delineate the requirements for fee waivers," *id.*, which "allows for individuals to have fees waived upon a *discretionary determination of inability to pay*." *Id.* at 82,782 (emphasis added). Those regulations provide that an immigration judge or the BIA "has the discretion to waive a fee for an appeal, motion to reconsider, or motion to reopen upon a showing that the filing party is unable to pay the fee." 8 C.F.R. §§ 1003.8(a)(3), 1003.24(d). While requests to

---

[4] To the extent Plaintiffs disagree with and seek to challenge the reasonableness of the Agency's regulatory standards governing fee waivers, any such challenge is time-barred. Where, as here, no other statute provides a limitations period, a plaintiff has six years to bring a civil action against the United States. 28 U.S.C. § 2401. The current regulations governing fee waiver consideration by immigration judges or the BIA have been in place since 2004. *See* 8 C.F.R. 1003.8(a)(3); 8 C.F.R. 1003.24(d); 69 Fed. Reg. 44,903 (July 28, 2004).

the Board must be submitted via a Fee Waiver Request (Form EOIR-26A), requests to immigration judges does not require any particular form. 8 C.F.R. §§ 1003.8(a)(3), 1003.24(d). The only evidentiary requirement is a "properly executed affidavit" or "declaration to be signed under penalty of perjury" "substantiating the filing party's inability to pay the fee." 8 C.F.R. §§ 1003.8(a)(3), 1003.24(d).

Moreover, while some commenters asserted (and Plaintiffs' declarants insinuate) that "the regulations do not require [immigration judges and the BIA] to grant fee waivers even to an individual who has provided proof of inability to pay[,]" 85 Fed. Reg. at 82,758, that assertion is contrary to the applicable regulations, 8 C.F.R. §§ 1003.8(a)(3), 1003.24(d), which are unchanged by the Rule. Indeed, for the commenters' assertions—and Plaintiffs' suggestions—to be valid, EOIR adjudicators must ignore the plain text of 8 C.F.R. §§ 1003.8(a)(3) and 1003.24(d). Although Plaintiffs' declarants insinuate that EOIR adjudicators would ignore these binding regulations, they provide no evidence to back up their suggestions, which cannot "overcome a presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975); *see also United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.").

Moreover, the Agency's interpretation of the regulations is clear: "The Department believes this process is rational and accessible and allows for individuals to have fees waived upon a *discretionary determination of inability to pay*." *Id.* at 82,782 (emphasis added). In that regard, contrary to commenters' assertion, this discretion is considered to be limited to whether inability to pay has actually been proven. Further, as the Agency explained in the Final Rule, it "expects its adjudicators to issue fee waiver determinations in a fair manner and consistent with the regulations[,]" *id.* at 82,760, *see also id.* at 82,764 (same), noting that "there is no evidence that Board members or immigration judges would be unable or unwilling to adjudicate fee waiver requests consistent with applicable law and their respective independent judgment and discretion." *Id.* at 82,759.

The APA requires only that an "agency's response to public comments" show "what major issues of policy were ventilated and why the agency reacted to them as it did." *Public Citizen, Inc. v.*

FAA, 988 F.2d 186, 197 (D.C. Cir. 1993) (citation and ellipsis omitted). The Final Rule demonstrates that the Agency satisfied this requirement with respect to comments regarding fee waivers. While Plaintiffs may disagree with the Agency's responses and conclusions, such disagreement is insufficient to undermine the Agency's judgment. *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 303 (D.C. Cir. 2003) (quotations and citations omitted) ("a court is not to substitute its judgment for that of the agency," "especially . . . when the agency is called upon to weigh the costs and benefits of alternative polic[i]es" (citations omitted)).

b.      Plaintiffs also assert that Defendants ignored evidence that the fees imposed under the Rule will be "prohibitive" and render many aliens unable to pay. Mot. 22–23. To the contrary, EOIR adequately considered the impact of the rule on the volume of applications and appeals that it would receive. The Agency explained that "the Department does not believe that these fees will have a material impact on the volume of filings received annually." 85 Fed. Reg. at 82,792. This belief was supported by an assessment that "demand for filing these forms and motions" is expected to be "relatively inelastic," given the high value applicants evidently place on these immigration benefits and the similarity of the fees with the fees imposed by USCIS in immigration proceedings even prior to the increases that agency proposed in its now-enjoined 2020 Fee Rule. *Id.* For example, the Agency noted that "the current fee for an appeal or motion charged by USCIS is $675, which is well above EOIR's current $110 fee and will remain significantly higher than EOIR's new fee for a motion to reopen filed with an immigration court." 85 Fed. Reg. at 82,758 n.13.

The Agency also noted the continued availability of fee waivers, the standard for which was not affected by the Final Rule. *Id.* at 82,758. Contrary to Plaintiffs' assertions, those waivers are directly relevant to the potential impact of these fees on demand for filings. The Agency's regulations, as discussed above, demonstrate that although adjudicative officials have discretion in determining whether an alien has demonstrated an inability to pay, a fee waiver should be granted to any alien that does demonstrate such an inability. *See supra* (discussing 8 C.F.R. §§ 1003.8(a)(3), 1003.24(d)). Thus, regulatory protections already exist as to any persons that will have a genuine inability to pay EOIR's fees. And for the reasons discussed above, Plaintiffs' have not raised any basis to say that these

regulatory authorities will not be appropriately implemented under the revised fees.

