**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CATHOLIC LEGAL IMMIGRATION NETWORK, INC., <br><br> COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, <br><br> KIND, INC., d/b/a KIDS IN NEED OF DEFENSE, and <br><br> COALITION FOR HUMANE IMMIGRANT RIGHTS, <br><br> *Plaintiffs,* <br><br> v. <br><br> EXECUTIVE OFFICE OF IMMIGRATION REVIEW, <br><br> JAMES MCHENRY, in his official capacity as DIRECTOR OF THE EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, <br><br> U.S. DEPARTMENT OF JUSTICE, and <br><br> JEFFREY A. ROSEN, in his official capacity as ACTING ATTORNEY GENERAL OF THE UNITED STATES, <br><br> *Defendants.* | Case No.  1:20-cv-03812-APM |

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN
FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR A STAY OF EFFECTIVE
DATES UNDER 5 U.S.C. §705 OR, IN THE ALTERNATIVE, PRELIMINARY
INJUNCTION**

**ORAL ARGUMENT SCHEDULED FOR JANUARY 14, 2021**

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 1

I.      THIS COURT HAS JURISDICTION OVER PLAINTIFFS' CLAIMS ............................. 1

   A.   Section 1252(b)(9) Applies to Challenges to Final Removal Orders, Not to Rulemaking
Challenges As Plaintiffs Bring Here .................................................................. 1

   B.   Plaintiffs Are Within the Zone of Interests of the Relevant Statute ................... 2

   C.   Plaintiffs Have Standing ................................................................................. 4

II.     PLAINTIFFS HAVE SHOWN THAT THEY WILL SUFFER IRREPARABLE HARM IF
THE FINAL RULE IS PERMITTED TO GO INTO EFFECT ............................................ 5

   A.   The Harm to Organizational Plaintiffs is Irreparable Because of the Substantial and
Immediate Diversion of Resources. ................................................................... 5

   B.   The Harm to Associational Plaintiffs is Irreparable. ........................................ 7

   C.   The Preliminary Injunctions Against USCIS's Asylum Fees Do Not Mitigate the
Irreparable Harm to Plaintiffs Here. ................................................................. 8

III.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ...................................... 8

   A.   Defendants' Failure to Disclose the Data and Methodology of their "Comprehensive Fee
Study" Violated the APA. .................................................................................. 8

   B.   Defendants Did Not Provide the Strong Justification Necessary for Changing a 34 Year-
Old Policy. ..................................................................................................... 10

   C.   Because Neither the INA Nor the Independent Offices Appropriation Act (IOAA)
Confers Upon Defendants the Authority to Set the Fees As they Did, the Final Rule is
Contrary to Law. ............................................................................................ 12

      1.   The INA Does Not Grant Authority .............................................................. 12

      2.   Even if IOAA Did Grant Authority, Defendants Violated Its Requirements for Setting
Fees. ............................................................................................................. 14

      3.   There is No Evidence that The Fees Will Support EOIR's Activities .............. 15

   D.   The 31-Day Comment Period—At the Onset of a Global Pandemic—Did not Give the
Public Enough Time to Comment. ................................................................... 15

   E.   The Final Rule is Arbitrary and Capricious Because The "Possibility" of Fee Waivers
Does Not Provided a Reasoned Basis for the Fee Increases .............................. 17

   F.   Defendants' Staggered Rulemaking Cannot Be Used to Deprive the Public of the
Opportunity for Meaningful Comment. ............................................................ 20

   G.   Defendants' Superficial Analysis Does Not Satisfy RFA's Requirements. ......... 21

i

IV.     PLAINTIFFS HAVE SHOWN THAT THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR THE REQUESTED PRELIMINARY RELIEF. ........................................ 23

   A.   The Public Would Suffer Grievous Harm from the Final Rule ......................................... 23

   B.   After 34 Years of Stable Fees, Maintaining the Status Quo for the Comparatively Brief Period Necessary to Litigate the Merits Would Serve the Public Interest................................ 24

CONCLUSION.................................................................................................................... 26

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aeronautical Repair Station Ass'n, Inc. v. FAA,*
    494 F.3d 161 (D.C. Cir. 2007) ............................................................................... 23

*AFL-CIO v. Chao,*
    496 F. Supp. 2d 76 (D.D.C. 2007) ......................................................................... 17

*Am. Radio Relay League, Inc. v. FCC,*
    524 F.3d 227 (D.C. Cir. 2008) ................................................................................. 9

*Am. Wild Horse Pres. Campaign v. Perdue,*
    873 F.3d 914 (D.C. Cir. 2017) ............................................................................... 11

*Anim v. Mukasey,*
    535 F.3d 243 (4th Cir. 2008) ................................................................................... 5

*Ayuda, Inc. v. Attorney Gen.,*
    848 F.2d 1297 (D.C. Cir. 1988) ........................................................................ 14, 20

*Bell Atlantic Tel. Cos. v. FCC,*
    131 F.3d 1044 (D.C. Cir. 1997) ............................................................................. 12

*Bennett v. Spear,*
    520 U.S. 154 (1997) .................................................................................................. 2

*Capital Area Immigrants' Rights Coalition v. Trump,*
    471 F. Supp. 3d 25 (D.D.C. 2020) ..................................................................... 2, 3, 4

*Casa de Maryland, Inc. v. Wolf,*
    2020 WL 5500165, at *26–27 (D. Md. Sept. 11, 2020). ....................................... 20

*Cement Kiln Recycling Coal. v. EPA,*
    255 F.3d 855 (D.C. Cir. 2001) ............................................................................... 22

*Chamber of Commerce v. SEC,*
    443 F.3d 890 (D.C. Cir. 2006) ................................................................................. 9

*City of Idaho Falls, Idaho v. FERC,*
    629 F.3d 222 (D.C. Cir. 2011) ............................................................................... 10

*Conf. of State Bank Sup'rs v. Office of Thrift Supervision,*
    792 F. Supp. 837 (D.D.C. 1992) ............................................................................ 15

*Conn. Light & Power Co. v. Nuclear Regulatory Comm'n*,
    673 F.2d 525 (D.C. Cir. 1982) ..............................................................................10

*Dallas Safari Club v. Berhardt*,
    453 F. Supp. 3d 391 (D.D.C. 2020) .........................................................................8

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020).......................................................................................2, 12

*District of Columbia v. U.S. Dep't of Agric.*,
    444 F. Supp. 3d 1 (D.D.C. 2020) .......................................................................6, 23

*E. Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018) ............................................................................3, 23

*Hosp. v. Burwell*,
    76 F. Supp. 3d 224 (D.D.C. 2014) ..........................................................................6

*Idaho Farm Bureau Fed'n v. Babbitt*,
    58 F.3d 1392 (9th Cir. 1995) ................................................................................15

*Immigrant Legal Res. Ctr. v. Wolf*,
    2020 WL 5798269 (N.D. Cal. Sept. 29, 2020) ................................................11, 12

*In NAACP v. Trump*,
    298 F. Supp. 3d 209 (D.D.C. 2018) .........................................................................4

*INS v. Legalization Assistance Proj. of L.A. Cty. Fed'n of Labor*,
    510 U.S. 1301 (1993).............................................................................................3

*INS v. St. Cyr*,
    533 U.S. 289 (2001)...............................................................................................2

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018)..............................................................................................2

*La Clinica de la Raza v. Trump*,
    2020 WL 6940934 (N.D. Cal. Nov. 25, 2020) .........................................................4

*Lee Mem'l Health Sys. v. Burwell*,
    206 F. Supp. 3d 307 (2016) ....................................................................................9

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    140 S.Ct. 2367 (2020).........................................................................................18

