**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

————————————————————   )
                                                              )
CATHOLIC LEGAL IMMIGRATION                 )
NETWORK, INC. et al.,                                   )
                                                              )
        Plaintiffs,                                          )
                                                              )
        v.                                                    )        Case No. 20-cv-03812 (APM)
                                                              )
EXECUTIVE OFFICE FOR IMMIGRATION      )
REVIEW et al.,                                           )
                                                              )
        Defendants.                                        )
————————————————————   )

## MEMORANDUM OPINION AND ORDER

### I.    INTRODUCTION

The Executive Office for Immigration Review ("EOIR") is an agency within the U.S. Department of Justice that oversees and conducts immigration court proceedings, administrative hearings, and appellate reviews before the Board of Immigration Appeals ("BIA") as part of the country's system of immigration adjudications. EOIR charges fees for various types of motions, applications, and appeals filed in these adjudications. Since 1986, the maximum fee for any such filing has been $110. EOIR now intends to raise those fees. On December 18, 2020, EOIR promulgated a final rule that increases filing fees by between 32 and 886 percent ("Final Rule"). Most dramatically, the filing fee for a notice of appeal of an immigration judge's decision to the BIA will increase from $110 to $975. These fee increases are set to go into effect on January 19, 2021.

Plaintiffs are non-profit organizations that provide legal and other assistance for immigrants. They seek to stay the effective date of the Final Rule or, alternatively, to enjoin it

from going into effect.  They raise a host of challenges to the Final Rule under the Administrative Procedure Act.

For the reasons that follow, the court grants in part and denies in part Plaintiffs' motion to stay the effective date of the Final Rule or, in the alternative, for a preliminary injunction.  The court holds that EOIR acted arbitrarily and capriciously by disregarding the Final Rule's impact on legal service providers and their capacity to provide legal services to persons subject to removal proceedings.  EOIR was obligated to address these concerns as part of the notice-and-comment process but it failed to do so.  In short, EOIR "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.* (*State Farm*), 463 U.S. 29, 43 (1983).  The court also finds that, absent equitable relief, Plaintiffs will suffer irreparable harm, and that the balance of the equities and the public interest favor staying the effective date of a portion of the Final Rule.

Accordingly, the court will stay the effective date of the Final Rule, and enjoin its implementation, insofar as it imposes increased fees for (1) Form EOIR-26 for filing an appeal from a decision of an immigration judge; (2) Form EOIR-29 for filing an appeal from a decision of an officer of the Department of Homeland Security ("DHS"); (3) filing a motion to reopen or to reconsider before the BIA; (4) Form EOIR-40 for an application for suspension of deportation; (5) Form EOIR-42A for an application for cancellation of removal for certain permanent residents; and (6) Form EOIR-42B for an application for cancellation of removal and adjustment of status for certain nonpermanent residents.  The fee increases for (1) Form EOIR-45 for filing an appeal from a decision of an adjudicating official in a practitioner disciplinary case and (2) a motion to reopen or reconsider in the Office of the Chief Immigration Judge may go into effect.

2

## II.     BACKGROUND

### A.     Factual Background

#### 1.     Current Fee Structure

Many of the filing fees that are the subject of the challenged rule were last updated in 1986 (the "1986 Rule").  *See* Powers and Duties of Service Officers; Availability of Services Records, 51 Fed. Reg. 39,993 (Nov. 4, 1986).  The Immigration and Naturalization Service ("INS") and EOIR jointly promulgated the 1986 Rule, citing a statutory mandate for "Federal agencies to establish a fee system in which a benefit or service provided to or for any person be self-sustaining to the fullest extent."  *Id.* at 39,993 (citing 31 U.S.C. § 9701 and OMB Circular A-25).  As the agencies explained, the fees were "neither intended to replace nor to be influenced by the budgetary process and related considerations, but instead, to be governed by the total cost to the agency to provide the service."  *Id.*  In determining the appropriate fee amounts, the agencies considered the availability of fee waivers for applicants who would be unable to pay the fees and set "several fees for administrative appeal processes and for filing naturalization petitions . . . at less than full cost recovery recognizing long-standing public policy and the interest served by these processes."  *Id.* The 1986 Rule was challenged as exceeding the statutory authority of INS and EOIR but ultimately was upheld by the D.C. Circuit as a valid exercise of power under the Independent Offices Appropriations Act, 31 U.S.C. § 9701.  *See Ayuda, Inc. v. Att'y Gen.*, 848 F.2d 1297, 1298 (D.C. Cir. 1988).

The fees from the 1986 Rule and other fees that are currently in place for EOIR filings are as follows:

**Table 1: Filing Fees Before 2021 Final Rule**

| Form | Description of Filing | 2020 Fee |
|---|---|---|
| EOIR-40 | Suspension of Deportation | $100 |
| EOIR-42A | Application for Cancellation of Removal for Certain Permanent Residents | $100 |
| EOIR-42B | Application for Cancellation of Removal and Adjustment of Status for Certain Nonpermanent Residents | $100 |
| N/A | Motion to Reopen or Reconsider Before Immigration Judge | $110 |
| EOIR-26 | Notice of Appeal from a Decision of an Immigration Judge | $110 |
| EOIR-29 | Notice of Appeal to the BIA from a Decision of a DHS Officer | $110 |
| EOIR-45 | Notice of Appeal from a Decision of an Adjudicating Official in a Practitioner Disciplinary Case | $110 |
| N/A | Motion to Reopen or Reconsider Before BIA | $110 |

*See* Executive Office for Immigration Review; Fee Review, 85 Fed. Reg. 11,866, 11,867–68 (Feb. 28, 2020).

> 2.    *Notice of Proposed Rulemaking*

The foregoing fees remained unchanged for over thirty years.  Then, on February 28, 2020, EOIR announced that it intended to increase the filing fees, in some cases quite dramatically. EOIR issued a Notice of Proposed Rulemaking that proposed to "increase the fees for [certain] EOIR applications, appeals, and motions that are subject to an EOIR-determined fee, based on a fee review conducted by EOIR."  *Id.* at 11,866.  EOIR explained that, as the agency "ha[d] rarely taken any actions related to its fees in the intervening 33 years" since the 1986 Rule, it "determined that it was necessary to conduct an updated assessment of the costs for processing the forms and motions for which EOIR sets the applicable fees."  *Id.* at 11,868.

4

To do so, "[i]n the spring of 2018, EOIR conducted a comprehensive study using activity-based costing to determine the cost to EOIR for each type of application, appeal, and motion for which EOIR levies a fee." *Id.* at 11,869. The 2018 study proceeded in three stages. In stage one, EOIR collected survey data and discussed with staff in both the Office of the Chief Immigration Judge ("OCIJ") and the BIA the staffing levels and "time required to process and adjudicate each" EOIR filing, while also gathering data on the "average salary rates for applicable staff levels." *Id.* In stage two, "EOIR developed step-by-step process maps, with assigned times and staff levels, for how each application, appeal, or motion is processed in the OCIJ and the BIA," and OCIJ and BIA staff later validated those maps. *Id.* Finally, in stage three, "EOIR allocated the salary costs" to each step in the process maps, "based on the time the step takes, the average salary of the responsible staff, and the percentage of total cases in which the step occurs." *Id.* EOIR also determined that its estimates should "not include overhead costs, cost of non-salary benefits, or costs that stem from processing corresponding applications or documents that may be filed in conjunction with those items for which EOIR charges a fee." *Id.* EOIR excluded such costs for various reasons, including that there is a "public interest in having non-parties bear some of the cost burden for filing documents associated with proper application of the law as it pertains to the statutory right to appeal or apply for certain forms of relief." *See id.*

EOIR did not release the data underlying its study. It did, however, include tables showing the "average processing cost" for each filing. *See id.* at 11,870. It also supplied tables showing the cost attributable to each staff member involved in adjudicating a filing (immigration judge, judicial law clerk, legal assistant, interpreter), as well as tables setting forth the cost associated with each component task of adjudicating a filing (administrative, preparation time, in-court time, and written decisions). *See id.* at 11,872–73. According to EOIR, "these estimated costs calculated

5

from the study demonstrate that EOIR's processing costs exceed the currently assessed fees for

every fee-based form or motion processed by EOIR." *Id.* at 11,873–74.

