IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————————
                                            )
CATHOLIC LEGAL IMMIGRATION                  )
NETWORK, INC., *et al.*,                    )
                                            )
                    Plaintiffs,             )
                                            )
            v.                              )        Civil Action No. 1:20-cv-3812 (APM)
                                            )
EXECUTIVE OFFICE FOR                        )
IMMIGRATION REVIEW, *et al.*,               )
                                            )
                    Defendants.             )
———————————————————————

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................3

      I.     History of EOIR Fees ....................................................................................3

             A.     Statutory Authority ...........................................................................3

             B.     Prior Fee Rulemakings.......................................................................5

             C.     The 2020 Fee Rulemaking .................................................................7

      II.    This Litigation ............................................................................................ 11

             A.     Complaint and Preliminary Injunction .................................................11

             B.     Post-Injunction Developments ...........................................................12

STANDARD OF REVIEW..................................................................................................13

ARGUMENT ...................................................................................................................13

      I.     The Final Rule is Consistent with the APA........................................................ 14

             A.     The Agency examined all relevant factors. ..........................................14

                     1.     The Agency adequately addressed the effect the Final Rule
                            would have on legal service providers....................................15

                     2.     The Agency adequately addressed commenters' concerns
                            about applicants' inability to pay and the availability of fee
                                waivers. ...........................................................................17

             B.     The Final Rule provided a reasoned basis for raising fees. ..............................21

              C.     The Final Rule did not reflect a change in fee policy.............................23

              D.     The Agency has authority to set fees under the INA and the IOAA. .............25

    II.    The Agency Provided a Sufficient Opportunity for Meaningful Public Comment.......................26

             A.     The Agency's comment period was not unreasonable. ....................................26

B.   The Agency provided sufficient information to enable meaningful comment........................................................................................29

1.   The Agency adequately disclosed its support for raising fees............29

2.   The Agency's reliance on fee waivers was reasonable..........................34

3.   Later proposed rules—which are not in effect—did not deprive Plaintiffs an opportunity for meaningful comment. .............35

III.   Plaintiffs' Regulatory Flexibility Act Claim Fails as a Matter of Law................................... 36

IV.   Any Relief Ordered Should Be Limited. ....................................................... 37

A.   Vacatur of the Final Rule is not warranted. ..........................................38

B.   Plaintiffs are not entitled to permanent injunctive relief...................39

CONCLUSION ....................................................................................................41

# TABLE OF AUTHORITIES

**Cases**

*A.P. Bell Fish Co. v. Raimondo,*
  94 F.4th 60 (D.C. Cir. 2024) ............................................................................39

*Aeronautical Repair Station Ass'n, v. FAA,*
  494 F.3d 161 (D.C. Cir. 2007) .........................................................................36

*Air Transp. Ass'n of Am. v. Civil Aeronautics Bd.,*
  732 F.2d 219 (D.C. Cir. 1984) ................................................................... 30, 34

*Alabama v. U.S. Army Corps of Eng'rs,*
  C.A. No. 15-696 (EGS), 2023 WL 7410054 (D.D.C. Nov. 9, 2023) .................40

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993) .........................................................................38

*Am. Hosp. Ass'n v. Becerra,* C.A.,
  No. 18-2084 (RC), 2022 WL 4534617 (D.D.C. Sept. 28, 2022) ......................40

*Am. Radio Relay League, Inc. v. FCC,*
  524 F.3d 227 (D.C. Cir. 2008) ................................................................... 31, 32

*Ayuda Inc. v. Att'y Gen.,*
  848 F.2d 1297 (D.C. Cir. 1988) ...................................................................*passim*

*Ayuda v. Att'y Gen.,*
  661 F. Supp. 33 (D.D.C. 1987)............................................................... 10, 23, 34

*Bar MK Ranches v. Yuetter,*
  994 F.2d 735 (10th Cir. 1993) ..........................................................................34

*Bowman Transp. Inc. v. Ark.-Best Freight Sys., Inc.,*
  419 U.S. 281 (1974) ........................................................................................21

*Burlington Truck Lines v. United States,*
  371 U.S. 156 (1962) ........................................................................................21

*Cement Kiln Recycling Coal. v. EPA,*
  255 F.3d 855 (D.C. Cir. 2001) .........................................................................37

*Centro Legal de la Raza v. EOIR,*
  524 F. Supp. 3d 919 (N.D. Cal. 2021) .............................................................28

*Chamber of Com. of the U.S. v. SEC,*
  443 F.3d 890 (D.C. Cir. 2006) .........................................................................34

*Chamber of Com. of U.S. v. SEC*,
   85 F.4th 760 (5th Cir. 2023) ..................................................................27

*Citizens to Pres. Overton Park v. Volpe*,
   401 U.S. 402 (1971) ..................................................................14

*Conn. Light & Power Co. v. Nuclear Regul. Comm'n*,
   673 F.2d 525 (D.C. Cir. 1982) ..................................................27, 28

*Cottage Health Sys. v. Sebelius*,
   631 F. Supp. 2d 80 (D.D.C. 2009) ..................................................13

*Council for Urological Interests v. Burwell*,
   790 F.3d 212 (D.C. Cir. 2015) ..................................................37

*eBay Inc. v. MercExchange*, LLC,
   547 U.S. 388 (2006) ..................................................................39

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211, 223-24 (2016) ..................................................17

*Engine Manufacturers Ass'n v. EPA*,
   20 F.3d 1177 (D.C. Cir. 1994) ..................................................32, 33

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ..................................................................23

*Fed. Power Comm'n v. New Eng. Power Co.*,
   415 U.S. 345 (1974) ..................................................................5

*Fla. Power & Light Co. v. United States*,
   846 F.2d 765 (D.C. Cir. 1988) ..................................................34

*Fox Television Stations, Inc. v. FCC*,
   280 F.3d 1027 (D.C. Cir. 2002) ..................................................39

*Home Box Off., Inc. v. FCC*,
   567 F.2d 9 (D.C. Cir. 1977) ..................................................17

*Int'l Union United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*,
   920 F.2d 960 (D.C. Cir. 1990) ..................................................38

*Johnson v. Panetta*,
   953 F. Supp. 2d 244 (D.D.C. 2013) ..................................................40

*L'Association des Américains Accidentels v. U.S. Dep't of State*,
   656 F. Supp. 3d 165 (D.D.C. 2023) ..................................................26

*Lee Memorial Health System v. Burwell*,
　206 F. Supp. 3d 307 (D.D.C. 2016), *opinion corrected on denial of reconsideration*, No. 13-CV-643
　(RMC), 2016 WL 10749143 (D.D.C. Nov. 10, 2016), and *aff'd sub nom. Billings Clinic v. Azar*,
　901 F.3d 301 (D.C. Cir. 2018). ........................................................................................................33

*Mid-Tex. Elec. Co-op. v. FERC*,
　773 F.2d 327 (D.C. Cir. 1985) .........................................................................................................36

*Monsanto Co. v. Geertson Seed Farms*,
　561 U.S. 139 (2010) ................................................................................................................... 39, 40

*Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau*,
　785 F.3d 684 (D.C. Cir. 2015) .........................................................................................................39

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
　463 U.S. 29 (1983) ..................................................................................................................... 14, 17

*N.C. Growers' Ass'n v. United Farm Workers*,
　702 F.3d 755 (4th Cir. 2012) ...........................................................................................................28

*Nat'l Lifeline Ass'n v. FCC*,
　921 F.3d 1102 (D.C. Cir. 2019) .......................................................................................................27

*New LifeCare Hosp. of N.C., LLC, v. Becerra*,
　7 F.4th 1215 (D.C. Cir. 2021) .................................................................................................... 23, 24

*Oceana, Inc. v. Ross*,
　920 F.3d 855 (D.C. Cir. 2019) .................................................................................................... 22, 34

*Owner–Operator Indep. Drivers Ass'n Inc. v. Fed. Motor Carrier Safety Admin.*,
　494 F.3d 188 (D.C. Cir. 2007) .........................................................................................................33

*Pangea Legal Servs. v. DHS*,
　501 F. Supp. 3d 792 (N.D. Cal. 2020) .............................................................................................28

*Petry v. Block*,
　737 F.2d 1193 (D.C. Cir. 1984) .......................................................................................................27

*Phillips Petroleum Co. v. EPA*,
　803 F.2d 545 (10th Cir. 1986) .........................................................................................................27

*Pub. Citizen, Inc. v. FAA*,
　988 F.2d 186 (1993) ................................................................................................................... 14, 17

*Pub. Emps. for Env't Resp. v. Nat'l Park Serv.*,
   605 F. Supp. 3d 28 (D.D.C. 2022), *appeal dismissed*, No. 22-5205, 2022 WL 4086993
   (D.C. Cir. Sept. 2, 2022) ........................................................................................................21

*Qi-Zhuo v. Meissner*,
   70 F.3d 136 (D.C. Cir. 1995) .................................................................................................26

*Rural Cellular Ass'n v. FCC*,
   588 F.3d 1095 (D.C. Cir. 2009) .............................................................................................16

*Shands Jacksonville Medical Center v. Burwell*,
   139 F. Supp. 3d 240 (D.D.C. 2015) .......................................................................................32

*Shinseki v. Sanders*,
   556 U.S. 396 (2009) ...............................................................................................................29

*Silver v. IRS*,
   531 F. Supp. 3d 346 (D.D.C. 2021), *modified*, 569 F. Supp. 3d 5 (D.D.C. 2021) ................37

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   985 F.3d 1032 (D.C. Cir. 2021) .............................................................................................38

*U.S. Sugar Corp. v. EPA*,
   830 F.3d 579 (D.C. Cir. 2016) ...............................................................................................38

*United States v. Chem. Found., Inc*,
   272 U.S. 1 (1926) ...................................................................................................................20

*United States v. Texas*,
   599 U.S. 670 (2023) ...............................................................................................................38

*Univ. of Colo. Health at Mem'l Hosp. v. Becerra*,
   2022 WL 2191690 (D.D.C. June 17, 2022)...........................................................................33

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
   435 U.S. 519 (1978) .........................................................................................................27, 32

*Withrow v. Larkin*,
   421 U.S. 35 (1975) .................................................................................................................20

*WJG Tel. Co. v. FCC*,
   675 F.2d 386 (D.C. Cir. 1982) ...............................................................................................32

**Statutes**

5 U.S.C. § 553 ...............................................................................................................26, 30, 31

5 U.S.C. §  601 .......................................................................................................................37

5 U.S.C. § 603 .......................................................................................................11

5 U.S.C. § 604 .......................................................................................................11

5 U.S.C. § 705 .......................................................................................................11

5 U.S.C. § 706 ...................................................................................................14, 29

5 U.S.C. §§ 701 *et seq.* ........................................................................................11

8 U.S.C. § 1103 .......................................................................................................3

8 U.S.C. § 1229a ...................................................................................................16

8 U.S.C. § 1356 ............................................................................................*passim*

28 U.S.C. § 2401 ...................................................................................................19

31 U.S.C. § 902 .......................................................................................5, 8, 10, 22

31 U.S.C. § 9701 ...................................................................................4, 5, 22, 25

The Homeland Security Act of 2002 (HSA),
   Pub. L. No. 107-296, 116 Stat. 2135 (2002) .................................................3

