# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CATHOLIC LEGAL IMMIGRATION
NETWORK, INC., et al.,

            *Plaintiffs,*

    v.

EXECUTIVE OFFICE FOR IMMIGRATION
REVIEW, et al.,

            *Defendants*.

**Case No. 1:20-cv-03812-APM**

**MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 4

   I.  The Final Rule Is Arbitrary, Capricious, and Unlawful. ........................................... 4

      A.   The Agency Failed to Examine Several Relevant Factors............................................ 4

      B.   Defendants Failed to Disclose the Methodology and Data
           Underlying Their Analysis.......................................................................... 12

      C.   The Final Rule Does Not Provide a Reasoned Basis for Increasing Fees. ................ 17

      D.   The Final Rule Provides No Justification for Departing from Longstanding
           Agency Policy and Practice Regarding Fees. ............................................... 20

      E.   The Final Rule Is Unlawful Because Neither the Immigration and Nationality Act Nor
           the Independent Offices Appropriations Act Authorizes the Final Rule. .................. 22

   II. Defendants Violated the APA's Notice and Comment Requirements. ............................... 25

      A.   EOIR's Failure to Extend the Comment Period in Light of the Outbreak of the
           COVID-19 Pandemic Harmed Would-Be Commenters.............................................. 25

      B.   Defendants' Failure to Disclose Forthcoming Rulemaking Resulted
           in Prejudicial Error................................................................................... 28

   III.   The Final Rule Was Promulgated in Violation of the Regulatory Flexibility Act. .......... 29

   IV.   The Final Rule Should Be Vacated as to the Challenged Fees.......................................... 32

   CONCLUSION...................................................................................................... 35

# TABLE OF AUTHORITIES

Page(s)

*A.P. Bell Fish Co. v. Raimondo*,
   94 F.4th 60 (D.C. Cir. 2024) ............................................................................................... 33

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
   429 F.3d 1136 (D.C. Cir. 2005) ........................................................................................... 33

*AFL-CIO v. Chao*,
   496 F. Supp. 2d 76 (D.D.C. 2007) ........................................................................................ 28

*Air Transp. Ass'n of Am. v. FAA*,
   169 F.3d 1 (D.C. Cir. 1999) ................................................................................................. 23

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) ........................................................................................ 20, 33

*Am. Fed'n of Lab. v. Chertoff*,
   552 F. Supp. 2d 999 (N.D. Cal. 2007) ................................................................................. 31

*Am. Radio Relay League, Inc. v. FCC*,
   524 F.3d 227 (D.C. Cir. 2008) ............................................................................................. 28

*Am. Wild Horse Pres. Campaign v. Perdue*,
   873 F.3d 914 (D.C. Cir. 2017) ............................................................................................. 21

*Ayuda, Inc. v. Attorney General*,
   848 F.2d 1297 (D.C. Cir. 1988) ........................................................................................... 22

*Billings Clinic v. Azar*,
   901 F.3d 301 (D.C. Cir. 2018) ............................................................................................. 14

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
   419 U.S. 281 (1974) .............................................................................................................. 17

*Butte Cnty. v. Hogen*,
   613 F.3d 190 (D.C. Cir. 2010) ............................................................................................. 15

*Casa de Md., Inc. v. Wolf*,
   486 F. Supp. 3d 928 (D. Md. 2020) ...................................................................................... 29

*Cath. Legal Immigr. Network, Inc. v. EOIR*,
   No. CV 21-00094 (RJL), 2021 WL 3609986 (D.D.C. Apr. 4, 2021) .................................. 28

*Cboe Futures Exch., LLC v. SEC*,
   77 F.4th 971 (D.C. Cir. 2023) .............................................................................................. 34

*Cent. & S. Motor Freight Tariff Ass'n, Inc. v. United States*,
    777 F.2d 722 (D.C. Cir. 1985) ...................................................................................23

*Centro Legal de la Raza v. EOIR*,
    524 F. Supp. 3d 919 (N.D. Cal. 2021) .........................................25, 27, 28, 29, 31

*Chamber of Com. v. U.S. Dep't of Lab.*,
    174 F.3d 206 (D.C. Cir. 1999) ...................................................................................31

*Cigar Ass'n of Am. v. FDA*, No. 16-CV-01460 (APM),
    2023 WL 5094869 (D.D.C. Aug. 9, 2023) ................................................................34

*Cobell v. Norton*,
    240 F.3d 1081 (D.C. Cir. 2001) .................................................................................35

*Connecticut Light & Power Co. v. Nuclear Regulatory Commission*,
    673 F.2d 525 (D.C. Cir. 1982) ...................................................................................27

*DHS v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020) ...............................................................................................22

*District of Columbia v. U.S. Dep't of Agric.*,
    444 F. Supp. 3d 1 (D.D.C. 2020) ...............................................................................15

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) .....................................................................................................7

*Engine Mfrs. Ass'n v. EPA*,
    20 F.3d 1177 (D.C. Cir. 1994) .............................................................................12, 13

*Fox Television Stations, Inc. v. FCC*,
    280 F.3d 1027 (D.C. Cir.),
    *opinion modified on reh'g*, 293 F.3d 537 (D.C. Cir. 2002) ......................................34

*Genuine Parts Co. v. EPA*,
    890 F.3d 304 (D.C. Cir. 2018) .....................................................................................7

*Getty v. Fed. Sav. & Loan Ins. Corp.*,
    805 F.2d 1050 (D.C. Cir. 1986) ...................................................................................5

*Gresham v. Azar*,
    950 F.3d 93 (D.C. Cir. 2020),
    *vacated as moot*, *Arkansas v. Gresham*, 142 S. Ct. 1665 (2022) ...........................5, 8

*Immigrant Legal Res. Ctr. v. Wolf*,
    491 F. Supp. 3d 520 (N.D. Cal. 2020) ..............................................................9, 21, 22

*Johnson v. Panetta*,
  953 F. Supp. 2d 244 (D.D.C. 2013) ..................................................................35

*L'Association des Américains Accidentels v. U.S. Department of State*,
  656 F. Supp. 3d 178 (D.D.C. 2023) ..................................................................22

*Lee Memorial Health System v. Burwell*,
  206 F. Supp. 3d 307 (D.D.C. 2016), *opinion corrected on denial of*
  *reconsideration*, No. 13-CV-643 (RMC), 2016 WL 10749143
  (D.D.C. Nov. 10, 2016)......................................................................................14

*McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*,
  375 F.3d 1182 (D.C. Cir. 2004) ..........................................................................6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)..............................................................................4, 11, 15, 16

*N.C. Fisheries Ass'n, Inc. v. Daley*,
  16 F. Supp. 2d 647 (E.D. Va. 1997) .............................................................29, 34

*Nat. Res. Def. Council, Inc. v. EPA*,
  859 F.2d 156 (D.C. Cir. 1988).........................................................................15

*Nat'l Ass'n for Home Care v. Shalala*,
  135 F. Supp. 2d 161 (D.D.C. 2001) ..................................................................29

*Nat'l Cable Television Ass'n v. FCC*,
  554 F.2d 1094 (D.C. Cir. 1976).......................................................................24

*Nat'l Wildlife Fed'n v. Lohr*,
  2024 WL 727695 (D.D.C. Feb. 22, 2024) ........................................................20

*National Lifeline Ass'n v. FCC*,
  921 F.3d 1102 (D.C. Cir. 2019).....................................................................3, 27

*New LifeCare Hospitals of North Carolina, LLC v. Becerra*,
  7 F.4th 1215 (D.C. Cir. 2021)...........................................................................21

*Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*,
  496 F. Supp. 3d 31 (D.D.C. 2020) ..................................................................9, 10

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*,
  494 F.3d 188 (D.C. Cir. 2007)..........................................................2, 12, 22, 23

*Pangea Legal Services v. DHS*,
  501 F. Supp. 3d 792 (N.D. Cal. 2020) ..............................................................26

iv

*Pangea Legal Servs. v. DHS,*
   512 F. Supp. 3d 966 (N.D. Cal. 2021) ...................................................................28

*Portland Cement Ass'n v. EPA,*
   665 F.3d 177 (D.C. Cir. 2011) ............................................................................29

*Pub. Emps. for Env't Resp. v. Nat'l Park Serv.,*
   605 F. Supp. 3d 28 (D.D.C. 2022) ......................................................................11

*Ragsdale v. Wolverine World Wide, Inc.,*
   535 U.S. 81 (2002) ..............................................................................................24

*Rural Cellular Ass'n v. FCC,*
   588 F.3d 1095 (D.C. Cir. 2009) ............................................................................8

*Shands Jacksonville Med. Ctr. v. Burwell,*
   139 F. Supp. 3d 240 (D.D.C. 2015) ....................................................................14

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
   985 F.3d 1032 (D.C. Cir. 2021) ..........................................................................32

*Steele v. United States,*
   657 F. Supp. 3d 23 (D.D.C. 2023) ......................................................................24

*Stewart v. Azar,*
   313 F. Supp. 3d 237 (D.D.C. 2018) ......................................................................6

*Sugar Cane Growers Co-op. of Fla. v. Veneman,*
   289 F.3d 89 (D.C. Cir. 2002) ..............................................................................25

*Time Warner Ent. Co. v. FCC,*
   240 F.3d 1126 (D.C. Cir. 2001) ..........................................................................14

*Transp. Div. of Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers v. Fed.*
   *R.R. Admin.,*
   40 F.4th 646 (D.C. Cir. 2022) .............................................................................24

*U.S. Cellular Corp. v. FCC,*
   254 F.3d 78 (D.C. Cir. 2001) ..............................................................................29

