**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CATHOLIC LEGAL IMMIGRATION NETWORK, INC. et al.,**<br><br>　　**Plaintiffs,**<br><br>　　　　**v.**<br><br>**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW et al.,**<br><br>　　**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)　　**Case No. 20-cv-03812 (APM)**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>MEMORANDUM OPINION</u>

### I.　　INTRODUCTION

In late December 2020, the Executive Office for Immigration Review (EOIR) published a Final Rule adopting proposed increases to eight filing fees for various motions, applications, and appeals before immigration courts and the Board of Immigration Appeals (BIA).  The Final Rule raised the fees for the first time in over 30 years by different multiples.  The smallest change was a modest $35, moving from $110 to $145.  The largest was over eight times more, increasing from $110 to $975.  Before the fee increases could become final, Plaintiffs moved for emergency relief. The court enjoined six of the eight fee increases from taking effect.  The original fees for those six therefore remain in place.

The case is now before the court on summary judgment for final resolution of a host of substantive and procedural claims under the Administrative Procedure Act (APA).  Although Defendants urge the court to rule only on the ground upon which it stayed the six fee increases, the court addresses all claims.  For the reasons explained below, each side's motion for summary

judgment is granted in part and denied in part.  The six fee increases will be vacated for the same reason they were stayed but not on the merits of any other claim.

## II.     BACKGROUND

### A.     Factual Background

This court covered the background facts of this case in the Memorandum Opinion and Order granting preliminary relief in part.  *See Cath. Legal Immigr. Network, Inc. v. EOIR* (*Cath. Legal I*), 513 F. Supp. 3d 154, 159–64 (D.D.C. 2021).  The court presumes familiarity with those facts and therefore sets forth only a general overview below.

EOIR is an agency within the U.S. Department of Justice that oversees and conducts removal proceedings in immigration courts and appeals before the BIA.  In February 2020, EOIR issued a Notice of Proposed Rulemaking (NPRM) that proposed to raise the fees it charges applicants to initiate various types of proceedings.  *See* Executive Office for Immigration Review; Fee Review, 85 Fed. Reg. 11866 (Feb. 28, 2020).  The increases were based on a study of the costs associated with each proceeding ("Fee Study").  *See id.* at 11869.  The proposed fee increases were as follows:

**Table 1: Proposed Filing Fees Comparison**

| Form | Description of Filing | 2020 Fee | 2021 Fee |
|---|---|---|---|
| EOIR-40 | Application for Suspension of Deportation | $100 | $305 |
| EOIR-42A | Application for Cancellation of Removal for Certain Permanent Residents | $100 | $305 |
| EOIR-42B | Application for Cancellation of Removal and Adjustment of Status for Certain Nonpermanent Residents | $100 | $360 |
| N/A | Motion to Reopen or Reconsider Before Immigration Judge | $110 | $145 |
| EOIR-26 | Notice of Appeal from a Decision of an Immigration Judge | $110 | $975 |
| EOIR-29 | Notice of Appeal to the BIA from a Decision of a DHS Officer | $110 | $705 |
| EOIR-45 | Notice of Appeal from a Decision of an Adjudicating Official in a Practitioner Disciplinary Case | $110 | $675 |
| N/A | Motion to Reopen or Reconsider Before BIA | $110 | $895 |

*See id*. at 11871, 11874.

The notice-and-comment period lasted for approximately 30 days, from February 28, 2020, through March 30, 2020. *Id.* at 11866. The comment period overlapped with the start of government shutdowns due to the COVID-19 pandemic, causing dozens of organizations to raise concerns about its brevity. Approximately 90 interested commenters asked the agency to extend the period from 30 days to 60 days, and 108 organizations later requested that EOIR freeze the comment deadline given the pandemic and national emergency. *See Cath. Legal I*, 513 F. Supp. 3d at 162–63. The agency did not respond to either request. *Id.*

EOIR received 601 comments. *See* Executive Office for Immigration Review; Fee Review, 85 Fed. Reg. 82750, 82752 (Dec. 18, 2020). Generally, as pertinent here, commenters raised the following concerns: (1) the fee increases would deter noncitizens from pursuing their rights before immigration tribunals; (2) the availability of fee waivers would not offset those deterrent effects; (3) the agency failed to disclose data underlying the Fee Study; and (4) legal services providers

would have less capacity to offer representation in immigration proceedings. *Id.* at 82752–84. In late 2020, EOIR adopted the Final Rule, ratifying the proposed fee amounts as set out in the NPRM. *Id.* at 82784.

### B.    Procedural Background

Plaintiffs are four non-profit organizations offering services to noncitizens navigating the immigration courts and BIA proceedings. *Cath. Legal I*, 513 F. Supp. 3d at 164. They filed this action on December 23, 2020, challenging the Final Rule under the APA. *See* Compl., ECF No. 1 [hereinafter Compl.]. Seven days later, Plaintiffs filed a Motion for a Stay of Effective Dates Under 5 U.S.C. § 705 or, in the Alternative, Preliminary Injunction, ECF No. 19. *Cath. Legal I*, 513 F. Supp. 3d at 159. The court enjoined all but two of the fee increases. *Id.* at 177–78.

Now on summary judgment, Plaintiffs limit their challenge to the six enjoined fee increases and raise three overarching claims across four counts. *See* Pls.' Mot. for Summ. J., ECF No. 56 [hereinafter Pls.' Mot.], Mem. of P. & A. in Supp. of Pls.' Mot., ECF No. 56-1 [hereinafter Pls.' Mem.], at 20 n.7. First, they contend that the Final Rule is arbitrary and capricious, an abuse of discretion, and not in accordance with law because Defendants[1] failed to (1) respond to significant concerns about the adverse impacts of the fee increases; (2) disclose underlying Fee Study data; (3) provide a reasoned basis for the increases; and (4) offer a rationale for departing from longstanding agency policy. They also allege that EOIR lacked statutory authority to increase fees. *See* Compl. ¶¶ 362–371, 378–387 (Counts I and III). Second, Plaintiffs assert two procedural violations of the APA. They maintain that (1) the 30-day comment period was too short given the disruptions caused by the COVID-19 pandemic and (2) Defendants failed to

---

[1] Defendants are EOIR, the Director of EOIR Daren K. Margolin, the U.S. Department of Justice, and the U.S. Attorney General Pamela Bondi. The court has substituted Margolin and Bondi as defendants, both in their official capacities, pursuant to Federal Rule of Civil Procedure 25(d).

disclose separate but related forthcoming rules impacting the fee increases proposed in the NPRM. *See id.* ¶¶ 372–377, 378–387 (Counts II and III).  Third, Plaintiffs assert that Defendants failed to assess the Final Rule's effects on small businesses as required by the Regulatory Flexibility Act (RFA).  *Id.* ¶¶ 388–405 (Count IV).  As relief, Plaintiffs ask the court to declare unlawful and set aside the Final Rule.  *Id.* at 65–66.