Moreover, as Plaintiffs point out, the Agency explained that it had scant evidence of aliens' financial status that would provide a basis to say the fees imposed under the Rule could not be paid. *Id.* at 82,756. In instances like this, where predictive judgments are required as to matters for which there is little evidence, an agency's assessment is entitled to substantial deference. *See Newspaper Ass'n of Am. v. Postal Regulatory Comm'n*, 734 F.3d 1208, 1216 (D.C. Cir. 2013) ("When, as here, an agency is making 'predictive judgments about the likely economic effects of a rule,' we are particularly loath to second-guess its analysis." (citation omitted)); *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 52 (1983) ("It is not infrequent that the available data does not settle a regulatory issue and the agency must then exercise its judgment in moving from the facts and probabilities on the record to a policy conclusion.").

In response, Plaintiffs point to only three pieces of evidence that they contend were raised by commenters as contrary to the Agency's assessment: (1) that the proposed fees would be difficult for applicants to raise in the 30-day period for appeal; (2) that a Federal Reserve study assessed that 40% of Americans would have difficulty paying an unexpected $400 bill; and (3) that many aliens have difficulty obtaining counsel. Mot. 23 (citing 85 Fed. Reg. at 82,761, 82,779). But as Plaintiffs readily acknowledge in their brief, Defendants responded to these very pieces of evidence, explaining why they disagreed with Plaintiffs' assessment as to each. *See id.* at 23 (citing 85 Fed. Reg. at 82,763, 82,779–80). For example, although commenters "asserted that many aliens' struggle to retain representation in removal proceedings" they "did not offer any evidence that aliens are unable to obtain counsel due to prohibitive cost." 85 Fed. Reg. at 82,779. To the contrary, 75 percent of aliens who have had at least one hearing, 85 percent of aliens with pending asylum applications, and 86 percent of aliens with pending appeals to the BIA have representation. EOIR, *Current Representation Rates* (Oct. 13, 2020), *available at* https://www.justice.gov/eoir/page/file/1062991/download. And as to the Federal Reserve study Plaintiffs cite, the Agency explained that the study had minimal utility given the fact that applicants would be aware of the fees at issue well in advance of 30 days before their due date and that even on that timeframe, "[o]nly 12 percent . . . would be unable to pay" according to the cited

source, a far smaller group that may be eligible for a fee waiver. *Id.* at 82,780.

The APA requires only that an "agency's response to public comments" show "what major issues of policy were ventilated and why the agency reacted to them as it did." *Public Citizen, Inc. v. FAA*, 988 F.2d at 197 (citation omitted). Moreover, "a court is not to substitute its judgment for that of the agency," "especially … when the agency is called upon to weigh the costs and benefits of alternative polic[i]es." *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 303 (D.C. Cir. 2003) (quotations and citations omitted). The Agency's consideration of Plaintiffs' assertions more than meets this standard.

c.      Plaintiffs also contend that the Agency "ignored evidence of the Final Rule's impact on legal service[s] providers such as Plaintiffs." Mot. 24.   Plaintiffs' argument is both irrelevant and inaccurate.   To begin, legal services providers are not the beneficiaries of immigration benefits; they are organizations that assist immigrants with applications for immigration benefits.   Congress did not frame the INA to benefit such third parties, and hence Plaintiffs have no legally cognizable reliance interests that the agency was required to consider. *See, e.g.*, *State Farm*, 463 U.S. at 43 (agency must show that it considered the "relevant factors").

Nevertheless, the Agency *did* consider comments regarding the purported negative impacts of the Rule on legal services providers, describing those comments at length. *See* 85 Fed. Reg. at 82,774 ("Numerous commenters expressed concerns that the rule would negatively affect legal service providers.   For example . . . .").   And the Agency explained that it was declining to make changes to the Proposed Rule on this basis because these concerns were speculative.   Consistent with that response, the APA does not require agencies to respond to comments that are "purely speculative." *See Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 n.58 (D.C. Cir. 1977); *Public Citizen, Inc. v. FAA*, 988 F.2d at 197.

The Agency's response was more than adequate because comments received as to the effect of the Rule on legal services providers did indeed stack speculation upon speculation.   For example, commenters posited that the "availability of pro bono counsel" would be diminished because legal services organizations would be "forced to assist fewer aliens," which would further "preclude law students from gaining valuable experience[.]"   85 Fed. Reg. at 82,774.   Commenters also hypothesized

that under a new fee schedule, legal services organizations would be forced to spend additional resources paying such fees and preparing fee waiver applications, which would render them "less able to provide comprehensive services to aliens" and make law firms "more hesitant to take these cases." *Id.* These comments ultimately rest on suppositions about the subjective reaction of numerous third parties to the Rule and on unknowable future budgetary and staffing situations for law firms and clinics. As the Agency explained, "access to counsel [is] affected by a number of factors beyond the cost of applications and appeals, and commenters provided no factual or policy bases for the Department to consider" on these points. *Id.* at 82,775. Thus, Plaintiffs' speculative contentions regarding the possible downstream effects of the Rule on legal services providers raised no basis for response by the Agency. *See Home Box Office*, 567 F.2d at 35 n.58 (comments which "do not disclose the factual or policy basis on which they rest require no response").