*Long Island Care at Home, Ltd. v. Coke*,
    551 U.S. 158 (2007)..............................................................................................21

iv

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012)......................................................................................2

*Merck & Co. v. U.S. Dep't of Health & Human Servs.*,
    385 F. Supp. 3d 81 (D.D.C. 2019) ...........................................................12

*Mid-Tex Elec. Co-op Inc. v. FERC*,
    773 F.2d 327 (D.C. Cir. 1985)...................................................................22

*N. Carolina Growers' Ass'n, Inc. v. United Farm Workers*,
    702 F.3d 755 (4th Cir. 2012) ....................................................................16

*Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*,
    522 U.S. 479 (1998)......................................................................................3

*Nielsen v. Preap*,
    139 S. Ct. 954 (2019)....................................................................................2

*Nken v. Holder*,
    556 U.S. 418 (2009)....................................................................................24

*Nw. Immigrant Rights Project v. U.S. Citizenship & Immigr. Servs.*,
    2020 WL 5995206 (D.D.C. Oct. 8, 2020) ..............................................3, 6

*O.A. v. Trump*,
    404 F. Supp. 3d 109 (D.D.C. 2019) .........................................................2, 4

*Open Cmtys. All. v. Carson*,
    286 F. Supp. 3d 148 (D.D.C. 2017) .............................................................6

*Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*,
    2020 WL 6802474 (N.D. Cal. Nov. 19, 2020) ..........................................16

*Scheduled Airlines Traffic Offices, Inc. v. Dep't of Def.*,
    87 F.3d 1356 (D.D.C. 1996) .........................................................................3

*Washington v. U.S. Dep't of Homeland Sec.*,
    2020 WL 1819837 (W.D. Wash. Apr. 10, 2020).........................................4

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) .....................................................................7

## Statutes

5 U.S.C. § 605...................................................................................................21

6 U.S.C. § 271...................................................................................................14

6 U.S.C. § 521...................................................................................................14

8 U.S.C. § 1103 ..........................................................................................................14

8 U.S.C. § 1158 ............................................................................................................3

8 U.S.C. § 1229 ............................................................................................................3

8 U.S.C. § 1252 .......................................................................................................1, 2

8 U.S.C. § 1255 ............................................................................................................3

8 U.S.C. § 1356 ...........................................................................................12, 14, 25

31 U.S.C. § 9701 ...................................................................................................12, 15

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002) ...............................................................................................................13, 14

**Regulations**

8 C.F.R. §§ 208.6(b) .....................................................................................................5

8 C.F.R. § 1003.1 .......................................................................................................13

8 C.F.R. § 1240.1 .......................................................................................................13

8 C.F.R. § 1240.1(a)(ii) .............................................................................................13

## INTRODUCTION

The Final Rule is the antithesis of the reasoned rulemaking required by the APA.  Plaintiffs' uncontroverted evidence shows that the Final Rule would damage Plaintiff organizations (an effect that Defendants ignored); would wreak hardship on respondents in Removal Proceedings (though Defendants made no effort to assess that harm); and that the "possibility" of fee waivers would not mitigate the impact of the fee increases (the Final Rule provides no analysis or data in support of its reliance on the "possibility" of fee waivers).  Plaintiffs' uncontroverted evidence also shows that the Defendants failed to disclose the "comprehensive study" that purportedly formed the basis of the fee increases, and unreasonably truncated the comment period.

The Final Rule will impose a sudden and dramatic change to the rules that have governed access to crucial protections from deportation for the past 34 years.  Defendants cite no urgency to having the rule go into effect after that long—but there is tremendous urgency to preventing it from taking effect.

Plaintiffs respectfully request that the Final Rule be stayed or preliminarily enjoined.

## ARGUMENT

## I.     THIS COURT HAS JURISDICTION OVER PLAINTIFFS' CLAIMS

### A.     Section 1252(b)(9) Applies to Challenges to Final Removal Orders, Not to Rulemaking Challenges As Plaintiffs Bring Here

The Immigration and Nationality Act ("INA") provides a streamlined process for judicial review of final removal orders through Section 1252(b)(9), which reads in relevant part:

> (b) With respect to review of an order of removal under subsection (a)(1), the following requirements apply:
> …
> (9) Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under [§ 1252].

1

8 U.S.C. § 1252(b)(9).  The text is clear: each subsection of Section 1252(b) applies "*only* '[w]ith respect to review of an order of removal under subsection (a)(1).'"  *INS v. St. Cyr*, 533 U.S. 289, 313 (2001) (emphasis added).  Because subsection (a)(1) governs judicial review of "final order[s] of removal," 8 U.S.C. § 1252(a)(1), and Plaintiffs here do not seek review of any final order of removal, that predicate is not met.  Likewise, Section 1252(b)(9) bars only review of claims arising from "action[s]" or "proceeding[s]" to remove an alien.  Plaintiffs' APA challenge does not arise from any such action or proceeding, so that predicate is not met, either.

The Supreme Court has repeatedly rejected the Government's prior efforts to expand the reach of Section 1252(b)(9), emphasizing that the statute "does not present a jurisdictional bar where those bringing suit are not asking for review of an order of removal, the decision to seek removal, or the process by which removability will be determined."  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (citations and alterations omitted); *accord Nielsen v. Preap*, 139 S. Ct. 954, 962 (2019) (plurality op.); *Jennings v. Rodriguez*, 138 S. Ct. 830, 839–41 (2018) (plurality op.).  Indeed, in an APA case, the Supreme Court recently held that Section 1252(b)(9) "is certainly not a bar where, as here, the parties are not challenging any removal proceedings."  *Regents of the Univ. of Cal.*, 140 S. Ct. at 1907.  *See O.A. v. Trump*, 404 F. Supp. 3d 109, 129–38 (D.D.C. 2019) (§ 1252(b)(9) did not divest the court of jurisdiction over plaintiffs' claims); *Capital Area Immigrants' Rights Coalition v. Trump*, 471 F. Supp. 3d 25, 39–40 (D.D.C. 2020) ("*CAIR Coal.*").

### B.    Plaintiffs Are Within the Zone of Interests of the Relevant Statute

The zone-of-interests test "is not meant to be especially demanding," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012), and a claim passes the test if it "arguably" falls within the interests protected by the underlying statute, and "the benefit of any doubt goes to the plaintiff." *Id.*; *see also Bennett v. Spear*, 520 U.S. 154, 163 (1997).

2

Here, Plaintiff organizations are squarely within the zone of interests of the INA, far exceeding the minimal standard that applies. Plaintiffs represent indigent individuals in removal proceedings and the INA establishes a right to counsel (at no expense to the government) in removal proceedings. 8 U.S.C. § 1229a(b)(4)(A). The INA requires that DOJ provide indigent individuals in removal proceedings a list of pro bono legal organizations. *See* 8 U.S.C. §§ 1229(a)(1)(E), (b)(2); § 1158(d)(4)(B) (for asylum applications). Plaintiffs CLSEPA, KIND, and CHIRLA are on EOIR's list of such pro bono service providers, as are Plaintiff CLINIC's affiliates. *See* List of Pro Bono Service Providers, EOIR, https://tinyurl.com/y23v42z8 (updated Jan. 2021); Mendez Decl. ¶ 15; *see also E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 768 (9th Cir. 2018) (holding that nonprofit organizations were within the INA's zone of interests in part because the INA gives those organizations "a role in helping immigrants navigate the immigration process" (citing 8 U.S.C. §§ 1158(d)(4)(A)–(B); 1101(i)(1)); *Nw. Immigrant Rights Project v. U.S. Citizenship & Immigr. Servs.*, 2020 WL 5995206, at *10 (D.D.C. Oct. 8, 2020) (plaintiff organizations are within the INA's zone of interests to challenge USCIS fee increases in part because helping individuals apply for fee waivers is "a non-trivial portion of each organization's work" (citing 8 U.S.C. § 1255(l)(7) and other INA sections). Thus, Plaintiffs' "interests are sufficiently congruent with those of the intended beneficiaries" of the INA for Plaintiffs to be within the statute's zone of interests. *Scheduled Airlines Traffic Offices, Inc. v. Dep't of Def.* , 87 F.3d 1356, 1359 (D.D.C. 1996).