All told, EOIR proposed the following fee increases:

**Table 2: Filing Fees After 2021 Final Rule**

| Form | Description of Filing | 2020 Fee | 2021 Fee |
|------|----------------------|----------|----------|
| EOIR-40 | Application for Suspension of Deportation | $100 | $305 |
| EOIR-42A | Application for Cancellation of Removal for Certain Permanent Residents | $100 | $305 |
| EOIR-42B | Application for Cancellation of Removal and Adjustment of Status for Certain Nonpermanent Residents | $100 | $360 |
| N/A | Motion to Reopen or Reconsider Before Immigration Judge | $110 | $145 |
| EOIR-26 | Notice of Appeal from a Decision of an Immigration Judge | $110 | $975 |
| EOIR-29 | Notice of Appeal to the BIA from a Decision of a DHS Officer | $110 | $705 |
| EOIR-45 | Notice of Appeal from a Decision of an Adjudicating Official in a Practitioner Disciplinary Case | $110 | $675 |
| N/A | Motion to Reopen or Reconsider Before BIA | $110 | $895 |

*See id*. at 11,871, 11,875.

In addition, the Notice of Proposed Rulemaking noted that, under an existing policy by

which EOIR collected fees set by DHS when using DHS forms, EOIR planned to incorporate

DHS's $50 filing fee associated with Form I-589 for seeking asylum. *Id.* at 11,871–72. A person

subject to removal can assert qualification for asylum as a defense to avoid removal. According

to EOIR, "in proceedings before an immigration judge a [$]50 fee would apply to a Form I-589 if

the applicant seeks asylum," unless the applicant sought asylum "for the sole purpose of applying

for withholding of removal under the [Immigration and Nationality Act] or protection under the

[Convention Against Torture]." *Id.* at 11,872 (citing USCIS Fee Schedule and Changes to Certain

6

Other Immigration Benefit Request Requirements, 84 Fed. Reg. 62,280, 62,360–61 (Nov. 14, 2019)).[1]

The Notice of Proposed Rulemaking called for comments to be submitted on or before March 30, 2020, creating a comment period of approximately 30 days.  85 Fed. Reg. at 11,866. Less than two weeks after the Notice of Proposed Rulemaking issued, the president declared a national state of emergency dating back to March 1, 2020, due to the COVID-19 pandemic. *See* Presidential Proclamation 9994, 85 Fed. Reg. 15,337, 15,337 (Mar. 13, 2020).  On March 5, 2020, approximately 90 interested organizations signed a request to extend the comment period from 30 days to 60 days.  *See* Pls.' Mot. for a Stay of Effective Dates, ECF No. 19 [hereinafter Pls.' Mot.], Decl. of Michelle N. Mendez [hereinafter Mendez Decl.], ECF No. 19-5, Ex. A; Mendez Decl. ¶ 17.  EOIR did not respond to the request.  Mendez Decl. ¶ 17.  On March 23, 2020, as the gravity of the COVID-19 pandemic became clearer, 108 organizations requested that EOIR "freeze the comment deadline . . . until the federal government has lifted the national emergency related to the COVID-19 pandemic."  Mendez Decl., Ex. B; *see also* Mendez Decl. ¶ 17.  The agency did not respond to this request either.  Mendez Decl. ¶ 17.

### 3.    *Final Rule*

After refusing to extend the comment period, EOIR promulgated "Executive Office for Immigration Review; Fee Review" on December 18, 2020.  85 Fed. Reg. 82,750.  The Final Rule adopted the proposed fee schedule from the Notice of Proposed Rulemaking.  *See id.* at 82,784 ("The final rule adopts the fee amounts set out in the proposed rule as final . . . .").

---

[1] Defendants' counsel further clarified at oral argument that EOIR follows a policy of collecting the fees set by DHS when a DHS form is used in proceedings that fall within EOIR's jurisdiction, that Form I-589 for asylum is a DHS form, and that neither the Notice of Proposed Rulemaking nor the Final Rule establishes an independent fee for asylum applications.  *See* Hr'g Tr. (draft), Jan. 15, 2021, at 64–65; *see also* 8 C.F.R. § 1103.7(b)(4)(ii) (codifying this policy).

The Notice of Proposed Rulemaking garnered 601 comments.  *Id.* at 82,752.  While many of the comments are not relevant to the grounds on which this court rests its decision, the court briefly recounts several of the themes in the comments and EOIR's responses.

a.      The amount by which the fees increased

EOIR received comments "object[ing] to the amount of [the] fee increases, stating that the fee increases were too high," that EOIR did not consider applicants' ability to pay the increased fees, and that the fees were not set "at a rate that most aliens would be able to pay."  *Id.* at 82,754–56.  The agency defended the significant fee increases as necessary "to ensure that U.S. taxpayers do not bear a disproportionate burden in funding the immigration system."  *Id.* at 82,755.  EOIR also rejected the idea that the fees were prohibitive for applicants.  The agency responded that, although it generally did not "have an alien's financial records at its disposal for review," the information it did possess—information regarding "the ability of an alien to retain representation or the ability of an alien to pay application fees set by DHS"—suggested "that most aliens would be able to afford [the] proposed fees."  *Id.*  at 82,756.  EOIR also repeatedly lodged its disagreement that the increased fees "would deter individuals from pursuing meritorious claims" and dismissed such claims as "not supported by any evidence."  *Id.* at 82,772.

EOIR's most frequent response to such comments was that the availability of fee waivers ameliorated any depressive effect the increased fees might have on an applicant's decision to file for immigration relief.  *See, e.g.*, *id.* at 82,761 (noting that "[a]lthough the rule changes the amount that would be charged for filing an appeal, the Department has been careful through the entire process to ensure that it does not affect the availability of a fee waiver"); *id.* at 82,762 ("As stated in the [Notice of Proposed Rulemaking], this rule does not foreclose or limit the ability of aliens to seek a fee waiver for the appeal fee."); *id.* at 82,763 ("[T]he Department again emphasizes that

a fee waiver remains available for a cancellation applicant . . . who is unable to pay the fee."); *id.* at 82,764 ("Consistent with longstanding practice, a fee waiver remains available for motions to reopen and motions to reconsider.").   Several commenters pointed out that fee waivers are "discretionary" and are "inconsistent[ly]" granted, *id.* at 82,758, but EOIR responded that it had "no evidence or data, and none was provided by commenters, regarding the specific adjudications of fee waivers that would support such statements," *id.* at 82,760.  The agency noted that it "expects its adjudicators to issue fee waiver determinations in a fair manner and consistent with the regulations" and credited "the fee waiver process [a]s a proper, viable solution for aliens who may be unable to pay updated fees."  *Id.*

> b.    The study data

Other commenters took specific issue with the 2018 study that EOIR relied upon to support the fee increases, and EOIR received "numerous comment requests" seeking the study's underlying data.  *Id.* at 82,754–55.  EOIR disputed commenters' complaints that the agency "did not adequately explain its methodology or justification for increasing costs," but belatedly agreed to "publish[] the data collected in its spring 2018 study."  *Id.* at 82,755.  Of course, by the time EOIR released the study on December 18, 2020, the opportunity for interested parties to comment on it had long since passed.  *See id.* at 82,752 (noting the comment period closed on March 30, 2020).