## Regulations

8 C.F.R. § 1003.0 ....................................................................................................3

8 C.F.R. § 1003.1 ....................................................................................................3

8 C.F.R. § 1003.8 ...........................................................................................*passim*

8 C.F.R. § 1003.8 (2020)........................................................................................36

8 C.F.R. § 1003.24 .........................................................................................*passim*

18 Fed. Reg. 3526 (June 19, 1953)..........................................................................5

48 Fed. Reg. 8038 (Feb. 25, 1983) ..........................................................................3

51 Fed. Reg. 2895 (Jan. 22, 1986) (1986 Proposed Rule).......................................6

51 Fed. Reg. 39,993 (Nov. 4, 1986) (1986 Final Rule) .......................................6, 23

58 Fed. Reg. 38,142 (July 15, 1993).........................................................................5

69 Fed. Reg. 44,903 (July 28, 2004) ..................................................................................... 19

86 Fed. Reg. 70,708 (Dec. 13, 2021) ............................................................................... 13, 21

89 Fed. Reg. 6194 (Jan. 31, 2024) ....................................................................................... 12

**Other Authorities**

EOIR, Form EOIR-26A (Rev. Aug. 2022),
    https://www.justice.gov/eoir/page/file/1237856/dl?inline ............................................. 16

EOIR, Types of Appeals, Motions, and Required Fees,
    https://www.justice.gov/eoir/types-appeals-motions-and-required-fees ......................... 12

Executive Office for Immigration Review, EOIR 1125-AA90 fee study,
    https://www.regulations.gov/document/EOIR-2020-0013-0002 (posted Dec. 18, 2020) ........... 33

FASAB, Handbook of Federal Accounting Standards and Other Pronouncements, as
    Amended 493 (Dec. 15, 2023),
    https://files.fasab.gov/pdffiles/2023_FASAB_Handbook.pdf ......................................... 7

# INTRODUCTION

The Executive Office for Immigration Review (EOIR or the Agency) adjudicates immigration cases through administrative proceedings before the immigration courts and the Board of Immigration Appeals (BIA or the Board). The United States charges fees for certain applications adjudicated in those proceedings, for certain types of motions, and for certain types of appeals.

In 2020, after those fees had remained at the same level for more than thirty years, EOIR proposed to increase the fees to reflect the current cost to the government of processing the associated applications, motions, and appeals. To do so, it relied on a comprehensive study using activity-based costing—a common methodology in the private and public sectors—to determine the cost to the Agency for each type of application, motion, and appeal for which it levies a fee. That study demonstrated that the cost to the Agency of processing greatly exceeded the fees the Agency charged. To address this disconnect, the Agency undertook a rulemaking to ensure that the fees it required for those types of filings more closely matched the costs it incurred.

The Agency's rulemaking was consistent with its statutory authority to impose fees, the Immigration and Naturalization Act (INA) and the Independent Offices Appropriations Act of 1952 (IOAA). Each of those statutes authorized the Agency to set fees at a level that would ensure full-cost recovery for the services it provides. And when an agency sets a user fee charge, statutory and regulatory guidance dictate that the agency should biennially review those charges to reflect costs incurred by the agency in providing those services.

Plaintiffs' challenge to the Agency's Final Rule increasing these fees asserts claims under the Administrative Procedure Act (APA) and the Regulatory Flexibility Act (RFA). Although the Court has already preliminarily determined that Plaintiffs are likely to succeed on a portion of their APA claim, Defendants hereby maintain and preserve their arguments that the Final Rule was a reasonable exercise of the Agency's authority to set fees for services it provides to respondents in immigration

court and before the Board. The Agency examined all relevant factors Congress intended for it to consider, as well as the multitude of comments submitted by interested parties, and the Agency reasonably acted within its fee-setting authority. It also provided a sufficient description of the methodology and data on which it proposed to rely to permit the public a meaningful opportunity to participate, as well as a reasonable basis for its decision to increase fees.

Plaintiffs' claims that the Agency violated the APA's procedural requirements are similarly misguided. The Agency reasonably determined that a thirty-one day comment period was sufficient for interested parties to address a relatively straightforward rulemaking that did no more than increase preexisting fees. Nor can Plaintiffs establish that it was unfair for the Agency to propose *other* rules in separate rulemakings with comment periods after this one when they were afforded an opportunity to comment as to those other rules and none of them went into effect. And because the fees apply only to individuals, the Agency reasonably complied with its obligations under the RFA by certifying that its Final Rule would not have a significant impact on a substantial number of small entities as defined by the statute. The Court should, therefore, grant summary judgment to the Defendants.

As acknowledged above, the Court preliminarily enjoined the Final Rule in its entirety, determining that Plaintiffs were likely to succeed on the merits as to their contention that the Rule failed to consider its impact on legal service providers. If the Court adheres to the merits analysis in its preliminary injunction order, it need not reach Plaintiffs' other claims and the only remaining question would be that of remedies. On that score, Plaintiffs entirely fail to justify their request for injunctive relief, and none should be granted. Instead, the Court should remand, without vacatur, to the Agency to address in the first instance any deficiencies the Court identifies. That approach would permit the Agency to comply with the Court's judgment—without imposing any of the enjoined fees until those deficiencies were corrected—and would avoid any potential confusion about the status of fees adopted in a partially vacated rule.

**BACKGROUND**

EOIR is an agency within the Department of Justice (DOJ or Department) with the primary mission of adjudicating immigration cases and appeals for individuals placed in immigration proceedings before the Agency. The Attorney General established EOIR in 1983 through an internal DOJ reorganization, which combined the BIA and the immigration judge function previously performed by the then-Immigration and Naturalization Service (INS) pursuant to the Immigration and Nationality Act (INA). *See* Department of Justice, INS, Board of Immigration Appeals; Immigration Review Function; Editorial Amendments, 48 Fed. Reg. 8038 (Feb. 25, 1983). The Homeland Security Act of 2002 (HSA), Public L. No. 107-296, 116 Stat. 2135 (2002), further reorganized federal immigration and naturalization functions by transferring immigration enforcement and benefit functions to the newly created Department of Homeland Security. The Attorney General, however, retained the "authorities and functions" relating to the "immigration and naturalization of aliens as were exercised by [EOIR], or by the Attorney General with respect to" EOIR prior to the effective date of the HSA. 8 U.S.C. § 1103(g)(1). Under delegated authority from the Attorney General, EOIR conducts immigration court proceedings, appellate review, and administrative hearings. *See* 8 C.F.R. §§ 1003.0, 1003.1(a)(1).

## I.     History of EOIR Fees

### A.     Statutory Authority

This case involves Plaintiffs' challenge to EOIR's decision, through the Final Rule, to increase fees in connection with six categories of filings before the BIA or immigration courts. *See* Pls.' Mot. for Summ. J. at 20 n.6, ECF No. 56 (Mot.). Under the HSA, the Attorney General retained the authority to charge fees for immigration adjudication services previously granted to him by Congress when it established the Immigration Examinations Fee Account (IEFA) within the Treasury of the United States. *See* 8 U.S.C. § 1356(m), (n). Section 286 of the INA, codified at 8 U.S.C. § 1356,

describes collection of certain fees and fines by the Attorney General and, by virtue of references in the HSA, the Secretary of Homeland Security. Specifically, § 1356(m) provides that the Attorney General and the Secretary may charge fees for "immigration adjudication and naturalization services" at a rate "that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to" certain categories of aliens. Under that provision, and the regulations promulgated thereunder, all designated adjudication fees are deposited in the IEFA. *See* 8 U.S.C. § 1356(m), (n). Deposits into the IEFA "remain available until expended to the Attorney General [or the Secretary] to reimburse any appropriation the amount paid out of such appropriation for expenses in providing immigration adjudication and naturalization services and the collection, safeguarding and accounting for fees deposited in and funds reimbursed from the [IEFA]." *Id.* § 1356(n).

In addition to section 286 of the INA, the Independent Offices Appropriations Act of 1952, 31 U.S.C. § 9701, which applies government-wide, authorizes EOIR to charge fees to individuals who receive special services from the Agency. The IOAA provides, in relevant part,

> (a) It is the sense of Congress that each service or thing of value provided by an agency (except a mixed-ownership Government corporation) to a person (except a person on official business of the United States Government) is to be self-sustaining to the extent possible.

> (b) The head of each agency . . . may prescribe regulations establishing the charge for a service or thing of value provided by the agency. Regulations prescribed by the heads of executive agencies are subject to policies prescribed by the President and shall be as uniform as practicable. Each charge shall be –

> (1) fair; and

> (2) based on –

>> (A) the costs to the Government;

>> (B) the value of the service or thing to the recipient;

>> (C) public policy or interest served; and

(D) other relevant facts.

31 U.S.C. § 9701(a)-(b).   Congress also directed agencies, through the "agency Chief Financial Officer," to "review, on a biennial basis, the fees . . . imposed by the agency for services and things of value it provides, and make recommendations on revising those charges to reflect costs incurred by it in providing those services and things of value."  31 U.S.C. § 902(a)(8).

Pursuant to the IOAA, OMB has issued Circular No. A-25 Revised, which "establishes Federal policy regarding fees assessed for Government services[,] . . . provides information on the scope and types of activities subject to user charges and on the basis upon which user charges are to be set[,] . . . [and] provides guidance for agency implementation of charges and the disposition of collections." Off. of Mgmt. & Budget, Circular A–25, "User Charges," 58 Fed. Reg. 38,142, 38,144 (July 15, 1993); AR4994-5003; *see also Fed. Power Comm'n v. New Eng. Power Co.*, 415 U.S. 345, 349–51 (1974) (holding that OMB Circular A-25 is a "proper construction" of the IOAA and "establishes guidelines for Federal agencies to assess fees for Government services," 58 Fed. Reg. at 38,142).  The Circular directs agencies "to review charges biennially and update them as necessary."  58 Fed. Reg. at 38,142.

### B.    Prior Fee Rulemakings

Beginning in 1953, the Department has set fees for certain services it provided under the INA. *See* Title 8—ALIENS AND NATIONALITY, Chapter I—Immigration and Naturalization Service, Department of Justice, Miscellaneous Amendments, 18 Fed. Reg. 3526, 3527 (June 19, 1953).  The initial regulation setting those fees provided that persons filing certain motions or appeals submit payment of the required fee along with the notice of appeal or motion, or an affidavit establishing an "inability to pay the required fee."  *Id.*  The relevant body to which the filing was made had the "discretion" to "authorize the prosecution of any appeal or motion without prepayment of [the] fee." *Id.*  Today, requests for a fee waiver are submitted via a Fee Waiver Request (Form EOIR-26A). 8 C.F.R. § 1003.8(a)(3); *see* 8 C.F.R. § 1003.24(d).  The only evidentiary requirement is a "properly

executed affidavit" or "declaration to be signed under penalty of perjury" "substantiating the filing party's inability to pay the fee." *Id.* §§ 1003.8(a)(3), 1003.24(d).