*U.S. Sugar Corp. v. EPA,*
   830 F.3d 579 (D.C. Cir. 2016) ............................................................................33

*United States v. Midwest Oil Co.,*
   236 U.S. 459 (1915) ............................................................................................20

**Statutes**

5 U.S.C. § 553(c) ......................................................................................................28

5 U.S.C. § 601 ..................................................................................................29

5 U.S.C. § 603 ..................................................................................................29

5 U.S.C. § 604 ..................................................................................................29

8 U.S.C. § 1356 ................................................................................................17

31 U.S.C. § 9701 ............................................................................17, 20, 22, 23

Pub. L. No. 116-93, 133 Stat. 2317 (Dec. 20, 2019) ....................................18

**Other Authorities**

EOIR FY 2024 Congressional Budget Submission ........................................19

EOIR FY 2025 Congressional Budget Submission ........................................19

FY 2024 Executive Office for Immigration Review President's Budget Exhibits.......................19

OMB, Off. of Info. & Regul. Affs., *Unified Agenda of Regulatory and Deregulatory Actions* (Spring 2022), RIN 1125-AB19, https://perma.cc/98XR-KZNN ..................................................................................................32

**Regulations**

8 C.F.R. § 1003.8 ........................................................................................10, 13

8 C.F.R. § 1003.24 ..........................................................................................10

## INTRODUCTION

Plaintiffs—four not-for-profit organizations that provide legal services for immigrants—challenge the Executive Office for Immigration Review's ("EOIR") Final Rule dramatically raising fees that noncitizens must pay to file applications, motions, and appeals before immigration courts and the Board of Immigration Appeals ("BIA"). Defendants' failure both to provide a reasonable comment period and to account for the copious evidence that was submitted of the Rule's adverse effects makes EOIR's Final Rule arbitrary and capricious and violates both the Administrative Procedure Act ("APA") and the Regulatory Flexibility Act ("RFA").

Defendants would have the Court ignore most of the deficiencies that infected the rulemaking and the Final Rule, and instead remand the Rule so that they could purportedly address (and ostensibly fix) one of the most readily apparent infirmities. But even if Defendants could do the work now that they failed to do in 2020, and address the impact that the Rule would have on legal service providers, it is unlikely that Defendants could do so in a way that is neither arbitrary nor capricious. For all of the reasons in Plaintiffs' Opening Brief and below, the Rule simply cannot be justified given its deleterious effect on legal service providers. More importantly, even if at the agency level, EOIR could somehow find a way on remand to explain away the harm to legal service providers—a task it has been unable to do in litigation, and for which it has provided no plausible promise of success—that detour would not and could not fix all of the other problems with the rulemaking and the Rule. Having the Court address the issues piecemeal, and postponing most analysis for another day, when all of the issues are ripe for adjudication now, would be a considerable waste of resources. And no law compels or even supports such judicial inefficiency.

When Defendants do reach Plaintiffs' arguments about those other rulemaking and Rule deficiencies, they seek to denigrate them as mere flyspecking, *see, e.g.*, Opp. at 15, 19–21, but

their brief is replete with concessions showing that these deficiencies do rise to the level of arbitrary, capricious, and unlawful conduct warranting vacatur.

*First*, Defendants concede that, if the Court "adheres to the merits analysis in its preliminary injunction order," then "the only remaining question" is the proper remedy.  Opp. at 2.  Defendants have given no reason to deviate from the Court's preliminary injunction order.  As detailed below, the Administrative Record only confirms what the Court recognized in its preliminary injunction order:  EOIR "ignored the impact that the Final Rule would have on legal service providers and their capacity to provide representation."  PI Order at 26.

*Second*, Defendants concede that EOIR did not publish the Fee Study, which served as the basis for the revised fee schedule, during the rulemaking process, and that even now it has never produced the data underlying the Study.  Opp. at 31–34.  Defendants' position—that disclosing what it purportedly did with the data obviates the need to disclose the data itself—runs contrary to long-established D.C. Circuit caselaw that an agency must "'identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules.'" *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 199 (D.C. Cir. 2007).  Moreover, Defendants' concessions about the data—that they do not track noncitizens' financial information or the rates of fee waiver denials, Opp. at 35—themselves strike a blow to EOIR's analysis and conclusions.  It was unreasonable for the Agency to proceed without this data, given that the Agency is unable to predict whether higher fees would lead to a greater numbers of fee waiver requests and whether fee waivers would, in fact, ameliorate the harm from these fee hikes.  AR10.

*Third*, Defendants concede that EOIR denied the request to extend the 31-day comment period due to the onset of the COVID-19 pandemic because EOIR believed the events of March

2020 had "'no effect'" on the sufficiency of the comment period.  Opp. at 28–29 (quoting AR21–22).  But this ignores the reality of March 2020, and the ability of potential commenters to conduct their analyses during that time period.  Defendants seek shelter under the D.C. Circuit's instruction that a 30-day comment period is "generally the shortest time period sufficient for interested persons to meaningfully review a proposed rule," but ignore the caveat that goes with that generalization:   that period is inadequate where there are circumstances limiting interested persons' ability "to comment meaningfully."  *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019).  And in March 2020, there undoubtedly were.

Defendants further fail to provide a reasoned basis for raising fees given EOIR's status as an appropriated agency and the total lack of transparency as to how collected fees, which are paid into a DHS account, are transferred back to EOIR and used.  Indeed, the Administrative Record suggests that EOIR does not receive back or use all of the fees it collects under the current fee schedule.  In addition, Defendants' reliance on the Immigration and Nationality Act ("INA") as support for raising fees is misplaced, and they do not make the required showing under the Independent Offices Appropriations Act ("IOAA") to justify the fee increases.

Taken individually or together, these deficiencies reveal an arbitrary, capricious, haphazard, and truncated rulemaking process that runs afoul of both the APA and the RFA.  This Court should grant summary judgment for Plaintiffs, deny summary judgment for Defendants, and vacate the Final Rule as to the six fees in dispute.

## ARGUMENT

**I.     The Final Rule Is Arbitrary, Capricious, and Unlawful.**

**A.     The Agency Failed to Examine Several Relevant Factors.**

Under the APA, an agency must "examine the relevant data and articulate a satisfactory explanation for its action."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  As the Court noted in its PI Order, "[i]t is black letter law that an agency acts arbitrarily and capriciously when it 'entirely fails to consider an important aspect of the problem.'"  PI Order at 26 (quoting *State Farm*, 463 U.S. at 43).  Here, EOIR violated the APA by failing to consider fully at least three dimensions of the Final Rule.

**1.     EOIR Did Not Adequately Address the Impact of the Final Rule on Legal Service Providers, as This Court Previously Recognized.**

In granting Plaintiffs' request for a preliminarily injunction, this Court previously concluded that EOIR "ignored the impact that the Final Rule would have on legal service providers and their capacity to provide representation."  PI Order at 26.  Defendants acknowledge that the Court's conclusion that EOIR "failed to consider 'the Final Rule's impact on legal service providers,'" PI Order at 24, would also support granting Plaintiffs summary judgment on their APA claims.  Opp. at 13.  Defendants nonetheless contend that EOIR sufficiently considered these impacts.  The Court should reject these arguments and adhere to its conclusion that EOIR's cursory dismissal of legal service providers' concerns violated the APA.

Defendants acknowledge that commenters' concerns about the Final Rule's fee increases arose from "deep experience representing clients in the immigration court system."  Opp. at 17. Nevertheless, Defendants contend that EOIR met its obligations under the APA by simply summarizing these concerns in the Final Rule and conclusorily rejecting them.  *See* Opp. at 15, 17 (claiming that EOIR "acknowledged and described th[e]se comments at length" and "addresse[d]

the basic substance of each comment"). But rote recitation of comments and conclusory rejection of their substance is not reasoned analysis. *See Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020) ("Nodding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decision[-]making."), *vacated as moot*, *Arkansas v. Gresham*, 142 S. Ct. 1665 (Mem.) (2022); *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986) ("Stating that a factor was considered, however, is not a substitute for considering it.").

*First*, EOIR failed to consider adequately comments discussing the impact of the Rule on access to counsel. Defendants disparagingly characterize many of the comments as "boil[ing] down" to concern for "the effects the higher fees would have on legal service providers' bottom lines." Opp. at 15. This response only highlights EOIR's failure to meaningfully consider the comments. As legal service providers explained, the fee increases would force many noncitizens to choose between paying for representation (even at low rates) and paying filing fees. Legal service providers' practice of covering indigent clients' filing fees—far from just a "voluntary, informal" practice, as Defendants characterize it (Opp. at 15)—is fundamental to their model of representing low-income noncitizens, given the uncertainties and risks of the fee waiver process. As the Court correctly noted in its preliminary injunction order, Congress expressed in the INA its intent that indigent noncitizens have *access* to counsel in removal proceedings. PI Order at 26–27. When commenters provided extensive evidence (from first-hand knowledge) that the Final Rule would burden both pro bono attorneys and non-profit legal service providers and reduce noncitizens' access to counsel, EOIR was required to consider modifications that would address service reduction resulting from big increases to fees, not dismiss that evidence as "speculative" or "outside the . . . scope" of the rulemaking. AR26. Its failure to do so was arbitrary and

capricious.  *See Stewart v. Azar*, 313 F. Supp. 3d 237, 268–70 (D.D.C. 2018) (finding agency "must . . . evaluate the effect of" its actions on statutorily protected interests).