Defendants dispute these contentions.  They respond that EOIR examined all relevant factors, were not required to disclose the underlying Fee Study data, provided a reasoned basis for raising fees, did not change any policy, and properly invoked its statutory authority to set fees. *See generally* Defs.' Cross-Mot. for Summ. J., Mem. in Opp'n to Pls.' Mot. & in Supp. of Defs.' Cross-Mot. for Summ. J., ECF No. 57 [hereinafter Defs.' Mem.], at 14–26.  They also defend the notice-and-comment period's duration and disclosures, *id.* at 26–36, as well as the agency's nonperformance of an RFA assessment because the Final Rule does not directly impact small entities, *id.* at 36–37.

For the reasons explained below, the court reaffirms its preliminary injunction ruling that EOIR acted arbitrarily and capriciously by failing to consider the impact of higher fees on legal services providers and will vacate the six fee increases on that ground.  *See Cath. Legal I*, 513 F. Supp. 3d at 172–174.  The court rules in Defendants' favor, however, as to Plaintiffs' remaining claims.

## III.    LEGAL STANDARD

When evaluating cross-motions for summary judgment under the APA, "the Rule 56 standard does not apply."  *Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d 23, 36 (D.D.C. 2017). Instead, "the district judge sits as an appellate tribunal," and "[t]he entire case on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)

(internal quotation marks omitted).  The court must "decid[e], as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006).

## IV.  DISCUSSION

This opinion is structured as follows.  The court begins by reaffirming its preliminary injunction ruling and rejecting Defendants' arguments for why the decision was erroneous. The court then addresses in order: the inability-to-pay and the fee-waivers issues; EOIR's nondisclosure of the Fee Study data; the agency's alleged failures to engage in reasoned decisionmaking and explain a change in policy; and EOIR's statutory authority to increase fees. The court then turns to the procedural challenges, followed by the RFA claim.  The court concludes with a discussion of remedies.

### A.   Arbitrary and Capricious and Contrary to Law

#### 1.   EOIR's alleged failure to respond to comments

An agency's action is arbitrary and capricious when it "entirely fail[s] to consider an important aspect of the problem."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983); *Michigan v. EPA*, 576 U.S. 743, 753 (2015) (noting agencies are required to "pay[] attention to the advantages *and* the disadvantages of agency decisions"). An agency also must "adequately explain its result," *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993), and respond to "relevant" and "significant" public comments, *Home Box Office, Inc. v. FCC* (*HBO*), 567 F.2d 9, 35 & n.58 (D.C. Cir. 1977) (citations omitted).  "[N]either requirement is particularly demanding."  *Pub. Citizen*, 988 F.2d at 197.  But, as to the latter, the agency must respond to significant points—that is, "comments which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed

rule [and would] cast doubt on the reasonableness of a position taken by the agency." *HBO*, 567 F.2d at 36 n.58.

a.     <u>Legal organizations' ability to deliver services</u>

The court held before—and now holds again—that EOIR acted arbitrarily and capriciously because it largely disregarded the concerns raised by numerous legal services providers about the proposed fee increases' adverse impacts on them and their capacities to represent clients.  As the court previously stated, "Congress's concern for the availability of pro bono and low-cost legal services in removal proceedings is evident on the face of the [Immigration and Nationality Act (INA)]." *Id.*  "These provisions of the INA make clear that Congress was concerned not merely about the right to counsel in removal proceedings, but with actual *access* to counsel for persons who Congress anticipated might not be able to afford to hire private lawyers." *Id.* at 173–74.  EOIR thus had an obligation to acknowledge legal services providers' concerns about access to counsel and "respond to them in a meaningful way." *Id.* at 174.

The providers' comments generally fell into four categories.  "First, [they] explained that the Final Rule would effectively reduce representation because the higher fees would force individuals to choose 'between paying the fee or obtaining counsel.'" *Id.* at 172.  "Second, they noted that 'legal aid organizations, small firms, and attorneys providing pro bono services would be unable to routinely pay the fees for their clients,' as they typically had in the past." *Id.* at 172–73.  "Because these organizations would be able to afford fees for fewer clients under the Final Rule, 'they would be forced to assist fewer aliens, especially indigent aliens and children, which would . . . reduce the availability of pro bono counsel generally.'" *Id.* at 173 (omission in original).  "Third, legal service providers 'expressed concerns that the funds used to pay their clients' fees would come at the expense of other programmatic elements of their budget' and they would

7

therefore 'be less able to provide comprehensive services to aliens.'" *Id.* "Fourth and finally, commenters explained that the Final Rule would drain their resources, as 'the higher fees and resulting fee waivers would increase the time that an attorney spends on a case.'" *Id.* "This would 'cause them to turn away clients for lack of time and resources to represent them.'" *Id.* EOIR did not address any of these comments. Instead, it "blithely dismiss[ed] them as 'outside the limited scope of this rulemaking'" and as "'speculative.'" *Id.* at 174. The court explained why neither assertion was correct. *See id.* EOIR therefore failed to consider an "important aspect of the problem" and acted arbitrarily and capriciously. *Id.* (quoting *State Farm*, 463 U.S. at 43).

Defendants argue that the court's reasoning was flawed. Unlike before, they no longer seriously defend the agency's dismissal of the service providers' concerns as "speculative." *Compare id.* at 174, *with* Defs.' Mem. at 15–17. Instead, they dismiss their significance. They note that the Final Rule imposes fee increases on individuals, not legal services providers, and thus "[t]he first three concerns the Court identified boil down to the effects the higher fees would have on legal service providers' bottom lines if they chose to voluntarily pay the fee on behalf of their indigent clients." Defs.' Mem. at 15. That is a mischaracterization of the three concerns. They are not about legal services providers' "bottom lines." Rather, they signal alarm about the adverse impact the fee increases will have on those organizations' capacities to serve indigent or low-income clients. "Congress plainly had as an objective under the INA to optimize the availability of pro bono or low-cost counsel to persons subject to removal." *Cath. Legal I*, 513 F. Supp. 3d at 171. When the very organizations that provide those services asserted that the fee increases would

reduce their capacity to deliver them, it was incumbent upon the agency to listen and address their concerns.  EOIR failed to do so.