The same rule of administrative law demonstrates that no response was required to Plaintiffs' speculation that the fees would "diminish the integrity of EOIR Proceedings, undermine due process, reduce access to counsel, subject respondents to abusive lending practices" and have vague "cumulative negative . . . effects on aliens." Mot. 25. As the Agency explained in response to commenters pressing these points, such concerns are "extremely attenuated" and, indeed, Plaintiffs posit that these filing fees for certain appeals and motions will have wide-ranging effects on the whole of the immigration adjudication system. In any event, the Agency further responded that the "continued availability of fee waivers" would mitigate negative effects as to "aliens who are unable to afford the cost of an application or appeal." 85 Fed. Reg. at 82,775. Again, it would be squarely inconsistent with the APA for the Court to "second-guess" this "predictive judgment" about the effects of these increased fees, particularly on matters as attenuated from the fees as lending practices in the consumer finance industry. *See Newspaper Ass'n of Am.*, 734 F.3d at 1216.

### 3. *The Final Rule provides a reasoned basis for increasing fees.*

Plaintiffs next argue that the Final Rule lacks a "reasoned explanation" for increasing the fees at issue. Plaintiffs do so in a manner squarely contrary to APA standards, which provide that arbitrary and capricious review is "narrow" and "deferential." *Am. Trucking Ass'ns, Inc. v. EPA*, 600 F.3d 624,

627 (D.C. Cir. 2010). Rather than apply this deferential approach, however, Plaintiffs seem to invite the Court to simply substitute Plaintiffs' judgment for the Agency's and, indeed, Congress's on these questions. There is no basis for this kind of second-guessing under the APA.

With two apparent exceptions, all of Plaintiffs' arguments as to a failure of reasoned explanation simply repackage the arguments discussed above. *See* Mot. 25–28. For the reasons set forth in prior sections of this brief, the Agency adequately considered the possible effects of these increased fees on respondents and their due process rights, the availability of fee waivers, the potential effect of these increases on demand for immigration adjudication services, and the method chosen for determining the amount of the revised fees. *See supra.*

The remaining two arguments also lack merit. First, Plaintiffs contend that the Agency failed to explain why it was "trying to align fees with processing costs" where EOIR is funded by congressional appropriations. Mot. 25. But Congress has expressly provided that the Agency is authorized to charge user fees up to the level of costs for immigration adjudication services and that "each service . . . provided by an agency . . . to a person . . . is to be self-sustaining to the extent possible." *See* 8 U.S.C. § 1356(m); 31 U.S.C. § 9701(a). And far from failing to explain this Congressional judgment, EOIR explicitly stated that its basis for the Final Rule arose from these INA and IOAA provisions. *See* 85 Fed. Reg. at 82,751.

Second, Plaintiffs assert that the Agency has not identified the purpose for which the increased fees will be used. Not so. The Final Rule states that "the fees will be deposited into the [Immigration Examinations Fee Account] pursuant to section 286(m) of the [Immigration and Naturalization] Act (8 U.S.C. 1356(m))." 85 Fed. Reg. at 82,778. The INA explains that adjudication fees are to be deposited as "offsetting receipts" in the Account and be used to "reimburse any appropriation the amount paid out of such appropriation for expenses in providing immigration adjudication and naturalization services . . . ." 8 U.S.C. § 1356(m), (n). EOIR cited these INA provisions in explaining the purpose of the fees. 85 Fed. Reg. at 82,778.

4. *The Final Rule does not effect a change in policy and is adequately explained regardless.*

Plaintiffs also argue that the Final Rule did not adequately explain the Agency's purported

"departure from longstanding agency policy" regarding fee increases.  Mot. 28–29.  Plaintiffs rely on the standard articulated in *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), which holds that an agency change in policy must be supported by an "awareness" that the agency "*is* changing position," rather than a "*sub silentio*" departure from past rules.  Plaintiffs misunderstand the *Fox Television* standard and ignore the Agency's substantial explanation regardless.

To begin, *Fox Television* is inapposite here because there has been no agency change in policy at all.  As discussed above, the most recent rule setting the fees at issue in the Final Rule, promulgated in 1986, expressly stated that the purpose of these fees is to "place the financial burden of providing special services and benefits, which do not accrue to the public at large, on the recipients."  51 Fed. Reg. at 39,993.  The 1986 Rule went on to state that fees were adjusted in that rule to "more nearly reflect the current cost of providing the benefits and services, taking into account public policy and other pertinent factors."  *Id.*  That is *precisely* the policy being carried out in the Final Rule.  Indeed, EOIR quoted this very text in the Final Rule to explain that its policy "has not changed since the last time it assessed fees."  85 Fed. Reg. at 82,771.  Plaintiffs assert without support that the Agency has implicitly adopted a different policy since 1986 because EOIR has not increased fees since 1986.  But Plaintiffs do not and cannot articulate what that different policy is because none has ever been published.  And under the deferential standards of the APA, the Court should not accept Plaintiffs' invitation to presume the existence of such a policy.[5]

Even if the Court concluded that the Final Rule implicates the *Fox Television* standard, the Rule passes that test.  As Plaintiffs' own brief acknowledges, the Final Rule explicitly recognizes the thing Plaintiffs accuse the Agency of ignoring, namely the fact that "[f]or over 30 years the Department did not either review or update the fees charged for applications, appeals, and motions for which EOIR levies a fee."  85 Fed. Reg. at 82,750.  The Agency went on to state that EOIR conducted a recent study of the cost of each type of application at issue and had proposed fees in accord with those costs.  *See id.* at 82,751.  And in further explaining why that study had been conducted, EOIR relied upon 31

---

[5] Indeed, the implicit policy change that Plaintiffs posit would itself be a violation of *Fox Television*, given that it would represent a clear change from the 1986 Rule.