Defendants' cases are inapposite. *INS v. Legalization Assistance Proj. of L.A. Cty. Fed'n of Labor*, 510 U.S. 1301 (1993) (O'Connor, J., in chambers) ("*LAP*"), is non-precedential and reflects the views of a single Justice on a different statute, and conflicts with later Supreme Court decisions. *See CAIR Coal.*, 471 F. Supp. 3d at 44 (noting inconsistency with *Nat'l Credit Union*

*Admin. v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 492 (1998)).  *Fed. for Am. Immigration Reform, Inc. v. Reno* ("*FAIR*") is also inapposite because the plaintiff, was a group that sought to restrict immigration and its impact on specific geographical regions of the country; that was not an interest with which the INA was concerned.  93 F.3d 897, 900, 901–04 (D.C. Cir. 1996).

Notably, this Court and other district courts have consistently rejected the very arguments Defendants advance here—distinguishing the same two cases (*LAP* and *FAIR*).  *E.g.*, *CAIR Coal*, 471 F. Supp. 3d at 43 (rejecting same arguments based on *LAP* and *FAIR*); *Washington v. U.S. Dep't of Homeland Sec.*, 2020 WL 1819837, at *9 & nn. 19–20 (W.D. Wash. Apr. 10, 2020) (same); *O.A.*, 404 F. Supp. 3d at 144–45 & n.14 (same); *see also La Clinica de la Raza v. Trump*, 2020 WL 6940934, at *10 (N.D. Cal. Nov. 25, 2020) (rejecting government's reliance on *LAP*).

### C.    Plaintiffs Have Standing

Defendants do not dispute Plaintiffs' Article III standing to bring suit, but Plaintiffs address it here in light of the Court's direction relating to CHIRLA members T.F.F., M.S.R., and Y.M.G.R. *See* Minute Order (Jan. 11, 2021).   In response to the Court's January 11, 2020 request, Plaintiffs filed a revised Salas Declaration under seal that provides the name of CHIRLA member T.F.F., who is described in Plaintiffs' opening brief.  ECF No. 32; *see* Pls. Br. 29, 49.  Plaintiffs continue to reference CHIRLA members M.S.R. and Y.M.G.R. by their initials because they are asylum seekers, and precedent permits the use of such identification to establish harm to identifiable association members.  *See In NAACP v. Trump,* 298 F. Supp. 3d 209, 225–26 (D.D.C. 2018).  In *NAACP*, Judge Bates held that a plaintiff may rely on "an anonymous affidavit from at least one of its members" to demonstrate standing. The Court noted the government's argument that specific members must be identified by name was "tenuous" even before the government abandoned it on reply.  *Id.* at n.10.  Here, the interest in preserving the anonymity of the two unnamed CHIRLA members is strong as they intend to seek asylum. Indeed, government regulations require strict

4

confidentiality regarding the identities of asylum seekers to protect them from exposure to their persecutors. *See* 8 C.F.R. §§ 208.6(b).  DHS has acknowledged that confidentiality of asylum seekers' identities serves an important role in "safeguard[ing] information that . . . could subject the claimant to retaliatory measures by government authorities or non-state actors" or endanger "the claimant's family members who may still be residing in the country of origin." *Anim v. Mukasey,* 535 F.3d 243, 253 (4th Cir. 2008) (internal quotation marks omitted).  Should the Court nevertheless require disclosure of these members' names, Plaintiffs request it be done *in camera*.

## II.     PLAINTIFFS HAVE SHOWN THAT THEY WILL SUFFER IRREPARABLE HARM IF THE FINAL RULE IS PERMITTED TO GO INTO EFFECT

### A.     The Harm to Organizational Plaintiffs is Irreparable Because of the Substantial and Immediate Diversion of Resources.

Plaintiffs have submitted unrebutted evidence that the new fees will cause them to undertake significantly more fee waiver work, straining their ability to meet client needs and provide removal defense services that are at the core of their missions.  *See* dos Santos Decl. ¶¶ 40, 43-44; Mendez Decl. ¶¶ 24, 33; Odom Decl. ¶ 28.  In busy nonprofit removal defense programs such as theirs, the need to begin work on fee waivers will commence immediately, because, for example, BIA appeals must be filed within 30 days of an Immigration Judge's decision.  Moreover, Plaintiff organizations and their pro bono partners will no longer be able to front filing fees for their clients, further burdening them with fee waiver requests and development work to find charitable funding for indigent clients' filing fees, taking staff away from merits work on the removal defense and increasing the work that each case requires.  *See* Salas Decl. ¶ 39; Odom Decl. ¶¶ 23, 28; dos Santos Decl. ¶ 33; Mendez Decl. ¶ 37.

Defendants do not dispute that the massive fee increases for Immigration Court and BIA filings will result in an increased need for fee waivers among respondents.  Instead, Defendants

pick at additional harms that Plaintiffs identified as flowing from the rule—such as a reduction in client volume and a decrease in grant funding due to Plaintiff organizations' inability to meet deliverables tied to the number of clients served—and erroneously dismiss this harm as speculative. Opp. Br. 25. But courts routinely find such harms to be irreparable. *See, e.g., District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 41–42 (D.D.C. 2020) (finding irreparable harm where agency rule would require organization "to expend its limited resources meeting demand for food assistance" and assist individuals with navigating new requirements); *Nw. Immigrant Rights Project*, 2020 WL 5995206, at *30–32  (finding irreparable harm where agency rule "will interfere with [plaintiff organizations'] ability to provide essential services to their clients and/or members.").[1]

Plaintiffs have also submitted evidence of *current* harmful impacts arising from the Rule's imminent effective date. *See* Salas Decl. ¶ 39 (fundraising for filing fees for CHIRLA clients will need to commence in January 2021); Odom Decl. ¶ 27 (KIND has already begun diverting resources to prepare training materials and provide technical assistance to pro bono partners to address fee rule); Mendez Decl. ¶ 30 (CLINIC is seeking alternative sources of funding to cover defensive asylum fees).[2] The Final Rule will immediately make it harder for Plaintiffs to carry out

---

[1] Defendants advance the curious argument that EOIR "has not been presented with any evidence that any substantial decrease in immigration filings would occur as a result of these fee increases," Opp. Br. 36, but this misses the point. Plaintiffs have submitted unrebutted evidence that their clients will be priced out of essential court filings and that neither Plaintiffs nor their pro bono partners can cover fees for those clients.  It follows that fewer filings will be made—as multiple commenters to the proposed rule noted.  *See* dos Santos Decl. ¶ 40; Mendez Decl. ¶ 34.

[2] Even to the extent that some of Plaintiffs' harms may be characterized as financial, they are irreparable because the APA contains no damages provision and sovereign immunity would bar recovery against the government for overpaid fees. *See Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 177–78 (D.D.C. 2017).  Plaintiffs' status as nonprofit entities also underscores the irreparable nature of this harm. *Tex. Child.'s Hosp. v. Burwell*, 76 F. Supp. 3d 224, 243-44 (D.D.C. 2014) (noting that for nonprofit hospital plaintiffs where a funding decrease would result in a reduction of their capacity to serve Medicaid-eligible individuals, not a loss in "profits").

their mission and cause reputational harm. *See* Mendez Decl. ¶¶ 23, 34; Salas Decl. ¶ 9; dos Santos Decl. ¶¶ 8; 49. This shows that harm will occur "in the near future" for purposes of establishing irreparable injury. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Finally, Defendants' argument that Plaintiffs seek preliminary relief based on "bare assertions" of procedural violations, Opp. Br. 37, is belied by the record, which includes many examples of harm that would immediately flow from the substantive terms of the Final Rule.