> c.    Impact on legal service providers

EOIR also received "numerous" comments "express[ing] concerns that the rule would negatively affect legal service providers."  *Id.* at 82,774.  Commenters noted that, due to the sharp increases, "legal aid organizations, small firms, and attorneys providing pro bono services would be unable to routinely pay the fees for their clients."  *Id.*  Organizations that use their funds to pay

their clients' fees would, according to commenters, need to forgo key "programmatic elements" of the organization's agenda, and the fee hikes would cause such organizations to "assist fewer aliens, especially indigent aliens and children," "reduc[ing] the availability of pro bono counsel generally." *Id.* Moreover, "[s]everal commenters noted that attorneys would be forced to spend more time on fee waiver applications rather than substantive issues, which could relatedly cause them to turn away clients for lack of time and resources to represent them." *Id.* In addition to straining organizations' resources, "commenters expressed concern that the increased fees would place aliens in a position of choosing between paying the fee or obtaining counsel." *Id.*

EOIR responded that, "[o]verall," it found such "general concerns about possible negative effects too speculative to warrant changes to the" Notice of Proposed Rulemaking and "disagree[d] with commenters' concerns about the rule's extensive negative impact." *Id.* The Final Rule, EOIR said, "was not proposed to . . . increase aliens' access to counsel," and the agency expressly "decline[d] to respond to commenters' speculative concerns regarding . . . aliens' ability to obtain counsel, including effects on legal service providers." *Id.* at 82,775. EOIR added that "commenters' assertions concerning the burden of increased fees on organizations and the private bar fall[] outside the limited scope of this rulemaking." *Id.*

The Final Rule is set to go into effect on January 19, 2021. *Id*. at 82,750.

### B.    Procedural Background

#### *1.    The Parties*

Plaintiffs in this action are four non-profit organizations that assist immigrants in navigating proceedings before the immigration courts and the BIA. *See* Pls.' Mot., Pls.' Mem. of P. & A. in Supp. of Pls.' Mot. for a Stay of Effective Dates, ECF No. 19-10 [hereinafter Pls.' Br.], at 5.

Catholic Legal Immigration Network, Inc., or CLINIC, is a non-profit organization whose mission is to "provid[e] services and benefits to immigrants," thereby "promot[ing] the dignity, and protecting the rights, of immigrants." Compl., ECF No. 1 [hereinafter Compl.], ¶ 22.  CLINIC both supports "a network of approximately 400 dedicated affiliate organizations" and "provides legal representation directly and in partnership with pro bono attorneys to vulnerable adults, children, and families in proceedings in Immigration Courts and before the BIA."  *Id.* ¶ 15. CLINIC also provides affiliate organizations with training and support for representing immigrants and prepares "practice advisory materials on removal defense, asylum appeals, and other topics to assist affiliate staff."  *Id.* ¶ 18.

Community Legal Services in East Palo Alto, or CLSEPA, works "to provide legal services that are transformative in nature, enabling diverse communities in and around East Palo Alto to achieve a secure and thriving future."  *Id.* ¶ 26.  CLSEPA "provides direct legal services to individuals in its target communities," including advising and representing immigrants in removal proceedings.  *Id.* ¶ 28.  In addition, CLSEPA "operates a pro bono program" and "trains and supports community members . . . and attorneys at other not-for-profit organizations" on immigration matters. *Id.* ¶¶ 29–30.

Kids in Need of Defense, or KIND, "advocates throughout the United States for the rights of unaccompanied migrant and refugee children."  *Id.* ¶ 33.  The organization provides free direct "legal representation for unaccompanied migrant children," runs "programs that educate unaccompanied minors about their rights," and "provides mental health and social services for its clients."  *Id.* ¶¶ 34–36.  KIND also advocates for refugee and migrant children and operates a pro bono program, through which it supports and trains attorneys representing children pro bono.  *Id.* ¶¶ 36, 38.

Lastly, Coalition for Humane Immigrant Rights, or CHIR, seeks "to ensure that immigrant communities are fully integrated into society with full rights and access to resources." *Id.* ¶ 42. CHIR's members are typically "low-income immigrants in mixed status families, in which one or more members are undocumented." *Id.* ¶ 45. CHIR engages in grassroots organizing and advocacy to secure policies that benefit its members and runs "a legal services program that provides representation to clients, which includes members of CHIR[] and others in proceedings before EOIR and [U.S. Citizenship and Immigration Services ('USCIS')]." *Id.* ¶ 43.

The lead defendant is EOIR, an agency within the Department of Justice that heads both the BIA and OCIJ. *See id.* ¶¶ 48–50. Defendant James McHenry is the director of EOIR; he reports directly to the deputy attorney general, who in turn reports to the acting Attorney General, who is also a Defendant in this suit. *See id*. ¶¶ 52, 57–58. EOIR is funded by congressional appropriations. For Fiscal Year 2021, Congress allocated $734 million to EOIR, just $4 million of which is to be derived from fees. *See* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182, 1246 ("For expenses necessary for the administration of immigration-related activities of the Executive Office for Immigration Review, $734,000,000, of which $4,000,000 shall be derived by transfer from the Executive Office for Immigration Review fees deposited in the 'Immigration Examinations Fee' account . . . .").

### 2.    *Plaintiffs' Suit*

On December 23, 2020, Plaintiffs filed their Complaint. Compl. The Complaint asserts six counts:   Counts I, II, and III allege that EOIR's rulemaking violates the Administrative Procedure Act ("APA"), Compl. ¶¶ 362–387; Count IV asserts that the Final Rule violates the Regulatory Flexibility Act, *id.* ¶¶ 388–405; and Counts V and VI claim that the Final Rule violates

the Due Process Clause and the Equal Protection Clause of the Fifth Amendment, respectively, *id.* ¶¶ 406–423.

On December 30, 2020, Plaintiffs filed the instant Motion for a Stay of Effective Dates Under 5 U.S.C. § 705 or, in the Alternative, Preliminary Injunction, ECF No. 19.  The motion advocates for relief with respect to only their administrative law claims (Counts I through IV); Plaintiffs do not seek preliminary relief as to their constitutional claims (Counts V and VI).  *See* Pls.' Br. at 2 n.2.  Following expedited briefing, the court heard oral argument on January 14, 2021.  *See* Minute Entry, Jan. 14, 2021.

## III.   LEGAL STANDARD

Whether Plaintiffs' motion is treated as one to stay the effective date under 5 U.S.C. § 705 or for a preliminary injunction, the court "applie[s] the four-part test used to evaluate requests for" a preliminary injunction.  *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 30 (D.D.C. 2012) (internal quotation marks omitted).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Prior to *Winter*, courts in this Circuit had employed a sliding scale analysis in which "a strong showing on one factor could make up for a weaker showing on another."  *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011).  *Winter* arguably casts some doubt on that approach.  *See id.*  At a minimum, the D.C. Circuit has explained, *Winter* means that a plaintiff must demonstrate "a likelihood of success [a]s an independent, free-standing requirement" to secure a stay or preliminary injunction.  *See id.* at 393.  And, of course, equitable relief is warranted only upon a showing that irreparable injury is likely absent an injunction.  *See Winter*, 555 U.S. at 22.  Therefore, although the court must

13

apply the sliding scale here, because neither the Supreme Court nor the D.C. Circuit has expressly overruled that approach, the court must be satisfied that Plaintiffs have established both a likelihood of success and irreparable harm to award injunctive relief.