Prior to the Final Rule challenged in this case, the Department last updated its fee levels for filing motions to reopen, reconsider, or appeal to the BIA in 1986. *See* INS, EOIR, DOJ, Powers and Duties of Service Officers; Availability of Service Records, 51 Fed. Reg. 2895 (Jan. 22, 1986) (1986 Proposed Rule); INS, EOIR, DOJ, Powers and Duties of Service Officers; Availability of Service Records, 51 Fed. Reg. 39,993 (Nov. 4, 1986) (1986 Final Rule). As the Agency explained in the 1986 Final Rule, it based its decision to raise fees on the IOAA and OMB Circular A-25, which "require federal agencies to establish a fee system in which a benefit or service provided to or for any person be self-sustaining to the fullest extent." 51 Fed. Reg. at 39,993. The Agency observed that fees "are neither intended to replace nor to be influenced by the budgetary process," but rather "the total cost to the agency to provide the service." *Id.* Thus, the Agency explained that the fees had "been adjusted to more nearly reflect the current cost of providing the benefits and services, taking into account public policy and other pertinent facts." *Id.*

Following a legal challenge to the 1986 Final Rule, the D.C. Circuit held that the IOAA authorized the Attorney General, through EOIR and the INS, to impose the fees. *Ayuda Inc. v. Att'y Gen.*, 848 F.2d 1297, 1301 (D.C. Cir. 1988). The D.C. Circuit similarly affirmed the district court's holdings that "the provision for waiver of fees for aliens who certify their inability to pay" mitigated any "alleged deterrent effect of the increased fees on the ability of aliens to pursue their rights" and that the fee changes were not arbitrary and capricious "in view of the two-year, agency-wide process of review, complete with elaborate cost accounting and notice-and-comment procedures." *Id.* at 1299 & n.5.

###### C.    The 2020 Fee Rulemaking

The Agency took no action to review or update those fees for more than thirty years.  Then, in 2018, EOIR undertook a review of whether its fees should be updated to reflect the modern cost of processing related filings and appeals to ensure compliance with the IOAA, the INA, and OMB Circular No. A-25 Revised.  *See* AR1-2; AR5020-5021; AR5042.  To do so, the Agency "conducted a comprehensive study using activity-based costing to determine the cost to EOIR for each type of application, appeal, and motion for which EOIR levies a fee."[1]    AR5024.    The Agency comprehensively explained its fee study in its Notice of Proposed Rulemaking (NPRM):

> First, EOIR gathered survey data and consulted with staff in the [Office of the Chief Immigration Judge (OCIJ)] and the BIA to determine the appropriate staff levels and time required to process and adjudicate each application, appeal, or motion and studied data from the Office of Personnel Management ("OPM") and the General Services Administration ("GSA") to determine the average salary rates for applicable staff levels, including both Federal employees and EOIR contractors.  Second, EOIR developed step-by-step process maps, with assigned times and staff levels, for how each application, appeal, or motion is processed in the OCIJ and the BIA.  These estimates were validated by staff in the OCIJ and the BIA.  Finally, EOIR allocated the salary costs from the GSA and OPM data to each step in the process, based on the time the step takes, the average salary of the responsible staff, and the percentage of total cases in which the step occurs.

*Id.*; *see also* AR5029-5030 (similar description of study).  The Agency "used this methodology to calculate an estimated cost for processing each form or motion for which EOIR levies a fee." AR5030; *see also* AR5024-5025 (similar).  As the Agency noted, the fee study purposefully "included only direct salary costs" and did not include "other costs, such as the overhead costs for EOIR space that is used for processing applications, fringe benefits received by EOIR staff and contractors, interpreter costs,

---

[1]    As the Federal Accounting Standards Advisory Board (FASAB) has noted, "activity-based costing has gained broad acceptance by manufacturing and service industries as an effective managerial tool," and "[f]ederal entities are encouraged to study its potential within their own operations."  *See* FASAB, Handbook of Federal Accounting Standards and Other Pronouncements, as Amended 493 (Dec. 15, 2023), available at https://files.fasab.gov/pdffiles/2023_FASAB_Handbook.pdf (last visited Mar. 17, 2024); AR5043 n.13 (citing prior edition of FASAB Handbook).

Federal Records Center costs, non-EOIR government agency costs, or the costs and time to process any non-fee-based application that is submitted in conjunction with a motion to reopen or reconsider." AR5204; AR5029-5030. The Agency did so both "to avoid potential inaccuracies in the calculation of overhead and non-salary benefits" and to "account[] for the public interest in having non-parties bear some of the cost burden for filing documents associated with proper application of the law as it pertains to the statutory right to appeal or apply for certain forms of relief." AR5024. The Agency published the results of its activity-based-costing analysis in the NPRM. *See* AR5025; AR5030-5035.

The fee study "demonstrate[d] that EOIR's processing costs consistently exceed the assessed fees for these EOIR applications for relief, appeals, and motions." AR5025; *see* AR7507-7569 (Fee Study). Accordingly, using the results of the fee study, the Agency prepared a revised fee schedule in which the fee for each application for relief, appeal, and motion corresponded to the direct salary costs associated with adjudication of that application, appeal, or motion. AR5026-5035.

On February 28, 2020, the Department published a NPRM, proposing to increase the fees for those EOIR applications, appeals, and motions that are subject to an EOIR-determined fee. AR5019. The Agency explained in the NPRM the basis for its proposal to raise fees:

> Despite the instruction in the Chief Financial Officers Act, 31 U.S.C. 902(a)(8), for agencies' Chief Financial Officers to review user fees biennially, it has been 35 years since EOIR last conducted a thorough review of the costs and appropriateness of the fees for the applications, appeals, and motions for which EOIR levies a fee. The fees have remained static, not accounting for inflation or any other intervening changes in EOIR's processing costs. EOIR is now proposing this rule to remedy the failure to update the fees in past years. The mismatch between fees and the underlying costs of review has become more of a burden on the immigration adjudication system as aliens overall have begun filing more of these fee-based forms and motions. In just FY 2018, the U.S. taxpayer subsidization for these filings was $44,379,247.

AR5023. The Agency proposed to revise the subject fees consistent with the results of the fee study. AR5026-5035. The Proposed Rule did not articulate any changes to fee waiver availability or procedures, nor did it add any new fees (although it did propose to update cross-references to DHS

regulations regarding fees).  AR5019.  The Agency proposed to increase the fees as follows:

| Form | Description of Filing | Prior Fee | Prior Fee adjusted for inflation | Proposed Fee |
|------|----------------------|-----------|----------------------------------|--------------|
| EOIR-26 | Notice of appeal from a Decision of an Immigration Officer | $110 | $252.63 | $975 |
| EOIR-29 | Notice of Appeal to the BIA from a Decision of a DHS Officer | $110 | $252.63 | $705 |
| EOIR-40 | Suspension of Deportation | $100 | $229.66 | $305 |
| EOIR-42A | Application for Cancellation of Removal for Certain Permanent Residents | $100 | $229.66 | $305 |
| EOIR-42B | Application for Cancellation of Removal and Adjustment of Status for Certain nonpermanent Residents | $100 | $229.66 | $360 |
| N/A | Motion to Reopen or Reconsider Before Immigration Judge | $110 | $252.63 | $145 |
| N/A | Motion to Reopen or Reconsider Before BIA | $110 | $252.63 | $895 |
| EOIR-45 | Notice of Appeal from a Decision of an Adjudicating Official in a Practitioner Disciplinary Case | $110 | $252.63 | $675 |

AR5026-27.

Following a 31-day period for the public to submit comments on the Proposed Rule, AR5019, the Agency reviewed and considered 601 individual public comments received, AR3.  On December 18, 2020, the Department issued the Final Rule adopting the fees at the level it had proposed in the NPRM, to take effect on January 19, 2021.  AR1.

The Agency's consideration of and response to the comments spans more than 30 pages of the Federal Register.  *See* AR3-35.  As relevant here, the Agency acknowledged that several groups had requested additional time to submit comments and explained why it did not expand that period.  *See* AR22.  The Final Rule explained the Department's view that the comment period "was sufficient to allow for a meaningful public input" in light of the "small, discrete number of applications" affected

by the proposed fee increase "that are well established and with which aliens and practitioners have been quite familiar with for decades." *Id.* In response to commenters' concerns that the comment period overlapped with the onset of work from home orders related to the COVID-19 pandemic, the Agency responded that electronic transmission of comments and telework flexibilities mitigated those concerns. *Id.*

The Agency also addressed comments arguing that respondents in immigration proceedings could not afford an increase in proposed fees. The Agency responded to those comments by disagreeing that those respondents "will be prevented from filing" motions or appeals "simply due to an inability to pay the higher fee" because "a fee waiver remains available for" those filings. AR15; *see also* AR9-10; AR14-15; AR19 (citing *Ayuda v. Att'y Gen.*, 661 F. Supp. 33, 35 (D.D.C. 1987)). EOIR never assumed that all respondents would be able to afford the higher fees. To the contrary, the Agency recognized that "it is possible—and perhaps even probable—that the increased fees may lead to more aliens to seek a fee waiver than would without" the Final Rule. AR9-10; *see also* AR10 (acknowledging that "a particular subset of those who can afford the current fees currently may not be able to after the increases"). But, the Agency reasoned, it was "speculative to assert that all who could afford the lower amount will necessarily not be able to pay the higher fee," especially in light of the "ultimate importance of the benefit they seek (*i.e.*, legal status or being able to remain in the United States indefinitely)." AR10.

The Agency also addressed comments regarding the fee waiver process. *See, e.g.*, AR9-11. The Agency noted that "Board members and immigration judges are experienced in adjudicating such requests." AR10. It also explained that the courts had affirmed the Agency's views that its fee waiver system mitigated the harsh deterrent effects that might otherwise result from a fee-based filing system. *See* AR11 (citing *Ayuda*, 848 F.2d at 1299 & n.4). The Agency recognized that "differences in adjudicatory outcomes are inherent in any system rooted in adjudicator discretion." AR10. But it also

noted that the information before the Agency suggested that relatively few fee waiver requests were denied. AR30. For those individual fee waiver denials that respondents believed were erroneous, the Agency explained that "the denial of a fee waiver would lead to the immigration judge denying an application or motion, which is then appealable to the Board," granting "recourse to review" the fee waiver denial as part of the appeal. AR30 n.45. As to commenters' concern that a fee waiver request may be denied after the time for a motion had elapsed, the Agency responded that the Final Rule "does not change . . . eligibility for fee waivers" and that, therefore, those concerns "exceed the bounds of this rulemaking." AR11. The Agency nevertheless indicated that it "may consider" issues related to fee waiver eligibility "in a future rulemaking." *Id.*

The Agency also responded to comments about its methodology. The Final Rule noted that the Department "explained its methodology" in the NPRM. AR6. In addition, for "full transparency," AR22, the Department published "the data collected in its spring 2018 study, accompanied by an updated dataset that was applied to that study when finalizing this rule, upon which it has based its calculations in the docket of this rulemaking" at the time of the final rule. AR6.

## II.    This Litigation

### A.    Complaint and Preliminary Injunction

Plaintiffs Catholic Legal Immigration Network, Inc., Community Legal Services in East Palo Alto, KIND, Inc., and Coalition for Humane Immigrant Rights of Los Angeles challenge the Final Rule, asserting claims under the APA, 5 U.S.C. §§ 701 *et seq.*, the RFA, 5 U.S.C. §§ 603-04, and the Due Process and Equal Protection Clauses of the Fifth Amendment to the United States Constitution. Compl. ¶¶ 362-423, ECF No. 1. Plaintiffs filed their Complaint on December 23, 2020, Compl., and moved for a stay of the Final Rule's effective dates under 5 U.S.C. § 705 or, in the alternative, a preliminary injunction on the basis of their APA and RFA claims, ECF No. 19.