*Second*, EOIR ignored comments about the impact of the Rule on the fee waiver process. Rather than contend with the evidence that some noncitizens will be forced to choose between engaging counsel and paying the new filing fees, *see supra*, Defendants repeatedly insist that these concerns are overblown because legal service providers are not *required* to pay the filing fees for their clients and can instead rely on fee waivers to fill any gaps created by the fee hikes.  Opp. at 15–16.  Put simply, Defendants maintain that the existence of fee waivers inoculates the Final Rule against any negative impacts.  But when commenters pointed out that higher fees would logically lead to more fee waivers being filed, EOIR downplayed these concerns without pointing to any evidence or data to the contrary.  While EOIR acknowledged that it was "possible," and "perhaps even probable," that higher fees would lead to more noncitizens seeking fee waivers, the Agency waved away the concern that a large influx of fee waiver applications would impose a significant burden on legal service providers, the immigration courts, and the BIA, summarily concluding that adjudicators' experience with adjudicating waivers meant any increased volume would be addressed in due course.  AR9–10, 26.

Notably, EOIR admitted that this conclusion was not based on any data, because the Agency does not track or "universally evaluate[]" fee waiver data, nor does it collect data about noncitizens' financial condition.  AR30 & n.45, AR10.  Instead, EOIR reached its conclusion in the *absence* of data supporting its conclusion and despite commenters' informed warnings about the Rule's likely deleterious effects—quintessentially arbitrary and capricious rulemaking. *See McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1186–87 (D.C. Cir. 2004) ("[W]e do not defer to the agency's conclusory or unsupported suppositions."); *see also*

*Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) ("Conclusory explanations for matters involving a central factual dispute where there is considerable evidence in conflict do not suffice to meet the deferential standards of our review." (citation omitted)).

Defendants downplay the significance of the concerns raised by arguing that commenters "had no recent—if any—experience with how fee increases might increase workloads in individual cases." Opp. at 17. That legal service providers had no experience dealing with the massive, *future* fee increases does not render their concerns "speculative." As the Court previously held, "the legal services providers offered ample basis for the truth of their positions: their extensive knowledge and experience with the immigration system," grounded in "firsthand knowledge of how their practices operate and the role of fees in their practices," such that their comments are, by definition, deeply rooted in "deep institutional knowledge and experience, not mere conjecture, as EOIR claimed." PI Order at 27. And while Defendants contend that "'[a]n agency may justify its policy choice by explaining why that policy is more consistent with statutory language than other policies,'" Opp. at 17 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 223–24 (2016)), it must still provide a minimum level of analysis such that its "path may reasonably be discerned," *Encino Motorcars*, 579 U.S. at 221 (citation omitted); *id.* at 224 (An agency's "conclusory statements do not suffice to explain its decision."). EOIR failed to undertake that minimum level of analysis of the impact on legal service providers to support its conclusions, in

violation of the APA.  Far from offering a well-informed "predictive judgment[]" deserving deference, Opp. at 16, EOIR turned a blind eye to the anticipated harms of the Final Rule.[1]

### 2.    The Agency Failed to Consider Evidence Concerning Respondents' Inability to Pay and the Inadequacy of Fee Waivers.

Beyond the impact on legal service providers, EOIR failed to meaningfully consider the additional harmful impacts that commenters identified, including noncitizens' reduced ability to pay fees and the inadequacy of fee waivers to solve the financial concerns raised, given the flaws in the fee waiver process.  As EOIR did in the Final Rule, Defendants' Opposition merely recites and then dismisses these concerns, failing to give them the consideration the APA requires. *See Gresham*, 950 F.3d at 103.

*First*, Defendants erroneously assert that EOIR sufficiently considered the comments that higher fees would reduce noncitizens' ability to pay.  But EOIR's "response" to these comments— that "not all who could afford the lower amount would be unable to afford the higher" fees (Opp. at 18 (citing AR10))—was nonsensical.  It does not matter that *some* noncitizens who can pay the current lower fees may also be able to pay the massively increased fees.  Opp. at 18; AR10. Commenters' point was not that the fee increases will price each and every noncitizen out of filing motions, applications, and appeals, but that *all* of those who cannot pay the fees at their current rate, *plus* a much larger number of further individuals (including those who could afford the current lower rates), will now be priced out of relief.  Commenters grounded their analysis in deep and longstanding familiarity with the socioeconomic status of the client populations they serve, while

---

[1] *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095 (D.C. Cir. 2009), is inapposite—there, the court evaluated an interim regulation and found that because "certainty [was] impossible," the agency's conclusion that a "crisis would ensue" in the absence of "immediate regulatory action" was entitled to deference.  *Id.* at 1105.  No such exigent circumstances motivate an immediate decision here, however, where EOIR ignored the evidence in front of it while providing none of its own.

EOIR conceded that it had no evidence of its own about the financial condition of noncitizens in removal proceedings.  AR10.

*Second*, EOIR's response to commenters' concerns that the increased fees would lead some noncitizens to forego meritorious applications, motions, and appeals was equally speculative. EOIR contended that no such decrease would arise because "demand" for filing motions, applications, and appeals in immigration court is expected "to be relatively inelastic."  Opp. at 18; AR43.  Even assuming the concept of price elasticity is relevant in this context—an assumption the Agency did not support—EOIR cited *no* evidence to support its belief that the volume of filings would remain static after implementation of the new rules.  *See* AR43.  In determining that it needed to raise fees to better recover the costs to the Agency of processing filings, one would expect to find some evidence in the record that EOIR investigated whether the volume of filings might decrease as the result of the fee increases.  But no such evidence is presented.  Instead, EOIR relied solely on its unsubstantiated beliefs about the value of the filings to noncitizens facing removal and an unsupported comparison between immigration court filings and applications for affirmative USCIS benefits.  Opp. at 18; AR43.

Courts in this District and elsewhere have rejected similar unsupported arguments about inelasticity in the context of USCIS applications, where the agency had an "admitted dearth of knowledge" but insisted fee increases would not result in decreased applications because of the agency's "belie[f]" about the value of these filings to individuals.  *Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 74 (D.D.C. 2020); *see also Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 540 (N.D. Cal. 2020).  Indeed, in the USCIS context, the agency at least had some "anemic" evidence of the impact of prior fee increases on filing volume; in contrast, EOIR here cited no evidence or even an inquiry into the effect of price on the

number of applications filed. *Nw. Immigrant Rts. Project*, 496 F. Supp. 3d at 75; *see also id.* at 79 ("A lack of data makes DHS's conclusions regarding price insensitivity—including the Department's belief that 'price elasticity for immigration services is inelastic and [that] increases in price will have no impact on the demand for these services'—more baffling, not less." (citation omitted)).

*Third*, Defendants' insistence that fee waivers cure any issues with increased fees remains unavailing. Commenters provided ample evidence of inconsistent fee waiver adjudications and erroneous denials of waivers to indigent noncitizens, which EOIR minimized by stating that different outcomes are inherent in a system that relies on adjudicator discretion. Opp. at 20; AR33. Defendants now make the puzzling assertion that the regulations require fee waivers to be granted once the individual has shown an inability to pay, but the plain language of these regulations makes clear that the determination remains discretionary. Opp. at 20, *see* 8 C.F.R. § 1003.24(d) (immigration court) ("The immigration judge *has the discretion to waive* a fee for a motion or application for relief *upon a showing that the filing party is unable to pay the fee*." (emphases added)); 8 C.F.R. § 1003.8(a)(3) (BIA) ("The Board *has the discretion to waive* a fee for an appeal, motion to reconsider, or motion to reopen *upon a showing that the filing party is unable to pay the fee.*" (emphases added)).[2] No matter how sincerely Defendants "believe[]" the fee waiver process is "rational and accessible," Opp. at 20; AR33, the Agency was not permitted to brush aside commenters' evidence of improper fee waiver denials and inconsistent adjudications or ignore the plain language of the regulations.

---

[2] Defendants' reference to the presumption of regularity, Opp. at 20, is a red herring. Commenters provided examples of their experience with erroneous fee waiver denials not to challenge individual adjudications but to underscore that the existence of a fee waiver process does not mitigate the harms identified.

*Finally*, Defendants assert that recent changes to the fee waiver regulations, which provide a 15-day tolling period after a fee waiver request is denied, have mooted Plaintiffs' concerns about the risks inherent in filing a fee waiver request. Opp. at 21. This argument is misplaced and plainly relies on evidence outside the Administrative Record, as EOIR did not consider a tolling period when finalizing the Rule. If anything, EOIR's decision to change the fee waiver procedure suggests that the protocol in place when the Agency promulgated the Final Rule, over commenters' objections about the fee waiver process, was inadequate.[3] Notably, commenters suggested during the rulemaking at issue here that the Agency adopt procedural safeguards for fee waivers, including restarting the 30-day appeal period in the event of a denied fee waiver—suggestions EOIR ignored. AR8206; AR9301. That EOIR later made limited modifications to its fee waiver procedures— while retaining the purely discretionary nature of those waivers—raises more questions than it answers and does not moot commenters' concerns nor cure the Agency's rulemaking deficiencies.[4] EOIR's failure to contend with the evidence submitted about the risks of submitting a fee waiver application represented another failure to consider an important aspect of the problem in violation of the APA. *State Farm*, 463 U.S. at 43 ("an agency rule would be arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem").

---

[3] This is not a situation where the challenge has been mooted by subsequent events—that would only be the case had Defendants engaged in a new rulemaking as they repeatedly committed to doing since the preliminary injunction was entered. *See* Opp. at 21 (citing *Pub. Emps. for Env't Resp. v. Nat'l Park Serv.*, 605 F. Supp. 3d 28, 38 (D.D.C. 2022)).