Next, Defendants argue that they addressed the legal services providers' concerns by noting the continued availability of fee waivers.  *See* 85 Fed. Reg. at 82775 ("Additionally, the Department reiterates the continued availability of fee waivers available to aliens who are unable to afford the cost of an application or appeal.").  According to Defendants, "[i]f no fee need be paid because the respondent is eligible for a fee waiver, then there is also no harm to the legal service providers' budget or practice of paying the fees."  Defs.' Mem. at 16.  But again, the argument misses the point.  The commenters raised issues not about impacts on their budgets, but on their capacity to deliver representation.  Not only do fee waivers not address that problem, but they exacerbate it, as numerous commenters observed.  Here are just two.  Practitioner Karenina Wolff stated that "with fees rising as much as 800%, the number of fee waiver requests will also increase dramatically.  . . .  Having to prepare applications for fee waivers would not only divert our already limited resources from focusing on the facts of our clients' cases, it would also make the entire process financially burdensome for our office and our clients in general."  J.A. at 7953–54.  Another practitioner, Rebecca Rojas, said the same.  She acknowledged the availability of fee waivers but predicted that "the amount of work this adds to a case is so considerable that it will in practice cause attorneys to refuse pro bono cases where indigent individuals, often children, are not immediately able to come up with the large fees. . . .  Fee waivers require considerable additional work which will cause many attorneys to not take on fee waiver cases."  *Id.* at 7643.  Others raised similar concerns.[2]

---

[2] *See, e.g.*, J.A. at 7707 (comment of Kentucky Refugee Ministries: "Screening for and preparing fee waiver requests presents an administrative burden for low-bono and pro-bono attorneys, which inhibits our capacity by requiring more attorney time per case. Additionally, the need for fee waivers in more cases introduces more uncertainty . . . . This

Yet, EOIR declined to address these predicted impacts of increased fee-waiver work. EOIR agreed that "it is possible—and perhaps even probable—that the increased fees may lead more aliens to seek a fee waiver than would without this rule." 85 Fed. Reg. at 82758–59. And it even acknowledged commenters' concerns that increased fee-waiver work would reduce attorneys' capacity and willingness to provide legal services. *Id.* at 82774. But, again, EOIR dismissed these concerns as "speculative" and "outside the limited scope of this rulemaking." *Id.* at 82774–75. It thus was "unable to provide a response." *Id.* at 82775. Once again, EOIR failed to address an "important aspect of the problem." *State Farm*, 463 U.S. at 43.

Defendants offer two additional arguments. They point to the agency's answer that the increase in fee waivers "'alone will not substantially increase the burden on either the immigration courts or the BIA' because of the 'extensive experience' immigration judges and [BIA] members have with fee waiver requests." Defs.' Mem. at 16 (quoting 85 Fed. Reg. at 82775). Maybe so. But it is also beside the point. It is no answer to concerns expressed about the fee increases' negative impacts on legal services providers.

Next, relying on the D.C. Circuit's opinion in *HBO*, Defendants insist that EOIR was entitled to dismiss as "speculative" commenters' "concerns that preparing fee waivers is less desirable and might lead to lower rates of pro bono participation." Defs.' Mem. at 17 (citing *HBO*, 567 F.2d at 35 n.58). They note that "[t]hose commenters had no recent—if any—experience with how fee increases might increase workloads in individual cases." *Id.* But *HBO* says that only

---

creates an additional variable in taking cases and representing clients that must be screened at the outset and can ultimately discourage some attorneys and clients from pursuing meritorious cases."); *id.* at 8376 (comment of World Relief: "An increase in fee waiver filings . . . will also increase the work of immigration advocates, like World Relief, as we will now have to obtain financial evidence of fee waiver need, increasing the work to prepare an immigration appeal, limiting the total number of immigrants we can serve as immigration appeals will involve a greater time commitment."); *id.* at 8380 (comment of the Migrant & Immigrant Community Action Project: "This increase in the need for fee waivers . . . would impose a huge burden on our organization. Due to our limited staff size, our organization would probably have to turn away clients . . . simply because we don't have the human capital required to complete a fee waiver within the timeframe allotted.").

"comments which themselves are purely speculative and do not disclose the factual or policy basis on which they rest require no response.  There must be some basis for thinking a position taken in opposition to the agency is true."  *HBO*, 567 F.2d at 35 n.58.  Here, as this court previously explained, commenters "offered ample basis for the truth of their positions: their extensive knowledge and experience with the immigration system."  *Cath. Legal I*, 513 F. Supp. 3d at 174. "They are intimately familiar with their budgets and resources and therefore have a unique capacity to estimate how the Final Rule's significant increase[s] in fees would upend their normal practices and would affect the number of clients they can serve."  *Id.*  It may be true that the commenting practitioners have not had recent experiences with fee increases.  But a commenter did not have to be Nostradamus to predict that fee increases of up to 800% would yield corresponding increases in fee-waiver work—EOIR itself conceded that it would.  The concerns expressed about those increases therefore were not speculative.  They deserved a reasoned response.  EOIR's failure to deliver one was arbitrary and capricious.

### b.    Applicants' inability to pay

Plaintiffs further assert that EOIR "failed to give a reasoned response to comments that the new fee schedule would erect a financial barrier to noncitizens pursuing routine steps in an EOIR or BIA adjudication, including making motions and applications, or filing appeals."  Pl.'s Mem. at 24.  Plaintiffs claim that the agency ignored a host of comments about clients' "limited financial resources," challenges associated with raising funds within the 30 days afforded to file an appeal, and the impacts of increased fees on the integrity of administrative proceedings.  *Id.* at 24–26. In response to such comments, EOIR sang a common refrain: those applicants unable to afford the increased fees could seek a fee waiver.  *See, e.g.*, 85 Fed. Reg. at 82755, 82762, 82775, 82779 (referencing the availability of fee waivers); 8 C.F.R. §§ 1003.8(a)(3), 1003.24(d), 1103.7(c)

11

(fee waiver provisions).  The prospect of no-cost applications, EOIR said repeatedly, mitigated concerns about access to immigration proceedings and their integrity.  85 Fed. Reg. at 82755, 82762, 82775, 82779; *see also* Defs.' Mem. at 19 (asserting that EOIR did respond "to each of the[] concerns by noting its disagreement and the availability of fee waivers to mitigate any harmful effects for those who could not pay the increased fee").

But Plaintiffs find no comfort in the possibility of fee waivers and accuse EOIR of failing to address in a reasoned manner commenters' views that the mere availability of fee waivers is no cure-all.  Pl.'s Mem. at 26–28.  Featured prominently throughout were comments about the "discretionary approach and the absence of metrics" guiding judges' decisions to grant or deny the fee waiver applications. J.A. at 7993 (discussing concerns with the discretionary nature of fee waiver-proceedings); *see also id.* at 7699 (noting waivers are not granted uniformly); *id.* at 7643 (noting "several courts grant fee waivers as a matter of course and other courts almost never grant fee waivers" and that fee waivers are denied for indigent "unaccompanied children on a routine basis"); *id.* at 8375 (noting that fee waiver requests are subject to the discretion of immigration judges, who are not independent judicial actors); *id.* at 8797 (noting the proposed rule should provide guidance on how the immigration judges and the BIA may exercise discretionary authority).  A comment from CAIR Coalition is representative.  It highlighted the "arbitrary nature" of the fee waiver adjudication process by pointing to experiences where "individual immigration judges have previously denied fee waiver requests of CAIR Coalition clients who provided letters from homeless shelters as proof of income, or provided statements from family members to substantiate their claims of economic hardship." *Id.* at 8084–85.