U.S.C. § 902(a)(8), which states that agency Chief Financial Officers "shall" "review, on a biennial basis, the fees . . . imposed by the agency for services and things of value it provides, and make recommendations on revising those charges to reflect costs incurred by it in providing those services and things of value." The Department further relied on OMB Circular A-25, which also commands agencies to conduct biennial review of fees assessed for Government services. 58 Fed. Reg. 38,142, 38,146 (July 15, 1993). Thus, far from effecting any "*sub silentio*" change in policy, Defendants expressly acknowledged the Final Rule increased various user fees and explained why the agency believed doing so was necessary and reasonable. The APA requires no more. *See Fox Television*, 556 U.S. at 515 (an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one").

B. The Final Rule Allowed For Meaningful Comment.

In Counts II and III of the Complaint, Plaintiffs assert three primary objections to the rulemaking process. First, they challenge the Agency's *comment* procedures, alleging that the Agency's chosen 30-day comment period violated the APA's notice-and-comment requirements both on its face and in light of the circumstances of the then-emerging global pandemic. Second, they challenge the *notice* the Agency provided, alleging both that the Agency disclosed insufficient information regarding the methodology and data underlying the Rule, and that the Agency had an obligation to provide notice of *other* rules the Agency would *subsequently propose*. None of Plaintiffs' challenges is likely to succeed, for the Agency adequately complied with the APA's procedural requirements and exercised its discretion reasonably in doing so, and Plaintiffs have identified no harm which has accrued to them owing to any procedural deficiencies.

1. *The comment period satisfied the APA.*

Plaintiffs argue that the Agency "[v]iolated the [n]otice and [c]omment [r]equirements of the APA," because the 30 days allotted for public comment was both "insufficient standing on its own" and, by virtue of its "[c]oincid[ence] with the onslaught of a global pandemic . . . , that abbreviated period hobbled public participation in the rulemaking process." Mot. 30-31. This argument fails.

*First*, 5 U.S.C. § 553 sets forth the procedures necessary in informal rulemaking: the agency

must provide notice of the proposed rulemaking, and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." This opportunity to participate is all that the APA requires. 5 U.S.C. § 553(c). *Second*, the APA "does not specify a minimum time for submission of comments in an informal rulemaking," *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984)—some "opportunity to participate is all that the APA requires," *Phillips Petroleum Co. v. EPA*, 803 F.2d 545, 559 (10th Cir. 1986). Therefore, courts generally lack the authority to arbitrarily impose some minimum required comment-period length. *See id.* (citing *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 543 (1978)). *Third*, the APA entrusts this sort of procedural minutiae to an agency's reasonable discretion. *Vt. Yankee*, 435 U.S. at 543 ("[A]dministrative agencies 'should be free to fashion their own rules of procedure and methods of inquiry permitting them to discharge their multitudinous duties.'") (quoting *FCC v. Schreiber*, 381 U.S. 279, 290 (1965))).

The D.C. Circuit, in fact, has explicitly found a 30-day comment period reasonable even for regulations that were "technical[ly] complex[]." *Conn. Light & Power Co. v. NRC*, 673 F.2d 525, 534 (D.C. Cir. 1982) (finding the agency's "choice of a [30-day] comment period" not "unreasonable," notwithstanding "the technical complexity of the regulations," noting that "[n]either statute nor regulation mandates that the agency do more"). All the more here, where the Final Rule consists of a relatively straightforward change to the Agency's fee schedule to better reflect the actual cost of services the Agency provides. Further, the breadth and number of comments received suggest that the comment period was reasonable. And, the failure of Plaintiffs to identify a genuine issue that they were unable to raise during that period—discussed in more detail below—also strongly suggests that the period was reasonable. 85 Fed. Reg. 82,771 ("[C]ommenters did not suggest or indicate what additional issues the comment period precluded them from addressing; to the contrary, the comments received reflect both a breadth and a level of detail that suggest that the period was more than sufficient.").

Nor does anything in the APA obligate the Agency to extend the selected comment period because some commenters asked the Agency to do so nor because that period subsequently came to

include "the early days of an unprecedented global COVID-19 pandemic." Compl. ¶ 376; Mot. 31.
And Plaintiffs have identified no caselaw supporting their contention otherwise, which contravenes
the Supreme Court's holding in *Vermont Yankee* that the APA entrusts this sort of procedural minutiae
to an agency's reasonable discretion. *Vt. Yankee,* 435 U.S. at 543 ("[A]dministrative agencies should
be free to fashion their own rules of procedure and methods of inquiry permitting them to discharge
their multitudinous duties."(citation omitted)).