**B.      The Harm to Associational Plaintiffs is Irreparable.**

The Final Rule will irreparably injure Plaintiff CLINIC's affiliate members—small nonprofits working with limited budgets to represent clients in removal proceedings—for substantially the same reasons as those enumerated in Section II.A, *supra*. *See* Bryant Decl. ¶¶ 4; 8 (increased need for fee waiver work, requiring shift of resources); Borgonos Decl. ¶ 10–12 (threat to grant funding arising out of inability to represent clients on appeal due to high appeal fees).

The harm is similarly irreparable for CHIRLA's members, such as T.F.F. who is eligible and intends to apply for cancellation of removal for Lawful Permanent Residents but cannot afford the new $365 fee. Salas Decl. ¶ 58. Because of the uncertainty surrounding fee waiver adjudication, T.F.F.—a disabled, elderly man—must cut back on basic needs right now to ensure that he has the funds available to pay the increased cancellation fee. *Id.* And Y.M.G.R. a single mother whose asylum hearing is scheduled for this year, will have to forego necessities to ensure that she can save $975 for a BIA appeal that she almost certainly will have to file given recent administrative changes to the law affecting asylum eligibility. *Id.* ¶ 61. Likewise, M.S.R., who along with her four children is seeking asylum after her case was reopened, is struggling to pay rent while facing the need to pay asylum application fees. *Id.* ¶ 59. With no guarantee of fee

waivers, the need of these CHIRLA members to cut corners so they can begin saving immediately for their filings represents concrete and irreparable harms.[3]

### C.      The Preliminary Injunctions Against USCIS's Asylum Fees Do Not Mitigate the Irreparable Harm to Plaintiffs Here.

Defendants suggest that two preliminary injunctions that block USCIS from imposing a $50 fee for an asylum application mitigate the harm to Plaintiffs of the Final Rule's imposition of that same fee on respondents in Removal Proceedings.  Not so.  *First*, the preliminary injunctions against the USCIS asylum fee do not apply to most of the fee increases governed by the Final Rule. *Second*, even injunctions running against the same defendant would not preclude granting an injunction in an entirely separate case.  *See, e.g., Whitman-Walker Clinic,* 2020 WL 5232076, at *41 (D.D.C. Sept. 2, 2020) ("Courts routinely grant follow-on injunctions against the Government, even in instances when an earlier nationwide injunction has already provided plaintiffs in the later action with their desired relief.").  *And third,* the USCIS preliminary injunctions may be modified, so they do not cure the harm that Plaintiffs face.

## III.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

Plaintiffs opening brief delineated numerous violations of the APA, any one of which dooms the Final Rule.

### A.      Defendants' Failure to Disclose the Data and Methodology of their "Comprehensive Fee Study" Violated the APA.

Defendants' obligation to provide—in the NPRM—the data and methodology of the "comprehensive study," and for any other analyses on which they relied, is clear:

> It would appear to be a fairly obvious proposition that studies upon which an agency relies in promulgating a rule must be made available during the rulemaking in order

---

[3] Individuals must pay the fees at issue here to defend themselves against deportation, in some cases to countries where they may be persecuted or killed.  Defendants' citation to *Dallas Safari Club v. Berhardt*, 453 F. Supp. 3d 391 (D.D.C. 2020), for its finding that fees for storing imported elephant trophies was not irreparable harm, is wholly inapposite.  *See* Opp. Br. 36.

> to afford interested persons meaningful notice and an opportunity for comment. 'It is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of inadequate data, or on data that, [to a] critical degree, is known only to the agency.'

*Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236-37 (D.C. Cir. 2008) (internal quotation omitted).   Defendants concede that they "did not publish [the comprehensive fee study] during the rulemaking."  Opp. Br. 32.  That failure deprived the public of a meaningful opportunity to comment, and violated the APA.

In response, Defendants ***first*** argue that they met their notice obligation by describing several phases of the study.  *Id.* at 31.  But Defendants' description of their disclosure spotlights the importance of what they withheld, such as survey data, consultations with OCIJ and BIA experts, OPM and GSA data, and process maps.  *See id.* at 32.  Defendants' descriptions of the study are a far cry from "the data set and the formula used each year" that allowed commenters to replicate the calculations performed by the agency in *Lee Mem'l Health Sys. v. Burwell*, 206 F. Supp. 3d 307, 332 (2016)).

***Second***, Defendants argue that their failure was harmless, because Plaintiffs have not yet identified specific ways that the Final Rule is unlawful in view of the withheld data and methodology.  But that argument renders the APA requirement of meaningful public participation illusory, for if the only issue were whether a final rule is supported by data, no agency would ever subject a study or data to public scrutiny during a comment period—relying instead on their ability to justify the rule if challenged.  That is not the law:  where a rule is based on technical studies or scientific data, those studies and data "must be revealed for public evaluation." *Chamber of Commerce v. SEC*, 443 F.3d 890, 899 (D.C. Cir. 2006) (citation omitted).  It is not enough to simply *describe* the studies or data, they must be produced in whole. *See Am. Radio Relay League, Inc.*, 524 F.3d at 237 (FCC violated the APA when it redacted pages of a study on which it relied

in rulemaking). And that is particularly the case where a federal agency changes fees levied to the public. *See, e.g.*, *City of Idaho Falls, Idaho v. FERC*, 629 F.3d 222, 231 (D.C. Cir. 2011)

**Third**, Defendants suggest that they mitigated the harm by publishing certain data along with the Final Rule. But that's too late: the comment period was over. *See Conn. Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 530–31 (D.C. Cir. 1982) ("An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary.") Defendants never even explain why they waited until the Final Rule to disclose the fee study.

**Finally**, the data and methodology produced with the Final Rule present a host of unanswered questions that the public never had a chance to vet. For example, the study does not discuss how time data were collected, from what systems or records, during what period, or whether it was based on empirical records or staff estimates. EOIR 1125-AA90 Fee Study, Dec. 18, 2020, at 1, 3, *available at* https://tinyurl.com/y6fogcha. Likewise, the data lead to the conclusion that it is more expensive for a Judicial Law Clerk to write a decision than for an Immigration Judge to write the same decision, *id.* at 3, raising a question as to why respondents should pay extra for Law Clerk work. The study was complete at the time of the NPRM, and could have been provided.

### B.    Defendants Did Not Provide the Strong Justification Necessary for Changing a 34 Year-Old Policy.

Defendants argue that the strong justification needed for a change in longstanding agency policy is not necessary here because there was no change in EOIR's policy, Opp. Br. 26–27, noting that the 1986 Fee Rule and the Final Rule both purportedly strive to adjust fees to a level that "more nearly reflect the current cost of providing the benefits and services, taking into account public policy and other pertinent factors." Opp. Br. 27.

Those quotations blithely ignore the relevant policy that applied during those 34 intervening years: keeping fees stable and within the realm of affordability, permitting respondents to have access to protections of the Immigration Court system guaranteed by due process (and setting fees "at less than full recovery recognizing longstanding public policy", 51 Fed. Reg. at 39,993), and the decision by an appropriated, adjudicative agency like EOIR not to employ a "cost recovery" model. In fact, when USCIS attempted to implement a set of similar, albeit less radical, fee increases, the agency's shift from an ability-to-pay principle to a beneficiary-pays principle was an arbitrary and capricious departure from past practice. *Immigrant Legal Res. Ctr. v. Wolf*, 2020 WL 5798269, at *15 (N.D. Cal. Sept. 29, 2020) ("ILRC"). The Final Rule is an even more abrupt change, as EOIR is an appropriated rather than a fee-based agency like the USCIS.