## IV.   DISCUSSION

### A.   Jurisdiction

The court begins with its jurisdiction to hear this matter.  Defendants argue that jurisdiction is lacking over Plaintiffs' claims because the Immigration and Nationality Act ("INA") contains a "zipper" clause that channels through the courts of appeals judicial review of "'all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien.'"  *See* Defs.' Mem. in Opp'n to Pls.' Mot., ECF No. 30 [hereinafter Defs.' Br.], at 11 (quoting 8 U.S.C. § 1252(b)(9)). Defendants construe Plaintiffs' arguments that the Final Rule's increased fees will preclude some individuals from accessing proceedings as a challenge to "the process by which their members' removability will be determined."  *Id.* at 12 (cleaned up).  Plaintiffs respond that they have not sought "review of any final order of removal" and that their "APA challenge does not arise from any such [removal] action or proceeding"; therefore, they argue, the court retains jurisdiction. *See* Pls.' Reply Mem. of P. & A. in Further Supp. of Pls.' Mot., ECF No. 33 [hereinafter Pls.' Reply], at 1–2.

Defendants rely on two provisions of the INA to advance their jurisdiction-stripping argument.  First, Defendants cite section 1252(a)(5), which makes "a petition for review filed with an appropriate court of appeals . . . the sole and exclusive means for judicial review of an order of removal," 8 U.S.C. § 1252(a)(5).  Defs.' Br. at 11.  Second, Defendants point to section 1252(b)(9), which channels "[j]udicial review of all questions of law and fact, including interpretation and

application of constitutional law and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States" into the "judicial review of a final order under this section," 8 U.S.C. § 1252(b)(9). Defs.' Br. at 11. Together, these two provisions "fold[] all precedent challenges arising from the removal proceeding or action taken to remove the alien into review of the final order of removal" before a court of appeals. *O.A. v. Trump*, 404 F. Supp. 3d 109, 130 (D.D.C. 2019) (cleaned up). This court must therefore determine whether Plaintiffs' APA challenge is a question of law or fact "arising from" a removal proceeding. *See* 8 U.S.C. § 1252(b)(9).

On that score, courts have uniformly read "arising from" to delineate between claims that "directly regard[] the removal hearing and collateral issues." *S. Poverty Law Ctr. v. U.S. Dep't of Homeland Sec.*, No. 18-cv-760, 2020 WL 3265533, at *15 (D.D.C. June 17, 2020), *appeal filed*, No. 20-5257 (D.C. Cir. Aug. 26, 2020); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018) (plurality) (finding section 1252(b)(9) did "not present a jurisdictional bar" where question presented did not directly regard removal). The Supreme Court in *Jennings v. Rodriguez* considered the scope of legal questions that "'aris[e] from' the actions taken to remove . . . aliens." *Jennings*, 138 S. Ct. at 840. Justice Alito, writing for a plurality of the Court,[2] assumed without deciding that "detention" could be considered an "action taken to remove an alien." *Id.* at 841 n.3 (internal quotation marks omitted). But, he explained, "[t]he question is not whether *detention* is an action taken to remove an alien but whether *the legal questions* in this case arise from such an action." *Id.* Looking to the origin of the legal questions before the Court, section 1252(b)(9) could

---

[2] While *Jennings* was a plurality decision, because Justice Breyer, joined by Justices Ginsburg and Sotomayor in dissent, "would have read section 1252(b)(9) even more narrowly[,] . . . [a]t least five Justices . . . agreed that section 1252(b)(9) does not clearly bar challenges collateral to the removal proceeding." *S. Poverty Law Ctr.*, 2020 WL 3265533, at *15.

not serve as a jurisdictional bar: "respondents [we]re not asking for review of an order of removal; they [we]re not challenging the decision to detain them in the first place or to seek removal; and they [we]re not even challenging any part of the process by which their removability w[ould] be determined." *Id.* at 841; *see also Nielsen v. Preap*, 139 S. Ct. 954, 962 (2019) (plurality) (reiterating the reasoning in *Jennings*).

Courts in this Circuit, interpreting *Jennings*, consistently have concluded that section 1252(b)(9)'s zipper clause is inapplicable when a rule of general applicability is challenged outside the context of a removal proceeding. *See O.A.*, 404 F. Supp. 3d at 132; *Nat'l Immigr. Project of the Nat'l Lawyers Guild v. Exec. Office of Immigr. Review*, 456 F. Supp. 3d 16, 29 (D.D.C. 2020). In *O.A. v. Trump*, for instance, the court concluded that the APA challenge before it did not arise from removal proceedings but instead required the court to "consider a series of questions of law 'arising from' a rulemaking of general applicability." 404 F. Supp. 3d at 133. The court emphasized that "[t]he question is not whether an issue *could* be raised in removal proceedings, but rather whether it arises from those proceedings," and the plaintiffs' APA challenge, the *O.A.* court decided, did not arise from removal proceedings. *Id.* (cleaned up). In *National Immigration Project of the National Lawyers Guild*, upon which Defendants rely, the court likewise recognized the "exception" articulated in *O.A.* that a plaintiff's challenge to "the validity of a regulation of general applicability based on the administrative record generated in rulemaking" was not zippered into review of a final order of removal. 456 F. Supp. 3d at 29 (internal quotation marks omitted). Similarly, the court in *Southern Poverty Law Center* drew on *Jennings* to hold that claims "alleging punitive conditions of confinement" were also "not barred by section 1252(b)(9)." *S. Poverty Law Ctr.*, 2020 WL 3265533, at *16. The court found the confinement issues to be collateral to removal

16

proceedings and agreed with *Jennings* that "cramming judicial review of those questions into the review of final removal orders would be absurd." *Id.* (internal quotation marks omitted).

Defendants' contention that "[t]he questions of law underlying [Plaintiffs'] Complaint arise from removal proceedings," Defs.' Br. at 12, is incompatible with these authorities. While the fees in the Final Rule may be associated with filings that occur because of removal proceedings, the questions presented to the court do not "arise from" removal proceedings. *See Jennings*, 138 S. Ct. at 841 n.3. Rather, Plaintiffs' legal challenges to the Final Rule originate in an entirely separate agency action: a "rulemaking of general applicability." *O.A.*, 404 F. Supp. 3d at 133. Such questions are not subject to section 1252(b)(9)'s zippering clause.

Defendants' citations to Ninth Circuit case law do not alter the court's conclusion.[3]  First, Defendants rely on *J.E.F.M. v. Lynch*, which considered claims of immigrant children who had been unable to obtain counsel for removal proceedings. 837 F.3d 1026, 1030 (9th Cir. 2016). The Ninth Circuit concluded that the minors' due process and statutory claims regarding the right to appointed counsel were "inextricably intertwined with" the administrative process of removal. *Id.* at 1033 (internal quotation marks omitted). That is, the claims arose because the children were in removal proceedings, during which they lacked counsel. The same cannot be said here. Plaintiffs do not challenge the validity of removal proceedings or claim that any procedures leading to removal are unfair. Rather, they challenge whether the agency used reasoned decisionmaking to increase existing fees, in some cases, by more than eight-fold. These claims are "collateral to, or independent of, the removal process" and thus beyond the reach of section 1252(b)(9). *See id.* at 1032.

---

[3] Indeed, the court in *Southern Poverty Law Center* appears to have rejected the very same playbook Defendants follow here. *See* 2020 WL 3265533, at *17.