The Court granted in part and denied in part Plaintiffs' motion. First, the Court concluded it had jurisdiction to hear Plaintiffs' claims. Mem. & Op. at 14-23, ECF No. 34 (PI Op.). The Court then concluded that Plaintiffs were "likely to succeed in showing that the Final Rule is arbitrary and capricious" under the APA "because Defendants failed to consider the Final Rule's impact on legal services providers." *Id.* at 24 (citation omitted). Even so, the Court declined to stay two fee increases set by the Agency—the fee increases for Form EOIR-45 for filing an appeal in a practitioner disciplinary case and for filing a motion to reopen or reconsider before an immigration judge—because Plaintiffs had not shown those fees would result in irreparable harm. *Id.* at 32-33. The Court also declined to enjoin the $50 fee DHS had set for defensive asylum applications. *Id.* at 33.[2] The Court also "did not grapple with" Plaintiffs' other arguments under the APA or the RFA. *Id.* at 24.

### B.    Post-Injunction Developments

The Agency complied with the Court's injunction and published guidance to clarify fee levels currently in force, exclusive of the fee increases enjoined by the Court's order. *See* EOIR, *Types of Appeals, Motions, and Required Fees*, https://www.justice.gov/eoir/types-appeals-motions-and-required-fees (listing fees). The two EOIR-imposed fees that the Court did not enjoin are currently in effect. *See id.*

The Agency has also updated its rules regarding denials of fee waivers by the BIA and immigration judges. Effective February 11, 2022, if a request for a fee waiver is denied by the immigration judge or the Board, "the application or motion will not be deemed properly filed, provided the" Board or immigration judge "grants 15 days to re-file the rejected document with the filing fee or new fee waiver request and tolls any applicable filing deadline during the 15-day cure

---

[2]    Plaintiffs no longer seek vacatur of the two EOIR-imposed fees the Court declined to enjoin or the $50 DHS-imposed asylum fee, Mot. 20 n.6, and in any event the DHS fee is no longer in force, *see* DHS, USCIS Fee Schedule & Changes to Certain Other Immigration Benefit Request Requirements, 89 Fed. Reg. 6194, 6388 (Jan. 31, 2024).

period."  8 C.F.R. §§ 1003.8(3) (BIA); 1003.24(d) (immigration judge); *see* DOJ, EOIR, Executive Office for Immigration Review Electronic Case Access and Filing, 86 Fed. Reg. 70,708, 70,713 (Dec. 13, 2021).  Under this practice, there is no longer any risk that a filing will be deemed improperly filed merely because the unexpected denial of a fee waiver.

## STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Cf. Cottage Health Sys. v. Sebelius*, 631 F. Supp. 2d 80, 90 (D.D.C. 2009) (explaining that summary judgment is appropriate in a typical APA case when the court determines "as a matter of law" that the agency's action "is supported by the administrative record and otherwise consistent with the APA standard of review").

## ARGUMENT

At the preliminary injunction phase, this Court determined that Plaintiffs were "likely to succeed in showing that the Final Rule is arbitrary and capricious because Defendants failed to consider the Final Rule's impact on legal service providers."  PI Op. 24 (citation omitted).  While the Government respectfully disagrees with the Court's conclusion and preserves its arguments, it acknowledges that the reasoning of the Court's preliminary analysis is sufficient to find for Plaintiffs on their APA claims.  The Government also acknowledges that the Court rejected its jurisdictional arguments that the INA precludes review and that Plaintiffs fall outside that statute's zone of interests. *See* PI Op. 14-23.  To avoid burdening the Court with duplicative arguments on issues it has already resolved, the Government notes its respectful disagreement with the Court's prior jurisdictional analysis and incorporates its prior briefing by reference.

If the Court adheres to its prior reasoning, it should exercise its discretion to decline to address Plaintiffs' remaining arguments and enter a declaratory judgment as outlined below.  *See* Mot. 1 n.1

(arguing that "a grant of summary judgment to Plaintiffs as to any one of" to claims on which it has sought summary judgment "will dispose of the entire case").  Defendants raise the following points both to preserve their arguments in defense of Plaintiffs' APA claims and to address claims the Court did not resolve in its prior opinion.

## I.      The Final Rule is consistent with the APA.

In an APA challenge, a court should uphold an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Under this deferential standard, the agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).  An agency's decision may be deemed arbitrary and capricious only in circumstances where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or its decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The court may not "substitute its judgment for that of the agency."  *Id.*  Rather, the agency's decision should be affirmed as long as it is supported by a rational basis.  *Id.*

### A.      The Agency examined all relevant factors.

Arbitrary and capricious review "includes a requirement that the agency adequately explain its result" and "respond to 'relevant' and 'significant' public comments," but "neither requirement is particularly demanding."  *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (1993) (citation omitted).  In issuing its Final Rule, the Agency considered and reasonably responded to each of the categories of comments on which Plaintiffs focus.  *See* Mot. 22.

1.    **The Agency adequately addressed the effect the Final Rule would have on legal service providers.**

The Agency adequately considered and addressed comments regarding the effect the Final Rule would have on pro-bono and low-cost legal service providers.  In its preliminary injunction opinion, this Court identified "four major categories of harm that would accrue to legal service providers" described by commenters.  PI Op. 25.  Those categories included concerns that the Final Rule would "reduce representation" in removal proceedings because:  (1) the "higher fees would force individuals to choose 'between paying the fee or obtaining counsel'"; (2) certain legal service providers would be unable to continue their practice of voluntarily paying fees for their indigent clients; (3) those legal service providers that chose to pay the fee would have less funds in their budgets for "other programmatic elements"; and (4) higher fees and more fee waivers would increase the amount of time an attorney spends on each case, which might "'cause them to turn away clients for lack of time.'"  *Id.* (quoting AR25).  As the Court recognized, the Agency acknowledged and described those comments at length.  *Id.*; *see* AR25 (describing that "[n]umerous commenters expressed concerns that the rule would negatively affect legal service providers").

The Agency also responded in substance to each of those concerns.  The first three of the concerns the Court identified boil down to the effects the higher fees would have on legal service providers' bottom lines if they chose to voluntarily pay the fee on behalf of their indigent clients.  As an initial matter, nothing about the Final Rule or the INA requires legal service providers to pay the filing fees of their clients.  "Only individuals, rather than entities, are responsible for paying the fees affected by this proposed rule."  AR36; *see* 8 C.F.R. § 1003.8(a)(3) (establishing that the fee may be waived "upon a showing that *the filing party* is unable to pay"); 8 C.F.R. § 1003.24(d) (same).  Legal service providers were thus concerned about the Final Rule's effect on their voluntary, informal practice of covering fees for indigent clients.  But those concerns are addressed by the Agency's explanation that fee waivers would continue to be "available to aliens who are unable to afford the

cost of an application or appeal." AR26. That statement appears in the same paragraph in which the Agency addressed commenters' concerns about the effects of the Final Rule on legal service providers. *See* AR26. And it is responsive to those concerns. If no fee need be paid because the respondent is eligible for a fee waiver, then there is also no harm to the legal service providers' budget or practice of paying the fees. The Agency further responded to commenters' concern by noting that "the Government is . . . not required to subsidize representation through artificially low fees" that would permit legal service providers to continue its practice of covering costs. *Id.*; *see* 8 U.S.C. § 1229a(b)(4)(A) ("[T]he alien shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing . . . .").

The Final Rule is also replete with explanations about why the Agency did not change course despite commenters' projections that fee waivers would be burdensome on the immigration court system and the private bar, addressing the fourth concern identified by the Court. The Agency "agree[d] that it is possible—and perhaps even probable—that the increased fees may lead more aliens to seek a fee waiver than would without this rule." AR9-10. But it also explained its view that "the increase alone will not substantially increase the burden on either the immigration courts or the BIA" because of the "extensive experience" immigration judges and Board members have with fee waiver requests. AR26; *see also* AR10.[3] Those predictive judgments about the impact of the Final Rule satisfied the Agency's obligation to address comments. *See Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009) (explaining that courts are "particularly deferential" to agencies "in matters implicating predictive judgments"); *Public Citizen*, 988 F.2d at 197 ("agency's response to public comments need only show what major issues of policy were ventilated and why the agency reacted to

---

[3]    Pursuant to the Paperwork Reduction Act, EOIR has estimated that an EOIR-26A Fee Waiver Request form has an "estimated average time to complete" of "one (1) hour." *See* EOIR, Form EOIR-26A (Rev. Aug. 2022), https://www.justice.gov/eoir/page/file/1237856/dl?inline.

them as it did." (citation omitted)).  While the Agency also wrote that it "decline[d] to respond to commenters' speculative concerns regarding . . . effects on legal service providers," the Final Rule addresses the basic substance of each comment.  AR26.  Plaintiffs may disagree with the Agency's conclusions, but that policy disagreement does not render the Final Rule unlawful.  *See State Farm*, 463 U.S. at 43 ("[A] court is not to substitute its judgment for that of the agency.").

As to commenters' other concerns that preparing fee waivers is less desirable and might lead to lower rates of pro bono participation, the Agency permissibly concluded that those comments were speculative.  To be sure, those comments were submitted by practitioners and legal services groups with deep experience representing clients in the immigration court system.  But the filing fees raised by the final rule had not been changed in over thirty years.  Those commenters had no recent—if any—experience with how fee increases might increase workloads in individual cases.  And the Agency explained that it was declining to make changes to the Proposed Rule on this basis because these concerns were speculative.  Consistent with that response, the APA does not require agencies to respond to comments that are "purely speculative."  *See Home Box Off., Inc. v. FCC*, 567 F.2d 9, 35 n.58 (D.C. Cir. 1977); *Pub. Citizen*, 988 F.2d at 197.  In any event, the Agency was entitled to prioritize compliance with a congressional directive to set fees at a level that ensures its services are self-sustaining over commenters' suppositions about the effect of the Final Rule.  *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 223-24 (2016) ("[A]n agency may justify its policy choice by explaining why that policy is more consistent with statutory language than other policies." (citation omitted)).

### 2.    The Agency adequately addressed commenters' concerns about applicants' inability to pay and the availability of fee waivers.

As explained above, the Court need not consider Plaintiffs' additional APA arguments if it adheres to its preliminary ruling that the Agency was required to, and did not sufficiently, consider the impact of the Final Rule on legal services providers.  To the extent the Court reaches these claims, Plaintiffs' additional arguments that the Final Rule violates the APA are misplaced.

Contrary to Plaintiffs' arguments, Mot. 24-26, EOIR responded in detail to comments that the increased fees might leave some aliens unable to pay. Indeed, the Agency accepted the premise of these comments that "a particular subset of those who can afford the current fees . . . may not be able to" afford the fees "after the increases." AR10. The Agency reasoned, however, that even if some respondents could not afford the higher fee, some likely would. *See id.* ("[I]t is speculative to assert that all who could afford the lower amount will necessarily not be able to pay the higher fee."). As the Agency put it, "a respondent who could not afford a lesser amount will presumably not be able to afford the new, higher amount," but not all who could afford the lower amount would be unable to afford the higher. AR10.