[4] In the fee waiver rule that Defendants cite, EOIR noted that the rule as originally proposed would have held in abeyance any underlying filings whose fee waiver requests were rejected, but that the final fee waiver rule modified proposed language "to more closely match the existing process, while retaining the filing deadline tolling period." 86 Fed. Reg. 70,708, 70,713 (Dec. 13, 2021). In other words, the immigration courts and BIA still reject the underlying filings when they deny fee waiver requests but now permit a brief cure period of 15 days. Defendants proffer no evidence of how these changes are working in practice.

**B.      Defendants Failed to Disclose the Methodology and Data Underlying Their Analysis.**

The APA "requires [an] agency to make available to the public, in a form that allows for meaningful comment, the data the agency used to develop the proposed rule." *Engine Mfrs. Ass'n v. EPA*, 20 F.3d 1177, 1181 (D.C. Cir. 1994).  And "[a]n agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary." *Owner-Operator Indep. Drivers*, 494 F.3d at 199 (citation omitted). Defendants' failure to provide, for consideration in the comment period, the EOIR Fee Study or any of the underlying data for that study or the Agency's assessment of the effects of increased filings fees on indigent noncitizens is such a "serious procedural error." *Id.*

**1.      Defendants Did Not Disclose the EOIR Fee Study or Its Underlying Data.**

Defendants concede that they did not publish their Fee Study during the rulemaking.  Opp. at 31.  Rather than provide a reasoned explanation for why they withheld the study, Defendants insist that they were never required to produce the full study or the underlying data, as long as they provided a description sufficient for commenters to know "the subjects and issues involved."  Opp. at 30 (citation omitted).

EOIR failed to meet its notice obligation because its descriptions of the dataset were inadequate substitutes for the Fee Study itself and its underlying data.  This deficiency should have been apparent to EOIR at the time because numerous commenters, including Plaintiff CLINIC, asked for the study and received no response.  Defendants insist that providing a description of "the methodology used for the study and the data it generated" is sufficient under the APA.  Opp. at 31.  But as Plaintiffs described in their Opening Brief, these high-level descriptions of the study do not allow the public to confirm that the Fee Study, which Defendants acknowledge is the basis for "the updated fee schedule" (Opp. at 31), was conducted rigorously.  *See* Pls.' Mot. at 29–30.

For example, the Administrative Record states that the Fee Study began with the collection of "survey data and Subject Matter Experts (SME) input to determine appropriate staff levels and time required to process and adjudicate each form/motion."  AR7507; *see also* 85 Fed. Reg. 11,866, 11,869 (Feb. 28, 2020) (NPRM) (claiming that the first phase of the "comprehensive study" entailed "gather[ing] survey data and consult[ing] with staff").  But the survey data and the input from these unidentified "SMEs" and staff were not disclosed.  That omission is significant because it prevented Plaintiffs from confirming what several commenters suspected to be true— that the study failed to offset the costs associated with processing an appeal filed by the government, which, under 8 C.F.R. § 1003.8(a)(2)(vi), may be filed without any fee.  *See, e.g.*, AR8795–97 (comment of Legal Services NYC); AR8305–06 (comment of KIND).  Defendants attempt to refute this criticism by confirming now that "processing costs . . . did not depend on whether the respondent or the government made the filing."  Opp. at 32 n.6.  However, this point only confirms commenters' suspicions—that the increased fees offset not only the cost of noncitizens' filings, but also the cost of processing government-initiated filings—and make evident the disadvantage that commenters faced by not having the underlying data, which would have allowed them to identify and potentially quantify the disconnect between the proposed fee increases and the services actually rendered to noncitizen filers.  *See Engine Mfrs. Ass'n*, 20 F.3d at 1180  ("An agency may not charge more than the reasonable cost it incurs to provide a service, or the value of the service to the recipient, whichever is less.").

Similarly, the Fee Study says that it relies on "survey data," Subject Matter Experts, and Office of Personnel Management ("OPM") and Government Services Agency ("GSA") data to estimate average salary (and contractor) rates for applicable staff levels.  AR7507.  It further cites "process maps, staff levels, and process step times" that they validated with Subject Matter Experts

from BIA and the Office of the Chief Immigration Judge to determine the number of minutes for each task. *Id.* That is the extent of the cited sources, which provide no details on who these experts were, what the surveys asked or when they were administered, or what OPM and GSA data they relied on.

Such "'critical factual material'" "must [be] disclose[d] and 'expose[d] to refutation.'" *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 262 (D.D.C. 2015) (citation omitted). Indeed, "an agency cannot rest a rule on data that, [in] critical degree, is known only to the agency." *Time Warner Ent. Co. v. FCC*, 240 F.3d 1126, 1140 (D.C. Cir. 2001) (quotation marks omitted). Defendants argue that the *Shands* standard is not applicable here because that case involved an agency's "exclud[ing] an entire category of data" until the final rule. Opp. at 32. But as noted above, and *infra*, regarding the lack of actual annual EOIR appropriations offsetting receipt data, commenters here were equally left in the dark and remain unable to assess the underlying data and to examine rigorously the assumptions underlying the Fee Study. *Lee Memorial Health System v. Burwell*, on which Defendants rely, only underscores the deficiencies in EOIR's process. *See* 206 F. Supp. 3d 307, 332 (D.D.C. 2016), *opinion corrected on denial of reconsideration*, No. 13-CV-643 (RMC), 2016 WL 10749143 (D.D.C. Nov. 10, 2016), *aff'd sub nom. Billings Clinic v. Azar*, 901 F.3d 301 (D.C. Cir. 2018). In *Lee Memorial*, the court concluded that there was no APA violation where CMS both disclosed its payment methodology and "provided the data set and the formula used in each [relevant] year." *Id.* That is exactly what EOIR failed to do here.

### 2. Defendants Did Not Collect or Disclose Data Underlying Their Assumptions Concerning Fee Waivers and Noncitizens' Ability to Pay.

Defendants also violated the APA in failing to collect or provide data about noncitizens' financial means. "Normally, an agency rule would be arbitrary and capricious if the agency has . . .

14

entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. While EOIR argues that it "based its decision to raise fees on the costs to the Agency," Opp. at 35, the ability of noncitizens to pay those fees remains "an important aspect of the problem," *State Farm*, 463 U.S. at 43; *see also Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) (explaining that "an agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706" because "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight" (citation omitted)). EOIR failed to consider noncitizens' financial means by ignoring practitioner comments describing the financial circumstances of noncitizens in immigration proceedings, while providing no data of its own to address those comments or justify its reasoning. *See, e.g.*, AR7812; AR8894; AR7952; AR7764; AR8213–18; AR8798; AR8186–87; AR7987; AR8863.

Defendants contend that Plaintiffs' cases about speculation are immaterial, and yet double down on their speculative assertion that "it is enough for the Agency to note that some applicants would *likely* be able to pay the increased fees." Opp. at 35 (emphasis added). Far from being immaterial, the ability of noncitizens to pay the increased fees is a central issue requiring reasoned, data-backed decision-making. *See Nat. Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 210 (D.C. Cir. 1988) (holding that an agency violated the APA by failing to discuss "any record evidence" in its reasoning and offering "no more than mere speculation to support its conclusion"); *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 27–29 (D.D.C. 2020) (vacating a final rule because the agency "provided no evidence" and "speculation [could not] substantiate the [agency's] assumption" (citation omitted)).

Defendants failed to provide an evidence-based response to comments suggesting that additional fee waivers would result in additional costs and decreased revenue to EOIR. *See* Opp. at 34. Defendants attempt to paint the comments as unrelated to the issue at hand, somehow relieving EOIR of its obligation to justify its decision with data. *See id.* However, as Defendants themselves state, "EOIR based its decision to raise fees on the costs to the Agency." Opp. at 35; *see also* AR2. Thus, data explaining exactly why a rule that seeks to ameliorate costs to the Agency may, in actuality, *increase costs* because of additional fee waiver adjudication is not "beside the point." Opp. at 35; *see also* AR9564 (email from CLINIC asking, "if fee waivers will increase as a result of the proposed fee increases, won't there be new cost burdens expected as a result of fee waiver adjudications?"). Under the APA, this lack of data is precisely "the point." *See State Farm*, 463 U.S. at 43 (explaining that promulgating agency must "examine the relevant data" and "articulate a satisfactory explanation for its action").

Defendants emphasize that "fee waivers exist[] to ameliorate any impact that the increase in fees would have on filers." Opp. at 34 (emphasis omitted). But, again, the Agency failed to provide sufficient data in the NPRM or Final Rule to explain how fee waivers impact filers and whether they would "ameliorate any impact" of increased fees. *See* AR30. The data included in the Final Rule is limited, and fails to capture the outcome of fee waiver requests submitted under the existing fee schedule, as well as projections of the increase in the number of fee waiver requests in light of the Final Rule's proposed fee increases. *See* AR30 & n.45 (acknowledging that fee waiver data is not tracked at all at the immigration-court level and only incompletely and for one fiscal year at the BIA level). While EOIR collects the financial information of every respondent who requests a fee waiver, this data "has not been tracked or universally evaluated." AR10. And EOIR's response to a FOIA request after the comment period closed revealed that EOIR's records

included facially inaccurate entries (such as dates that precede EOIR's existence) and entries showing that Defendants have not consistently maintained fee waiver data and do not know the number or rate of fee waiver denials. Mendez Decl., Dkt. 19-5, ¶ 22. Ultimately, Defendants have not established the sufficiency of the data in the NPRM or Final Rule regarding fee waivers because no such comprehensive data exists in the first place.