EOIR did acknowledge such comments.  *See* 85 Fed. Reg. at 82758–59.  The agency wrote that "commenters alleged that the fee waiver process is an insufficient remedy for low-income

individuals because determinations are inconsistent," and opposed fee waivers because of the "discretionary nature of fee waiver determinations." *Id.* at 82758. It further noted that "[c]ommenters [had] explained that, in their experience, some immigration courts granted fee waivers as a matter of course, while other immigration courts rarely granted fee waivers at all," and that, in their view, uniformity and predictability would be better achieved with defined eligibility criteria. *Id.*

Plaintiffs no doubt found the agency's response to these comments unsatisfying. But it passes APA muster. EOIR explained that "differences in adjudicatory outcomes are inherent in any system rooted in adjudicator discretion, [but] there is no evidence that [BIA] members or immigration judges would be unable or unwilling to adjudicate fee waiver requests consistent with applicable law and their respective independent judgment and discretion." *Id.* at 82759. EOIR also reasoned that, "[d]espite commenters' allegations that fee waivers are inconsistent around the country, the Department has no evidence or data, and none was provided by commenters, regarding the specific adjudication of fee waivers that would support such statements." *Id.* at 82760. The agency therefore did not ignore commenters' views about the arbitrariness of the fee waiver process—they simply disagreed with them. That result, without more, is not an APA violation.

This conclusion is consistent with the decisions in *Ayuda, Inc. v. Attorney General* (*Ayuda I*), a case concerning EOIR's last fees increase in 1986. *See* 661 F. Supp. 33 (D.D.C. 1987), *aff'd*, 848 F.2d 1297 (*Ayuda II*) (D.C. Cir. 1988). There, as here, the plaintiffs complained that higher fees would "significantly deter aliens from pursuing their rights." *Ayuda I*, 661 F. Supp. at 35. The District Court held otherwise. It relied on the fee waiver provision and the absence of any "suggestion in the papers that the Attorney General intends in any way to withhold liberal exercise of this waiver provision." *Id.* Then, on appeal, the plaintiffs again argued "that the waiver

provision does not in fact mitigate the deterrent effect of the increased fees because the Attorney General retains discretion to decline to waive the fees even after an applicant has demonstrated his or her inability to pay." *Ayuda II*, 848 F.2d at 1299 n.4 (internal citation omitted). The D.C. Circuit affirmed. It held that "[w]e have been directed to no evidence . . . that the Attorney General has in fact exercised his discretion in this manner. We thus find no error in the District Court's reasoning in this respect." *Id.* To be fair, this is not a "no evidence" case. It differs from *Ayuda* in that commenters did offer evidence, based their own experiences, of inconsistent rulings on waiver requests and perhaps some erroneous denials. EOIR acknowledged such outcomes were possible in a "system rooted in adjudicator discretion." 85 Fed. Reg. at 82759; *see also id.* at 82760. A discretionary waiver process, without more, however, is not arbitrary and capricious. *See Ayuda II*, 848 F.2d at 1299 n.4. And, in the absence of compelling evidence to the contrary, it was not unreasonable for the agency to conclude that immigration judges and the BIA would continue to adjudicate fee waiver requests in a fair and evenhanded manner. *See Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (recognizing "a presumption of honesty and integrity in those serving as adjudicators").

Plaintiffs also complain that EOIR's heavy reliance on fee waivers was unreasonable because the agency lacked data to prove their efficacy. Pls.' Mem. at 26–27. They point out that EOIR "stated that its failure to track and evaluate financial information in fee waiver requests— that is, an *absence* of evidence—left it unable to predict whether higher fees would lead to a greater number of fee waiver requests" and that it "had no evidence or data" about inconsistent fee waiver adjudication. *Id.* That contention is unpersuasive for two reasons. For one, "[t]he APA imposes no general obligation on agencies to produce empirical evidence. Rather, an agency has to justify its rule with a reasoned explanation." *Stilwell v. Off. of Thrift Supervision*, 569 F.3d 514, 519

(D.C. Cir. 2009). And for another, EOIR in fact did rely on some empirical proof to sustain its view that waivers would mitigate the effects of the fee increases. *See* 85 Fed. Reg. at 82779. It cited BIA data from FY 2019 showing that of the 19,874 case appeals or motions decided, the BIA "granted, either tacitly or explicitly, approximately 5,499 fee waivers and recorded no fee waiver requested for approximately 14,322 cases." *Id.* That data "suggest that, at most, the [BIA] denied 53 fee waiver requests in FY 2019." *Id.* To be sure, those are high-level figures (and denials are not separately tracked). And the agency does not keep data about "fee waiver grants and denials at the immigration court level," so the BIA numbers may not represent what happens before individual adjudicators. *Id.* at 82779 n.45. Still, the limited data before EOIR ran counter to the experiences of certain commenters, and it was not arbitrary and capricious to rely on it.

Finally, it is useful to contrast this case with *Northwest Immigrant Rights Project v. USCIS*, 496 F. Supp. 3d 31 (D.D.C. 2020). That matter concerned rule changes by the U.S. Citizenship and Immigration Services that both resulted in increased fees and "curtail[ed] the availability of fee waivers." *Id.* at 43. During the comment period, interested parties directed the agency's attention to multiple studies suggesting that higher application fees would lead to a reduction in naturalization applications filed by low-income individuals. *See id.* at 72–73. Still, the agency found otherwise. It concluded, based on their "belie[f]" that "the price elasticity for immigration services is inelastic and increases in price will have *no impact* on the demand for these services." *Id.* at 74. The court found this response inadequate. The agency undertook "no analysis or response to the cited studies" and "offer[ed] nothing of substance to rebut or to 'grapple with' the evidence that an 83% price hike, accompanied with the abandonment of fee waivers and reduced fees for low-income applicants, will dissuade a significant number of low-income applicants from applying to naturalize." *Id.* at 74–75. This was arbitrary and capricious decisionmaking.

15

By contrast, no commenter in this case "backed up their concerns with empirics." *Id.* at 72. EOIR therefore did not ignore any data that conflicted with its position. Rather, it acknowledged commenters' experiences of unpredictable and uneven adjudication of fee waivers. Ultimately, though, it disagreed with those concerns, relying on limited statistical evidence showing that the BIA routinely granted fee waivers requests and the presumed good faith of its judges. That response may not satisfy commenters, but it is enough to satisfy the APA.