And even if the Agency's determination not to set a longer comment period or extend the
comment period in these circumstances were unreasonable, such error is harmless. Plaintiffs have not
identified any unique concerns that would have been raised by Plaintiff CLSEPA—which claims that
the Agency's chosen length of comment period prevented it from submitting comments—and that
were not raised by other commenters. Rather, each of the points CLSEPA asserts it would have made
during the rulemaking was made by another commenter and responded to by the Agency in the Final
Rule. *Compare* Decl. of Cristina Dos Santos ("Santos Decl.") ¶¶ 12-13, 36, ECF No. 19-9 (concerns
about a new asylum fee) *with* 85 Fed. Reg. at 82,765-69; Santos Decl. ¶¶ 14, 37-38, 45-46 (concerns
about fees being unaffordable) *with* 85 Fed. Reg. at 82,760-65; Santos Decl. ¶¶ 15, 36, 39-44, 47-48
(concerns about fee waiver availability and burdens on legal service provides) *with* 85 Fed. Reg. at
82,774. And because the Agency thus already heard the substance of these "missing" comments,
Plaintiffs cannot demonstrate that the "missing" comments would have changed the outcome.

For all of these reasons, Plaintiffs are unlikely to succeed on Count II of their Complaint.

2. *The Agency provided sufficient information to enable meaningful comment.*

Plaintiffs also argue that the Agency "commit[ted] . . . 'serious procedural error,'" by not
making available during the rulemaking "necessary information about either the methodology of the
[Agency's fee] study or the data that it generated." Mot. 33. But the APA's procedural requirements
do not set the high bar Plaintiffs desire. The Department published sufficient information to provide
an opportunity for meaningful comment, which requires only that an agency "set forth in its notice of
proposed rulemaking '. . . the terms or substance . . . [and] a description of the subjects and issues
involved' in the proposed rule," *Air Transp. Ass'n of Am. v. Civil Aeronautics Bd.*, 732 F.2d 219, 224

(D.C. Cir. 1984) (quoting 5 U.S.C. § 553(b)(3)), and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments[.]" 5 U.S.C. § 553(c).

As to the methodology, the Agency explained in the Proposed Rule that it "conducted a comprehensive study using activity-based costing to determine the cost to EOIR for each type of application, appeal, and motion for which EOIR levies a fee."  85 Fed. Reg. 11,869.  The Agency further provided extensive details concerning the three phases of the study.  First, the Agency collected survey data and consulted with OCIJ and BIA staff, to "determine the appropriate staff levels and time required to process and adjudicate each application, appeal, or motion," and reviewed OPM and GSA data to "determine the average salary rates for applicable staff levels."  *Id.*  Second, the Agency developed and validated "step-by-step process maps, with assigned times and staff levels, for how each application, appeal, or motion is processed in the OCIJ and the BIA."  *Id.*  Third, the Agency "allocated the salary costs from the GSA and OPM data to each step in the process, based on the time the step takes, the average salary of the responsible staff, and the percentage of total cases in which the step occurs."  *Id.*; *see also id.* at 11,872 (similar).  The Agency "used this methodology to calculate an estimated cost for processing each form or motion for which EOIR levies a fee."  *Id.* at 11,872; *see also id.* at 11,870 (similar).  As noted, the Agency purposefully "included only direct salary costs" in the fee study.  *Id.* at 11,869; 11,872.  The Agency did so both "to avoid potential inaccuracies in the calculation of overhead and non-salary benefits" and to "account[] for the public interest in having non-parties bear some of the cost burden for filing documents associated with proper application of the law as it pertains to the statutory right to appeal or apply for certain forms of relief."  *Id.* at 11,869.

The Agency also provided the substance of and necessary information concerning the "data . . . generated," Mot. 33, by the study.  For each fee, the Agency provided the total average cost (to the nearest dollar) for processing and adjudicating each application, motion, or appeal generated by the fee study calculations.  *Id.* at 11,870.  It also broke out that cost in two ways: (1) by "staff level," i.e., what category of staff (for example, as to "Motion to Reopen (OCIJ)," Immigration Judge, Judicial Law Clerk, or Legal Assistant) performs the activity to process and adjudicate the application, motion,

or appeal; and (2) by "process category," i.e., the nature of the activity (for example, as to "Motion to Reopen/Reconsider (BIA)," Initial Processing, Case Screening/Preparation, Decision and Adjudication, or Final Processing) involved in the processing and adjudication of the application, motion, or appeal.  *Id.* at 11,872-73.  For each fee, the information in the NPRM shows how the cost breakdowns clearly correlate with the updated fees.  *Id.*

In that regard, although the Agency did not publish the study itself during the rulemaking, the NPRM clearly demonstrates that the Agency detailed both the methodology used for the study and the data it generated, while showing how the methodology and data resulted in the updated fee schedule.  The Agency additionally identified the sources of the data inputs it relied on in the study— "survey data," "consult[ations] with OCIJ and BIA experts," and "data from OPM and GSA" regarding salaries.  *Id.* at 11,869.  Accordingly, Plaintiffs' suggestion that the Agency "failed to provide *any* data about the 'comprehensive study' on which they . . . relied in formulating the Proposed Fee Rule. . . . [t]o allow meaningful analysis and commentary about whether the study was reliable and its results supported," Mot. 33 (emphasis added), cannot be seriously countenanced.