Defendants claim that the "lack of action" was not a policy, but an administrative oversight, *see* 85 Fed. Reg. at 82,773, but that assertion is unsupported by evidence. *See Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 928 (D.C. Cir. 2017) ("[T]here is no 'oops' exception to the duty of federal agencies to engage in reasoned decisionmaking"). And their assertion that the fee increases are necessary is unsupported by data, and belied by EOIR's own calculations, which show increases far exceeding inflation. *See* 85 Fed. Reg. at 11870.

Finally, legal service providers have a reliance interest in the decades-long policy—as shown by Plaintiffs' evidence that the increased fees will upend their business models, forcing them to divert resources away from serving clients to apply for fee waivers, and to represent fewer clients as a result. A caseload reduction impacts the funding structure of Plaintiffs and similarly situated legal service providers, as multi-year grants were structured on the representation rates that stabilized around the fee structure that had been in place for more than 30 years. *See* Borgonos Decl. ¶¶ 8, 10. But Defendants did not address these concerns in their rulemaking, notwithstanding

Plaintiffs' concrete evidence of their need to adjust business models based on EOIR's fee structure. *See* Opening Br. at 24–25.  The indirect nature of such harms does not make them speculative and dismissible.  *See ILRC*, 2020 WL 5798269, at *15 (acknowledging non-profit legal service organizations' reliance interests where they "structured their service models based on the ability-to-pay principle", and noting that reliance interests are not limited to those "'directly affected' by proposed action."); *see also Regents of the Univ. of Cal.*, 140 S.Ct. at 1914 (although "DHS may determine . . . that other interests and policy concerns outweigh any reliance interests," DHS "failed to make that decision by ignoring reliance interests" of individuals indirectly impacted by the DACA program).  Defendants' failure to consider the Final Rule's impact on legal services providers' reliance interests is arbitrary and capricious.

## C.   Because Neither the INA Nor the Independent Offices Appropriation Act (IOAA) Confers Upon Defendants the Authority to Set the Fees As they Did, the Final Rule is Contrary to Law.

Defendants assert that INA Section 286(m), codified at 8 U.S.C. § 1356(m), and the IOAA, 31 U.S.C. § 9701, authorize them to collect fees. Opp. Br. 1, 5–6, 14.  These statutes do not provide such authorization; the Final Rule is arbitrary, capricious, and contrary to law for that reason too.

### 1.   The INA Does Not Grant Authority

Any authority that Section 1356(m) may provide to "set" "fees for providing adjudication and naturalization services" does not extend to collecting immigration court fees. *See Merck & Co. v. U.S. Dep't of Health & Human Servs.*, 385 F. Supp. 3d 81, 89 (D.D.C. 2019) (listing the "traditional tools of statutory construction") (quoting *Bell Atlantic Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997).

As originally enacted in 1988, Section 1356(m) created the Immigration Examinations Fee Account (IEFA) to hold "all adjudication fees" collected by the Attorney General; it did not address the setting of fees. *See* Pub. L. No. 100–459, § 209(a), 102 Stat. 2186, 2203 (1988). At the

time, EOIR and the Immigration and Naturalization Service (INS) were both housed within the DOJ.[4]  As they do now, EOIR administered adversarial proceedings initiated by the government to deport or exclude people. *See* Board of Immigration Appeals, Immigration Review Functions, 48 Fed. Reg. 8,038, 8,039 (Feb. 25, 1983) (creating EOIR to consolidate all "quasi-judicial functions"); *see also* 8 C.F.R. § 1240.1 (authority of immigration judges); 8 C.F.R. § 1003.1 (authority of BIA).  EOIR has never provided naturalization services. *See* 8 C.F.R. § 1240.1(a)(ii). By contrast, the INS adjudicated affirmative immigration benefits, including naturalization applications.  *See* HSA § 451(b).

In 1990, Congress added the language on which Defendants now rely—permitting the government to recoup the full cost of "adjudication and naturalization services."  Pub. L. No. 101– 515, § 210(d), 104 Stat. 2101, 2121 (1990).  The purpose of the 1990 amendment was to ensure that the IEFA fees would fund "'the entire cost of operating the Adjudications and Naturalization program.'"  *Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1991: Hearing on H.R. 5021 Before a Subcomm. of the Comm. on Appropriations*, 101st Cong. 72 (1990); *see also* Conference Report on H.R. 4782, 134 Cong. Rec. H8297-01, 1988 WL 176092 (Sept. 26, 1988). This was necessary because the Adjudications Branch of the INS was newly required to be "self-sustaining," having been removed as a line item from the INS budget. *Immigration and Naturalization Service and the Executive Office for Immigration Review; Fee Review*, 55 Fed. Reg. 20,261, 20,261 (May 16, 1990).  By contrast, EOIR remained an appropriated sub-agency.  *See* 85 Fed. Reg. at 82,754.

---

[4]  DOJ, EOIR-About, https://tinyurl.com/yxuj8b8o; *see, e.g.*, Homeland Security Act of 2002 , Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002) (hereinafter "HSA").

When Congress eliminated the INS and created DHS, Congress transferred to USCIS the authority for the adjudication of visa and naturalization petitions, affirmative asylum applications, refugee applications, and "all other adjudications" previously performed by the INS. HSA § 451(b), 116 Stat. at 2196 (codified at 6 U.S.C. § 271(b)).  The HSA maintained EOIR as an appropriated agency within the DOJ.  HSA § 1101, 116 Stat. at 2273–74 (codified at 6 U.S.C. § 521); *see also* 8 U.S.C. § 1103(g)(1) (Attorney General authority over EOIR).

Accordingly, the "adjudication and naturalization services" in Section 1356(m) refer to the **benefits services** previously provided by the INS and now administered by USCIS.  *See* 6 U.S.C. § 271(b); *see also id.* § 557.  The text links "adjudication and naturalization"—services long-provided by USCIS and the former INS.  *Id.*  EOIR, by contrast, does not provide naturalization services, and therefore cannot collect fees for "adjudication and naturalization services."  And EOIR, unlike USCIS, remains an appropriated agency that has never been required to "recover[] the full costs" of adjudicating defensive applications, motions, and appeals. *See* 85 Fed. Reg. at 82,754. Defendants err in relying on Section 1356(m).

## 2.    Even if IOAA Did Grant Authority, Defendants Violated Its Requirements for Setting Fees.

The Court need not address whether the IOAA would have authorized collection of the fees at issue here—which Plaintiffs do not concede, *see Ayuda, Inc. v. Attorney Gen.*, 848 F.2d 1297 (D.C. Cir. 1988))—because Defendants did not even follow that statute's dictates. Defendants improperly calculated their fees by focusing only on the costs to the government.  Pls. Br. 30. Defendants' response that they considered "the public interest in ensuring immigration courts are accessible to aliens seeking relief and the public interest in ensuring that taxpayers" are not burdened,  Opp. Br. 2, is belied by the record, which shows their failure to consider the impact the fees would have on the ability of noncitizens to access the immigration courts, including that

the fees are prohibitive and would price the public out of relief in removal proceedings.  Op Br. at 22–23, 25.  Against that backdrop, Defendants' bald assertions do not satisfy the statutory requirements that fees be "fair" and take into account the "public policy or interest served" and "other relevant facts."  31 U.S.C. § 9701(b).