Defendants' reliance on *Martinez v. Napolitano*, 704 F.3d 620 (9th Cir. 2012), is equally unpersuasive.  There, the plaintiff was seeking "a full and fair hearing to adjudicate his withholding and [Convention Against Torture] claims" and brought claims that the agency violated "the APA based on the denial of his withholding and [Convention Against Torture] claims based on arbitrary, capricious, and *ultra vires* criteria" and "on the [BIA's] failure to give [him] a full and fair hearing to adjudicate his asylum claim."  *Id.* at 621.  In determining whether Martinez's claims were subject to the zipper clause, the Ninth Circuit explained that "the distinction between an independent claim" under the APA and an "indirect challenge" to the plaintiff's adverse immigration decision "'turn[ed] on the substance of the relief'" that the plaintiff requested.  *Id.* at 622 (quoting *Delgado v. Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011)).  The court found Martinez's claims were subject to section 1252(b)(9) because they challenged the validity of the BIA's decision, and "[i]f Martinez had prevailed on any one of them, the BIA would not have affirmed the removal order."  *Id.* at 623.  In contrast, none of the claims here seek to overturn an order of removal or any aspect of an existing removal proceeding.  Thus, under both *J.E.F.M.* and *Martinez*, the court concludes that Plaintiffs' claims are collateral to any removal proceedings, and it therefore retains federal question jurisdiction over Plaintiffs' suit.

### B.    Standing

The court next turns to standing.  Defendants do not challenge Plaintiffs' constitutional standing under Article III but do contest whether Plaintiffs satisfy considerations of prudential standing, namely, whether they fall in the INA's zone of interests.  *See* Defs.' Br. at 13–14.  Notwithstanding Defendants' silence as to constitutional standing, the court briefly discusses it below before addressing Defendants' prudential standing argument.  *See Summers v. Earth Island*

*Inst.*, 555 U.S. 488, 499 (2009) (stating that the court "has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties").

     1.     *Article III Standing*

Plaintiffs assert both organizational standing and associational standing. *See* Pls.' Br. at 18. Because the court is satisfied that Plaintiffs have established a substantial likelihood of organizational standing, the court need not reach the question of associational standing. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) ("[A] party who seeks a preliminary injunction must show a substantial likelihood of standing.").

If an organization "claims standing only on its own behalf, . . . it must make the same showing required of individuals:  an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision." *Am. Soc'y for the Prevention of Cruelty to Animals v. Feld Ent., Inc.* (*ASPCA*), 659 F.3d 13, 24 (D.C. Cir. 2011).  With respect to the requisite injury in fact, "if the defendant's alleged action prompts an organization to increase the resources it must devote to programs independent of its suit against the defendant, the organization has shown an injury in fact." *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1139 (D.C. Cir. 2011) (cleaned up).  There are two important limitations to this principle.  First, the organization "must show a 'direct conflict between the defendant's conduct and the organization's mission.'" *ASPCA*, 659 F.3d at 25 (emphasis omitted) (quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996)). "Second, an organization may not 'manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit.'" *Id.* (quoting *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990)).  Accordingly, the court begins its inquiry into organizational standing "by asking whether the defendant's allegedly unlawful activities injured the plaintiff's interest in

19

promoting its mission," and, if so, proceeds to determine "whether the plaintiff used its resources to counteract the injury." *Id*.

Plaintiffs have provided numerous declarations that demonstrate that the Final Rule's fee increases directly conflict with the organizations' missions. For example, relying on the declaration of Michelle Mendez, director of its Defending Vulnerable Populations program, CLINIC has averred that its "mission is to provide immigration legal services to low income and vulnerable populations." Mendez Decl. ¶ 3. CLINIC fulfills this mission by supplying training and support for a network of affiliated programs that offer pro bono or low-cost immigration legal services and by providing direct representation, as well as pro bono referrals. *Id.* ¶¶ 5, 8. Mendez explains that the fees imposed by the Final Rule will frustrate CLINIC's mission by reducing pro bono participation and thus the organization's capacity to represent immigrants in three ways. *Id.* ¶¶ 34, 39. First, it will harm CLINIC's ability to place indigent clients with pro bono partners because (1) pro bono partners will no longer be able to afford their historical practice of fronting filing fees, potentially forcing them to decline clients, *id.* ¶ 34; and (2) pro bono partners will be forced to take on additional fee-waiver-application work, which will make pro bono representation more burdensome to counsel, reducing the maximum case load pro bono counsel can shoulder, *id.* ¶ 39. Second, Mendez explains that the Final Rule is likely to decrease CLINIC's and its affiliates' client bases because clients will need to use their modest financial resources to pay EOIR fees rather than to pay even the low-cost rates that some of CLINIC's affiliates charge. *Id.* ¶ 58. CLINIC anticipates that this will in turn reduce client volume, which itself will leave some affiliates "who rely in part on the low fees they charge clients to fund their operations" unable to pay CLINIC's membership fee. *Id.* Third, Mendez avers that CLINIC will need to significantly divert its resources from its core mission toward assisting and performing work related to fees,

educating affiliates and immigrants about the new fees, and revising training materials.  *E.g.*, *id.* ¶¶ 35, 38, 41, 43.  As a consequence, CLINIC will be hampered in "provid[ing] immigration legal services to low income and vulnerable populations."  *Id.* ¶¶ 3, 28.  These "concrete drains on [CLINIC's] time and resources," *Spann*, 899 F.2d at 29, "are the type of substantial, tangible costs that are cognizable for purposes of organizational standing," *Nw. Immigrant Rts. Project v. USCIS*, No. 19-cv-3282, 2020 WL 5995206, at *7 (D.D.C. Oct. 8, 2020) (internal quotation marks omitted).

In addition, CLINIC has explained that it will be forced to use its resources to advise clients and affiliates on how to manage the increased fees and to revise training materials regarding fees and fee waivers.  *See e.g.*, Mendez Decl. ¶¶ 35, 38, 41, 43; *see also Nw. Immigrant Rts. Project*, 2020 WL 5995206, at *7 (finding plaintiffs would "use their resources to counteract their injuries" where they explained "they will need to spend greater time helping clients meet the Rule's demands" (cleaned up)).  CLINIC thus has suffered an injury in fact.  *See Ayuda*, 848 F.2d at 1298 n.3 (holding that organizational plaintiffs who challenged EOIR's fee increase in 1986 had standing because they had alleged that "imposition of the increased fees would thwart their organizational purposes and subject them to additional financial burdens").[4]

The other two elements of standing are easily satisfied.  Regarding causation, CLINIC has adequately established that the Final Rule will cause fewer of its clients to be able to afford fees, thereby forcing CLINIC to divert its resources and adapt its operations to meet an increased need for fee waivers and training materials related to the new fees.  *Nw. Immigrant Rts. Project*, 2020

---

[4] Declarations supplied by other Plaintiffs similarly assert that their missions are in conflict with the Final Rule, *see* Pls.' Mot., Decl. of Cristina dos Santos, ECF No. 19-9 [hereinafter dos Santos Decl.], ¶ 3 (CLSEPA); Pls.' Mot., Decl. of Maria Odom, ECF No. 19-6 [hereinafter Odom Decl.], ¶ 5 (KIND); Pls.' Mot., Decl. of Angelica Salas, ECF No. 19-8 [hereinafter Salas Decl.], ¶ 3 (CHIR), and that they also will suffer drains on their resources, *see* dos Santos Decl. ¶¶ 17–18, 32–34, 36–38, 40–42, 43–49; Odom Decl. ¶¶ 25–30; Salas Decl. ¶¶ 17, 35–47.

WL 5995206, at *9 (finding causation where the rule at issue would "increase the costs of seeking the immigration benefits," making "it more difficult for low-income individuals (including Plaintiffs' clients and members) to qualify for those benefits, and Plaintiffs' asserted injuries [would be] the product of those changes"). Finally, CLINIC's injury is redressable because if the Final Rule does not go into effect—even temporarily—CLINIC will not have to adapt its operations to adjust for increased fees. *Id*. As one plaintiff has established Article III standing to assert APA claims, the court need not evaluate the constitutional standing of any other Plaintiff. *See Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 9 (D.C. Cir. 2017).