The Agency also considered and responded to comments that the fee increases would erect a barrier to meritorious applications. As the Agency explained that "the Department does not believe that these fees will have a material impact on the volume of filings received annually." AR43. This belief was supported by an assessment that "demand for filing these forms and motions" is expected to be "relatively inelastic," given the high value applicants evidently place on these immigration benefits and the similarity of the fees with the fees imposed by USCIS in immigration proceedings even prior to the increases that agency proposed in its now-enjoined 2020 Fee Rule. *Id.* For example, the Agency noted that "the current fee for an appeal or motion charged by USCIS" at that time was "$675, which is well above EOIR's current $110 fee and will remain significantly higher than EOIR's new fee for a motion to reopen filed with an immigration court." AR9 n.13.

For those that could not afford the increased fees, the Agency pointed to the existence of fee waivers as a safety valve to ensure that all necessary applications and appeal avenues remained available to indigent aliens. *See, e.g.*, AR10; AR14-15; AR15-16. Plaintiffs argue that the Agency "dismissed" a host of concerns without sufficient consideration. *See* Mot. 25-26 (suggesting that the increased fees would "diminish the integrity of EOIR [p]roceedings," "undermine due process," "reduce access to

counsel," lead to "abusive lending practices," and have other unspecified "cumulative negative" effects). In truth, the Agency responded to each of these concerns by noting its disagreement and the availability of fee waivers to mitigate any harmful effects for those who could not pay the increased fee. *See* AR13 (responding to concerns that increased appeal fees would deprive aliens of due process); AR26 (responding to concerns that increased fees will have "widespread effects on families, communities, crime rates, and predatory lending tactics" because the Agency "continues to offer the same options for relief, including fee waivers for aliens who cannot pay a fee"). Plaintiffs may disagree with the Agency's assessment, but it is incorrect to say that the Agency did not address those comments.

The Agency also considered and responded to comments "oppos[ing] fee waivers as a viable solution because of the discretionary nature of fee waiver determinations." AR9. On the whole, the Agency reasonably "disagree[d] with commenters that the discretionary nature of fee waivers is problematic."[4] AR11. As the Agency explained, "[t]he appropriate regulations, 8 CFR 1003.8(a)(3), 1003.24(d), 1103.7(c), clearly delineate the requirements for fee waivers," *id.*, which "allows for individuals to have fees waived upon a *discretionary determination of inability to pay.*" AR 33 (emphasis added). Those regulations provide that an immigration judge or the BIA "has the discretion to waive a fee for an appeal, motion to reconsider, or motion to reopen upon a showing that the filing party is unable to pay the fee." 8 C.F.R. §§ 1003.8(a)(3), 1003.24(d). Respondents request fee waivers by submitting Form EOIR 26-A. 8 C.F.R. §§ 1003.8(a)(3), 1003.24(d). The only evidentiary requirement

---

[4] To the extent Plaintiffs disagree with and seek to challenge the reasonableness of the Agency's regulatory standards governing fee waivers, any such challenge is time-barred. Where, as here, no other statute provides a limitations period, a plaintiff has six years to bring a civil action against the United States. 28 U.S.C. § 2401. The current regulations governing fee waiver consideration by immigration judges or the BIA have been in place since 2004, except as amended to incorporate the 15-day cure period described above. *See* 8 C.F.R. 1003.8(a)(3); 8 C.F.R. 1003.24(d); EOIR; Definitions; Fees; Powers and Authority of DHS Officers and Employees in Removal Proceedings, 69 Fed. Reg. 44,903 (July 28, 2004).

is a "properly executed affidavit" or "declaration to be signed under penalty of perjury" "substantiating the filing party's inability to pay the fee."  8 C.F.R. §§ 1003.8(a)(3), 1003.24(d).

Moreover, while some commenters asserted that "the regulations do not require [immigration judges and the BIA] to grant fee waivers even to an individual who has provided proof of inability to pay," AR9 (citation omitted), that assertion is contrary to the applicable regulations, 8 C.F.R. §§ 1003.8(a)(3), 1003.24(d), which are unchanged by the Rule.  Indeed, for the commenters' assertions—and Plaintiffs' suggestions—to be valid, EOIR adjudicators must ignore the plain text of 8 C.F.R. §§ 1003.8(a)(3) and 1003.24(d).  Though certain commenters provided examples of fee waiver requests they believed to be erroneously denied, the Agency responded to that concern as well by explaining that "differences in adjudicatory outcomes are inherent in any system rooted in adjudicator discretion" and that fee waiver denials were subject to appeal.  *See* AR10, AR30 n.45.  That response is reasonable, for even the best adjudicators acting in good faith sometimes get it wrong.  Crediting Plaintiffs' argument that EOIR adjudicators routinely deny meritorious fee waiver requests, however, would be directly contrary to the "presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975); *see also United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.").

Moreover, the Agency's interpretation of its fee waiver regulations runs counter to Plaintiffs' suggestion that immigration judges are permitted to deny a fee waiver request from a truly indigent client.  As the Agency explained: "The Department believes this process is rational and accessible and allows for individuals to have fees waived upon a *discretionary determination of inability to pay*."  AR33 (emphasis added).  In that regard, contrary to commenters' assertions, this discretion is considered to be limited to whether inability to pay has actually been proven.  Further, as the Agency explained in

the Final Rule, it "expects its adjudicators to issue fee waiver determinations in a fair manner and consistent with the regulations," AR11, *see also* AR15 (same), noting that "there is no evidence that Board members or immigration judges would be unable or unwilling to adjudicate fee waiver requests consistent with applicable law and their respective independent judgment and discretion." AR10.

Plaintiffs' remaining concern about fee waivers—that the request for a fee waiver may not be adjudicated before the filing deadline—has been mooted by subsequent events. In 2021, EOIR amended its fee waiver regulations to provide a fifteen-day tolling period after a denial of a fee waiver request to permit the filer either to pay the fee or make a new fee waiver request. *See* 86 Fed. Reg. 70,708, 70,713; *see* 8 C.F.R. § 1003.8(a)(3) (BIA); *id.* § 1003.24(d) (immigration courts). As a result, concerns that a filer may have his or her application or appeal denied because of a denied fee waiver application after the deadline has no continuing force. *See Pub. Emps. for Env't Resp. v. Nat'l Park Serv.*, 605 F. Supp. 3d 28, 38 (D.D.C. 2022) ("[T]he Court may look beyond the administrative record to determine whether a case has become moot."), *appeal dismissed*, No. 22-5205, 2022 WL 4086993 (D.C. Cir. Sept. 2, 2022).

### B.    The Final Rule provided a reasoned basis for raising fees.

To satisfy arbitrary and capricious review, an agency need only articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962). The agency's decision will be upheld even if it is "of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp. Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

The Agency's explanation for its decision to update its fees easily satisfies that low standard. As the Agency explained, "the Department had fallen out of compliance with" regulatory and statutory guidance "regarding the review of EOIR's fees on a biennial basis." AR1. The Agency explained that it proposed to raise fees "to ensure compliance with the" IOAA, the INA, and OMB Circular No. A-

25 Revised.  AR2.  Those authorities direct administrative agencies to periodically update the fees they charge.  Through the IOAA, Congress expressed its sense that "each service . . . provided by an agency . . . to a person . . . is to be self-sustaining to the extent possible." *See* 31 U.S.C. § 9701(a).  OMB Circular No. A-25 implements that congressional policy by directing agencies to review and revise user charges on a biennial basis "to reflect costs incurred by it in providing those services."  AR1; *see also* 31 U.S.C. § 902(a)(8) (providing that an agency's Chief Financial Officer should "review, on a biennial basis, the fees . . . and other charges imposed by the agency for services and things of value it provides"); AR5002.

Plaintiffs acknowledge that the Agency explained that it was updating its fees "'to more accurately reflect the costs for EOIR's adjudications of these matters.'"  Mot. 32 (citing AR5).  They claim, however, that the Agency did "not explain *why* it was necessary to do so."  *Id.*  But the face of the Final Rule explains that the Agency was doing so pursuant to the legislative and regulatory guidance directing it to periodically update its fee structure.  AR1-2.[5]

That EOIR is a congressionally appropriated agency is entirely beside the point.  *See* Mot. 32.  EOIR did not attempt to justify the increase in fees to cover a budgetary shortfall.  *See* AR5 ("The Department never intended for this rulemaking to update fees in order to recover the entirety of processing costs or to fully fund EOIR's adjudication costs."); *id.* (noting that the agency retained authority to set fees "even if the overall budget is supported and funded via congressional appropriations").  Rather, it explained that the increase in fees was driven by the policies of the user

---

[5]     Plaintiffs suggest that the "AR contains virtually no evidence of internal deliberation and no privilege log indicating that such deliberations occurred but were withheld."  Mot. 17.  But it is black-letter law in this Circuit that "predecisional and deliberative documents are not part of the administrative record to begin with, so they do not need to be logged as withheld from the administrative record."  *Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019) (internal quotation marks omitted).  The absence of such materials from the administrative record, therefore, says nothing about the extent of deliberation by the Agency.

charge statute. *Id.* Were Plaintiffs' argument that EOIR cannot reasonably charge fees through the INA and the IOAA because it is an appropriated agency correct, then it would have no authority to charge fees at all, let alone increase those fees. But binding D.C. Circuit authority has held otherwise. *Ayuda*, 848 F.2d at 1301.

Plaintiffs also argue that the Agency did not explain how it planned to use the fees. Mot. 33. Not so. The Final Rule states that "the fees will be deposited into the [Immigration Examinations Fee Account] pursuant to section 286(m) of the [Immigration and Naturalization] Act (8 U.S.C. 1356(m))." AR29. The INA explains that adjudication fees are to be deposited as "offsetting receipts" in the Account and be used to "reimburse any appropriation the amount paid out of such appropriation for expenses in providing immigration adjudication and naturalization services . . . ." 8 U.S.C. § 1356(m), (n). EOIR cited these INA provisions in explaining the purpose of the fees. AR29. Plaintiffs' contention is simply wrong.

### C.    The Final Rule did not reflect a change in fee policy.

The level at which the Agency set each fee was consistent with its past practices in determining the appropriate fee amount. The APA's requirement of reasoned explanation generally requires an agency changing policy to acknowledge the change and provide a reason for it. *See, e.g.*, *New LifeCare Hosp. of N.C., LLC, v. Becerra*, 7 F.4th 1215, 1222 (D.C. Cir. 2021). The APA, however, does not subject an agency's policy change to more searching review. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514-15 (2009).

The Agency's prior rule setting fees, promulgated in 1986, expressly stated that the purpose of imposing fees was to "place the financial burden of providing special services and benefits, which do not accrue to the public at large, on the recipients." 51 Fed. Reg. at 39,993. That earlier rule went on to state that fees were adjusted to "more nearly reflect the current cost of providing the benefits and services, taking into account public policy and other pertinent factors." *Id.* On judicial review of

23

those fees, the district court noted that most of the "fees are no greater than the rough actual cost of providing the services" and two were lower than the cost to the Agency. *Ayuda*, 661 F. Supp. at 36.