### C.     The Final Rule Does Not Provide a Reasoned Basis for Increasing Fees.

While courts may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974), Defendants' "path" here is not reasonably discernable.  In addition to misplaced statutory justifications, *see* Section I.E, *infra*, Defendants' failure to analyze the extent to which the costs of EOIR's application processing exceeds its legislative appropriations, and whether the fees paid in relation to such applications offset any difference, was unreasonable.  Defendants attempt to justify this lack of analysis by pointing to two purported sources of statutory authority for the Final Rule's fee increases:  INA § 286(m) and (n) (codified at 8 U.S.C. § 1356(m)–(n)), and the IOAA, 31 U.S.C. § 9701.  AR2, 5.  Defendants urge that, because these provisions purportedly authorize the Agency to increase and set fees, it should be able to do so without more.  But where EOIR attempts to justify fee increases for individuals facing removal from the United States by explicitly referring to taxpayer costs, analysis of its congressionally appropriated budget is required.  Moreover, failure to account for how filing fees are paid into a fund controlled and administered *by DHS*, not EOIR, and how they will be used to support EOIR operations, represents a glaring shortcoming in the Agency's rulemaking process.

Defendants assert that the fact "[t]hat EOIR is a congressionally appropriated agency is entirely beside the point," Opp. at 21–22 (citing AR1–2, AR5002); *see also* Opp. at 8 (citing

AR5023).  This is a remarkable statement from the Agency that received over $672 million in congressional appropriations during the 2020 fiscal year.  *See* AR5 (citing Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, 133 Stat. 2317, 2396 (Dec. 20, 2019)).  EOIR's refusal to factor that amount into its analysis of the need and amount of proposed fee increases, while justifying the increases on the grounds of saving taxpayer money, Opp. at 25–26 (citing AR5026), is patently unreasonable.

Even more peculiar is the Agency's failure to discuss or account for the amount transferred from DHS to EOIR from the DHS-controlled account into which noncitizens must pay EOIR filing fees.  *See* AR5 (noting that $4 million of the EOIR budget is derived from transfer from the Immigration Examinations Fee Account ("IEFA")).  EOIR claims on the one hand that it "retains authority . . . to charge fees for immigration adjudications to recover up to the full costs expended by the agency in providing such services," AR5, which Plaintiffs dispute, yet insists that it need not provide further information about how it intends to use fees paid into that account, when only $4 million of that fund is even accessible to the Agency at all—and apparently at the discretion of DHS.  Indeed, a cursory review of the Administrative Record reflects puzzling and unexplained discrepancies:  a chart published in the Final Rule lists amounts paid by filing type, over $9 million in EOIR fees were paid (into a DHS account) in FY2018, far above the $4 million that DHS transferred back to EOIR.  *See* AR8.  Defendants cannot merely state that "fees [will] be deposited as 'offsetting receipts'" into the IEFA and "used to 'reimburse any appropriation,'" Opp. at 23, while simultaneously disclaiming the need to account for what happens to those fees once they are

paid or how those fees are used.[5]  Notwithstanding the inclusion of EOIR's own appropriations legislation (AR2155), Defendants failed to include EOIR's 2020 annual congressional appropriations budget submission in the AR, ignoring more than 90 comments in the record that cite it (Pls.' Mot. at 33–34 & n.10).[6]  Merely pointing to general guidance that EOIR's fees should be reviewed on a biennial basis due to a current "mismatch between fees and the underlying costs of review," without providing the underlying data, calculations, or factual support regarding how *actual* appropriated costs are inadequately offset by current fees does not provide a reasoned basis for the Final Rule's fee increases.  Opp. at 8 (quoting AR5023); Opp. at 21–22 (quoting AR1–2, AR50002).  Moreover, Defendants also failed to explain any gaps or "mismatch" between costs or fees listed in its congressional budget submission and the costs listed in the EOIR Fee Study.  AR7507–7571.

---

[5] Notably, when USCIS proposed to increase its fees, the agency specifically noted the "limited" appropriations provided by Congress and pointed to budgetary shortfalls in justifying the fee increases, *see* AR5411 (*U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements*, 84 Fed. Reg. 62,280 (Nov. 14, 2019)).  That contrasts sharply with EOIR's failure to undertake a similar analysis here.

[6] Additionally, EOIR's FY 2024 Congressional Budget Submissions reflect that any EOIR fee and cost requirements should be included *specifically in DHS and USCIS rulemaking* around USCIS fee-based services; notably, Congress does not contemplate any EOIR rulemaking regarding fees here.  *Compare, e.g.*, EOIR Fee Study at AR7508–71, *with* EOIR FY 2024 Congressional Budget Submission, Ex. L, FY 2024 Executive Office for Immigration Review President's Budget Exhibits, available at https://www.justice.gov/d9/2023-03/eoir_fy_2024_pb_exhibits_omb_cleared_03.07.23.pdf ("USCIS Fees - The Committee continues to encourage EOIR to engage with its DHS counterparts regarding EOIR's requirements that need to be considered *as part of any future USCIS fee rules* and during its annual budget formulation process.  The Committee directs EOIR to keep the Committee apprised of these efforts. . . .  FY Expenditures - The Committee directs EOIR to continue to provide a quarterly report on all expenditures during the fiscal year as directed in House Report 117–97." (emphasis added)).  The same language appears in EOIR's Fiscal Year 2025 submissions.  *See* EOIR FY 2025 Congressional Budget Submission, Ex. L, FY 2025 Executive Office for Immigration Review President's Budget Exhibits, available at https://www.justice.gov/d9/2024-03/eoir_fy_2025_pb_exhibits_02.29.24_final_1.pdf.

Defendants' assertion that "the Agency was entitled to prioritize compliance with a congressional directive to set fees at a level that ensures its services are self-sustaining over commenters' suppositions about the effect of the Final Rule," Opp. at 17, also contravenes the IOAA, which requires the Agency to appropriately weigh "the costs to the Government," "the value of the service or thing to the recipient," "public policy or interest served," and "other relevant facts," 31 U.S.C. § 9701(b). Defendants' conclusory and unsupported statements, like those proffered in the Final Rule, *see, e.g.*, AR1–2, AR5023, AR5002, do not withstand scrutiny. *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 152 (D.C. Cir. 1993).

### D.    The Final Rule Provides No Justification for Departing from Longstanding Agency Policy and Practice Regarding Fees.

Government agencies seeking to change longstanding practice and policy must provide a strong justification for doing so. *See, e.g.*, *Nat'l Wildlife Fed'n v. Lohr*, 2024 WL 727695, at *8 (D.D.C. Feb. 22, 2024). As the Supreme Court has recognized, lawmakers and citizens alike "naturally adjust themselves to any long-continued action of the Executive Department," and "weight" is accordingly "given to the usage [of a particular practice]." *United States v. Midwest Oil Co.*, 236 U.S. 459, 472–73 (1915).

Defendants argue that the strong justification needed for a change in longstanding agency policy is not necessary here because there was no change in EOIR's policy, Opp. at 23–26, noting that the 1986 Fee Rule and the Final Rule both purportedly strive to adjust fees to a level that "more nearly reflect the current cost of providing the benefits and services, taking into account public policy and other pertinent factors," Opp. at 23 (citation omitted).

But the fact that the Final Rule echoes the 1986 Fee Rule does not address the Agency's divergence from the relevant policy that applied during those 34 intervening years: keeping fees stable and within the realm of affordability to respondents; permitting respondents to have access

to protections of the Immigration Court system guaranteed by due process; and eschewing a "cost recovery" model by setting fees "at less than full cost recovery recognizing long-standing public policy." 51 Fed. Reg. 39,993, 39,993 (Nov. 4, 1986). The NPRM represented a stark departure from this long-standing approach, and EOIR's own calculations reveal that its proposed fee increases represented not just an adjustment for inflation—which would itself have been a shift— but the adoption of a new approach to agency funding. *See* 85 Fed. Reg. at 11,870. In fact, when USCIS attempted to implement similar fee increases, the agency's shift from an ability-to-pay principle to a beneficiary-pays principle was found to be an arbitrary and capricious departure from past practice. *Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 542–43 (N.D. Cal. Sept. 29, 2020) ("*ILRC*"). The Final Rule here is an even more abrupt change, as EOIR is an appropriated agency, rather than a fee-based agency like the USCIS.

Defendants claim that "mere inaction" was not a policy, Opp. at 24, but rather an administrative oversight, *see* 85 Fed. Reg. 82,750, 82,773 (Dec. 18, 2020). "[T]here is no 'oops' exception to the duty of federal agencies to engage in reasoned decision[-]making." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 924 (D.C. Cir. 2017). *New LifeCare Hospitals of North Carolina, LLC v. Becerra* is not to the contrary. 7 F.4th 1215, 1222 (D.C. Cir. 2021). That case involved a move to enforce a non-exempt policy following years of *third-party* inaction, not any change in agency policy. By contrast, *EOIR's inaction* over 34 years reflects its own agency policy and practice.