2.  *EOIR failed to disclose Fee Study data, but the error does not merit relief*

EOIR undertook an activity-based costing study to determine the new fee structure. 85 Fed. Reg. at 11868–70. The agency estimated the processing cost for each proceeding based on the direct salary costs of involved personnel but excluded the costs of non-salary benefits and overhead. *Id.* at 11869–70. To determine the final fee schedule, EOIR "allocated the salary costs . . . data to each step in the process, based on the time the step takes, the average salary of the responsible staff, and the percentage of total cases in which the step occurs." *Id.* at 11869.

Plaintiffs contend that EOIR acted arbitrarily and capriciously by not disclosing the data underlying the Fee Study. Pls.' Mem. at 28–30. This withholding meant that "the public had no opportunity to see and comment on that critical purported support for the fee hikes." *Id.* at 29. The court agrees that EOIR had an obligation to disclose the data underlying the Fee Study.

An agency must disclose data critical to its decisionmaking process to provide the public an opportunity to meaningfully comment on the agency's rulemaking rationale. *See, e.g.*, *Conn. Light & Power Co. v. Nuclear Regul. Comm'n*, 673 F.2d 525, 530 (D.C. Cir. 1982); *Engine Mfrs. Ass'n v. EPA*, 20 F.3d 1177, 1181 (D.C. Cir. 1994). The D.C. Circuit has consistently maintained that, "[i]n order to allow for useful criticism, it is especially important for the agency to identify and make available *technical studies and data* that it has employed in reaching the decisions to

16

propose particular rules." *Conn. Light & Power Co.*, 673 F.2d at 530 (emphasis added); *see also Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008) ("It would appear to be a fairly obvious proposition that studies upon which an agency relies in promulgating a rule must be made available during the rulemaking in order to afford interested persons meaningful notice and an opportunity for comment.").

Relying on the D.C. Circuit's decision in *American Radio Relay League*, Defendants insist that EOIR did not violate the APA "by not disclosing each bit of underlying granular data underpinning its fee study." Defs.' Mem. at 31. They point to the following principle from that case: APA "notice is sufficient if it affords interested parties a reasonable opportunity to participate in the rulemaking process, and if the parties have not been deprived of the opportunity to present relevant information by lack of notice that the issue was there." *Id.* (quoting *Am. Radio Relay League*, 524 F.3d at 236 (cleaned up)). But *American Radio Relay League* also unequivocally states: "Under APA notice and comment requirements, among the information that must be revealed for public evaluation are the technical studies and data upon which the agency relies in its rulemaking." 524 F.3d at 236 (cleaned up). EOIR thus had an obligation to publicly disclose the data underlying the Fee Study.

But that is not the end of the analysis. Plaintiffs must demonstrate prejudice to secure relief. *See id.* at 237 (citing 5 U.S.C. § 706). To do so, "[i]t is sufficient for a [plaintiff] to show that an opportunity to comment regarding an agency's important information created 'enough uncertainty' as to its possible affect on the agency's disposition." *Allina Health Servs. v. Sebelius,* 746 F.3d 1102, 1110 (D.C. Cir. 2014). Plaintiff "need not prove that its comment would have persuaded the [agency] to reach a different outcome," *Chamber of Com. of the U.S. v. SEC*, 443 F.3d 890, 905 (D.C. Cir. 2006); it is sufficient to "show[] that it ha[d] something useful to say

. . . that may allow it to mount a credible challenge if given the opportunity to comment," *Am. Radio Relay League*, 524 F.3d at 237–38 (internal quotation marks and citation omitted).

Plaintiffs argue they would have had "something useful to say" about two aspects of the undisclosed data. To start, they assert that "the data may have been incomplete." Pls.' Mem. at 29. Specifically, they posit, "it seems that the study at least did not consider the costs associated with processing an appeal filed by the government, which under 8 C.F.R. § 1003.8(a)(2)(v), may be filed without any fee." *Id.* "That omission is significant," Plaintiffs contend, "because it prevented [them] from confirming what several commenters suspected to be true—that the study failed to offset the costs associated with processing an appeal filed by the government." Pls.' Mem. of P. & A. in Further Supp. of Pls.' Mot. & in Opp'n to Defs.' Mot., ECF No. 61 [hereinafter Pls.' Reply], at 13.

But that contention fails to show prejudice for two reasons. First, some commenters advanced the very same critique, and EOIR responded to it. *See* 85 Fed. Reg. at 82756. Plaintiffs have not suggested how that comment might have been different with the benefit of the underlying data. Second, as EOIR explained in the Final Rule, the asserted criticism misconstrues how it determined the processing costs of an appeal to the BIA. EOIR did not aggregate the salary costs of processing of all appeals—regardless of who filed it—and then divide it by the number of appeals filed only by noncitizens. A calculation using that approach would have unfairly resulted in a higher cost per appeal—and therefore a higher fee—because the denominator (the number of filings) would not have included government-initiated appeals. EOIR instead calculated the fee based on the estimated processing costs "by allocating [the] average direct salary costs to each step in an average process map for how the fee, application, or motion works through the adjudicatory process." *Id.* "The processing costs identified by the fee study . . . are, as a result, not tied to the

18

volume of the forms or motions filed, either in total or by DHS." *Id.* In other words, the agency calculated the new appeals fee based on the average direct salary cost to resolve *any* appeal, regardless of who filed it. Accordingly, Plaintiffs' proffered criticism of the data underlying the fee calculation for appeals would not have presented a credible challenge to the final decision to adopt the proposed fee.

Plaintiffs also object to lacking access to the "process step times" used to estimate the total cost of adjudicating a motion, application, or appeal. Pls.' Mem. at 29. Plaintiffs say that these times were "validated" by unidentified personnel, and although "the EOIR Fee Study presents results of this 'validation' process in tables," such tables "are no substitute for providing the data itself." *Id.* But Plaintiffs say no more. They do not identify what "useful" comment they would have submitted had they had access to the process step times.

Notably, EOIR released the data underlying the Fee Study with the Final Rule. 85 Fed. Reg. at 82771. That Plaintiffs have not cited, let alone challenged, any of that data in their briefing underscores the absence of any prejudice from the earlier nondisclosure.

### 3. The Final Rule provides a reasoned basis for increasing fees

Plaintiffs next assert that EOIR failed to explain why, "after three decades," it suddenly needed to update the fee schedule. Pls.' Mem. at 32–33. Plaintiffs argue primarily that EOIR is a congressionally appropriated agency, "and there is no evidence in the [administrative record] of any shortfalls in appropriations" to justify a fee increase. *Id.* at 32. Further, they say, the Final Rule does not show that "it is necessary to recoup EOIR's costs through fees." *Id.* at 33.