Nor is Plaintiffs' assertion that the Agency's "fail[ure] to provide . . . upon request" the data the Agency collected from the surveys and staff consultations "violate[s] the APA" correct.  *Id.*  For an APA "notice is sufficient 'if it affords interested parties a reasonable opportunity to participate in the rulemaking process,' and if the parties have not been 'deprived of the opportunity to present relevant information by lack of notice that the issue was there.'"  *Am. Radio Relay League, Inc. v. FCC,* 524 F.3d 227, 236 (D.C. Cir. 2008) (quoting *WJG Tel. Co., Inc. v. FCC,* 675 F.2d 386, 389 (D.C. Cir. 1982)); *see* 5 U.S.C. § 553(b)(3) (requiring notice of the "subjects and issues involved").  In support of their assertion, Plaintiffs cite only *Shands Jacksonville Medical Center v. Burwell*, 139 F. Supp. 3d 240, 263 (D.D.C. 2015).  But the Agency's non-publication of the granular survey data and staff consultations —which granular information informed the methodological data and study results the Agency *did* disclose—is not comparable to the agency's "fail[ure] to disclose critical aspects of [its] methodology until after the comment period" in *Shands*. 139 F. Supp. 3d at 262.  There, not until the final rule did the agency disclose that it had excluded an entire category of data consisting of "hundreds of

thousands of cases." *Id.* at 262-63.  As the court held, "[w]here an agency disregards a significant portion of the information on which it claims to have based its analysis, the APA requires *some* disclosure and explanation." *Id.* at 263.  That contrasts sharply with this Rule, in which the Agency disclosed and explained its data and analysis, *i.e.*, provided "*some* disclosure and explanation," *id.*—just not every single detail.  Rather, this case is more like *Lee Mem'l Health Sys. v. Burwell*, in which the agency provided substantial information about the methodology and data it used, but simply did not provide "the specific set of hospitals [the agency] used to do its simulations."  206 F. Supp. 3d 307, 332 (D.D.C. 2016), *opinion corrected on denial of reconsideration*, No. 13-CV-643 (RMC), 2016 WL 10749143 (D.D.C. Nov. 10, 2016), and *aff'd sub nom. Billings Clinic v. Azar*, 901 F.3d 301 (D.C. Cir. 2018).  As the court there held, "that alone does not render its explanations or data inadequate," because "Plaintiffs had the 'critical factual material' necessary to review the agency's method."  *Id.* (quoting *Owner–Operator Indep. Drivers Ass'n Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 199 (D.C. Cir. 2007)).

Moreover, the Agency "publish[ed] the data collected in its spring 2018 study" when the Final Rule was published.  85 Fed. Reg. at 82,755; Executive Office for Immigration Review, *EOIR 1125-AA90 fee study*, *available at* https://beta.regulations.gov/document/EOIR-2020-0013-0002 (posted Dec. 18, 2020).  And although Plaintiffs had access to that data prior to filing their Complaint or Motion, Plaintiffs offer no arguments challenging the Rule on the basis of this previously unavailable data.  Because Plaintiffs cannot "demonstrat[e] that [they] had something useful to say about this critical data," *Chamber of Commerce of the U.S. v. SEC*, 443 F.3d 890, 905 (D.C. Cir. 2006), their argument that the Agency "failed to disclose data critical for meaningful comment" (and any possible argument that Plaintiffs were prejudiced by such "fail[ure]") must be rejected.  *See Fla. Power & Light Co. v. United States*, 846 F.2d 765, 772 (D.C. Cir. 1988) (APA procedural requirements have not been violated when plaintiff asserts "[n]o substantive challenges which differ in kind from the original comments . . . raised").

Finally, the fact that the comment period closed before the Agency had "propose[d] *other* rules," Mot. 35 (emphasis added), has no bearing on whether the Agency "fairly apprise[d] interested parties of all significant subjects and issues involved" in *this* rulemaking to render its notice adequate

under the APA.  *Id.* (quotations omitted).  Finding otherwise would both yield a standard that is impossible to police—how far down the "regulatory pipeline," *id.*, need a rule in consideration be to trigger an obligation for the agency to disclose its substance in the NPRM for another rule? *Cf. Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007) (noting that a "proposed rule [is] simply a *proposal*, its presence meant that the Department was *considering* the matter; after that consideration the Department might choose to adopt the proposal or to withdraw it")—and also would run headlong into the Supreme Court's holding in *Vermont Yankee* that courts may not impose on agencies additional procedural requirements not prescribed in the APA.  *See Phillips Petroleum*, 803 F.2d at 559 (admonishing that "[t]o impose upon the agency more stringent procedural requirements, absent extraordinary circumstances, would clearly violate the Supreme Court's holding in *Vermont Yankee*" (citing *Vt. Yankee*, 435 U.S. at 524)).  Finally, if Plaintiffs had concerns about the interaction between any or all of the "Subsequent Proposed Rules," Mot. 35, and the Final Rule, the comment periods for each of the "Subsequent Proposed Rules"—all of which took place before the Agency finalized *this rule*—provided ample opportunity for Plaintiffs to voice those concerns to the Agency.