### 3.    There is No Evidence that The Fees Will Support EOIR's Activities

Finally, although Defendants argue that money collected from the increased fees will be used to support EOIR's activities, there is no evidence showing how EOIR will use these funds, if they themselves know.[5]  Either way, the fee increases violate the APA.

### D.    The 31-Day Comment Period—At the Onset of a Global Pandemic—Did not Give the Public Enough Time to Comment.

Defendants suggest that *any* comment period—no matter how short and no matter what the national circumstances—would satisfy the APA if it gives the public an "opportunity to participate" in the rulemaking.  *See* Opp. Br. 29.  But that elides the requirement that the public's "opportunity to participate" must be "meaningful." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995); *see also Conf. of State Bank Sup'rs v. Office of Thrift Supervision*, 792 F. Supp. 837, 844 (D.D.C. 1992) ("The purpose of the notice requirement in the APA is to permit interested parties to comment meaningfully.").  The 31-day comment period fails that test.

*First*, Defendants ignored the pleas by Plaintiffs and others that many interested parties would be unable to comment within the 31-day period because of the pandemic.  In the Final Rule, Defendants—writing nine months *after* the nation began adapting to work-from-home restrictions— state, astonishingly, that they "believe[] that the COVID-19 pandemic has no effect on the sufficiency of the 30-day [sic] comment period" because, among other things, "[e]mployers

---

[5] *See* DOJ, Office of Inspector General, *Audit of the Executive Office for Immigration Review's Fiscal Year 2019 Financial Management Practices* (June 2020), https://tinyurl.com/ybgpty33 (concerns about "EOIR's ability to identify its budget needs and address its financial priorities").

around the country have adopted telework flexibilities to the greatest extent possible" and "some of the issues identified by commenters—*e.g.*, childcare—would apply regardless of the length of the comment period." 85 Fed. Reg. at 82,771. Not surprisingly, Defendants turn a blind eye to other similar situated agencies having acknowledged and responded to the early circumstances of the pandemic, and they cited no evidence whatsoever for the nonsensical proposition that "telework flexibilities [were] adopted to the greatest extent possible" during the March 2020 comment period, or that the child-care burdens that commenters experienced at the *start* of the work-from-home orders would never be ameliorated.[6] The first month of the pandemic regulations was *sui generis*, not to mention the extraordinarily disruptive transition to telework.

**Second**, Defendants argue that the "breadth and number of comments received suggest that the comment period was reasonable." Opp. Br. 29. Defendants cite no evidence or statistics for that position, whereas Plaintiffs have submitted significant evidence that the public's ability to comment was decimated, such as the low number (601) of comments submitted on this NPRM compared to 43,000 comments submitted to USCIS in 2019 on a similar rule. *See N. Carolina Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 770 (4th Cir. 2012) (observing that receipt of fewer-than-usual comments is evidence of insufficiency of comment period); *Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, 2020 WL 6802474, at *21 (N.D. Cal. Nov. 19, 2020) (receipt of fewer comments is evidence of insufficiency of comment period). As discussed below, Plaintiffs' declarations also establish that specific entities were either unable to comment as fully as they wished, or even at all.

---

[6] During the same period, several other federal agencies explicitly recognized the challenges posed by the COVID-19 pandemic and extended comment periods, including the Bureau of Consumer Financial Protection, the Food and Drug Administration, and the Department of Agriculture. Similarly, courts around the nation suspended or delayed filing deadlines and the Internal Revenue Service extended the filing and payment deadline for 2019 taxes to July 2020.

***Third***, Defendants suggest that any error was "harmless" because the comments purportedly covered the full range of criticisms.  But "[n]either a showing of actual prejudice nor proof that the agency would have reached a different result is required to establish prejudicial error."  *AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 89–90 (D.D.C. 2007) (citations omitted).  In any event, Plaintiffs submitted evidence on the nature of comments they would have made.  *See* dos Santos Decl. ¶¶ 9–10, 16–27 (CLSEPA would have provided unique comments reflecting the likely impact of the Proposed Fee Rule on their clients, who have "little to no income" and often cannot even "afford bus fare to get to [the] clinics"); *id.* at ¶¶ 12–13, 34 (the increased fees would "cause confusion and have a chilling effect" on filings).  Likewise, as Plaintiff CLINIC explains, the actual comment period was not sufficient for them to obtain data that would have informed its comments.  *See* Mendez Decl. ¶¶ 19–20.

## E.   The Final Rule is Arbitrary and Capricious Because The "Possibility" of Fee Waivers Does Not Provided a Reasoned Basis for the Fee Increases

Repeating their mantra from the Final Rule, Defendants' brief looks to the "possibility" of fee waivers to mitigate and justify the burden of the fee increases.  *See, e.g.*, Opp. Br. 9, 15.  That reliance is based on no evidence.  As such, it does not provide a reasoned basis for the fee increases.

***First***, Defendants admit that their confidence that fee waivers would mitigate the harmful effect of the fees in Immigration Court was not based on any data.  *See, e.g.*, Opp. Br. 18 ("[T]he subset of applicants who would not be able to [pay the higher fees] has not been estimated"), 19 (EOIR's "data on [fee waivers] is not granular" and "the Board does not track fee waiver denials separately"), 23 ("[T]he Agency explained that it had scant evidence of aliens' financial status that would provide a basis to say the fees imposed under the Rule could not be paid").  Indeed, the only data Defendants cite in support of their reliance on fee waivers to mitigate the impact of the fee increases relate to BIA proceedings, Opp. Br. 18–19, which says nothing about what happens in

Immigration Courts.  It is Defendants' obligation to support their rule, and their own shoddy recordkeeping and failure to conduct meaningful analysis do not excuse them from complying with that obligation.  Indeed, ***Defendants*** cannot and do not dispute that:

- EOIR collects the financial information of every respondent who requests a fee waiver, but this data "has not been tracked or universally evaluated," 85 Fed. Reg. at 82,759;

- EOIR has declined to examine any aspect of fee waiver requests or adjudications at the Immigration Court level—*i.e.*, despite owning the universe of relevant data, EOIR has no idea how many fee waivers have been requested, how many have been denied, or whether there has been any rhyme or reason to the outcome;

- EOIR offered nothing more than a conclusory assertion in its NPRM that fee waiver requests would be "entertained" and would still be "possible" for those seeking them, 85 Fed. Reg. at 11,870, 11,874 (though in fact they will not be available for the asylum application fee established by the Rule), but did not offer sufficient data for the public to examine as to whether fee waivers had been an adequate safeguard for those who could not afford the long-time lower fees, or a shred of analysis of how the existing process would be impacted by historic fee increases as much as almost 800%; and

- EOIR withheld the fee data that it admits it did have in its possession until after the close of the comment period, and when it finally released some records, those records were riddled with errors for which the agency offers no explanation, *see* Mendez Decl. ¶ 22.

Defendants admit that they relied on their feelings or beliefs about how fee waivers operated during the existing, 34-year-old fee system, *see* Opp. Br. 21, and not on any data or analysis of how the fee increases would affect the salutary effect of fee waivers.  But rulemaking cannot be based on unfounded beliefs; it must be reasoned and evidence-based.  *See, e.g.*, *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S.Ct. 2367, 2383 (2020) (final rules must "articulate . . . a rational connection between the facts found and the choice made"); *State Farm*, 463 U.S. at 43 (explaining that promulgating agency must "examine the relevant data" and "articulat[e] a satisfactory explanation for its action").

Ultimately, Defendants tip their hand—they themselves do not expect fee waivers to ensure immigrants' court access under their new fee regime.  They are simply willing to accept that premise.  As  Defendants acknowledged in the Final Rule publication, they could institute criteria for fee waiver adjudication, just as they could examine evidence in EOIR's possession (or the evidence offered in comments or in the declarations before the Court).  85 Fed. Reg. at 82,760; see also id. at 82759 ("If the new fees lead to unanticipated results, the agency can evaluate those results upon its next biennial review.").  They just chose not to.