### 2.   Zone of Interests

The prudential standing, zone-of-interests inquiry also presents no impediment to Plaintiffs proceeding with their APA claims. A plaintiff's interests must "fall within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Ctrl. Components, Inc.*, 572 U.S. 118, 129 (2014) (internal quotation marks omitted). The test for whether a plaintiff's interests fall within that zone "is not meant to be especially demanding" and "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (internal quotation marks omitted).

Plaintiffs readily surpass that low bar. Congress plainly had as an objective under the INA to optimize the availability of pro bono or low-cost counsel to persons subject to removal. First, the INA establishes a right to counsel in removal proceedings. *See* 8 U.S.C. § 1229a(b)(4)(A) (stating that "the alien shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such

proceedings"). A person subject to removal must be notified in writing that they "may be represented by counsel," *id.* § 1229(a)(1)(E), and the INA expressly bars the setting of a hearing earlier than "10 days after the service of the notice to appear" "[i]n order that an alien be permitted the opportunity to secure counsel before the first hearing date," *id.* § 1229(b)(1). Second, to effectuate that right to representation, Congress has directed the Attorney General to maintain and regularly update a list of "persons who have indicated their availability to represent pro bono aliens in [removal] proceedings" and to provide this current list to the alien upon written notice of removal. *Id.* §§ 1229(a)(1)(E), 1229(b)(2). Plaintiffs CLSEPA, KIND, and CHIR all appear on the list of pro bono legal service providers, and CLINIC's affiliate organizations are also included on the list.[5] Accordingly, because "Plaintiffs' daily work is governed by the INA and the fee provisions at issue here," and because "the INA contemplates an important role for organizations like Plaintiffs," the court has no trouble concluding that Plaintiffs are within the INA's zone of interests. *Nw. Immigrant Rts. Project*, 2020 WL 5995206, at *10.

## C.    The Injunction Factors

### 1.    Likelihood of Success

The court now reaches the merits. Plaintiffs' primary challenges to the Final Rule arise under the APA.[6] The APA requires the court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). An agency's decision is arbitrary and capricious if the agency relies "on factors which Congress has not intended it to consider, entirely

---

[5] *See* Dep't of Justice, List of Pro Bono Legal Service Providers, http://www.justice.gov/eoir/list-pro-bono-legal-service-providers (last updated Jan. 2021); Mendez Decl. ¶ 15 (listing CLINIC's affiliates on Department of Justice's pro bono list).
[6] Plaintiffs also challenge the Final Rule under the Regulatory Flexibility Act, *see* Pls.' Br. at 36–38, but, as explained below, the court finds the Final Rule invalid under the APA and therefore does not reach that argument.

fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. "Although the arbitrary and capricious standard of review is deferential, the court will intervene to ensure that the agency has examined the relevant data and articulated a satisfactory explanation for its action." *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1221–22 (D.C. Cir. 1999) (cleaned up).

Plaintiffs have identified a raft of alleged deficiencies with the Final Rule. Among them are that the Final Rule is arbitrary and capricious because EOIR (1) disregarded evidence that the higher fees will be prohibitively expensive, (2) failed to demonstrate that the availability of fee waivers will mitigate any negative effects of fee increases, and (3) ignored the adverse impact that fee increases would have on legal service providers and their ability to provide pro bono or low-cost legal services. *See* Pls.' Br. at 22–25. Plaintiffs also challenge (4) the agency's legal authority for increasing fees, (5) its policy justification for doing so, and (6) its departure from its decades-long imposition of more modest fees. *See id.* at 25–30. Plaintiffs additionally complain of APA violations stemming from (7) EOIR's failure to enlarge the comment period beyond 30 days and (8) its refusal to disclose, prior to publication of the Final Rule, the data underlying the "comprehensive study" that led to the fee increases. *See id.* at 30–35.

The court does not grapple with all of these claims and arguments. For present purposes, Plaintiffs need show that they are likely to succeed on only one of their claims to justify a stay of the Final Rule's effective date or preliminary injunction. Having carefully considered all claims and arguments asserted under the APA, the court finds that Plaintiffs are likely to succeed in showing that the Final Rule is arbitrary and capricious because Defendants failed to consider "the Final Rule's impact on legal service providers," *see id*. at 24–25; Pls.' Reply at 11–12.

The Final Rule observes that "[n]umerous commenters expressed concerns that the rule would negatively affect legal service providers."  85 Fed. Reg. at 82,774.  Commenters identified four major categories of harm that would accrue to legal service providers, each of which is animated by the concern that the Final Rule will lead to fewer applicants obtaining representation in immigration proceedings.  First, commenters explained that the Final Rule would effectively reduce representation because the higher fees would force individuals to choose "between paying the fee or obtaining counsel."  *Id.*  Second, they noted that "legal aid organizations, small firms, and attorneys providing pro bono services would be unable to routinely pay the fees for their clients," as they typically had in the past.  *Id.*  Because these organizations would be able to afford fees for fewer clients under the Final Rule, "they would be forced to assist fewer aliens, especially indigent aliens and children, which would . . . reduce the availability of pro bono counsel generally."  *Id.*  Third, legal service providers "expressed concerns that the funds used to pay their clients' fees would come at the expense of other programmatic elements of their budget" and they would therefore "be less able to provide comprehensive services to aliens."  *Id.*  Fourth and finally, commenters explained that the Final Rule would drain their resources, as "the higher fees and resulting fee waivers would increase the time that an attorney spends on a case."  *Id.*  This would "cause them to turn away clients for lack of time and resources to represent them."  *Id.*

EOIR largely disregarded these concerns.  EOIR "decline[d] to respond" to what it deemed "speculative concerns regarding . . . aliens' ability to obtain counsel, including effects on legal service providers."  *Id.* at 82,775.  EOIR supported its declination by stating that "access to counsel [is] affected by a number of factors beyond the cost of applications and appeals" and that "such concerns" were "mere speculation."  *Id.*  EOIR also responded that the "commenters' assertions concerning the burden of increased fees on organizations and the private bar fall[] outside the

25

limited scope of this rulemaking." *Id.* Defendants reassert those same rationales in these proceedings. Defs.' Br. at 24–25 (arguing that "Plaintiffs' argument is both irrelevant and inaccurate").

It is black letter law that an agency acts arbitrarily and capriciously when it "entirely fails to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43; *Michigan v. EPA*, 576 U.S. 743, 753 (2015) (noting agencies are required to "pay[] attention to the advantages *and* the disadvantages of agency decisions"); *see also Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 647 (D.C. Cir. 2020) (finding policy arbitrary and capricious where it failed to consider how the policy affected certain statutory mandates). An agency also must respond to "relevant" and "significant" public comments. *Home Box Office, Inc. v. FCC* (*HBO*), 567 F.2d 9, 35 & n.58 (D.C. Cir. 1977). "[N]either requirement is particularly demanding." *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993). In this case, EOIR utterly failed to consider an important aspect of the problem, and to respond to relevant and significant public comments, when it ignored the impact that the Final Rule would have on legal service providers and their capacity to provide representation. Their concerns were neither irrelevant nor speculative.

Congress's concern for the availability of pro bono and low-cost legal services in removal proceedings is evident on the face of the INA. As already discussed, the INA not only entitles a person to counsel in removal proceedings, but it also mandates that written notice of that right be provided, and that the Attorney General maintain a current list of pro bono legal service providers and make that list available to a person subject to removal. *See supra* section IV.B.2. Additionally, an initial removal hearing cannot be scheduled until 10 days after service, specifically to afford a person time to secure counsel. *See supra* section IV.B.2. These provisions of the INA make clear that Congress was concerned not merely about the right to counsel in removal proceedings, but

with actual *access* to counsel for persons who Congress anticipated might not be able to afford to hire private lawyers.  So, when multiple legal service providers raised the alarm that increased filing fees would adversely impact their organizations and would depress their capacities to provide pro bono and low-cost legal services, the APA required EOIR to acknowledge those concerns and respond to them in a meaningful way, not blithely dismiss them as "outside the limited scope of this rulemaking," 85 Fed. Reg. at 82,775.  EOIR therefore ignored "an important aspect of the problem."  *State Farm*, 463 U.S. at 43.