The 2020 Final Rule applied the same analysis. It noted "the proposed rule"—which had set the fees at the level ultimately adopted—"roughly matched the new fee amounts with the processing costs" that resulted from the fee study but excluded other costs to the Agency, such as overhead, non-salary benefits, and the cost of processing related filings. AR2. "Put more simply, the proposed rule intentionally put forth fee amounts that were less than the cost to the agency in order to effectively serve the public interest." *Id.* The Agency also quoted the 1986 Rule to explain that its policy "has not changed since the last time it assessed fees." AR22. As in the 1986 Rule, the 2020 Rule did not seek to "recoup the full costs of adjudications in assessing fees," but rather the Agency "intentionally did not include a variety of costs in its fee analysis to more fully ensure the fees remained at a level reflected by the public interest." AR22-23.

Plaintiffs contend that the Agency's decision to update its fees reflects a "departure from longstanding agency policy," Mot. 35, but do not identify precisely what policy was supposed to have changed, *see New LifeCare*, 7 F.4th at 1222 (noting that plaintiffs "identify no change in . . . policy"). At most, Plaintiffs note that "[f]ees for EOIR filings remained unchanged for the past 34 years." Mot. 34. But that contention refutes itself, given the underlying reason for the rule: to comply with its obligation to periodically review its fees and to make adjustments based on a new analysis of the cost to the Agency of processing certain filings. AR1-2, 5. The notion that mere inaction can somehow establish an affirmative policy, particularly against this backdrop, is meritless.

If Plaintiffs instead mean to suggest that the Agency departed from its policy of charging less than the full cost of processing filings, the Final Rule makes clear there was no such departure. *E.g.*, AR2 ("[T]he proposed rule intentionally put forth fee amounts that were less than the cost to the agency in order to effectively serve the public interest."); AR5 (""The proposed rule did not, and the

final rule does not, purport to cover all costs . . . .  The Department never intended for this rulemaking to update fees in order to recover the entirety of processing costs or to fully fund EOIR's adjudication costs.").  Plaintiffs do not dispute that the fee levels set in the Final Rule do not reflect the full cost to the Agency.  *See* Mot. 38 (acknowledging that EOIR excluded certain costs from its fee study); Compl. ¶ 278 (alleging that the "fee increases set forth in the Final Rule" reflect "*almost* all costs" (emphasis added)).  That Plaintiffs would have offered a steeper discount or balanced the public interest differently does not establish that the Agency departed from any policy of charging less than full cost.

### D.    The Agency has authority to set fees under the INA and the IOAA.

In setting the filing fees at issue here, the Agency relied on its authority to impose user charges under the INA, 8 U.S.C. § 1356(m), and the IOAA, 31 U.S.C. § 9701.  *See* AR1.  Plaintiffs argue that neither "statute authorizes EOIR to increase these fees," Mot. at 35, but this argument lacks merit.

The IOAA permits the Agency to set filing fees.  That statute provides that "each service or thing of value provided by an agency . . . to a person . . . is to be self-sustaining to the extent possible." 31 U.S.C. § 9701(a).  It authorizes agencies to "prescribe regulations establishing the charge for a service or thing of value provided by the agency" and requires only that the charges be "(1) fair; and (2) based on—(A) the costs to the Government; (B) the value of the service or thing to the recipient; (C) public policy or interest served; and (D) other relevant facts," *Id.* § 9701(b).

Binding D.C. Circuit authority establishes that the IOAA grants the Department statutory authority to set and collect the filing fees in dispute here.  *Ayuda*, 848 F.2d at 1299, 1301; *see* Mot. 37 n.12.  Instead of disputing the Agency's authority to set fees, Plaintiffs argue that the Agency improperly focused solely on the cost to the government and "fail[ed] to consider public interest concerns."  Mot. 38.  But Plaintiffs' argument ignores that the Agency explained how the updated fees do comport with *each* aspect of this requirement.  *See* AR23 (explaining that "[t]he Department believes that the newly established fees are fair" because they are "based upon data gathered from an

activity-based cost analysis[,]" and because "EOIR's calculation of fees has factored in both 'the public interest in ensuring that the immigration courts are accessible to aliens seeking relief and the public interest in ensuring that U.S. taxpayers do not bear a disproportionate burden in funding the immigration system'" (citing AR5026)).

Plaintiffs do not contest that the Agency's updated fee levels did not exceed its costs in providing the service. Indeed, they do not dispute that the Agency excluded overhead and non-salary benefits costs, which, as they concede, "presumably are greater than zero." Mot. 38. That is all the IOAA requires. *See L'Association des Américains Accidentels v. U.S. Dep't of State*, 656 F. Supp. 3d 165, 178 (D.D.C. 2023) (upholding agency fee where the agency "asserts, and the administrative record does not refute, that it has endeavored to charge no more than its cost for providing" the service), *appeal filed*, No. 23-5034 (D.C. Cir. Feb. 16, 2023).

The final rule is also authorized by the INA, which states that "fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services." 8 U.S.C. § 1356(m). The plain language of the statute, therefore, provides authority to "set" fees for "adjudication and naturalization services." *Id.* The INA does not exclude "the immigration court system" from the general category of "adjudication and naturalization services" for which the government may set fees. Plaintiffs' reliance on legislative and statutory history, Mot. 35-37, cannot overcome the plain language of the statute, *Qi-Zhuo v. Meissner*, 70 F.3d 136, 140 (D.C. Cir. 1995). Even if Plaintiffs were correct that the INA does not authorize the Agency to set fees, the IOAA would nevertheless authorize the Final Rule. *See Ayuda*, 848 F.2d at 1301.

## II.    The Agency provided a sufficient opportunity for meaningful public comment.

### A.    The Agency's comment period was not unreasonable.

The Agency here provided a thirty-one day period for interested persons to comment on its proposed fee increases. The APA requires an agency engaged in informal rulemaking to provide a

"[g]eneral notice of proposed rule making" and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(b), (c). The APA "does not specify a minimum time for submission of comments in an informal rulemaking." *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984). Some "opportunity to participate is all that the APA requires." *Phillips Petroleum Co. v. EPA*, 803 F.2d 545, 559 (10th Cir. 1986). The APA leaves the specific period up to agency discretion. *Id.*; *see Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 524 (1978).

The thirty-one day comment period used by the Agency here was reasonable. The D.C. Circuit has described thirty days as "generally the shortest time period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment." *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019). It has also found that a thirty-day comment period reasonable even for regulations that were "technical[ly] complex[]." *Conn. Light & Power Co. v. Nuclear Regul. Comm'n*, 673 F.2d 525, 534 (D.C. Cir. 1982) (finding the agency's "choice of a [30-day] comment period" not "unreasonable," notwithstanding "the technical complexity of the regulations," noting that "[n]either statute nor regulation mandates that the agency do more"); *see also Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 779 (5th Cir. 2023) ("[T]he APA generally requires only a minimum thirty-day comment period."). Plaintiffs' argument that a thirty-day comment period is *per se* insufficient, Mot. 39, is manifestly incorrect.

The circumstances surrounding this rulemaking did not require a longer comment period. The Final Rule was a relatively straightforward change in the Agency's fee schedule to account for the passage of time and the increased cost of the services it provides. This was not a complex rule imposing new regulatory standards in a highly technical field. As the Agency explained, the rulemaking addressed fees for "a small, discrete number of applications that are well established and which aliens and practitioners have been quite familiar with for decades." AR22. Further, the Agency received

over 600 public comments, "including 157 detailed comments from interested organizations." *Id.* The Agency, therefore, reasonably concluded that "the 30-day comment period was sufficient to allow for meaningful public input." *Id.*

None of the authorities Plaintiffs cite establish that the comment period used by the Agency here was unreasonable. One case they cite *affirms* an agency's decision to offer a 30-day comment period. *See* Mot. 39 (citing *Conn. Light & Power Co.*, 673 F.2d at 534 ("The NRC allowed but a thirty-day comment period. . . . We cannot say that the NRC's choice of a comment period was unreasonable.")) The other cases they cite that disapproved a comment period are not from this Circuit and either involved significantly shorter comment periods or significantly more complex rulemakings. *Mot.* 40-41; *see N.C. Growers' Ass'n v. United Farm Workers*, 702 F.3d 755, 770 (4th Cir. 2012) (ten-day comment period); *Centro Legal de la Raza v. EOIR*, 524 F. Supp. 3d 919, 928, 937-47, 955 (N.D. Cal. 2021) (describing the "sweeping changes to the procedures and regulations governing immigration courts in this country" including thirteen substantive and procedural changes challenged by the plaintiffs and concluding that "30 days for a rule *of this magnitude* is . . . short" (emphasis added)); *Pangea Legal Servs. v. DHS*, 501 F. Supp. 3d 792, 801-05 (N.D. Cal. 2020) (reviewing rulemaking that adopted changes to asylum applications). Here, by contrast, the Agency merely updated the fee level for certain filings. It did not impose any additional fees or make any change to the substantive and procedural rules governing immigration court proceedings. Under those circumstances, the Agency's decision to set a thirty-one day comment period was not unreasonable.

The onset of the COVID-19 pandemic did not require the Agency to extend the comment period. Mot. 39-40. Plaintiffs suggest that the Agency did not respond to requests by certain groups to extend the comment period, Mot. 39, but that is incorrect. The face of the Final Rule describes those organizations' "request[] that the comment period be delayed due to the disruptions caused by the COVID-19 pandemic" and responded to that request by explaining it "believe[d] that the COVID-

19 pandemic has no effect on the sufficiency of the 30-day comment period." AR21-22. The Agency explained that telework and electronic submissions made it possible for organizations to comment during the period provided. AR22. That analysis was not unreasonable.

Even if the Agency's determination not to set a longer comment period was unreasonable, such error is harmless. *See* 5 U.S.C. § 706 (instructing reviewing courts that "due account shall be taken of the rule of prejudicial error"). The "burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). Despite submitting several declarations at the preliminary injunction stage and through two rounds of briefing, Plaintiffs have never identified any unique concerns that would have been raised by those who were unable to comment and that were not raised by other commenters. One of the Plaintiffs—Community Legal Services in East Palo Alto—did not submit a comment during the period. But each of the points that Plaintiff asserted during the preliminary injunction stage it would have made during the rulemaking was made by another commenter and responded to by the Agency in the Final Rule. *Compare* Decl. of Cristina Dos Santos ("Santos Decl.") ¶¶ 12-13, 36, ECF No. 19-9 (concerns about a new asylum fee) *with* AR16-20; Santos Decl. ¶¶ 14, 37-38, 45-46 (concerns about fees being unaffordable) *with* AR11-16; Santos Decl. ¶¶ 15, 36, 39-44, 47-48 (concerns about fee waiver availability and burdens on legal service provides) *with* AR25. And because the Agency thus already heard the substance of these "missing" comments, Plaintiffs cannot demonstrate that the "missing" comments would have changed the outcome.