Legal service providers have a reliance interest in the decades-long policy—as shown by Plaintiffs' evidence that the increased fees will upend their business models, forcing them to divert resources away from serving clients to apply for fee waivers, and to represent fewer clients as a result. A caseload reduction impacts the funding structure of Plaintiffs and similarly situated legal

service providers, as multi-year grants were structured on the representation rates that stabilized around the fee structure that had been in place for more than 30 years.  *See* Borgonos Decl., Dkt. 19-2, ¶¶ 8, 10.  Defendants did not address these concerns in their rulemaking, notwithstanding Plaintiffs' concrete evidence of their need to adjust service models based on EOIR's fee structure. *See* Pls.' Mot. at 9–10.  The indirect nature of such harms does not make them speculative and dismissible.  *See ILRC*, 491 F. Supp. 3d at 542–43 (acknowledging non-profit legal service organizations' reliance interests where they "structured their service models based on the ability-to-pay principle," and noting that reliance interests are not limited to those "'directly affected' by proposed action"); *see also DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1914 (2020) (although "DHS may determine . . . that other interests and policy concerns outweigh any reliance interests," DHS "failed to" "[m]ak[e] that difficult decision").  Defendants' failure to consider the Final Rule's impact on legal service providers' reliance interests is arbitrary and capricious.

### E.     The Final Rule Is Unlawful Because Neither the Immigration and Nationality Act Nor the Independent Offices Appropriations Act Authorizes the Final Rule.

Perhaps recognizing the weakness in EOIR's reliance on the INA to set fees, Defendants now focus on the IOAA as the source of statutory authority for the fee increases.  *See* Opp. at 25–26.  But Defendants did not satisfy IOAA's statutory requirements to ensure that each charge *shall* be "fair"; based on "the costs to the Government"; "the value of the service or thing to the recipient"; "public policy or interest served"; and "other relevant facts."  31 U.S.C. § 9701(b).[7]

---

[7] As Plaintiffs noted in their Opening Brief, Pls.' Mot. at 37 n.12, *Ayuda, Inc. v. Attorney General* is not to the contrary, because that case addressed only whether IOAA, if *properly followed*, authorized the 1986 fees.  848 F.2d 1297, 1299 (D.C. Cir. 1988).  And Defendants' citation of *L'Association des Américains Accidentels v. U.S. Department of State* is of little help to them because its conclusion that the imposition of a citizenship renunciation fee was not a violation of the IOAA rested on the court's conclusion that "the administrative record does not refute, that [the State Department] ha[d] endeavored to charge no more than its cost for providing

Defendants improperly calculated fees by focusing only on the government's personnel costs for covered processes, yet claim that these considerations alone were sufficient to consider "the public interest."  Opp. at 25–26 (citing AR23).  Defendants' argument that they considered the "public interest" in excluding undisclosed amounts for personnel overhead and benefits costs where "updated fee levels did not exceed its costs in providing the service," Opp. at 26, does not satisfy the requirements of 31 U.S.C. § 9701(b) or the APA, because these undisclosed amounts are nowhere estimated for the public to review and comment on, *Owner–Operator Indep. Drivers*, 494 F.3d at 199 ("'[t]he most critical factual material that is used to support the agency's position on review must have been made public *in the proceeding* and exposed to refutation'" (quoting *Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 7 (D.C. Cir. 1999)).  Moreover, under the IOAA, "when the specific agency activity in question produces an *independent* public benefit, the agency must reduce the fee that it would otherwise charge by that portion of the agency's costs attributable to that public benefit."  *Cent. & S. Motor Freight Tariff Ass'n, Inc. v. United States*, 777 F.2d 722, 729 (D.C. Cir. 1985).  Defendants' Fee Study did not offset costs or benefits associated with processing an appeal filed *by the government*, which may be filed without any fee.  AR8795–97 (comment of Legal Services NYC); AR8305–06 (comment of KIND).

More broadly, Defendants' Fee Study does not meet the IOAA's requirement that an agency take into account "the value of the service or thing to the recipient," 31 U.S.C. § 9701(b), nor have Defendants explained how such estimated fee increases are "reasonably related" to any costs to the Agency under current appropriations legislation, *see* AR9173 (Comment of Chairs of

---

renunciation services." 656 F. Supp. 3d 165, 178 (D.D.C. 2023).  But, here, Plaintiffs challenge whether the present Administrative Record is itself sufficient, given EOIR's failure to provide relevant data and setting of an inadequate comment period, which prevented relevant consideration and comments on the NPRM.

the House Committees on the Judiciary and Appropriations and Ranking Member of the Senate Judiciary Immigration Subcommittee: "there is simply nothing to substantiate EOIR's claims that it considered anything other than costs to the government, which is contrary to the balanced approach required by the IOAA"). *See also Steele v. United States*, 657 F. Supp. 3d 23, 35 (D.D.C. 2023) (remanding IRS fees where estimates were not reasonably related to costs or value of each service to recipients, and holding that "activities charged for need [to] be 'reasonably related' to the cost to the agency and the value to the recipient" (quoting *Nat'l Cable Television Ass'n v. FCC*, 554 F.2d 1094, 1107 (D.C. Cir. 1976)).

In claiming authority to issue the Final Rule under the IOAA without following its requirements, Defendants violated the APA. *See Transp. Div. of Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers v. Fed. R.R. Admin.*, 40 F.4th 646, 662 (D.C. Cir. 2022) (rejecting a final rule where the agency failed to comply with statutory requirements to appropriately weigh and address safety concerns); *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 91–92, 94 (2002) (invalidating agency action that constituted an "end run around important [statutory] limitations" and thus "contravene[d] Congress' will" and "subvert[ed] the careful balance" of the statute).

To the extent Defendants continue to rely on the INA as a source of authority for the Final Rule, they fail to address Plaintiffs' extensive explanation of the evolution of both the INA and the structure of the immigration agencies following the passage of the Homeland Security Act to split responsibilities formerly held by Immigration and Naturalization Services between the newly formed DHS and its subagencies (including USCIS), on the one hand, and the EOIR, on the other. *See* Pls.' Mot. at 43–45. At bottom, Defendants cannot graft statutory language that plainly relates to fee-funded USCIS functions onto the immigration court system by asking Plaintiffs to prove a

negative (*i.e.*, that the INA does not say that immigration courts are "excluded" from this part of the statute). *See* Opp. at 26. The INA does not authorize the Final Rule here.

## II.      Defendants Violated the APA's Notice and Comment Requirements.

### A.      EOIR's Failure to Extend the Comment Period in Light of the Outbreak of the COVID-19 Pandemic Harmed Would-Be Commenters.

Defendants offer no real defense of their failure to adequately consider the effect of a global pandemic on the length of the comment period, arguing instead that any error was harmless and that they did not need to hear the "missing" comments.[8] Opp. at 29. The D.C. Circuit has said that "an utter failure to comply with notice and comment cannot be considered harmless if there is any uncertainty *at all* as to the effect of that failure." *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002) (emphasis added). Here, the combination of the truncated comment period, Defendants' failure to produce the fee study and underlying data (the latter of which has still not been produced), and late notice of highly relevant subsequent rulemaking left would-be commenters without sufficient time and information to comment. And the numbers speak for themselves—EOIR received double the comments on a separate rule that had a 60-day comment period, and U.S. Citizenship and Immigration Services received more than 40,000 comments to its proposed fee increase rule, more than 66 times the number of comments submitted with this Rule. *See* Pls.' Mot. at 40–41.

Truncated comment periods like this one have routinely been found to be inadequate. In *Centro Legal de la Raza v. EOIR*, 524 F. Supp. 3d 919, 955 (N.D. Cal. 2021), the Northern District of California found that EOIR's failure to extend the comment period at the start of the pandemic

---

[8] Defendants also suggest that they "responded" to requests for an extended time period via the Final Rule. But EOIR never wrote back to Plaintiff CLINIC, Congressional members, or the immigration organization HIAS to engage with them on their requests for more time when the requests were made. The requests appeared to go into an administrative black hole until the Final Rule was published.

was unfair and out of touch with reality, while the court in *Pangea Legal Services v. DHS* found

that 30 days was too short to comment on a rule that implicated staggered rulemaking, as this Rule

does, 501 F. Supp. 3d 792, 821 (N.D. Cal. 2020).  Defendants seek to distinguish these cases by

characterizing the Final Rule as a "mere[] update[]" or a "relatively straightforward change in the

Agency's fee schedule."  Opp. at 27–28.  Not so.  Even if the textual adjustment to EOIR's fee

schedule was minor, the consequences of the fee hike (coming after 30 years of stability),

especially on vulnerable noncitizens and the not-for-profit organizations dedicated to assisting

them, were widespread and complex.  As commenters outlined, the fee hike would close the

courthouse door to many noncitizens who cannot afford the fees.  *See, e.g.*, AR7812, AR8894,

AR7952, AR7764–65.  The rule would also have a serious adverse impact on legal service

providers' ability to provide legal representation to noncitizens, as the fee increases would limit,

if not eliminate, their ability to cover fees for indigent clients, *see, e.g.*, AR7699, AR8085,

AR8768, and the need to file significantly more fee waiver requests would detract from their work

on other cases, *see, e.g.*, AR7953–54, AR7643, AR7707.  Calling this Rule a "mere[] update[]"

ignores the massive disruption to noncitizens' access to the immigration courts and the provision

of immigration legal services likely to result from the Final Rule.

Defendants also contend that the comment period met the APA's standards because there

were enough comments and there is no legally required minimum comment period, Opp. at 26–

27, but this assertion ignores the reality of March 2020.  Noncitizens, along with the immigration

lawyers and nonprofit organizations who serve them (like Plaintiffs here), were dealing with the

start of an unprecedented global pandemic, which disproportionately affected those without the

resources to adapt to a remote, rather than in-person, model of working.[9]  For example, CLINIC detailed, in its request for an extension of the comment period, how the start of the COVID-19 pandemic created telework issues, childcare concerns, and difficulty reaching clients who could share illustrative examples for their comments.  AR9576.  Moreover, legal service providers were not alone in facing disruption in the early days of the pandemic.  Many federal agencies and courts also extended deadlines in light of the unprecedented disruption.  *See, e.g.*, Miscellaneous Order, 589 U.S. --- (Mar. 19, 2020) (extending the deadline to file a petition for a writ of certiorari by 150 days "[i]n light of the ongoing public health concerns relating to COVID-19"); *In re: Court Operations in Exigent Circumstances Created by the COVID-19 Pandemic*, Standing Order No. 20-9 (BAH) (D.D.C. Mar. 16, 2020) (postponing all civil and criminal petit jury selections and trials).