But EOIR did explain why it deemed it appropriate to update the fee schedule: to comply the Independent Offices Appropriations Act of 1952 (IOAA), 31 U.S.C. § 9701, and other statutes, as well as Office of Budget and Management Circular A-25 Revised. 85 Fed. Reg. at 82750–51.

The IOAA expresses "the sense of Congress that each service or thing of value provided by an agency . . . to a person . . . is to be self-sustaining to the extent possible." 31 U.S.C. § 9701(a). To that end, the IOAA authorizes heads of agencies to establish charges for a "service or thing of value." *Id.* § 9701(b). Such a fee must be "fair" and based on "the costs to the Government," "the value of the service of thing to the recipient," "public policy or interest served," and "other relevant facts." *Id.* § 9701(b)(1)–(2). Circular A-25 in turn directs the agencies to review user charges every two years.[3] Coming into compliance with a statute and OMB guidance is unquestionably a reasonable explanation for revisiting and revising the fee schedule. The agency did not need additional justification.

### 4.    *EOIR did not depart from longstanding agency policy and practice*

Plaintiffs next argue that EOIR changed longstanding policies underlying the fee schedule that had "remained unchanged for the past 34 years." Pls.' Mem. at 34. "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). A reasoned explanation is one that "'display[s] awareness that [the agency] is changing position' and 'show[s] that there are good reasons for the new policy.'" *Gentiva Health Servs., Inc. v. Becerra*, 31 F.4th 766, 780 (D.C. Cir. 2022) (quoting *Encino Motorcars*, 579 U.S. at 221).

Plaintiffs claim that the Final Rule changed three policies: (1) "keeping fees stable and within the realm of affordability to respondents," (2) "permitting respondents to have access to protections of the Immigration Court system guaranteed by due process," and (3) "eschewing a 'cost recovery' model by setting fees 'at less than full cost recovery recognizing long-standing public policy.'" Pls.' Reply at 20–21. Plaintiffs cite as the source of these policies the final rule

---

[3] Circular No. A-25 Revised, § 8(e), https://www.whitehouse.gov/wp-content/uploads/2017/11/Circular-025.pdf [https://perma.cc/4FNE-KM4S] (last visited Mar. 30, 2026).

promulgating the last fees increase in 1986. *See id.* (citing Powers and Duties of Service Officers; Availability of Service Records, 51 Fed. Reg. 39993, 39993 (Nov. 4, 1986)).

The 1986 rulemaking did not, however, establish the policies that Plaintiffs claim. To the contrary, a comparison makes clear that the Final Rule did not mark a shift in fee-setting policy. Back then, the agency explained that fee increases were "necessary to place the financial burden of providing special services and benefits, which do not accrue to the public at large, on the recipients." 51 Fed. Reg. at 39993. The agency cited the same requirements that it would 34 years later—§ 9701 and OMB Circular A-25—as the legal basis for its action. *Id.* Those authorities, EOIR said, "require Federal agencies to establish a fee system in which a benefit or service provided to or for any person be self-sustaining to the fullest extent." *Id.* EOIR rejected contrary views, explaining that "[f]ees are neither intended to replace nor to be influenced by the budgetary process and related considerations, but instead, to be governed by the total cost to the agency to provide the service. A policy of setting fees on any basis other than cost would violate this principle." *Id.*

That approach to fee-setting mirrors the one that EOIR took in the Final Rule, that is, "roughly match[ing] the new fees amounts with the processing costs that were identified by" the Fee Study. 85 Fed. Reg. at 82751. And just as in 1986, the Final Rule did not "recoup the full costs of adjudications in assessing fees." *Compare id.* at 82771, *with* 51 Fed. Reg. at 39993 ("[S]everal fees for administrative appeal processes and for filing naturalization petitions are at less than full cost recovery recognizing long-standing public policy and the interest served by these processes."). Plaintiffs have not made the case that the Final Rule represents an unexplained change in policy.

### 5. *EOIR has authority to increase fees*

In publishing the Final Rule, Defendants cited both § 286(m) of the INA, 8 U.S.C. § 1356(m), and title V of the IOAA, 31 U.S.C. § 9701, as the sources of their legal authority to increase fees. 85 Fed. Reg. at 82750. Plaintiffs challenge Defendants' reading of the first and their compliance with the second. Pls.' Mem. at 35–38. The court need only address the latter.

The "IOAA provides the requisite authority for imposition of the fees" at issue. *Ayuda II*, 848 F.2d at 1299. It sets forth the criteria that should guide an agency in setting fees. *See* 31 U.S.C. § 9701(b). "Each charge shall be (1) fair; and (2) based on—(A) the costs to the Government; (B) the value of the service or thing to the recipient; (C) public policy or interest served; and (D) other relevant facts." 31 U.S.C. § 9701(b). Plaintiffs contend that EOIR "improperly calculated fees by focusing only on the government's personnel costs for covered processes" and ignoring the public interest. Pls.' Mem. at 37–38. The agency, they continue, neglected to consider the impacts on legal services providers and noncitizens, evincing an "abject failure to consider public interest concerns." *Id.* at 38.

But Plaintiffs demand more than what is required to satisfy the IOAA. A "user fee will be justified under the IOAA if there is a sufficient nexus between the agency service for which the fee is charged and the individuals who are assessed." *Seafarers Int'l Union of N. Am. v. U.S. Coast Guard*, 81 F.3d 179, 182–83 (D.C. Cir. 1996). User fees "are valid so long as the agency levies 'specific charges for specific services to specific individuals or companies,'" regardless of whether the "ultimate purpose of the [statutory] scheme giving rise to the . . . user fee[] is to benefit the public." *Id.* at 183 (quoting *Fed. Power Comm'n v. New England Power Co.*, 415 U.S. 345, 349 (1974)). Put another way, "[t]o justify a fee under the Act, then, an agency must show (i) that it provides some kind of service in exchange for the fee, (ii) that the service yields a specific benefit,

22

and (iii) that the benefit is conferred upon identifiable individuals." *Montrois v. United States*, 916 F.3d 1056, 1062–63 (D.C. Cir. 2019).  The "weighing [of] 'public' versus 'private' benefits" is not appropriate.  *Seafarers Int'l Union of N. Am.*, 81 F.3d at 184.

These requirements are easily satisfied here.  EOIR provides a service in exchange for the fee—it operates the process for resolving disputes regarding immigration matters.  The service yields a specific benefit in the form of such adjudications.  And a benefit is conferred upon identifiable individuals, namely, noncitizens who pursue relief before the immigration tribunals. The Final Rule therefore satisfies the IOAA.  *See* 85 Fed. Reg at 82772 (explaining why EOIR believed the new fees were "fair" and reflected the public interest in ensuring immigration courts are accessible and taxpayers are not disproportionately burdened in funding their operations).