Plaintiffs and other interested parties had reasonable opportunity to comment here.  The NPRM provides substantial detail of the Agency's methodology, data, and calculations in support of the updated fees, and the Court can reasonably discern the Agency's path.  Accordingly, the Agency satisfied its obligations under the APA and Plaintiffs' argument lacks merit.

C.   The Agency Satisfied The Requirements Of The RFA.

Finally, Plaintiffs are wrong that the Final Rule violates the Regulatory Flexibility Act.  Mot. 36–38.  Plaintiffs assert that the Agency failed to adequately consider the effect of the Final Rule on "small entities" as required by the RFA.  *See id.*  But as the Agency explained in the Rule, under the circumstances, the RFA requires nothing more than a certification that the regulation will not "have a significant economic impact on a substantial number of small entities."  85 Fed. Reg. at 82,785.  And here, the rule does not "regulate 'small entities' as that term is defined in 5 U.S.C. 601(6)" because "[o]nly individuals, rather than entities, are responsible for paying the fees affected by this proposed rule."  *Id.*  The Agency further noted that "[t]his position reflects the Department's consistent view

for decades regarding fees in EOIR proceedings," including in the 1986 Proposed Rule and the 1986 Final Rule,  and that it was "unaware of any challenge to this position" in past instances where it was articulated, "including much broader and more sweeping rulemakings." 85 Fed. Reg. at 82,785 (citing publications).

Plaintiffs argue that nonetheless, the Rule affects small entities because organizations and legal representatives allegedly pay these fees frequently on behalf of the directly regulated aliens.  Regardless of the accuracy of that contention, however, binding Circuit precedent demonstrates it is irrelevant to the RFA analysis.  The Circuit has "consistently rejected the contention that the RFA applies to small businesses indirectly affected by the regulation of other entities." *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 869 (D.C. Cir. 2001).  This line of authority is rooted in the plain text of the statute, which is "limited to small entities subject to the proposed regulation," and demonstrates no coverage as to "indirect effects" that regulations may have on small entities not directly regulated.  *Mid-Tex Elec. Co-op Inc. v. FERC*, 773 F.2d 327, 342–43 (D.C. Cir. 1985) (citing 5 U.S.C. § 603(b)(3), (4)).  The Plaintiff organizations here are not directly regulated by the fees imposed in the Final Rule.  They bear no responsibility to pay those fees and "nothing in the rule in any fashion regulates the legal representatives" of the applicants that do have that responsibility or "the organizations by which those representatives are employed." 85 Fed. Reg. at 82,785.

## IV.   THE REMAINING INJUNCTION FACTORS REQUIRE DENIAL OF PLAINTIFFS' MOTION.

A.  Plaintiffs Fail To Establish Irreparable Harm.

Plaintiffs also have not established that they are "likely to suffer irreparable harm in the absence of preliminary relief."  *Winter*, 555 U.S. at 20.  Plaintiffs assert harms to themselves and their members, and based on procedural violations of the APA.  None suffice to obtain the "extraordinary remedy" of a preliminary injunction.  *Id.* at 22.

As to the first category of harms—those to the Plaintiff organizations—Plaintiffs posit a cascading series of harms arising from the Final Rule, specifically based on Plaintiffs' prognostication that their organizations will see a "drop in the volume of clients they can represent." Mot. 38–39.  But

the premise of these asserted harms is no more than speculation.  Indeed, as discussed above, the Agency has not been presented with any evidence demonstrating that any substantial decrease in immigration filings would occur as a result of these fee increases.  At the least, Plaintiffs do nothing to establish that all of the broad organizational harms they assert on the basis of this loss of clients, such as to funding from third-party organizations, would occur immediately and before this Court can consider the merits.  Moreover, although Plaintiffs challenge the Rule in its entirety, they do not plausibly allege that the $35 fee increase established by the Rule for filing a motion to reopen in immigration court is certain to result in irreparable harm to Plaintiffs.  Accordingly, Plaintiffs have not established any basis for emergency relief as to this aspect of their challenge to the Rule.

Plaintiffs also contend that they will need to divert resources as a result of the Final Rule to various activities, such as fundraising, advising clients on the impact of the fees, and preparing fee waiver petitions.  Mot. 39–40.  But Plaintiffs can do no more than speculate about the immediate occurrence of these kinds of budgetary and staffing consequences in the relatively short timeframe between the Rule's effective date and this Court's ability to issue a ruling on the merits of Plaintiffs' challenge.  This APA matter can be decided on cross-motions for summary judgment in short order. Plaintiffs' speculations about second- and third-order effects on their organizations arising from imposition of fees on third-party applicants cannot provide support for immediate injunctive relief. *See E.B. v. U.S. Dep't of State*, 422 F. Supp. 3d 81, 88 (D.D.C. 2019) (the "alleged irreparable injury 'must be both certain and great,'" and "'the movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin'" (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985))).