***Second,*** Defendants fault Plaintiffs for not offering "conclusive" evidence of how many additional fee waivers will be needed under a scheme that more than triples application costs and increases the costs of motions and appeals as much as eight-fold for a population that is disproportionately low-income and already struggling in many instances to pay far lower fees.  *See* Opp. Br. 18.  But that gets it backwards.  It is Defendants who must provide a reasoned basis for their rule—that means a reasoned basis for relying on the "possibility" of fee waivers to mitigate the impact of the increases, including some analysis of the fact that more people will need fee waivers when the fees are higher.  And it is Defendants who have failed to rebut or challenge Plaintiffs' evidence that legal service providers would be forced to spend additional resources preparing fee waiver applications.  *Id.* at 24–25.

***Third,*** Defendants do not dispute that fee waivers are determined on a discretionary basis. *Id.* at. 20.  But their acknowledgment that "differences in adjudicatory outcomes are inherent in any system rooted in adjudicator discretion," 85 Fed. Reg. at 82,759, is not an excuse for promulgating a rule with no supporting evidence. *See id.* ("Any calculations attempted by the Department to 'account for' the effects of fee waiver adjudications in light of the updated fees would be unreliable because fee waivers are discretionary by nature. . . .").

**Fourth**, Defendants claim, without citation, that respondents may pursue an administrative appeal of a fee waiver denial. Opp. Br. 20. Assuming *arguendo* that such an appeal is theoretically possible, Defendants fail to address the costs or expenses associated with such an appeal, or the time-sensitive nature of the appeals, and the inherent difficulty in appealing a discretionary determination—and cite no basis for their reliance on this reported procedure.

**Finally**, Defendants cite a footnote in *Ayuda*, claiming that "faced with a similarly bare record in *Ayuda*, the Circuit rejected a nearly identical argument as Plaintiffs advance here." Opp. Br. 20. Not so. In *Ayuda*, the court dismissed plaintiffs' claim that fee waivers would not mitigate the deterrent effect of the increased fees due to the discretionary nature of fee waiver adjudications, but did so only because the plaintiffs offered "no evidence . . . that the Attorney General has in fact exercised his discretion in this manner." *Ayuda*, 848 F.2d at 1299 n.4. By contrast, Plaintiffs here provided ample evidence showing the inconsistency and lack of uniformity in fee waiver adjudications, and gave specific examples where immigration judges "decline to waive the fees even after an applicant has demonstrated his or her inability to pay." *See, e.g.,* Ortiz Dec. ¶ 16; Camilo Decl. ¶ 5; Romero Decl. ¶¶ 17–19; Mendez Decl. ¶ 25.

## F.  Defendants' Staggered Rulemaking Cannot Be Used to Deprive the Public of the Opportunity for Meaningful Comment.

Defendants defend their staggered rulemakings by suggesting that Plaintiffs would require them to disclose all future rulemakings in a field. Neither the APA, nor Plaintiffs, would require any such thing. Plaintiffs only seek what the APA promises: an opportunity to provide meaningful commentary on the effect of a proposed rule. An NPRM deprives the public of such opportunities and is, thus, insufficient if it omits information concerning "the adverse impact the rules visit in combination." *Casa de Maryland, Inc. v. Wolf*, 2020 WL 5500165, at *26–27 (D. Md. Sept. 11, 2020).

Plaintiffs' ability to comment on subsequent rules does not, as Defendants propose, Opp. Br. 34, mean that this NPRM complied with the APA. Defendants provided Plaintiffs with no opportunities to consider or comment upon the true effect of the fee increases at issue by deliberately publishing five additional rules, at least three of which would exacerbate the impact of the Rule, after the comment period was closed for *this* rule. *See* Compl. ¶¶ 198–200, 213–14. Further, unlike *Long Island Care v. Coke*, which Defendants cite, the DOJ here did not withdraw its initial NPRM or reach an outcome that was "reasonably foreseeable." *Compare Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007), *with* Compl. ¶¶ 204–212.

G.     **Defendants' Superficial Analysis Does Not Satisfy RFA's Requirements.**

Defendants argue that EOIR complied with the RFA because the Final Rule certifies that it "does not 'regulate "small entities . . . " because '[o]nly individuals, rather than entities,'" pay the relevant fees. Opp. Br. 34. But that certification is factually wrong, and falls far short of providing the required "factual basis for such certification." 5 U.S.C. § 605(b). The legal representatives employed by Plaintiffs are agents of their clients, and are ethically bound to assist them in removal proceedings. Thus, for example, although not obligated, Plaintiffs CLINIC, CLSEPA, and CHIRLA sometimes *also pay* the relevant fees on behalf of their indigent clients, and the Final Rule would directly affect their continued ability to do so. *See* Pls. Br. 40; Mendez Decl. ¶ 37; dos Santos Decl. ¶¶ 33, 40, 47; Salas Decl. ¶ 27, 39; *see also* Opp. 35. Plaintiffs' inability to continue to this practice would of course impact their clients, but would also reduce Plaintiffs' caseloads, jeopardizing their funding. *See, e.g.*, Mendez Decl. ¶ 52, Romero Decl. ¶¶ 21–24; Salas Decl. ¶ 40–43, 47; dos Santos Decl. ¶¶6–8, 15. The Final Rule recognizes these concerns, but dismisses them as outside the scope of the rulemaking. *See* 85 Fed. Reg. at 82,767, 82,774–75. Willful blindness, however, does not make these concerns "irrelevant to the RFA analysis" or show that "nothing in the rule . . . regulates the legal representatives." Opp. Br. 35.

On the contrary, these concerns demonstrate the Final Rule's impact on Plaintiffs' ability to continue to represent their clients.

Further, the Final Rule directly affects more than fee payment—the number of fee waivers Plaintiffs must prepare and file will increase, diverting resources from other work reducing case capacity and funding. *See* Pls. Br. 19–20, 39–40. Indeed, the Final Rule expressly *relies* on the availability of fee waivers—which are often prepared by organizations like Plaintiffs—to *justify* the additional financial burden of the fee increases. *See* 85 Fed. Reg. 82,755; 82,761–64; 82,784; *see also* 85 Fed. Reg. 11,866, 11,874 (Feb. 28, 2020) (same in the NPRM).

EOIR's reliance on its statements from 1986, when it last adjusted fees, *see* Opp. Br. 34–35 (quoting 85 Fed. Reg. at 82,785), is also flawed. A certification made 34 years ago cannot provide the requisite factual basis for the certification in the Final Rule, which must separately comply with the RFA. Moreover, the 1986 rule does not include the incorrect statement that only individuals, not entities, pay EOIR fees, and in any event, the largest fee increase in 1986 was from $50 to $110—significantly smaller than the eight-fold increase here. *See* Powers and Duties of Service Officers; Availability of Service Records, 51 Fed. Reg. 39,993 (Nov. 4, 1986).