Defendants also cannot escape their obligation by dismissing the legal service providers' comments as "speculative."  *See* 85 Fed. Reg. at 82,775; *see also* Defs.' Br. at 24.  To be sure, an agency need not respond to "comments which themselves are purely speculative and do not disclose [a] factual or policy basis . . . .  There must be some basis for thinking a position taken in opposition to the agency is true."  *HBO*, 567 F.2d at 35 n.58.  Here, the legal services providers offered ample basis for the truth of their positions:  their extensive knowledge and experience with the immigration system.  Who else would have a better understanding of how substantial fee increases would impact the delivery of legal services than the legal service providers themselves? They have firsthand knowledge of how their practices operate and the role of fees in their practices. They are intimately familiar with their budgets and resources and therefore have a unique capacity to estimate how the Final Rule's significant increase in fees would upend their normal practices and would affect the number of clients they can serve.  Their comments were thus the product of their deep institutional knowledge and experience, not mere conjecture, as EOIR claimed.

In these proceedings, Defendants echo EOIR's position in the Final Rule that the commenters' concerns were speculative because "'access to counsel [is] affected by a number of factors beyond the cost of applications and appeal, and commenters provided no factual or policy

27

bases for the Department to consider'" on these points.  Defs.' Br. at 25 (quoting 85 Fed. Reg. at 82,775).  By way of illustration, Defendants suggested at oral argument that the impacts on legal service providers were speculative because Plaintiffs had not shown that their funders would not increase their grants or donations to account for the increased fees; therefore, the organizations could not predict how the increased fees would affect them.  Hr'g Tr. (draft), Jan. 15, 2021, at 41–42.  But that is not how notice and comment works.  It was the agency's burden to consider the impact of the Final Rule on legal service providers, not the providers' burden to prove to the agency that they could not affirmatively mitigate that impact.  *See Stewart v. Azar*, 313 F. Supp. 3d 237, 268–70 (D.D.C. 2018) (finding agency "must . . . evaluate the effect of" its actions on interests protected by statute).  Moreover, in referencing potential increases in Plaintiffs' outside funding, Defendants' argument implicitly concedes that the Final Rule may squeeze the budgets of legal service providers and that, rather than speculation, the legal service providers' concerns about lacking the funds and resources to meet the additional fees are very much grounded in reality.  EOIR was required to consider the impact of the Final Rule on legal service providers and "provide the court an explanation sufficient to allow" it to review the agency's consideration of that impact.  *See Getty v. Fed. Sav. & Loan Ins.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986).  Because it did not do so, Plaintiffs are likely to succeed in establishing that the Final Rule is arbitrary and capricious.

### 2.   *Irreparable Harm*

Having shown that they are likely to succeed on the merits of one of their claims, Plaintiffs must next "demonstrate that irreparable injury is likely in the absence of an injunction."  *Winter*, 555 U.S. at 22 (emphasis omitted); *S. Poverty Law Ctr.*, 2020 WL 3265533, at *32.  To demonstrate irreparable harm, plaintiffs must show both (1) that the harm is "certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief

to prevent irreparable harm" and (2) that the harm is "beyond remediation." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (cleaned up).

Another judge in this District has previously found irreparable harm based on evidence showing that proposed fee increases for immigrant services "will interfere with the[] ability [of legal service providers] to provide essential services to their clients and/or members—in some cases irretrievably so." *Nw. Immigrant Rts. Project*, 2020 WL 5995206, at *30, *32. The harms documented in Plaintiffs' numerous declarations mirror the harms established in *Northwest Immigrant Rights Project*. CLINIC, for example, has submitted a declaration attesting that there will be "a significant decrease in the number of cases that CLINIC and its pro bono partners can take on due to the increased work load from preparing and verifying fee waiver requests and the "virtual[] impossib[ility]" that CLINIC and its pro bono partners will be able to front filing fees for indigent clients. Mendez Decl. ¶¶ 33–35. KIND too avers that it will face those same resource strains and "has already diverted resources from [its] other work to prepare training materials and provide technical assistance to [its] staff and pro bono partners on the forthcoming changes to the fee rule." Odom Decl. ¶¶ 26–29. In addition, KIND "plans to divert time and resources to fundraising efforts to cover clients'" fees. *Id.* ¶ 29. These efforts, KIND declares, consume "time and resources that KIND attorneys would otherwise spend on additional client matters," reducing the number of new clients the organization will be able to take on. *Id.* ¶ 30. CLSEPA has identified similar harms from the Final Rule. It attests that "[t]he Final Rule is already setting in motion some of the very harms [it] feared," including the "frustrat[ion]" of CLSEPA's "mission by increasing the amount of work required per case[,] therefore limiting [the organization's] transformative impact by decreasing the number of individuals [it] can serve." dos Santos Decl. ¶¶ 31, 45; *see also id.* ¶¶ 31–33, 36–37, 40, 44–46, 48–49 (describing harms inflicted by Final

Rule, ultimately leading to decreased capacity for additional cases). And finally, CHIR asserts that it "has already had to divert resources" to adapting to the new fees and that it "will necessarily need to assist [clients] in preparing fee waiver applications, which will again add to the staff's workload and limit the time available for existing cases and the new cases [it is] obligated to take on to maintain funding levels." Salas Decl. ¶¶ 38, 43; *see also id.* ¶¶ 38–39, 44–47.

Collectively, these declarations show that the Final Rule will have an "immediate effect on" Plaintiffs' "ability to serve their [existing] clients" and take on new clients. *Nw. Immigrant Rts. Project*, 2020 WL 5995206, at *31. The cumulative impact of the Final Rule will lead to decreased representation of applicants in immigration proceedings. Such harm is irreparable to both Plaintiffs and the immigrant populations they represent.

Defendants push back on Plaintiffs' showing of irreparable harm in two ways. First, they argue that Plaintiffs have not "presented . . . any evidence demonstrating that any substantial decrease in immigration filings would occur as a result of these fee increases." Defs.' Br. at 35–36. This argument misses the mark. Plaintiffs assert that they will be able to *represent* fewer applicants, not that there will be fewer applicants for immigration relief overall. Second, Defendants maintain that Plaintiffs have not established that they would lose funding "immediately and before this Court can consider the merits" of Plaintiffs' challenge to the Final Rule. *Id.* at 36. Again, this argument misconstrues Plaintiffs' injuries. Regardless of *when* any financial harm may befall them, absent an injunction, Plaintiffs will be irreparably harmed by the damage to their core missions—providing free or low-cost representation to persons needing counsel in removal proceedings—defusing any concerns about the timing of their loss of funding. Indeed, many organizations have already diverted resources away from representing clients toward adapting to the Final Rule. *See* Odom Decl. ¶ 27; dos Santos Decl. ¶ 31; Salas Decl. ¶ 38.

30

D.        **Balance of the Equities and Public Interest**

Having concluded Plaintiffs will suffer irreparable harm absent a preliminary injunction, the court turns to the balance of the equities and the public interest.  These factors merge when, as here, the government is the defendant.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).  Plaintiffs argue that the balance of the equities and the public interest weigh in favor of injunctive relief because such relief would maintain the status quo, the public's interests are served by the government following the law, and Defendants have identified no urgent fiscal need for the fee increases to go into effect.  Pls.' Br. at 43.  Defendants, on the other hand, argue that the public's interest in the government following the law is best served by not enjoining the Final Rule so that EOIR can work toward self-sustenance.  Defs.' Br. at 38.