**B.    The Agency provided sufficient information to enable meaningful comment.**

**1.    The Agency adequately disclosed its support for raising fees.**

Plaintiffs also argue that the Agency "commit[ted] . . . 'serious procedural error,'" by not making available during the rulemaking "any data from the EOIR Fee Study on which" the Agency relied in promulgating the rule. Mot. 28. But the APA's procedural requirements do not set the high

bar Plaintiffs desire.  The Department published sufficient information to provide an opportunity for meaningful comment, which requires only that an agency "set forth in its notice of proposed rulemaking '. . . the terms or substance . . . [and] a description of the subjects and issues involved' in the proposed rule," *Air Transp. Ass'n of Am. v. Civil Aeronautics Bd.*, 732 F.2d 219, 224 (D.C. Cir. 1984) (quoting 5 U.S.C. § 553(b)(3)), and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c).

As to the methodology, the Agency explained in the NPRM that it "conducted a comprehensive study using activity-based costing to determine the cost to EOIR for each type of application, appeal, and motion for which EOIR levies a fee." AR5024.  The Agency further provided extensive details concerning the three phases of the study.  First, the Agency collected survey data and consulted with OCIJ and BIA staff, to "determine the appropriate staff levels and time required to process and adjudicate each application, appeal, or motion," and reviewed OPM and GSA data to "determine the average salary rates for applicable staff levels." *Id.*  Second, the Agency developed and validated "step-by-step process maps, with assigned times and staff levels, for how each application, appeal, or motion is processed in the OCIJ and the BIA." *Id.*  Third, the Agency "allocated the salary costs from the GSA and OPM data to each step in the process, based on the time the step takes, the average salary of the responsible staff, and the percentage of total cases in which the step occurs." *Id.*; *see also* AR5029 (similar).  The Agency "used this methodology to calculate an estimated cost for processing each form or motion for which EOIR levies a fee." AR5030; *see also* AR5024 (similar).  As noted, the Agency purposefully "included only direct salary costs" in the fee study. AR5024; AR5029. The Agency did so both "to avoid potential inaccuracies in the calculation of overhead and non-salary benefits" and to "account[] for the public interest in having non-parties bear some of the cost burden for filing documents associated with proper application of the law as it pertains to the statutory right to appeal or apply for certain forms of relief." AR5024.

The Agency also provided the substance of and necessary information concerning the results of the study.  For each fee, the Agency provided the total average cost (to the nearest dollar) for processing and adjudicating each application, motion, or appeal generated by the fee study calculations.  AR5025.  It also broke out that cost in two ways: (1) by "staff level," i.e., what category of staff (for example, as to "Motion to Reopen (OCIJ)," Immigration Judge, Judicial Law Clerk, or Legal Assistant) performs the activity to process and adjudicate the application, motion, or appeal; and (2) by "process category," i.e., the nature of the activity (for example, as to "Motion to Reopen/Reconsider (BIA)," Initial Processing, Case Screening/Preparation, Decision and Adjudication, or Final Processing) involved in the processing and adjudication of the application, motion, or appeal.  AR5030-5035.  For each fee, the information in the NPRM shows how the cost breakdowns clearly correlate with the updated fees.  *Id.*

In that regard, although the Agency did not publish the study itself during the rulemaking, the NPRM clearly demonstrates that the Agency detailed both the methodology used for the study and the data it generated, while showing how the methodology and data resulted in the updated fee schedule.  The Agency additionally identified the sources of the data inputs it relied on in the study— "survey data," "consult[ations] with OCIJ and BIA experts," and "data from OPM and the GSA" regarding salaries.  AR5029.  Accordingly, Plaintiffs' suggestion that the Agency "failed to provide . . . *any* data from the EOIR Fee Study on which they . . . relied in formulating the Proposed Fee Rule" in advance of the comment period, Mot. 28 (emphasis added), cannot be seriously countenanced.

Nor is it correct for Plaintiffs to assert that the Agency violated the APA by not disclosing each bit of underlying granular data underpinning its fee study.  *See* Mot. at 29.  An APA "notice is sufficient 'if it affords interested parties a reasonable opportunity to participate in the rulemaking process,' and if the parties have not been 'deprived of the opportunity to present relevant information by lack of notice that the issue was there.'"  *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236

(D.C. Cir. 2008) (quoting *WJG Tel. Co. v. FCC*, 675 F.2d 386, 389 (D.C. Cir. 1982)); *see* 5 U.S.C. §

553(b)(3) (requiring notice of the "subjects and issues involved"). Plaintiffs' argument that the APA

requires the Agency to disclose not only the study, but the granular data underlying the study,

contravenes the principle that courts may not impose upon agencies conducting rulemakings

additional procedures beyond what Congress provided. *Vt. Yankee*, 435 U.S. at 524; *see Am Radio Relay*

*League*, 524 F.3d at 246 (Kavanaugh, J., concurring).[6]

In support of their assertion, Plaintiffs cite *Shands Jacksonville Medical Center v. Burwell*, 139 F.

Supp. 3d 240, 263 (D.D.C. 2015). But the Agency's non-publication of the granular survey data and

staff consultations—which granular information informed the methodological data and study results

the Agency *did* disclose—is not comparable to an agency's "fail[ure] to disclose critical aspects of [its]

methodology until after the comment period" in *Shands*. *Id.* at 262. There, not until the final rule did

the agency disclose that it had excluded an entire category of data consisting of "hundreds of

thousands of cases." *Id.* at 262-63. As the court held, "[w]here an agency disregards a significant

portion of the information on which it claims to have based its analysis, the APA requires *some*

disclosure and explanation." *Id.* at 263. That contrasts sharply with this Rule, in which the Agency

disclosed and explained its data and analysis, *i.e.*, provided "*some* disclosure and explanation," *id.*—just

not every single detail. Similar reasons distinguish *Engine Manufacturers Ass'n v. EPA*, 20 F.3d 1177

(D.C. Cir. 1994). *See* Mot. 28. There, the agency relied on a fee study that the court described as

"complete gibberish to anyone on less than intimate terms with the inner workings of the agency" and

---

[6]     Plaintiffs suggest that the fee study may have relied on incomplete data "because it seems the
study at least did not consider the costs associated with processing an appeal filed by the government."
Mot. 29. But as the Agency explained, the costs identified in the fee study were obtained by totaling
"salary costs for the different EOIR staff involved in the processing and adjudication for each form
and motion, based on the average time each type of official spends in that processing and
adjudication." AR7. The processing costs, therefore, did not depend on whether the respondent or
the government made the filing, "because it would take the same time, considered as an average, for
the different BIA staff members to process each individual appeal." *Id.*

that without further explanation there was "no way to know the agency's methodology." *Engine Mfrs.*

*Ass'n*, 20 F.3d at 1181-82. The Agency here *did* provide an explanation of its methodology and the

results of its study in narrative form.

Rather, this case is more like *Lee Memorial Health System v. Burwell*, in which the agency provided

substantial information about the methodology and data it used, but simply did not provide "the

specific set of hospitals [the agency] used to do its simulations." 206 F. Supp. 3d 307, 332 (D.D.C.

2016), *opinion corrected on denial of reconsideration*, No. 13-CV-643 (RMC), 2016 WL 10749143 (D.D.C.

Nov. 10, 2016), and *aff'd sub nom. Billings Clinic v. Azar*, 901 F.3d 301 (D.C. Cir. 2018). As the court

there held, "that alone does not render its explanations or data inadequate," because "Plaintiffs had

the 'critical factual material' necessary to review the agency's method." *Id.* (quoting *Owner–Operator*

*Indep. Drivers Ass'n Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 199 (D.C. Cir. 2007)).

Moreover, the Agency "publish[ed] the data collected in its spring 2018 study" when the Final

Rule was published. AR6; *see also* AR7507-69 (Executive Office for Immigration Review, *EOIR 1125-*

*AA90 fee study*, *available at* https://www.regulations.gov/document/EOIR-2020-0013-0002 (posted

Dec. 18, 2020)). Plaintiffs curiously point out that the description of the process by which the fee

study was created "is essentially the same as what was published in the NPRM." Mot. 18. But all that

proves is that the Agency disclosed the assumptions and methodologies underpinning its study, and

that its "full disclosure of the methodology (and its results) was sufficient to [meet] its critical-material

disclosure obligations." *Univ. of Colo. Health at Mem'l Hosp. v. Becerra*, 2022 WL 2191690, at *15 (D.D.C.

June 17, 2022), *appeal filed*, No. 22-5218 (D.C. Cir. Aug. 17, 2022).

Although Plaintiffs have now had access to the fee study for more than three years, they have

never challenged the Agency's basic conclusion that the updated fees are "roughly matched" with the

non-overhead costs to the Agency of processing filings and appeals to which the fees attach. AR2; *see*

AR6 (noting that the "'fees are no greater than *the rough actual cost* of providing the services.'" (quoting

*Ayuda*, 661 F. Supp. at 36 ).[7]  Because Plaintiffs cannot "demonstrat[e] that [they] had something useful to say about this critical data," *Chamber of Com. of the U.S. v. SEC*, 443 F.3d 890, 905 (D.C. Cir. 2006), their argument that any data the Agency did not disclose prejudiced their ability to comment must be rejected.  *See Fla. Power & Light Co. v. United States*, 846 F.2d 765, 772 (D.C. Cir. 1988) (APA procedural requirements have not been violated when plaintiff asserts "[n]o substantive challenges which differ in kind from the original comments . . . raised"); *Air Transp. Ass'n of Am.*, 732 F.2d at 224 n.11 ("Petitioner . . . does not explain what it would have said had it been given earlier access to the staff studies.  Under such circumstances, any error generally would be found harmless.").

### 2.    The Agency's reliance on fee waivers was reasonable.

Plaintiffs argue that the Agency had insufficient data to establish that fee waivers would mitigate additional cost burdens.  Mot. at 30.  The comments Plaintiffs rely on in support of this argument, however, express the concern that additional waivers would "result in less revenue for EOIR."  *Id.* (quoting AR8134); *see also* AR9564 (email from Plaintiff CLINIC asking if fee waivers would impose "new cost burdens"); AR7586 (comment noting that fee waivers could impact "revenue projections").  But EOIR never attempted to justify the fee increases on a revenue-generating basis. *See* AR5.  The Agency noted that fee waivers existed to ameliorate any impact that the increase in fees would have *on filers*, not on the Agency's bottom line.  *E.g.*, AR14 (noting "the availability of requests for fee waivers" to address concerns "regarding the economic hardship faced by aliens filing Form

---

[7]    Plaintiffs suggest that portions of the fee study were excluded from the AR, Mot. 18-19, 29, but that contravenes the "'presumption of administrative regularity'" that applies to properly certified Administrative Records, *Oceana*, 920 F.3d at 865 (quoting *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993)).  In any event, Plaintiffs fail to establish that the page references on AR 7570 indicate that a portion of the fee study was excluded from the record.  Those page references follow asterisks that refer to a table column titled "FY 2021 Receipts (projected)."  AR7570.  That suggests the data was pulled not from the fee study—which studied the cost to the Agency to process the various forms based on salary and time—but from a separate projection of receipts.  Similarly, Plaintiffs assert that the AR contains what they call "filler."  Mot. 17.  Even if that were correct, "Plaintiffs have failed to show how they were prejudiced by these documents."  *Bar MK Ranches*, 994 F.2d at 740.