Finally, Defendants have still failed to identify the exigent circumstances that warranted a 31-day comment period after more than 30 years of non-action.  *See Centro Legal de la Raza*, 524 F. Supp. 3d at 955 ("DOJ did not identify any exigent circumstances requiring a compressed comment period.").  Indeed, since this Court issued a preliminary injunction in January 2021 preventing most of the fee hikes from going into effect, EOIR has continued to de-prioritize these

---

[9] The D.C. Circuit caselaw Defendants rely on only underscores the deficiencies here.  In *National Lifeline Ass'n v. FCC*, the D.C. Circuit vacated the rule on the grounds that the agency had bungled the notice-and-comment rulemaking, as EOIR did here.  921 F.3d 1102, 1118 (D.C. Cir. 2019).  In *Connecticut Light & Power Co. v. Nuclear Regulatory Commission*, the D.C. Circuit upheld a 31-day comment period because the federal agency "had been exploring without complete success the problem . . . with members of the industry for over five years."  673 F.2d 525, 534 (D.C. Cir. 1982).  In contrast, EOIR had ignored its biennial obligation to analyze fees for more than 30 years, and then failed to share the study, methodology, underlying data, or proposed increases with stakeholders before announcing the proposed rule.

fee increases, having not issued a new proposed rule in three years' time, further showing there was no need for hurry in March 2020.

For all these reasons, a 31-day comment period violated the APA's notice-and-comment rulemaking requirements.  5 U.S.C. § 553(c).

### B.    Defendants' Failure to Disclose Forthcoming Rulemaking Resulted in Prejudicial Error.

Defendants do not dispute that they proposed new rules shortly after the close of the comment period for the Final Rule.  Opp. at 35–36.  Rather, they maintain that, because none of these rules have gone into effect, commenters' inability to address the interplay between those rules and the Final Rule was "necessarily harmless."  *Id.*  Defendants pointedly ignore the fact that some or all of these rules *could* go into effect.  Each of the three rules is the subject of *preliminary* injunctions in cases that are stayed pending further rulemaking without a final ruling on the merits.[10]  While the relevant agencies issued one interim final rule that partially undid some of this rulemaking, and proposed another rule that has yet to become final, none of the subsequent final rules has been vacated or rescinded.[11]  Because Plaintiffs have "indicate[d] with reasonable specificity" that they have "something useful to say" regarding the interplay of these rules, they met their burden to show prejudice.  *AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 89–90 (D.D.C. 2007) (citation omitted); *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237–38 (D.C. Cir. 2008)

---

[10]  *See Cath. Legal Immigr. Network, Inc. v. EOIR*, No. CV 21-00094 (RJL), 2021 WL 3609986, at *1 (D.D.C. Apr. 4, 2021) (preliminarily enjoining the Appellate Procedures and Closure Rule); *Centro Legal de la Raza*, 524 F. Supp. 3d at 980 (same); *Pangea Legal Servs. v. DHS*, 512 F. Supp. 3d 966, 969 (N.D. Cal. 2021) (preliminarily enjoining the Asylum Rule); *Nat'l Immigrant Justice Ctr. v. EOIR*, No. 21-56 (RBW) (D.D.C. Jan. 14, 2021) (Dkt. 11) (preliminarily enjoining the Asylum and Withholding of Removal Rule).

[11]  *See Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*, 87 Fed. Reg. 18,078 (Mar. 29, 2022) (interim final rule); *Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure*, 88 Fed. Reg. 62,242 (Sept. 8, 2023) (notice of proposed rulemaking).

(citation omitted).  Moreover, it is no defense to say that Plaintiffs could have raised these concerns through comments in the later rulemakings.  Opp. at 36.  The interplay of these rules should have been considered before the Final Rule was issued, and the public was entitled to comment on that interplay during this rulemaking.  *See Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) (per curiam); *see also Centro Legal de la Raza*, 524 F. Supp. 3d at 959–62; *Casa de Md., Inc. v. Wolf*, 486 F. Supp. 3d 928, 964 (D. Md. 2020).

## III.    The Final Rule Was Promulgated in Violation of the Regulatory Flexibility Act.

The Regulatory Flexibility Act requires federal agencies "to assess the impact of their regulations on small [entities]," *U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 88 (D.C. Cir. 2001), so that small entities are not "forced to bear an unnecessary or disproportionate burden when the federal government issues regulations," *Nat'l Ass'n for Home Care v. Shalala*, 135 F. Supp. 2d 161, 163 (D.D.C. 2001).  *See generally* 5 U.S.C. §§ 603, 604.  "[A]ny not-for-profit enterprise which is independently owned and operated and is not dominant in its field" is a "small entity." *Id*. § 601(4), (6).

EOIR does not dispute that Plaintiffs CLINIC, CLSEPA, and CHIRLA, like "most" immigration "attorneys and accredited [EOIR] representatives," are "small entities" within the meaning of the RFA.  *EOIR Electronic Case Access and Filing*, 85 Fed. Reg. 78,240, 78,246 (Dec. 4, 2020).  Instead, EOIR contends that, because "[o]nly individuals, rather than entities, are responsible for paying the fees affected by this proposed rule," "the rule does not 'regulate small entities'" and no regulatory flexibility analysis was required.  Opp. at 36–37 (quoting AR36) (quotation marks omitted).  The Administrative Record contradicts EOIR's conclusory assertion that "[t]he rule does not limit in any way the ability of practitioners to accept cases, manage dockets, or assess fees."  AR36; *see, e.g.*, *N.C. Fisheries Ass'n, Inc. v. Daley*, 16 F. Supp. 2d 647,

652–53 (E.D. Va. 1997) (requiring government to make some evidence-based showing and not rely on "[a] simple conclusory statement" "before certifying that there is no significant impact").

*First*, as set forth in the comments, practitioners often cover filing fees for their indigent clients, *see, e.g.*, AR8085, and will not be able to serve the same number of clients if the fee hikes go into effect. *See, e.g.*, AR7699 ("Attorneys seeking to provide pro bono immigration services will be unable to absorb the increased EOIR fees for their clients," and therefore "attorneys will be less likely to represent individuals in EOIR cases"); AR8768 (fee increase means law school clinic "would no longer be able to absorb costs of filings" and "necessarily means that we will not be able to provide the amount of representation we currently do"); AR8846–47 (fee increase "likely to curb the *pro bono* services offered by the private bar, who already assists clients in meeting existing fees beyond their reach"); AR8876 (nonprofit that "assist[s] noncitizens with filing fees" "can not afford to pay these [increased] filing fees"); AR9375 (ability of firms to pay filing fees for pro bono clients would be "greatly limit[ed]" and "firms would be forced to take on fewer pro bono immigration matters"). And if legal service organizations or practitioners somehow manage to "absorb[] the costs of these filing fees, funds that are needed for other line items will be diverted simply to prop up these exponential increases." AR7607.

*Second*, if practitioners choose to prepare fee waivers rather than paying the fee in view of the fee increase, the time-consuming process of preparing fee waivers will "divert . . . already limited resources" away from substantive applications for relief and, again, prevent practitioners from serving the same number of clients. AR 7953–54; *see also* AR7643 ("While fee waivers are available, the amount of work this adds to a case is so considerable that it will in practice cause attorneys to refuse pro bono cases"); AR7707 ("need for fee waivers in more cases" "inhibits [practitioners'] capacity by requiring more attorney time per case" and "can ultimately discourage

some attorneys"); AR8376 (fee increases and corresponding "increase in fee waiver filings" will "increase the work of immigration advocates"); AR8380 ("increase in the need for fee waivers . . . would impose a huge burden on our organization" and force it to "turn away clients that we might have been able to represent previously").

*Third*, if individuals have to pay the increased filing fees, for example, for a BIA appeal, themselves, they will, "in all likelihood, be unable to . . . also afford counsel to advocate the appeal." AR7626; *see also, e.g.*, AR7838 (immigrants will be forced to choose between paying the fees and hiring counsel); AR8846 (same); AR9080 (fee increases make some clients unable "to pay for representation," causing "increasing difficult[y] for those of us in smaller practices").

In short, contrary to EOIR's assertion, the rule profoundly "limit[s] . . . the ability of practitioners to accept cases, manage dockets, [and] assess fees." AR36. EOIR's attempt to downplay these effects as "indirect" should be rejected. *Id.*; *see* Opp. at 37. Even if "a[] [noncitizen]'s legal representative is 'not obligated' to pay those fees," Opp. at 37, it is "the practical effect . . . of the rule, not its formal characteristics," that matters, *Chamber of Com. v. U.S. Dep't of Lab.*, 174 F.3d 206, 209 (D.C. Cir. 1999); *see also, e.g., Am. Fed'n of Lab. v. Chertoff*, 552 F. Supp. 2d 999, 1013 (N.D. Cal. 2007) (rejecting DHS's arguments that a rule "will impose no costs because compliance is 'voluntary'").