## B.    Notice and Comment

The court now turns to Plaintiffs' procedural challenges to the notice-and-comment process.  First, Plaintiffs argue that an abbreviated 31-day comment period that coincided with the onset of the COIVD-19 pandemic was unreasonable.  Pls.' Mem. at 39–41.  Second, they contend that EOIR failed to give notice of additional rules that had a bearing on the effects of the fee increases.  *Id.* at 42–43.

### 1.    *The 31-day comment period was inadequate but does not merit relief*

The APA does not mandate a specific number of days for which an agency must give the public an opportunity to comment on a proposed rule, but 30 days is "generally the shortest time period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment."  *See Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019). But there is nothing "talismanic about that particular length of time."  *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984).  Indeed, a 30-day period might be inadequate "to allow people to

respond to proposals that are complex or based on scientific or technical data." *Id.* (internal quotation marks omitted). On the other hand, a 30-day comment period has been deemed reasonable where the agency had been "exploring" the issue with "members of the industry" for a years-long period. *See Conn. Light & Power Co.*, 673 F.2d at 534 ("While the technical complexity of the regulations is such that a somewhat longer comment period might have been helpful, the NRC had been exploring without complete success the problem of fire protection at nuclear plants with members of the industry for over five years.").

Here, the court finds that the 31-day comment period—from February 28 to March 30, 2020—was unreasonable. The comment period overlapped squarely with the start of the lockdowns in the United States due to the COVID-19 pandemic. The President declared a national state of emergency dating back to March 1, 2020. *See* Proclamation No. 9994 of March 13, 2020, 85 Fed. Reg. 15337, 15337 (Mar. 18, 2020). Commenters made it clear to EOIR that interested parties would have a difficult time fully responding within the proposed period given the evolving nature of the public health emergency. For instance, on March 5, 2020, Plaintiffs and over 87 other interested parties signed a request to extend the comment period from 30 to 60 days. J.A. at 9566–70. EOIR did not respond. Pls.' Mem. at 7. On March 20, 2020, congressional representatives wrote to EOIR requesting an extension. J.A. at 9571–73. They, too, received no response. Pls.' Mem. at 7. Plaintiff organization CLINIC wrote to EOIR on March 23, 2020, detailing how the evolving public health emergency was impacting their organization and partner organizations' ability to comment fully. J.A. at 9576. They could not "access hard copies of resources or background materials . . . to fully comment on the proposed rule." *Id.* And they explained that they were having a difficult time connecting with clients and otherwise navigating the early days of the pandemic. *Id.* EOIR did not respond. Pls.' Mem. at 7. Yet, in the Final Rule, EOIR said

that it "believe[d] that the COVID-19 pandemic ha[d] no effect on the sufficiency of the 30-day comment period." 85 Fed. Reg. at 82771.  EOIR's conclusory, after-the-fact response was wholly out of touch and did not grapple with the concerns raised regarding the inability to connect with clients and gather necessary materials.  The 31-day comment period was unreasonable given the evolving public health emergency.

That said, the failure to set a longer comment period was harmless error.  *See Sprint Corp. v. FCC*, 315 F.3d 369, 376 (D.C. Cir. 2003).  "Neither a showing of actual prejudice nor proof that the agency would have reached a different result is required to establish prejudicial error." *AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 90 (D.D.C. 2007).  But the challenging party "must indicate with reasonable specificity what portions of the [rule] it objects to and how it might have responded if given the opportunity." *Gerber v. Norton*, 294 F.3d 173, 182 (D.C. Cir. 2002) (cleaned up).

Plaintiffs have not established prejudice.  They note generally that they were "unable to provide fulsome comments" or "make any comments at all" and point out the large delta in the number of comments submitted compared to similar past proposed rules.  Pls.' Mem. at 40–41.  But Plaintiffs have not articulated "with reasonable specificity" the comments that they, or anyone else, would have made if only the comment period had been longer.  For that reason, the court finds the error harmless.

### 2.    The lack of notice of the subsequent rules was not prejudicial

Plaintiffs argue that Defendants violated the APA's notice-and-comment requirements by closing the comment period "before the agency informed commenters of the substance of three forthcoming rules . . . that would exacerbate the harms of the Final Rule."  Pls.' Mem. at 42.  But even if this was error, it was harmless.  One of the proposed rules was rescinded by later agency rulemaking.  *See* Mot. for Voluntary Dismissal, *Cath. Legal Immigr. Network, Inc. v. EOIR*,

No. 21-cv-00094-RJL (D.D.C.), ECF No. 75, at 2. A second has been preliminarily enjoined for over five years and is subject to ongoing rulemaking that may revise and rescind the rule at issue. Status Report (Jan. 30, 2026), *Nat'l Immigr. Just. Ctr. v. EOIR*, No. 21-5063 (D.C. Cir.); Order, *Nat'l Immigr. Just. Ctr. v. EOIR*, No. 21-cv-0056-RBW (D.D.C.), ECF No. 11. And the same is true of the third. Order*, Pangea Legal Servs. v. DHS*, No. 20-17490 (9th Cir.), ECF No. 42; *Pangea Legal Servs. v. DHS*, 512 F. Supp. 3d 966 (N.D. Cal. 2021).

Plaintiffs therefore have not demonstrated prejudice from the failure to notice these other rules in connection with the Final Rule.

### C.    Regulatory Flexibility Act

Plaintiffs' last challenge concerns the Regulatory Flexibility Act. Pls.' Mem. at 43–44. That statute requires "agencies issuing rules under the [APA]" to "publish a final regulatory flexibility analysis." *Nat'l Tel. Co-op. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009) (citing 5 U.S.C. § 604). The analysis must detail the final rule's impact on "small entities." *See* 5 U.S.C. § 604. Agencies are exempt from this requirement if they certify that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." *Id.* § 605(b); *accord Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667, 737 (D.C. Cir. 2000) (per curiam). An agency is also "under no obligation to conduct a small entity impact analysis of effects on entities which it does not regulate." *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 467 (D.C. Cir. 1998) (internal quotation marks omitted). A small entity is regulated by the rule only if it is "subject to the proposed regulation"—that is, those "small entities *to which the proposed rule will apply*." *Mid-Tex Elec. Coop., Inc. v. FERC*, 773 F.2d 327, 342 (D.C. Cir. 1985) (quoting 5 U.S.C. § 603(b)). Here, EOIR did not conduct a regulatory flexibility analysis because it concluded that "[t]he rule would not regulate 'small entities.'" 85 Fed. Reg. at 82785.