The same is true as to members of the associational Plaintiffs.  Generally speaking, "paying more in fees" is not an injury that "rise[s] to the level of 'irreparable' harm necessary to warrant the extraordinary remedy of a preliminary injunction."  *Dallas Safari Club v. Berhardt*, 453 F. Supp. 3d 391, 401 (D.D.C. 2020).  And here, Plaintiffs provide no clear evidence that any of their members will actually be obligated to pay these fees during the pendency of this litigation, especially due to the continued availability of fee waivers, or that any legal rights would expire in the absence of paying

them or receiving fee relief.  Plaintiffs at most point to one member, Mot. 41, that they contend will be forced to seek a fee waiver due to the increased EOIR fee at some unspecified time during 2021. *See* Declaration of Angelica Salas ("Salas Decl.") ¶ 58, ECF No. 19-8 (stating that member T.F.F. will need file an application for cancellation of removal sometime in 2021).  That does not represent the sort of immediate irreparable harm that can support preliminary relief, particularly where this individual may be granted a fee waiver, consistent with his expressed intent to seek one, *see id.*

The only other specific evidence of a payment obligation that Plaintiffs point to concerns a member that will at some point be required to pay a $50 asylum fee for herself and her four children, totaling $250.  *Id.* ¶ 59 (stating that member M.S.R. will need to pay this fee if her asylum application is not accepted as filed before the effective date of the Rule).  But as discussed, *supra*, that fee was established by DHS in a separate regulation issued by that agency, not EOIR.  85 Fed. Reg. at 82,759 (explaining that "this rulemaking specifically involves EOIR fees, and the USCIS fees and applications referenced by the commenters pertain to a separate USCIS-specific rulemaking" from the Department of Homeland Security).  And in any event, the DHS/USCIS rule establishing the asylum fee referenced is currently subject to a preliminary injunction, as Defendants noted in the Final Rule.  *Id.* at 82,759 n.15 (stating that the "final rule related to fees charged by DHS was preliminarily enjoined by two federal district courts prior to its effective date" and that "the DHS fees remain governed by DHS's previous regulations while the aforementioned injunctions remain in effect").  The United States has withdrawn its appeals of those preliminary injunctions.  *See Immigr. Legal Resource Ctr. v. Wolf*, No. 20-17339 (9th Cir. Dec. 31, 2020) (order granting appellants' unopposed motion for voluntary dismissal); Unopposed Mot. for Voluntary Dismissal, *Northwest Immigr. Rights Project v. USCIS*, No. 20-5369 (D.C. Cir., filed Dec. 28, 2020).  In short, Plaintiffs' requested preliminary injunction would have no effect on M.S.R.'s obligation to pay an asylum application fee, whether or not the pending preliminary injunctions in other litigation are lifted.

Finally, Plaintiffs' bare assertion of procedural violations of the APA does not support preliminary relief.  "[C]ourts generally 'will not base a finding of "irreparable injury" on a procedural violation standing alone[.]'"  *E.B.*, 422 F. Supp. 3d at 88 n.4 (quoting *Elk Assocs. Funding Corp. v. U.S.*

*Small Bus. Admin.*, 858 F. Supp. 2d 1, 31 (D.D.C. 2012)).  That rule is consistent with the Supreme Court's admonition that "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).  Plaintiffs' claims of irreparable injury must therefore rise or fall on their assertions of injury to themselves and their members.

> **B.**  Plaintiffs Fail To Establish That The Balance of Equities And Public Interest Favor The Requested Injunction.

The remaining preliminary injunction factors—whether the balance of equities and public interest are in favor of preliminary relief—also lean against Plaintiffs' request for preliminary relief. These factors merge when the United States is the defendant.  *Guedes*, 920 F.3d at 10.  And as Plaintiffs acknowledge, the "public's interest" is served "where the Government complies with its legal obligations."  Mot. 43; *see also See Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 58–59 (D.C. Cir. 1977) (recognizing that "there is an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate").  But that is precisely what the Agency has done via this rulemaking: remedy the decades-long neglect of its legal obligations under 31 U.S.C. § 902(a)(8), 31 U.S.C. § 9701(a)-(b), and OMB Circular No. A-25 Revised.  It is inconsistent with D.C. Circuit precedent, not to mention Plaintiffs' own argument, to say that the public interest is favored by preliminary relief that would undermine EOIR's ability to comply with Congress's expressed intent that "each service . . . provided by an agency . . . to a person . . . is to be self-sustaining to the extent possible."  *Compare* 31 U.S.C. § 9701(a) *with League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." (citation omitted)). That conclusion is bolstered by the fact that the fees set by the Final Rule are in support of immigration adjudication services; there is a strong public interest in the enforcement of federal immigration law.

Considering these points, as well as the meager showing Plaintiffs have made for harms that would immediately occur upon effectiveness of the Final Rule, the remaining preliminary injunction factors weigh against Plaintiffs' motion.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion should be denied.


Dated: January 11, 2021                          Respectfully submitted,

                                                 JEFFREY BOSSERT CLARK
                                                 Acting Assistant Attorney General

                                                 BRIGHAM J. BOWEN
                                                 Assistant Branch Director
                                                 Federal Programs Branch

                                                 */s/ Julie Straus Harris*
                                                 JULIE STRAUS HARRIS
                                                 DC Bar No. 1021298
                                                 Senior Trial Counsel

                                                 JAMES R. POWERS
                                                 TX Bar No. 24092989
                                                 Trial Attorney

                                                 U.S. Department of Justice
                                                 Civil Division, Federal Programs Branch
                                                 1100 L Street NW
                                                 Washington, DC 20530
                                                 Tel: (202) 353-7633
                                                 Fax: (202) 616-8470
                                                 Email: julie.strausharris@usdoj.gov

                                                 *Attorneys for Defendants*