Defendants' reliance on *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855 (D.C. Cir. 2001), and *Mid-Tex Elec. Co-op Inc. v. FERC*, 773 F.2d 327 (D.C. Cir. 1985), *see* Opp. Br. 35, is misplaced. The rule at issue in *Cement Kiln* regulated hazardous waste *combustors* (i.e., *users* of the waste), and plaintiff was a hazardous waste *generator* who faced increased costs of waste disposal. 255 F.3d at 868–69. In *Mid-Tex*, plaintiffs were mere customers "do[ing] business with" the regulated utilities whose purchasing costs would increase. 773 F.2d at 342. By contrast, Plaintiffs here are not mere consumers upset with the increased cost of doing business with a regulated entity—they are legal agents of respondents in removal proceedings with a critical "role

22

in helping immigrants navigate the immigration process," *E. Bay Sanctuary Covenant*, 932 F.3d at 769, not only by paying the fees in some circumstances, but also by preparing the fee waiver requests on which the Final Rule repeatedly relies and the need for which will dramatically increase.  *See, e.g.*, 85 Fed. Reg. at 82,761–64, 82,775.  Plaintiffs are directly affected by a rule. *See Aeronautical Repair Station Ass'n, Inc. v. FAA*, 494 F.3d 161, 177 (D.C. Cir. 2007) (plaintiffs were directly affected by a rule not "immediately addressed" to them because they were expressly "subject to" its requirements).

## IV.     PLAINTIFFS HAVE SHOWN THAT THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR THE REQUESTED PRELIMINARY RELIEF.

### A.     The Public Would Suffer Grievous Harm from the Final Rule

Not only would Plaintiffs and their affiliates and members suffer immediate and irreparable harm if the Final Rule goes into effect, but other similarly situated organizations, low-income and vulnerable applicants for relief, and the states and municipalities that benefit when immigrants are able to pursue avenues to legal status, would all also suffer harm.

*Legal services providers:*  Numerous legal services providers across the country—often small, regional organizations—would be forced to divert limited resources away from their core mission of helping asylum-seekers and other immigrants pursue their claims, to instead spend time preparing and litigating fee waivers, training their pro bono partners on filing fee waivers, and/or fundraising to cover the costs of fees.  *See Dep't of Agriculture*, 444 F. Supp. 3d at 51 (ordering nationwide injunction in part "because the burdens that would fall on the plaintiffs upon the Final Rule's implementation would also fall on those similarly situated"); Appelbaum Decl. ¶ 9; Ortiz Decl. ¶¶ 9, 17–18.  Further, such organizations would lose funding when clients are forced to choose between hiring an attorney or paying the new fees, or where funding is on a per-case basis

or tethered to an expectation that a minimum number of clients will be served.  *See* Romero Decl. ¶ 11.

  *Applicants for immigration relief.*  Low-income and vulnerable applicants for immigration relief are unlikely to be able to afford the new fees.  *See* Ortiz Decl. ¶¶ 10–11; Romero Decl. ¶¶ 12–13.  Thus, in light of the practical difficulties of preparing the fee waiver paperwork (particularly for detained individuals), *see* Appelbaum Decl. ¶¶ 14–15, and the risk of fee waiver denials, *see, e.g.*, Romero Decl. ¶¶ 17–19, the Rule will deprive these individuals of their right to appeal or seek reconsideration of adverse decisions that could force them back to the countries from which they are fleeing persecution.  *See Nken v. Holder*, 556 U.S. 418, 436 (2009) ("There is a public interest in preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm."); Camilo Decl. ¶ 10.  Particularly in the current context, where immigration judges confront the challenges of new case completion quotas and other time pressures, *see* Amicus Br. at 8 (collecting sources), the availability of error correction is an essential due process right.

  *States and municipalities.*  Finally, as elaborated in the amicus brief filed on behalf of the District of Columbia and 19 states, the Final Rule's barriers to securing and improving immigration status will have significant deleterious effects on states and localities.  *See* Amicus Br. 12–21.

**B.   After 34 Years of Stable Fees, Maintaining the Status Quo for the Comparatively Brief Period Necessary to Litigate the Merits Would Serve the Public Interest.**

  The government does not dispute that "the public's interest is served where the Government complies with its legal obligations."  Opp. Br. 38 (citations omitted).  Plaintiffs seek to compel the Government to do just that.  Defendants nonetheless argue that the Final Rule is necessary to bring the agency in compliance with its legal obligations to regularly review fees and

revise them to reflect costs incurred.  *Id.*  This is incorrect, but in any event preserving the status quo until this case is litigated on the merits does not undermine any legitimate public interest.

As noted above, the government has not offered any evidence that the Final Rule would actually increase revenue, in light of the foreseeable increase in fee waiver applications and the cost of adjudicating such applications.  Moreover, EOIR is a congressionally appropriated agency, and its congressional appropriation for 2021 will be unchanged by the increased fees delineated in the Final Rule.  *See* Pub. L. No. 116-260, Tit. II (Dec. 27, 2020).  There is no requirement that EOIR adjudications be self-sustaining; in fact, the agency has recognized "the public interest in having non-parties bear some of the cost burden for filing documents associated with . . . the statutory right to appeal or apply for certain forms of relief."  85 Fed. Reg. at 11,869; 85 Fed. Reg. at 82,772.

The 2021 appropriations bill provides that only $4 million for EOIR operations shall "be derived by transfer from the [EOIR] fees deposited in the 'Immigration Examinations Fee' account"—the DHS-controlled fund where the fees paid under the Final Rule are to be deposited.  *Id.* at 82,754.  That  figure is unchanged from 2020, *see id.*, and prior years—with no increase from the new fees that are supposed to bring increased revenue for the agency.

Finally, Defendants' invocation of a "strong public interest in the enforcement of federal immigration law," *see* Opp. Br. 38, is a non sequitur, though again raises the unanswered question of the purpose for which the fees are intended.  Under the Final Rule, the fees collected may be spent only on "expenses in providing immigration adjudication and naturalization services," 8 U.S.C. § 1356(m)–(n); 85 Fed. Reg. at 82,778.  That is not "enforcement."

## CONCLUSION

For the foregoing reasons, and as set forth in Plaintiffs' opening brief, this Court should

grant Plaintiffs' motion for a stay of effective dates under 5 U.S.C. § 705 of the APA or, in the

alternative, a nationwide preliminary injunction.

Dated:  January 13, 2021

Respectfully submitted,

/s/ *Vladimir J. Semendyai*
Vladimir J. Semendyai

Richard W. Mark (*pro hac vice*)
   (*admission pending*)
Joseph Evall (*pro hac vice*)
   (*admission pending*)
Katherine Marquart (D.C. Bar No. 1044618)
Julianne L. Duran (*pro hac vice*)
Laura C. Mumm (D.C. Bar No. 1032245)
   (*admission pending*)
Alexandra Perloff-Giles (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Tel: (212) 351-4000
Fax: (212) 351-4035
rmark@gibsondunn.com
jevall@gibsondunn.com
kmarquart@gibsondunn.com
jduran@gibsondunn.com
lmumm@gibsondunn.com
aperloff-giles@gibsondunn.com

Vladimir J. Semendyai (D.C. Bar No. 1044217)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Tel:  (202) 955-8500
Fax: (202) 467-0539
vsemendyai@gibsondunn.com

Anthony Moreno (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
Suite 3000
San Francisco, CA 94105-0921
Tel: (415) 393-8200
Fax: (415) 393-8306
amoreno@gibsondunn.com

Robin Goldfaden (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Blvd., #108-62
Los Angeles, CA 90010
Tel: (213) 639-3900
Fax: (213) 639-3911
goldfaden@nilc.org

Michelle Lapointe (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 247
Decatur, GA 30031
Tel: (213) 279-2508
Fax: (213) 639-3911
lapointe@nilc.org

Katherine Melloy Goettel (*pro hac vice*)
Emma Winger (*pro hac vice*)
AMERICAN IMMIGRATION COUNCIL
1331 G Street NW, Suite 200
Washington, DC 20005
Tel: (202) 507-7512
Fax: (202) 742-5619
kgoettel@immcouncil.org
ewinger@immcouncil.org

*Counsel for Plaintiffs Catholic Legal Immigration
Network, Inc., Community Legal Services in East
Palo Alto, KIND, Inc., and Coalition For Humane
Immigrant Rights*