The court concludes that the balance of the equities tips decidedly in Plaintiffs' favor.  First, as to the public's interest in the government following the law, the court has already ruled that Plaintiffs are likely to succeed on their claim that the Final Rule is arbitrary and capricious.  "There is generally no public interest in the perpetuation of unlawful agency action."  *League of Women Voters*, 838 F.3d at 12; *Nw. Immigrant Rts. Project*, 2020 WL 5995206, at *32.  Second, Defendants will suffer little, if any, harm from a delay in achieving a self-sustaining fee model; they have conceded that EOIR is not "dependen[t] on fee collections to operate," Defs.' Br. at 7, and Congress has already appropriated $734 million to EOIR for Fiscal Year 2021, Pub. L. No. 116-260, 134 Stat. at 1246.  In contrast, Plaintiffs have already begun to suffer harm to their organizational missions, *see supra* Section IV.C.2, and they have presented evidence that some of Plaintiff CHIR's indigent members have already been forced to cut spending on their basic needs to save money in anticipation of affording the new fees, *see* Salas Decl. ¶¶ 57–61; *see also* 85 Fed. Reg. at 82,763 (suggesting that "[a]n alien who is concerned that he or she may wish to appeal the

31

immigration judge's decision should, accordingly, use that time between the initiation of the proceeding and the immigration judge's issuance of a final decision to begin arranging funds for the future payment of the appeal").  Third and finally, as the court in *Northwest Immigrant Rights Project* noted, it is "far from clear that Defendants would benefit from a decision that would permit the Rule to take effect, only to be set aside months from now."  2020 WL 5995206, at *32.  The equities and public interest therefore favor entry of injunctive relief.

### E.      Scope of Injunction

The court concludes by defining the scope of the remedy.  "Crafting a preliminary injunction is an exercise of discretion and judgment," and "a court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (internal quotation marks omitted); *see also Winter*, 555 U.S. at 24 (noting "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief" (internal quotation marks omitted)).  It is well settled "that an injunction must be narrowly tailored to remedy the specific harm shown."  *Neb. Dep't of Health & Human Servs v. Dep't of Health & Human Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (cleaned up).  Here, the court confronts two questions in tailoring the preliminary injunction:  whether the effective date of each of the fee increases promulgated in the Final Rule must be stayed and whether the injunctive relief should issue nationwide.

Plaintiffs have requested that the court "stay the effective date of the Final Rule in its entirety."  Pls.' Br. at 44.  But as counsel for Defendants pointed out at oral argument, there are three fees that Plaintiffs have not shown will result in irreparable harm.  *See* Hr'g Tr. (draft), Jan. 14, 2021, at 34–37.  First, Plaintiffs conceded at oral argument that they do not seek an

injection of the $675 fee attached to Form EOIR-45 "[f]or filing an appeal from a decision of an adjudicating official in a practitioner disciplinary case," 85 Fed. Reg. at 82,794. Hr'g Tr. (draft), Jan. 15, 2021, at 71–72. Accordingly, the court will not stay the fee increase for Form EOIR-45.

Second, Plaintiffs have not sufficiently established that the $35 fee increase for filing a motion to reopen or reconsider in OCIJ, *see* 85 Fed. Reg. at 82,751, 82,794, will cause irreparable harm. An increase of this fee from $110 to $145 is too minimal to inflict the harms that Plaintiffs complain of, and Plaintiffs have not made any showing to the contrary.

Third, and finally, at oral argument counsel for Defendants clarified that the Final Rule does not impose a $50 fee for defensive asylum applications. Instead, according to counsel, there is a pre-existing EOIR policy to apply DHS's fees to forms that DHS drafts, including the form for seeking asylum. Hr'g Tr. (draft), Jan. 15, 2021, at 64–65. Plaintiffs have not challenged that policy, and, given that the DHS fee is subject to not one but *two* nationwide injunctions, *see Nw. Immigrant Rts. Project*, 2020 WL 5995206; *Immigrant Legal Res. Ctr. v. Wolf*, No. 20-cv-5883, 2020 WL 5798269 (N.D. Cal. Sept. 29, 2020), the court sees no pressing need to enjoin it here.

The court concludes that the remaining fee increases—which impose increases of between $205 and $865 per type of filing—are likely to cause Plaintiffs irreparable harm and enjoins those increases in their entirety. Specifically, the court enjoins:

    (1)    The $975 fee attached to Form EOIR-26 for filing an appeal from a decision of an immigration judge;

    (2)    The $705 fee attached to Form EOIR-29 for filing an appeal from a decision of an officer of DHS;

    (3)    The $895 fee for filing a motion to reopen or to reconsider before the BIA;

    (4)    The $305 fee attached to Form EOIR-40 for an application for suspension of deportation;

(5)    The $305 fee attached to Form EOIR-42A for an application for cancellation of removal for certain permanent residents; and

(6)    The $360 fee attached to Form EOIR-42B for an application for cancellation of removal and adjustment of status for certain nonpermanent residents.

*See* 85 Fed. Reg. at 82,793–94.  EOIR may continue to charge the fees already in effect for these filings.

Finally, Plaintiffs have requested that the court's preliminary injunction issue nationwide. *See* Pls.' Br. at 44–45.  The court agrees that a nationwide injunction is proper here because the court finds that the Final Rule is substantially likely to violate the APA and the injunction concerns the nation's immigration policies.  The D.C. Circuit has held "that 'when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated— not that their application to the individual petitioners is proscribed.'"  *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (alteration omitted) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)).  Accordingly, courts in this Circuit have "confirm[ed] the propriety of nationwide injunctions in APA cases where the challenged policy is found to be arbitrary and capricious or otherwise facially unlawful."  *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 20-1630(JEB), 2020 WL 5232076, at *43 (D.D.C. Sept. 2, 2020), *appeal filed*, No. 20-5331 (D.C. Cir. Nov. 9, 2020).  The court finds additional support for a nationwide injunction in the Supreme Court's recognition of the government's interest in establishing a "uniform Rule of Naturalization."  *Arizona v. United States*, 567 U.S. 387, 394 (2012) (internal quotation marks omitted) (quoting U.S. Const. Art. I, § 8, cl.4).  Defendants also have not asked the court to refrain from issuing a nationwide injunction, as they

34

have done in other cases.  Accordingly, the court will stay the effective date of and preliminarily enjoin the aforementioned provisions of the Final Rule nationwide.

## V.     CONCLUSION AND ORDER

For the foregoing reasons, the court grants in part and denies in part Plaintiffs' Motion for a Stay of Effective Dates Under 5 U.S.C. § 705 or, in the Alternative, Preliminary Injunction, ECF No. 19.  The court stays the effective date of the final rule, Executive Office for Immigration Review; Fee Review, 85 Fed. Reg. 82,750 (Dec. 18, 2020), as to the following fees pending final adjudication of this action:

(1)     The $975 fee attached to Form EOIR-26 for filing an appeal from a decision of an immigration judge;

(2)     The $705 fee attached to Form EOIR-29 for filing an appeal from a decision of an officer of DHS;

(3)     The $895 fee for filing a motion to reopen or to reconsider before the BIA;

(4)     The $305 fee attached to Form EOIR-40 for an application for suspension of deportation;

(5)     The $305 fee attached to Form EOIR-42A for an application for cancellation of removal for certain permanent residents; and

(6)     The $360 fee attached to Form EOIR-42B for an application for cancellation of removal and adjustment of status for certain nonpermanent residents.

Defendants are hereby enjoined from implementing or enforcing the above fees pending final adjudication of this action.  The parties shall meet and confer and, by January 27, 2021, file a Joint Status Report proposing a schedule for further proceedings in this matter.

Dated:  January 18, 2021

Amit P. Mehta
United States District Court Judge