EOIR-42B"); AR11 ("The Department also emphasizes that an EOIR fee waiver remains available for those individuals who aver that they cannot pay the fee"); AR26 (noting that the "Department continues to offer the same options for relief, including fee waivers" to address "allegations of the widespread effects on families, communities, crime rates, and predatory lending tactics"). Thus, any argument that the Agency failed to provide data to support the idea that the increased fees would increase revenue is beside the point.

For similar reasons, the Agency was also not required to collect and disclose data about the financial resources about respondents in removal proceedings. Mot. 31-32. The Agency acknowledged that it did not comprehensively track the financial status of filers—either those that paid the fee or those that sought fee waivers. AR7, 10. But such data was not essential to the Agency's position because it did not depend on any particular percentage of filers paying the fee. Plaintiffs' cases reversing agencies for relying on speculation, Mot. 31-32, are immaterial. EOIR based its decision to raise fees on the costs to the Agency, as instructed by the IOAA and OMB guidance. In that context, it is enough for the Agency to note that some applicants would likely be able to pay the increased fees, and provide fee waivers for those who could not.

### 3. Later proposed rules—which are not in effect—did not deprive Plaintiffs an opportunity for meaningful comment.

That the Agency proposed *other* rules after the comment period for this Final Rule closed does not mean that the public was deprived of an opportunity for meaningful comment *in this* rulemaking. Initially, Plaintiffs admit that "litigation and further rulemaking caused none of these [other] rules to go into effect." Mot. 43. That being so, any possible harm from not being able to comment on the interplay between the proposed rules is necessarily harmless. If those other rules will not be enforced in combination with the Final Rule at issue here, then it cannot have been prejudicial for Plaintiffs not to have submitted comments on the interplay between those various rules.

More fundamentally, Plaintiffs do not explain why their opportunity to comment on each proposed rule during the relevant comment period was insufficient. Plaintiffs argue, for example, that the Appellate Procedures Rule would have eliminated certain mechanisms that would have increased the need for motions for which a fee would apply. Mot. 42. But surely Plaintiffs could have made that point during the comment period for that other rulemaking as an argument to maintain those mechanisms.[8] Indeed, it appears that the alleged problems Plaintiffs identify were caused not by the Final Rule at issue here—which, again, merely raised preexisting fees—but by those other rules and their effect on "the substantive and procedural requirements for" pursuing claims before the immigration courts and appeals before the BIA. *Id.*[9]

## III.    Plaintiffs' Regulatory Flexibility Act claim fails as a matter of law.

The Regulatory Flexibility Act permits an agency to certify "that no regulatory flexibility analysis is necessary when it determines that the rule will not have a significant economic impact on a substantial number of small entities that are subject to the requirements of the rule." *Mid-Tex. Elec. Co-op. v. FERC*, 773 F.2d 327, 342 (D.C. Cir. 1985). The Agency correctly concluded it could make that certification here. *See* AR36-37.

The RFA is concerned with "small entities subject to the proposed regulation," not downstream small entities that are indirectly affected. *Mid-Tex. Elec. Co-op.*, 773 F.2d at 342; *see Aeronautical Repair Station Ass'n, v. FAA*, 494 F.3d 161, 176 (D.C. Cir. 2007) (explaining that an agency "was not required to consider the indirect economic effects on" third parties that are not "regulated

---

[8]    To the extent Plaintiffs claim those other rulemakings did not provide a sufficient opportunity to meaningfully comment, that claim could have been—and was—raised on judicial review of those other rules.

[9]    Plaintiffs also cite to BIA opinions and 8 C.F.R. § 1003.8(a)(3) (2020) to note that appeals were considered late-filed if a fee waiver was denied after the time to appeal expired. Mot. 42 n.14. As explained above, this concern is moot after a change to that regulation that requires a 15-day tolling period after denial of a fee waiver.

by the challenged rule"); *Silver v. IRS*, 531 F. Supp. 3d 346, 365 (D.D.C. 2021) ("[A]n entity is not 'subject to' a regulation unless the regulation imposes responsibilities directly on the entity." (internal quotation marks omitted)), *modified*, 569 F. Supp. 3d 5 (D.D.C. 2021).

The Final Rule does not impose any responsibilities directly on legal service providers like Plaintiffs. As the Agency explained, the rule does not "regulate 'small entities' as that term is defined in 5 U.S.C. 601(6)" because "[o]nly individuals, rather than entities, are responsible for paying the fees affected by this proposed rule." AR36. That much is apparent from the Agency's regulations related to fee waivers, which focus on the applicant's ability to pay any relevant filing fees. 8 C.F.R. § 1003.8(a)(3) (establishing that the fee may be waived "upon a showing that *the filing party* is unable to pay" (emphasis added)); 8 C.F.R. § 1003.24(d) (same).

Plaintiffs have argued they are nevertheless regulated by the proposed fees because they "sometimes" "in some circumstances" pay the relevant fees "on behalf of their indigent clients." Pls.' Reply in Supp. of Prelim. Inj. 21, 23, ECF No. 33 (PI Reply); *see also* Mot. 44. But as even they have conceded, an alien's legal representative is "not obligated" to pay those fees by the fee rule or any other source of law. PI Reply 21. The fee applies regardless of whether the alien has representation. While the regulation might indirectly affect organizations' willingness to pay fees on behalf of their clients, nothing about the rule imposes any obligation or directly regulates those organizations themselves. Because legal services providers were not "the targets of" the Final Rule, *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 869 (D.C. Cir. 2001), it was sufficient under the RFA for the Agency to certify that no regulatory flexibility analysis was required, *see Council for Urological Interests v. Burwell*, 790 F.3d 212, 226-27 (D.C. Cir. 2015).

## IV. Any relief ordered should be limited.

At the preliminary injunction stage, this Court concluded only that Plaintiffs were likely to succeed on their APA claims "because Defendants failed to consider the Final Rule's impact on legal

service providers." PI Op. 24 (citation omitted). While the Government respectfully disagrees with that decision for the reasons explained previously and above, if the Court adheres to that ruling, it should reject Plaintiffs' request that the Court vacate the Final Rule and issue a permanent injunction. Instead, the Court should remand the Final Rule to the Agency.

### A. Vacatur of the Final Rule is not warranted.

Circuit precedent permits the Court to vacate the Final Rule in appropriate circumstances, but courts retain discretion "to leave agency action in place while the decision is remanded for further explanation."[10] *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021) (citation omitted). "The decision whether to vacate depends on 'the seriousness of the order's deficiencies . . . and the disruptive consequences of an interim change that may itself be changed.'" *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (quoting *Int'l Union United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 966-67 (D.C. Cir. 1990)).

The procedural defect identified in the Court's preliminary injunction order is not so serious that vacatur is required. Where "there is a strong possibility that the Agency can properly explain its decision" on remand, vacatur is not required. *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 652 (D.C. Cir. 2016). That strong possibility exists here. If the Court concludes that the Agency's explanation was insufficient, then the Agency could readily supply additional explanation or otherwise reconsider its approach to fees on remand. To the extent the Court credits Plaintiffs' argument that the Final Rule is "unsupported by the AR" or "not a product of reasoned decisionmaking," Mot. 44, "further explanation, with sufficient support from studies, may adequately" address the deficiencies identified

---

[10]     The Government notes for preservation purposes its position that the APA does not authorize courts to universally vacate unlawful agency rules. *See United States v. Texas*, 599 U.S. 670, 693-99 (2023) (Gorsuch, J., concurring).

by the Court, *A.P. Bell Fish Co. v. Raimondo*, 94 F.4th 60, 65 (D.C. Cir. 2024).

As to the disruption that vacatur would cause, that factor is "barely relevant" here because "though the disruptive consequences of vacatur might not be great, the probability that" the Agency "will be able to justify retaining the" increased fees "is sufficiently high that vacatur of the Rule is not appropriate." *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1049 (D.C. Cir. 2002). Though it is true that the fees on which Plaintiffs seek vacatur did not go into effect, the Final Rule also raised other fees that the Court declined to enjoin and Plaintiffs no longer challenge. Mot. 20 n.7. The less-disruptive course would be for the Court to decline to grant any immediately effective relief and instead remand to the Agency. That route would avoid any potential confusion that vacatur applied to the fees that are no longer at issue here. The Agency has shown that it can clearly communicate the fee status in response to Court orders. *See supra* Statement of Facts at Part II.B. The Court should allow it to do so again here, without the strong medicine of vacatur or injunction.

**B.    Plaintiffs are not entitled to permanent injunctive relief.**

A permanent "injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). A plaintiff seeking that remedy must establish: "(1) that it has suffered an irreparable injury; (2) that remedies available at law . . . are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* at 156-57 (quoting *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)). "'If a less drastic remedy'" is sufficient to redress the plaintiffs' "'injury, no recourse to the additional and extraordinary relief of an injunction [is] warranted.'" *Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau*, 785 F.3d 684, 694 (D.C. Cir. 2015) (quoting *Monsanto*, 561 U.S. at 165-66) (alteration in original).

Plaintiffs have forfeited any claim for a permanent injunction by failing argue for that relief in

their opening brief.  Aside from three conclusory requests that the Court "permanently enjoin Defendants' final rule," Mot. 1; *see also id.* at 44, 45, Plaintiffs offer nothing to support their request for extraordinary relief.  Plaintiffs nowhere cite the relevant standard for granting a permanent injunction against an agency, nor do they explain why that relief is justified.  For that reason alone, Plaintiffs have forfeited any argument to injunctive relief.  *Alabama v. U.S. Army Corps of Eng'rs*, C.A. No. 15-696 (EGS), 2023 WL 7410054, at *39 (D.D.C. Nov. 9, 2023) (declining to reach argument because "Plaintiffs did not raise it in their opening summary judgment brief"); *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013) (noting that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed" forfeit).

Injunctive relief is unwarranted here in any event.  Even assuming that Plaintiffs' claims are meritorious, Plaintiffs fail to explain why declaratory relief is insufficient to grant them complete relief.  To the extent the Court concludes that the Agency inadequately addressed commenters' concerns about the effects of the Final Rule on legal services providers, further explanation from the Agency after declaratory relief would remedy any procedural defect.

If, instead, the Court were to vacate the Final Rule, there would be even less need for injunctive relief.  "When an agency action is unlawful, an injunction is required only when plaintiffs seek some action beyond that which was vacated."  *Am. Hosp. Ass'n v. Becerra*, C.A. No. 18-2084 (RC), 2022 WL 4534617, at *4 (D.D.C. Sept. 28, 2022) (citation omitted).  But vacatur would undo the increased fees the Agency set by the Final Rule.  Therefore, there would be "nothing to be enjoined" because undoing the Final Rule setting those increases would give Plaintiffs complete relief.  *Id.* at *5.  If in the future the Agency decided to pursue a fee increase, Plaintiffs "may file a new suit challenging such action and seeking appropriate preliminary relief," assuming they contend the new increase is unlawful.  *Monsanto*, 561 U.S. at 162.  But in either event, "a permanent injunction is not now needed to guard against any present or imminent risk of likely irreparable harm."  *Id.*

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be denied and Defendants' Cross-Motion should be granted.

Dated: March 26, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director
Federal Programs Branch

*/s/ Jacob S. Siler*
JACOB S. SILER
DC Bar No. 1003383
Trial Attorney

U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Tel: (202) 353-4556
Email: jacob.s.siler@usdoj.gov

*Attorneys for Defendants*