Notably, not long after EOIR issued the Final Rule, claiming that "case law indicates that indirect effects on entities not regulated by a proposed rule are not subject to an RFA analysis," AR36, a district court in California considered a challenge to a different set of EOIR rule changes that, like the Final Rule, did not appear to "directly" regulate small entities. *Centro Legal de la Raza*, 524 F. Supp. 3d at 974. The EOIR Rule at issue there—which included changes to appellate briefing schedules and other appeal deadlines, to immigration judges' administrative closure and

reopening authority, and to the BIA's authority to take administrative notice of facts, to affirm on any basis in the record, and to remand for voluntary departure—had less obvious economic consequences for legal service providers and immigration practitioners.  Nonetheless, the court held that, in light of "the many comments from organizations stating that they would suffer significant deleterious economic impacts as a result of the Rule," the plaintiffs showed "serious questions going to the merits" of their RFA claim.  *Id*. (citation omitted).  If *that* EOIR rule was improper under the RFA, there is no question that the Final Rule, which would have immediate and drastic economic effects on small legal service providers, required an RFA analysis.  EOIR's failure to conduct that analysis violates the RFA.

## IV.    The Final Rule Should Be Vacated as to the Challenged Fees.

For three years, Defendants have consented to a stay of proceedings, leaving the Court's preliminary injunction in effect, on the premise that they intended to "rescind or modify" the Final Rule. Dkt. 44 (quoting OMB, Off. of Info. & Regul. Affs., *Unified Agenda of Regulatory and Deregulatory Actions* (Spring 2022), RIN 1125-AB19, https://perma.cc/98XR-KZNN). Defendants have so far failed to do so.  It is thus little comfort when Defendants now ask for remand without vacatur, promising not to "impos[e] any of the enjoined fees until th[e] deficiencies" in the Final Rule are "corrected."  Opp. at 2.  Although Defendants now insist that there is a "high" probability that they "'will be able to justify retaining the' increased fees," Opp. at 38 (citation omitted), their failure to correct the Final Rule during the pendency of this litigation, on top of their representations that they would in fact modify the new fees or abandon them altogether, leaves that claim in serious doubt.  Defendants' argument is thus both disingenuous and legally incorrect.

Defendants fail to justify a departure from the foundational principle that "unsupported agency action normally warrants vacatur."  *Standing Rock Sioux Tribe v. U.S. Army Corps of*

*Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021) (quoting *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005)); *see id.* at 1052 (noting that *Allied-Signal* must not be used to encourage "agencies seeking to [act] first and conduct comprehensive reviews later"). Although Defendants try to cabin the Court's consideration to only Defendants' failure to consider the impact of the Final Rule on legal service providers, Opp. at 2, 37–38, Plaintiffs have established a host of substantive and procedural violations that render the Final Rule irremediable and warranting vacatur.

Nevertheless, even if the Court limits its holding to the procedural defect that supported its preliminary injunction order, that defect is undeniably "serious." Opp. at 38. This Court has already concluded that the agency arbitrarily and capriciously failed to consider legal service providers' evidence—based on "their deep institutional knowledge and experience"—"that increased filing fees would adversely impact their organizations and would depress their capacities to provide pro bono and low-cost legal services." PI Order at 27. The Court then preliminarily enjoined the fee increases after finding Plaintiffs would suffer irreparable harm because "[t]he cumulative impact of the Final Rule will lead to decreased representation of applicants in immigration proceedings." *Id.* at 30. There is no reason to think that on remand Defendants will be able to justify the Final Rule in the face of such profound harm to legal service providers and individuals facing removal. *See id.* at 26 ("Congress's concern for the availability of pro bono and low-cost legal services in removal proceedings is evident on the face of the INA."). Defendants' cited authorities are therefore inapposite. *See U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 652 (D.C. Cir. 2016) (per curiam) (finding "there is a strong possibility that the [EPA] can properly explain its decision to exclude synthetic boilers from the Title V permitting requirement"); *A.P. Bell Fish Co. v. Raimondo*, 94 F.4th 60, 65 (D.C. Cir. 2024) (holding "[t]here would appear to be a 'strong

possibility' that the Fisheries Service can differentiate between the two economic analyses" (citation omitted)); *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1048–49 (D.C. Cir.) ("[W]e cannot say it is unlikely the Commission will be able to justify a future decision to retain the Rule."), *opinion modified on reh'g*, 293 F.3d 537 (D.C. Cir. 2002).

Defendants' arguments regarding disruption are similarly meritless and do not "justify a departure from [the] normal course." *Cboe Futures Exch., LLC v. SEC*, 77 F.4th 971, 982 (D.C. Cir. 2023); *see also Cigar Ass'n of Am. v. FDA*, No. 16-CV-01460 (APM), 2023 WL 5094869, at *6 (D.D.C. Aug. 9, 2023) ("it is the agency's burden to demonstrate that the disruptive consequences of vacatur warrant displacing the default remedy"). Tellingly, Defendants have failed to identify a single case where a court preliminarily enjoined a rule from going into effect, then entered a final judgment finding the rule violated the APA yet lifted the injunction and remanded the matter without vacatur. Defendants argue that "[t]he less-disruptive course" would be to allow the drastic fee increases to go into effect to "avoid any potential confusion that vacatur applied to the fees that are no longer at issue here." Opp. at 39. This approach makes no sense. The Court's preliminary injunction likewise excluded the fees not at issue here, PI Order at 35, and there is no evidence of any resulting confusion. Moreover, Defendants themselves promise that they will not "impos[e] any of the enjoined fees until th[e] deficiencies [are] corrected." Opp. at 2. The uncertainty of having increased fees in effect but not being enforced seems far more confusing than following the ordinary process of vacatur. Defendants should not be permitted to upend the status quo and cause irreparable harm to Plaintiffs in order to allow the Agency to attempt to correct a fatally flawed rulemaking—one that the Agency itself has already represented it intends to abandon.

Plaintiffs have not waived their claim for further injunctive relief. *See* Pls.' Mot. at 1–2, 44–45. Given the posture of this case, where Plaintiffs have fully litigated, and won, a preliminary injunction, this is not a case where the Court is required to "research and construct legal arguments" to award such relief. *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013). On the merits, Defendants do not dispute that Plaintiffs will suffer irreparable injury should the challenged fees go into effect or that the balance of equities and public interest favor injunctive relief—which is unsurprising, because the Court has already found as much. PI Order at 28–32. Defendants' sole objection is that declaratory relief is a sufficient remedy here. Opp. at 40. Yet Defendants also argue that vacatur of the Final Rule is not the appropriate remedy. If the Court agrees, and remands the Final Rule without vacatur, then Plaintiffs will require injunctive relief to protect them from irreparable harm. *See* PI Order at 30. In that circumstance, Plaintiffs ask that the Court retain the current injunction until such a time as Defendants complete their reexamination of the Final Rule. At that point, Defendants may seek to vacate or modify the injunction. Plaintiffs likewise request that the Court retain jurisdiction. *See Cobell v. Norton*, 240 F.3d 1081, 1109 (D.C. Cir. 2001) ("[F]ederal courts regularly retain jurisdiction until a federal agency has complied with its legal obligations, and have the authority to compel regular progress reports in the meantime."). If, instead, the Court vacates the Final Rule, Plaintiffs agree that further injunctive relief would not be necessary.

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment and deny Defendants' motion for summary judgment. Accordingly, the Court should vacate the Final Rule or, in the alternative, extend the current injunction to bar enforcement of the challenged fees until Defendants complete their reexamination of the Final Rule.

Dated:  April 19, 2024            Respectfully submitted,

By:   */s/ John Matthew Butler*
       John Matthew Butler

       Richard W. Mark (*pro hac vice*)
       Joseph Evall (*pro hac vice*)
       Katherine Marquart (D.C. Bar No. 1044618)
       Alexandra Perloff-Giles (*pro hac vice*)
       GIBSON, DUNN & CRUTCHER LLP
       200 Park Avenue
       New York, NY 10166-0193
       Tel: (212) 351-4000
       Fax: (212) 351-4035
       rmark@gibsondunn.com
       jevall@gibsondunn.com
       kmarquart@gibsondunn.com
       aperloff-giles@gibsondunn.com

       John Matthew Butler (D.C. Bar No. 1721350)
       GIBSON, DUNN & CRUTCHER LLP
       1050 Connecticut Avenue, N.W.
       Washington, D.C. 20036-5306
       Tel: (202) 955-8500
       Fax: (202) 467-0539
       mbutler@gibsondunn.com

       Katherine Melloy Goettel (*pro hac vice*)
       Emma Winger (D.C. Bar No. 90010721)
       AMERICAN IMMIGRATION COUNCIL
       1331 G Street NW, Suite 200
       Washington, D.C. 20005
       Tel: (202) 507-7512
       Fax: (202) 742-5619
       kgoettel@immcouncil.org
       ewinger@immcouncil.org

       Michelle Lapointe (*pro hac vice*)
       NATIONAL IMMIGRATION LAW CENTER
       P.O. Box 247
       Decatur, GA 30031
       Tel: (213) 279-2508
       Fax: (213) 639-3911
       lapointe@nilc.org

Joanna Elise Cuevas Ingram (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 170392
Brooklyn, NY 11217
Tel.: (213) 377-5258
Fax: (213) 377-5258
cuevasingram@nilc.org

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 19th day of April, 2024, I caused a true and correct copy of the attached **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** to be filed and served pursuant to the Court's electronic filing procedures using the Court's CM/ECF System.

<u>*/s/ John Matthew Butler*</u>
John Matthew Butler (D.C. Bar No. 1721350)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Tel: (202) 955-8500
Fax: (202) 467-0539
mbutler@gibsondunn.com

*Counsel for Plaintiffs*

38