26

It reasoned that "[o]nly individuals, rather than entities, are responsible for paying the fees affected by this proposed rule." *Id.*

Plaintiffs CLINIC, CLSEPA, and CHIRLA maintain this conclusion was wrong. They assert that they are "each 'small entities' within the meaning of the RFA" because they are "not-for-profit organizations that are independently owned and operated and are not dominant in their field of operation." Pls.' Mem. at 43. They argue the proposed increases would economically impact them because, for instance, practitioners "*do* pay filing fees for indigent clients, and the fee hikes would adversely impact that practice." *Id.* at 44. But case law is clear. Plaintiffs are not the type of small entities that trigger the RFA's requirements.

The D.C. Circuit has "consistently rejected the contention that the RFA applies to small businesses indirectly affected by the regulation of other entities." *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 869 (D.C. Cir. 2001). While a rule need not be specifically addressed to a party in order for the party to be considered regulated, the rule must "impose[] responsibilities directly on the [party]" claiming to be regulated. *See Aeronautical Repair Station Ass'n, Inc. v. FAA*, 494 F.3d 161, 177 (D.C. Cir. 2007) (finding parties were regulated despite the rule being directed at different parties because the "regulations expressly require that the employees . . . be tested"). In other words, as outlined above, the RFA requires agencies to consider only regulatory burdens on small entities that are "subject to the proposed regulation" and among the group of entities "to which the [regulation] will apply." *Cement Kiln*, 255 F.3d at 869 (internal quotation marks omitted).

In no ordinary sense are Plaintiffs "directly affected and regulated by" the Final Rule. *Aeronautical Repair Station*, 494 F.3d at 176. While Plaintiffs detail how they will be impacted by the Final Rule, at most they have made the case that they and other legal services providers will

experience *indirect* effects of the fee increases. *See* Pls.' Reply at 29–31. The Final Rule does not "impose[] responsibilities directly" onto them. *Aeronautical Repair Station*, 494 F.3d at 177. EOIR therefore was correct not to undertake an RFA analysis.

Plaintiffs rely on *Centro Legal de la Raza v. EOIR*, 524 F. Supp. 3d 919 (N.D. Cal. 2021), but that case is inapposite. *See* Pls.' Reply at 31–32. *Centro Legal* involved a rule that changed procedures and regulations governing immigration courts, such as reducing time limits for briefing appeals and placing limits on the authorities of immigration judges and the BIA. *Centro Legal de la Raza*, 524 F. Supp. 3d at 937–47. The court found that the legal services providers in that case had raised "serious questions going to the merits of their RFA challenge," because they "must comply with the changes implemented by the Rule, such as the changes to the briefing schedule." *See id.* at 973. The Final Rule here, by contrast, requires no similar direct compliance by legal services providers. Unlike new court-ordered deadlines, lawyers here are under no legal or ethical obligation to pay a client's increased fee to initiate proceedings. The fact that they do so voluntarily does not make them "subject to the regulation."

## V.    RELIEF

Finally, the court addresses the appropriate remedy. Plaintiffs ask the court to grant summary judgment in their favor, vacate the Final Rule as to the challenged fees, and permanently enjoin Defendants from applying the challenged fees. Pls.' Mem. at 44. Defendants, on the other hand, request remand without vacatur and argue a permanent injunction is not warranted. *See* Defs.' Mem. at 37–40.

The APA commands that when the reviewing court finds "arbitrary" agency action, the court "shall . . . set aside that agency action." 5 U.S.C. § 706(2). Vacatur therefore is the norm. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1050 (D.C. Cir. 2021).

28

The D.C. Circuit, however, has permitted the "exceptional remedy of remand without vacatur in limited circumstances, and only if an agency's error is curable." *Cigar Ass'n of Am. v. FDA*, 132 F.4th 535, 541 (D.C. Cir. 2025) (internal quotation marks and citation omitted). "[T]he decision to vacate turns on two factors: 'the seriousness of the [agency action's] deficiencies' and the 'disruptive consequences' of vacatur." *Id.*

As to the first factor, the agency committed a serious error by not addressing the Final Rule's impact on legal services providers' ability to provide representation for indigent and low-income clients. As the court has explained, "Congress's concern for the availability of pro bono and low-cost legal services in removal proceedings is evident on the face of the INA." *Cath. Legal I*, 513 F. Supp. 3d at 173. "Congress was concerned not merely about the right to counsel in removal proceedings, but with actual *access* to counsel for persons who Congress anticipated might not be able to afford to hire private lawyers." *Id.* at 173–74. The agency, however, "blithely dismiss[ed]" the concerns of legal services providers that "increased filing fees would adversely impact their organizations and would depress their capacities to provide pro bono and low-cost legal services." *Id.* at 174. EOIR ignored an "important aspect of the problem," which warrants vacatur. *See id.* (quoting *State Farm*, 463 U.S. at 43); *see also Cigar Ass'n*, 132 F.4th at 541.

As to the second factor, considering that relevant portions of the Final Rule have been enjoined for the past five years, the disruptive consequences of vacatur will be minimal. This is not a case, for example, where the agency already was collecting fees and vacatur would require it to refund them. *See Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993) (finding vacatur would be "quite disruptive" because the "Commission would need to refund all 1990 OBRA fees collected"). Here, remand without vacatur would be the far

29

more disruptive course.  Entry of final judgment will cause the preliminary injunction to dissolve, and absent vacatur, the steep fee increases would go into effect immediately.  *See* Defs.' Reply at 21–22 (leaving open that the agency could immediately begin charging the higher fees without further notice).  And those increases could remain for an unknown period as EOIR decides how to proceed on remand.  In such circumstances, vacatur is the appropriate remedy.

Plaintiffs also seek to "permanently enjoin Defendants from enacting [the Final Rule] as to the Challenged Fees."  Pls.' Mem. at 45.  But Plaintiffs make no effort to show why permanent injunctive relief is warranted.  *See id.* at 44–45 (arguing only for vacatur).  It is therefore denied.

## VI.    CONCLUSION

For the reasons set forth in this opinion, the court grants in part and denies in part the parties' respective motions for summary judgment, ECF Nos. 56 & 57.  The court vacates the Final Rule insofar as it would have imposed the following fee increases:

(1)    The $975 fee attached to Form EOIR-26 for filing an appeal from a decision of an immigration judge;

(2)    The $705 fee attached to Form EOIR-29 for filing an appeal from a decision of an officer of DHS;

(3)    The $895 fee for filing a motion to reopen or to reconsider before the BIA;

(4)    The $305 fee attached to Form EOIR-40 for an application for suspension of deportation;

(5)    The $305 fee attached to Form EOIR-42A for an application for cancellation of removal for certain permanent residents; and

(6)    The $360 fee attached to Form EOIR-42B for an application for cancellation of removal and adjustment of status for certain nonpermanent residents.

30

A final, appealable order accompanies this Memorandum Opinion.[4]

Dated:  March 30, 2026

Amit P. Mehta
United States District Judge

---

[4] The court is grateful to the parties for their patience during the extended time their motions were pending.